IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON LEGAL FOUNDATION   ) | |
| ) | |
| Plaintiff    ) | |
| ) | |
| v.    ) | Civil Action No. 1:06-01490-RMC |
| ) | Judge Collyer |
| MICHAEL O. LEAVITT, *et al.*,  ) | |
| ) | |
| Defendants   ) | |
| _____) | |

DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

Sheila M. Lieber
Brian G. Kennedy (D.C. Bar 228726)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204
Washington, D.C.  20530
Tel.: (202) 514-3357
Fax: (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants

<u>TABLE OF CONTENTS</u>

<u>CASES</u>                                                                                Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    1.    Procedural Posture of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    2.    The Structure And Purposes Of The Washington Legal
         Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

         a.    Corporate Structure and "Corporate 'Members'" . . . . . . . . . . .  5

         b.    WLF's For-Purposes-Of-This-Lawsuit-Only Members . . . . . . .  6

         c.    WLF's Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    3.    The WLF Decision To File This Suit And To Acquire Rebecca
         Fox, Edward Samp And Mary Samp As Members For Purposes
         Of This Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    4.    The Challenged Agency Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    5.    The Alleged Circumstances Of The For-Purposes-Of-
         This-Case-Only Members WLF Claims To Represent . . . . . . . . . . .  11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

    I.    Plaintiff Has Not Demonstrated A Probability That It Will
        Be Able To Establish Its Standing To Maintain This Suit . . . . . . . .  13

        A.    Contrary To Plaintiff's' Assertion, The Court Of
           Appeals Has Not Already Decided That The
           WLF Has Standing To Represent Its Members . . . . . . . . . . .  14

        B.    Plaintiff Lacks Standing To Represent
           The Interests Of Its Alleged "Members" . . . . . . . . . . . . . . . .  15

1.  Plaintiff's Alleged Members Have No Standing
    To Challenge The Survey And Certification
    Memorandum And It Is Doubtful Whether They
    Would Have Standing To Sue In Their Own
    Right To Challenge The Guidelines For Plans . . . . . . .  15

2.  Ms. Fox, And Mr. And Mrs. Samp Are
    Not Members Of WLF Or The Functional
    Equivalent Of Members Of The WLF . . . . . . . . . . . . .  19

3.  The Interests WLF Seeks To Protect
    Are Not Germane To Its Purpose  . . . . . . . . . . . . . . . . .  24

II.   Plaintiff Has Not Demonstrated That It
      Would Be Likely To Prevail On The Merits . . . . . . . . . . . . . . . . . . . .  30

III.  Rebecca Fox, Edward Samp, And Mary Samp Would Suffer
      Little Or No Irreparable Harm If A Preliminary Injunction
      Were Denied, And Any Such Harm Is Clearly Outweighed
      By The Harm That Would Be Imposed Upon Defendants And
      The Public By Plaintiff's Proposed Preliminary Injunction . . . . . . . .  36

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

## TABLE OF AUTHORITIES

**CASES**                                                                                    Page(s)

Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach,
    445 F.3d 470 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,
    469 F.3d 129 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

American Legal Found. v. FCC,
    808 F.2d 84 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21

Auto Workers v. Brock,
    477 U.S. 274 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

Basel Action Network v. Maritime Admin.,
    370 F. Supp. 2d 57 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Central Hudson Gas v. Public Service Comm'n,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

DaimlerChrysler Corp. v. Cuno,
    126 S. Ct. 1854 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Fleck & Associates v. City of Phoenix,
    471 F.3d 1100 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Fund Democracy, LLC v. SEC,
    278 F.3d 21 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 22

Gettman v. DEA,
    290 F.3d 430 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Humane Soc'y v. Hodel,
    840 F.2d 45 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 26, 28

*Hunt v. Washington State Apple Advertising Comm'n,
    432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Kowalski v. Tesmer,
    543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

-iii-

McKinney v. Dep't of the Treasury,
    799 F.2d 1544 (Fed. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

Pasadena Board of Education v. Spangler,
    427 U.S. 424 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Public Citizen v. Dep't of Justice,
    491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Rust v. Sullivan,
    500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

United States v. Snepp,
    444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Washington Legal Found. v. Henney,
    202 F.3d 331 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

## STATUTES AND REGULATIONS

42 USC 1395w-21(e)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 C.F.R. § 410.33(g)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

42 C.F.R. § 423.38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 39

42 C.F.R. § 424.57(c)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

71 Fed. Reg. 69624, 69785 (Dec. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WASHINGTON LEGAL FOUNDATION | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-01490-RMC |
| | ) | Judge Collyer |
| MICHAEL O. LEAVITT, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

INTRODUCTION

Plaintiff Washington Legal Foundation ("WLF") challenges aspects of

guidelines issued by the Centers for Medicare and Medicaid Services ("CMS")

within the Department of Health and Human Services concerning  marketing by

private entities through which the Medicare Program delivers the new Medicare

Prescription Drug Benefit, commonly known as Part D.  Part D is an innovative

program that uses a managed care model and enlists private health care

organizations to sponsor prescription drug benefit plans (PDPs).  As explained in

the declaration filed herewith of Abby Block, Director of the CMS's Center for

Beneficiary Choices, Medicare beneficiaries can choose among a number of such

plans, which offer different features, coverage, and prices.  Each of these plans, in

turn, contracts with various heath care providers – principally pharmacists – to

deliver prescription drugs.  Any provider can contract to be part of the network of

any number of such plans.  Inherent in this model, therefore, is a potential conflict

of interest in which the provider, an otherwise trusted health care professional, may have a possible incentive to steer a beneficiary towards one plan or another because it financially benefits the provider without regard to the interests of the beneficiary. Accordingly, the Marketing Guidelines for Plans do not permit plans to use their provider subcontractors to "[s]teer[ ], or attempt[ ] to steer, an undecided potential enrollee towards a plan, or limited number of plans . . . for which the individual or entity performing marketing activities expects compensation directly or indirectly from the plan for such marketing activities." Def. Ex. G. at 8. The Guidelines allow, indeed encourage, providers to furnish a host of objective information to Medicare enrollees regarding the specifics of PDPs in which they participate. *Id.* at 127. The challenged guidelines are narrowly tailored to promote the significant government interest of protecting elderly and disabled Medicare beneficiaries from provider conflicts of interest. There is thus little or no likelihood that plaintiffs would prevail on the merits of this action.

But the merits should never be reached in any event, because WLF plainly lacks standing to sue. In the complaint and its motion for preliminary injunction, WLF claimed that it was suing on behalf of "numerous" members. However, WLF's subsequent discovery responses tell a different story. Although the WLF does have a "very limited" number of actual members, it now says that it is not suing on behalf of those members. Pl's Interrog. Responses (Def. Ex. A) at 5. For purposes of this case only, *see id.* at 2, WLF claims that it has a different kind of "members," though these *ad hoc* "members" have few, if any, of the indicia of normal

membership. *Compare id.* at 4-7 *with Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977). WLF now claims to be representing three, and only three, of those members, Rebecca Fox, Mary Samp, and Edward Samp. Pl's Interrog. Responses (Def. Ex. A) at 12. And even they were not "members" whose injuries prompted WLF to file suit. WLF <u>first</u> decided to file this suit and only "thereafter" recruited Ms. Fox and the Samps as "members." *Id.* at 12-13.

Even if they were members, the firm would still have no standing to sue in its name on their behalf. In the first place, these three alleged members have not suffered injury in fact due to the Guidelines that WLF had pre-determined it would challenge. Moreover, the WLF is not an association that serves a specialized community through diverse ways that, where necessary, include litigation. *Cf. Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). The situation is here the reverse: WLF deems itself to be serving the general public through essentially one means, litigation. The associational standing doctrine does not authorize suits by associations like WLF that are "merely law firms with standing." *Humane Soc'y v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). The example the Court of Appeals used to illustrate this point was a case in which "the Federal Circuit held that the Washington Legal Foundation, a self-described 'non-profit public interest law firm,'" lacked standing. *Id.*, *citing McKinney v. Dep't of the Treasury*, 799 F.2d 1544 (Fed. Cir. 1977).

A plaintiff without standing *a fortiori* has no entitlement to a preliminary injunction, an extraordinary remedy reserved to litigants who can show not only

harm, but irreparable harm.  Plaintiff has shown no such harm, much less that any

harm it would sustain would outweigh the harms an injunction would impose on

defendants and the public.  Indeed, the need for any preliminary relief is belied by

the timing of the motion.  PDPs change their offerings from year to year, and the

annual open season for Medicare-eligible individuals to choose a new Part D plan

(or join a plan for the first time) runs from November 15 to December 31.  42 C.F.R.

§ 423.38.  If preliminary relief actually were necessary to get enrollees advice from

their pharmacists on choosing a plan, January is not the right time to ask.

## STATEMENT OF THE CASE

1.    <u>Procedural Posture of the Case</u>

This case is before the Court on plaintiff's motion for preliminary injunction.

Defendants will argue below that one reason why the motion should be denied is

that plaintiff is unlikely to establish that it has standing to sue.

Defendants are not moving at this time for summary judgment on that issue

only because discovery on the standing point is not complete.[1]  Plaintiff's discovery

---

[1] Since standing is a threshold issue that must be decided before the merits, defendants attempted to take such discovery in a timely fashion.  On October 17, 2006, defendants' counsel wrote plaintiff's counsel a letter making initial disclosures, explaining that defendants would be seeking discovery on the standing issue, and asking for a Rule 26(f) conference "at your earliest convenience."  Def. Ex. H.   Plaintiff's counsel's earliest convenience was more than seven weeks later, December 8, 2008.  *See* Parties' Joint Rule 26 Report.  On that same day – the first day on which discovery was permitted under Rule 26(d) – defendants served discovery on the standing issue.  *E.g.*, Def.' Ex. B (request for production). Responses were initially due on January 10, 2006.  On January 11, after inquiry by defendants' counsel, plaintiff requested (and defendants agreed to) an extension of

(continued...)

responses to date are to some extent ambiguous. In setting forth the facts below, we do not resolve all those ambiguities in plaintiff's favor, as might be required in a motion by defendants for summary judgment. The recitals below are, however, based on one reading of plaintiff's responses that is fair in light of both plaintiff's greater opportunity to avoid ambiguity in drafting its responses and the rule that, on a motion for preliminary injunction, it is plaintiff who must bear the burden of showing a likelihood of success.

2.    The Structure And Purposes Of The Washington Legal Foundation

The plaintiff law firm is organized as a District of Columbia non-profit corporation. Def. Exs. D & E (articles of incorporation and amendments).

a.    Corporate Structure and "Corporate 'Members'"

WLF was incorporated in 1976 with directors but no voting members. Def. Exs. D & E. In 1993, the WLF amended its articles of incorporation to provide for "voting members" (Def. Ex. E ¶ SECOND), which the corporation did not yet have (*id*. ¶ THIRD). The directors chose who the members would be, WLF By-Laws (Def. Ex. F) at 4, and those members (and future members chosen by the those director-appointed members) in turn will choose who the directors are if there are ever any vacancies, *id*. at 3.

---

[1](...continued)
"a week to ten days." Def. Ex. I. The discovery answers and objections were served on February 1. Def. Exs. A and C.

There are only a "very limited" number of these WLF members, Pl's Interrog. Answers (Def. Ex. A) at 5. WLF does not claim to be representing any of these members and does not argue that Ms. Fox or Mr. and Mrs. Edward Samp are among these members.

      b.    <u>WLF's For-Purposes-Of-This-Lawsuit-Only Members</u>

WLF says that its "members" as defined in WLF's by-laws "are not to be confused with" the alleged "members whose interests WLF is representing in this lawsuit." Pl's Interrog. Answers (Def. Ex. A) at 5.

WLF says that its use of the word "members" to describe persons whom it claims a right to represent "should not be construed to apply outside" the "context" of the complaint in this case and should not even "suggest" that WLF "has assigned formal definitions" to "members" or "supporters" that would be "applicable in all context [*sic*] within which WLF may have in the past, or will in the future, use those words." Pl's Interrog. Answers (Def. Ex. A) at 2. Given that caution from plaintiff, we will refer to such persons as "for-purposes-of-this-lawsuit-only members."

Until plaintiff created its interrogatory responses, it had no documents that set forth or described any criteria by which such alleged "membership" in the firm is determined. Def. Ex. B (request for production 5) & C (no-documents response). In its interrogatory answers, WLF now claims, for purposes of this suit only, that its "members" are persons "who have expressed an interest in associating themselves

with WLF and/or to work with WLF in achieving common goals." Pl's Interrog. Answers (Def. Ex. A) at 2.

The alleged for-purposes-of-this-lawsuit-only members do not pay any membership dues. Pl's Interrog. Answers (Def. Ex. A) at 8. There are no meetings of the alleged for-purposes-of-this-lawsuit-only members. *Id.* The alleged for-purposes-of-this-lawsuit-only members play no role in the selection of the directors or officers of the firm. *Id.* at 9; WLF By-Laws (Def. Ex. F). The alleged for-purposes-of-this-lawsuit-only members do not receive a literal membership card or other acknowledgment or record of membership, unless one counts correspondence that "only irregularly includes the word 'membership.'" Pl's Interrog. Answers (Def. Ex. A) at 7. There are no documents in which such alleged members delegate any authority to the WLF. Def. Exs. B & C (request for production and response 3). WLF has no list of its alleged for-purposes-of-this-lawsuit-only members. Pl's Interrog. Answers (Def. Ex. A) at 4.

There is no WLF membership agreement or similar document. Def. Exs. B & C (request and response 2). One can go on the website of plaintiff (www.wlf.org) and find out how to give money to the WLF, but not how to become a member (if such a thing is possible). Indeed, nowhere on the website or anywhere else (except the for-purposes-of-this-case-only interrogatory answers) are there any documents that set forth the duties and obligations of "members," or that tell someone how he or she can become a member, avoid becoming a member, or resign from member-ship. Def. Exs. B & C (requests for production and responses 5, 7 & 8).

-7-

      c.    <u>WLF's Purposes</u>

WLF alleges that "it devotes a substantial part of its resources to defending the rights of individuals to go about their affairs without undue interference from government regulators." Complaint ¶ 7. According to the "WLF Mission" link at its website (www.wlf.org), WLF advocates "free-enterprise principles, responsible government, property rights, a strong national security and defense, and a balanced civil and criminal justice system."

"Providing health insurance information is not part of WLF's mission. Neither this lawsuit nor any other action can accurately be described as an effort to disseminate to its members information about Medicare Part D insurance." Pl's Interrog. Answers (Def. Ex. A) at 13.

      3.    The WLF Decision To File This Suit And To Acquire Rebecca Fox, <u>Edward Samp And Mary Samp As Members For Purposes Of This Suit</u>

Sometime between April 2006 and August 2006 (when the suit was filed), WLF decided to file this lawsuit. Pl's Interrog. Answers (Def. Ex. A) at 12-13. "WLF had no communications" from any of its members "regarding this lawsuit . . . until after WLF had made a decision to proceed with litigation." *Id.* at 13.[2]

After it had made the decision to proceed with the litigation, WLF identified "a number" (which turns out to be three) of for-purposes-of-this-litigation-only

---

[2] The interrogatory asked, *inter alia*, whether there were any pre-suit communications from members to WLF "reporting to the firm facts that you contend constitute injury in fact attributable to the policy you challenge." Def. Ex. A (interrogatory 18) at 12. The WLF identified no such communications.

members who WLF argues were adversely affected by the agency policies WLF had decided to challenge. *Id.* at 12-13. "Those individuals," Rebecca Fox, Mary Samp, and Edward Samp, "thereafter agreed that WLF should represent their First Amendment interests by filing this lawsuit." *Id.*[3]

On precisely the same date, August 3, 2006, both Ms. Fox and the Samps were sent similar letters. The letters "welcome[d]" them "as members" of the WLF and referred in particular to WLF's pre-existing intent to file this lawsuit. Def. Exs. K & L.

    4.    <u>The Challenged Agency Guidelines</u>

    Plaintiff challenges the Medicare Marketing Guidelines for Medicare Advantage Plans, Medicare Advantage Prescription Drug Plans (MA-PDs), Prescription Drug Plans, and 1876 Cost Plans ("Marketing Guidelines For Plans"). Some of the relevant portions of the Marketing Guidelines For Plans were filed as

---

[3] There is an ambiguity in the timing set forth in the discovery responses. The interrogatory answers seem to say that the three for-purposes-of-this-litigation-only members agreed to be represented by WLF only after WLF had <u>both</u> decided to file the suit (sometime before the suit was actually filed in August ) <u>and</u> had the approval of its Litigation Review Committee for such filing. Pl's Interrog. Answers (Def. Ex. A) at 12. However, that Committee did not approve the filing of the suit until November 15, 2006, Def. Ex. J, which was after correspondence between WLF and its three for-purposes-of-this-lawsuit members seems to have begun. For purposes of plaintiff's preliminary injunction motion only, defendants assume *arguendo* that WLF's recruitment of for-purposes-of-this-lawsuit members occurred after the decision to file the suit but at some time before the authorization to file the already-filed suit in November.

Exhibit A to the complaint.  A complete copy is filed herewith as Defendants'

Exhibit G.[4]

   The Marketing Guidelines For Plans define "marketing" as "[s]teering, or

attempting to steer, an undecided potential enrollee towards a plan, or limited num-

ber of plans, and for which the individual or entity performing marketing activities

expects compensation directly or indirectly from the plan for such marketing activi-

ties."  Def. Ex. G. at 8.  As we explain more fully below and in the Block

Declaration, the purpose of the anti-steering provision is to protect enrollees from

an inherent conflict of interest in which the provider may be tempted to promote a

specific plan that is better aligned with his own financial interests rather than with

the interests of the enrollee.  The agency was particularly concerned, for example,

about the conflicts of interest that could arise in the institutional long-term care

setting, where vulnerable elderly enrollees are often limited to one long-term care

pharmacy provider who may financially benefit if an enrollee chooses one plan over

another.  Block Decl. ¶¶ 13-16.

―――――――――――

   [4] Plaintiff also attaches (as its motion's Exhibit A) a memorandum of the
Survey and Certification Group to State Medicaid Directors reinforcing the
statutory right of nursing home patients, a uniquely vulnerable population, to
freedom of choice of Part D plans.  The non-member declarations submitted by WLF
concentrate on the nursing home context.  After filing the preliminary injunction
motion, however, WLF indicated in discovery that it was only suing on behalf of
three alleged for-purposes-of-this-case-only members, and none of them live in a
nursing home.  Accordingly, the Survey and Certification Group Memorandum no
longer appears to be at issue in this case.

The prohibition on "steering" or "promoting," does not, however, prohibit providers from furnishing a range of objective, truthful information about plans, or otherwise assisting enrollees with their enrollment. Indeed, the Marketing Guidelines For Plans encourage these activities so that enrollees can make fully formed decisions as to which plans are best for them. See Marketing Guidelines at 123. For example, the definition of "marketing" set forth above further clarifies that neither "[a]ssisting in enrollment" nor "education" constitute "marketing." *Id*. As part of the assistance in enrollment activities the Marketing Guidelines For Plans indicate is permitted, pharmacists and other providers who have contracted with plans can provide including written information that they or third parties develop that does not constitute marketing. For example, Walgreen's provides extensive information to its customers about the various plans. http://www.walgreens.com/pharmacy/medicare_d/default.jsp?ban=bil_hpb_medicare _0107.

> 5.    The Alleged Circumstances Of The For-Purposes-Of-
>        This-Case-Only Members WLF Claims To Represent

 According to Rebecca Fox's declaration, she is 87 years old and lives in Pennsylvania. Fox Decl. ¶¶ 1-2. She says that in early 2006 she received a letter from the Commonwealth of Pennsylvania indicating that the Commonwealth through its "PACE NET" program would enroll her in a Part D plan. *Id*. ¶ 7. She says that she was confused about what plan would be best for her and was sur-prised that her pharmacist told her that he could not advise her. *Id*. ¶¶ 11-13. She

indicates that she thought then that the best decision was to stay with PACE NET, as she would then be enrolled in a Part D program.  *Id.* ¶ 14.  She says she later learned that "PACE NET had not enrolled [her] in any Medicare Part D plan as the Governor's letter said would happen."  *Id.* ¶ 16.  At that point, she talked to a PACE NET representative who explained about different plans available to her and provided "helpful information."  *Id.*  She followed that recommendation for the current year, *id.* ¶¶ 16, 18, and does not express any dissatisfaction with her current Part D enrollment.

Mary Samp says that she had pre-existing prescription drug coverage from the Harvard University Retirees Association, and was "generally pleased" with that plan's prices.  Samp Decl. ¶ 3.  The Harvard retirees' plan "recommended strongly" that Ms. Samp not enroll in a Medicare Part D plan, and Mrs. Samp followed that advice.  *Id.* at 4.  She expresses no dissatisfaction with that decision under her current circumstances.  She says that if her health care needs should change, she would like to be able to receive advice from health care providers regarding which Part D plan she should choose.  *Id.* ¶¶ 4, 13.

Mrs. Samp says that she is more confused about the right course of action for her husband, who takes more prescription drugs.  *Id.* ¶ 5.  He had pre-existing coverage from the City of Cambridge, with whose prices the Samps were "generally pleased."  *Id.* ¶3.  The City told Mr. Samp that retirees should not sign up for Part D coverage on their own, and said that it would arrange for Part D coverage on their behalf, which it did in Mr. Samp's case.  *Id.* ¶¶ 5-6.  As a retired naval officer,

Mr. Samp qualifies for benefits under the TRICARE prescription drug program. *Id.* ¶ 7. He received a letter from TRICARE that indicated that "there will almost always be no advantage to enrolling in a Medicare prescription drug program for most TRICARE beneficiaries." *Id.* ¶ 7. TRICARE's letter, attached as an exhibit to the declaration, indicates that the exceptional circumstance in which it might make sense to enroll in Part D is an instance where the beneficiary has limited income and resources. If Edward Samp should enroll in Part D, "TRICARE would be reduced to a secondary payer." Samp Decl. ¶ 7. (It is not clear from Ms. Samp's declaration whether TRICARE is already a secondary payer to the City of Cambridge or *vice versa*.) Ms. Samp says that she sought advice from pharmacists, who told her that they were not in a position to "steer" her to a specific Part D plan. *Id.* ¶ 8.

<u>ARGUMENT</u>

I.    Plaintiff Has Not Demonstrated A Probability That It Will
      <u>Be Able To Establish Its Standing To Maintain This Suit</u>

Plaintiff's burden on a preliminary injunction motion of showing a probability of success on the merits necessarily includes the necessity of showing that there is a likelihood that the merits will even be reached, *i.e.*, a probability that plaintiff at least has standing to sue. Plaintiff has not carried that burden.

-13-

A.    Contrary To Plaintiff's Assertion, The Court Of
Appeals Has Not Already Decided That The
<u>WLF Has Standing To Represent Its Members</u>

WLF makes an argument that, if correct, would suggest that the question of

its standing to represent its members is no longer an open question in this Circuit.

The firm asserts that "[t]he DC Circuit has on several occasions upheld the

Washington Legal Foundation's standing to assert claims based on its members'

constitutional rights, in the face of federal government challenges to that standing."

Pl's PI Mem. at 52.  That assertion is false.

The citations provided by WLF for that assertion are:

> *See*, *e.g.*, *Washington Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir.
> 2000) (successful First Amendment challenge to FDA restrictions on
> the ability of WLF's members to receive truthful information about
> FDA-approved prescription drugs); *Abigail Alliance for Better Access
> to Developmental Drugs v. von Eschenbach*, 469 F.3d 129 (D.C. Cir.
> 2006) (denial of FDA request for panel rehearing) (due process
> challenge to FDA restrictions on access to drugs by terminally ill
> patients).

Pl's PI Mem. at 52.

In *Washington Legal Foundation v. Henney*, the case was dismissed for lack

of a constitutional case or controversy.  Standing is not even mentioned in the

opinion and certainly was not decided.  In *Abigail Alliance*, the WLF "conceded at

oral argument that it lacked Article III standing."  *Abigail Alliance for Better

Access to Developmental Drugs v. Von Eschenbach*, 445 F.3d 470, 475 n.4 (D.C. Cir.

2006).  The panel opinion on request for rehearing that WLF cites addressed Abigail

Alliance's standing, not WLF's standing.

-14-

Thus, neither of those cases forecloses this Court's ability to consider whether WLF has standing to represent its alleged members.

**B.**    **Plaintiff Lacks Standing To Represent**
**The Interests Of Its Alleged "Members"**

Where, as here, an organizational plaintiff seeks "associational standing" to represent its members, it must meet three criteria: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).[5] WLF does not satisfy either of the first two criteria.

**1.**    **Plaintiff's Alleged Members Have No Standing**
**To Challenge The Survey And Certification**
**Memorandum And It Is Doubtful Whether They**
**Would Have Standing To Sue In Their Own**
**Right To Challenge The Guidelines For Plans**

WLF now admits or asserts that it does not even purport to represent any "members" other than Rebecca Fox, Mary Samp, and Edward Samp. Pl's Interrog.

---

[5] As with any organization, there may be instances where WLF has interests *qua* organization that support standing to represent its own interests, as illustrated by *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989), which upheld WLF's standing to seek documents. The question in this case, however, is whether WLF has standing to assert the rights of its alleged members. *See* Pl's PI Mem. at 51. Because WLF is an organization rather than an individual eligible for Medicare, it can have no interest of its own in seeking a provider's advice about what Part D plan to choose. Nor does it have any interest as a speaker, as "[p]roviding health insurance information is not a part of WLF's mission," and it does not disseminate information about Part D insurance. Pl's Interrog. Answers (Def. Ex. A) at 13.

Answers (Def. Ex. A) at 12.  Accordingly, assuming for the moment that plaintiff even has members, the question whether any of those members would have standing to sue on their own reduces to the question whether any of those three alleged members would have standing.

With respect to one of the two agency documents plaintiff challenges, the Survey and Certification Group memorandum, it is now absolutely clear that no members would have standing.  That memorandum applies only to nursing homes and neither Ms. Fox nor the Samps nor anyone else WLF even purports to represent lives in a nursing home or is any way affected by the Survey and Certification Group memorandum.

As to the Marketing Guidelines For Plans, it is, at best, doubtful that Ms. Fox or the Samps have standing.  Probably because the WLF went about finding persons who could serve as exemplars of what plaintiff had predetermined their problem would be, there is no close fit between any injuries they may have actually suffered and the litigation cure plaintiff had already decided to peddle.  To satisfy the injury-in-fact requirement for standing, an injury must be "concrete," "actual," and "imminent," not "conjectural" or "hypothetical."  *E.g.*, *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1862 (2006).  The injuries alleged by the three alleged members due to the Marketing Guidance For Plans are conjectural and hypothetical, rather than imminent and actual.

Ms. Fox's declaration says that she was not enrolled in a Part D plan last year because she relied on a promise of the Commonwealth of Pennsylvania to

enroll her in a plan and the Commonwealth did not do what it promised. Fox Decl. ¶¶ 7, 14, 16. Ms. Fox says that for the current year she got "helpful" advice, *id.* ¶ 16, that she followed, and she expresses no dissatisfaction with her current choice of Part D plans. If it were still last year and if this were a lawsuit against the Commonwealth of Pennsylvania, the Fox declaration would scream injury in fact. But the therefore-she-needs-to-be-steered-by-a-pharmacist-to-a-particular-plan conclusion that plaintiff deduces from Ms. Fox's factual recital is a non-sequitur.

Mary Samp says that she got advice from the Harvard Retirees' Association not to enroll in <u>any</u> Part D plan and that she took that advice. She expresses no dissatisfaction or uncertainty about her decision under her current circumstances. At most, she says that <u>if</u> her circumstances ever change, she would want to talk to health care providers about her options. Samp Decl. ¶¶ 4, 13. Ms. Samp's statements make out, at most, only a possible hypothetical future injury that is not at all imminent or concrete at this time.

Edward Samp had pre-existing coverage from the City of Cambridge, which indicated that he should not sign up for a Part D program on his own, and that Cambridge would sign him up for a plan, which it did. *Id.* ¶¶ 5-6. Meanwhile, the TRICARE program said that he should not sign up for any Part D program and that, if he did, TRICARE would be reduced to a secondary payer. *Id.* ¶ 7. In light of these different communications from different non-Part D benefit plans, it is not surprising that the Samps might be "confused." *Id.* ¶ 5. What does not follow is

-17-

that a pharmacist would be a likely choice to straighten out <u>that kind</u> of confusion. An expert on insurance and retiree health plans would be a more likely choice.

But even if the Samps did want to talk to a pharmacist about this problem and even if one assumed that the pharmacist (surprisingly) did turn out to have the necessary knowledge, the point Mr. Edward Samp needs to know in light of the communications from Cambridge and TRICARE is whether he should choose <u>any</u> part D plan. Nothing in the Marketing Guidelines For Plans would preclude a pharmacist from advising Mr. Edward Samp on <u>that</u> point. The Marketing Guidelines For Plans instead address attempts to "steer" beneficiaries toward a <u>particular</u> plan or plans by persons who expect compensation from the plans for such steering. Def. Ex. G. at 8. The question of which particular plan to sign up for would arise only if Edward Samp, either on his own or with help from a pharmacist or more likely source of information, concluded that the City of Cambridge (which advises him not to sign up for a plan on his own) and TRICARE (which advises him not to sign up for any plan at all) are <u>both</u> wrong. At this time, any "injury" to Edward Samp from the Marketing Guidelines For Plans is thus merely conjectural and hypothetical.

In short, even if this suit had been filed in their own names it would be, at best, doubtful whether Rebecca Fox, Mary Samp, and Edward Samp have suffered injuries in fact attributable to the Marketing Guidelines For Plans.

2.    Ms. Fox, And Mr. And Mrs. Samp Are
Not Members Of WLF Or The Functional
Equivalent Of Members Of The WLF

For an organization to have standing to sue on behalf of its members, it must have members or the functional equivalent of members.  WLF does not have such members or functional equivalents of members on behalf of whom it may sue.

To be sure, under its articles of incorporation and by-laws the WLF allegedly does have a "very limited" number of actual members.  Pl's Interrog. Answers (Def. Ex. A) at 5; Def. Exs. E (amendments to articles of incorporation) & F (by-laws).  However, WLF now admits that it does not seek to represent any of these members, whom it calls "corporate members," Pl's Interrog. Answers (Def. Ex. A) at 5, and it nowhere identifies any such actual member of WLF who has suffered any injury in fact.  Accordingly, WLF lacks standing to represent its actual members in this action.

In an attempt to salvage its standing, WLF asserts in its interrogatory answers that it has what it calls "members" for purposes of this lawsuit only, Pl's Interrog. Answers (Def. Ex. A) at 2.  The mere fact, WLF argues, that it does not have a "formalized" membership structure should not matter because "[c]ourts have uniformly rejected such 'formalistic' challenges to representational standing."  Pl's PI Mem. at 51.  For that proposition of what "courts" have "uniformly" done, plaintiff cites one Third Circuit case that says in passing (before rejecting standing on other grounds) that a formalized membership structure is not always necessary.

*Id.* at 51-52, *citing Public Interest Group v.  Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997).

What WLF ignores is that the Supreme Court and the Court of Appeals for this circuit have addressed in some detail the standards for determining when an organization that has no members in the traditional sense may nonetheless assert associational standing.  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342-45 (1977); *American Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987); *Gettman v. DEA*, 290 F.3d 430 (D.C. Cir. 2002); *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25-26 (D.C. Cir. 2002).  As this Court has summarized the holdings of those cases, "an organization with no formal members can still have associational standing <u>if</u> it 'is the functional equivalent of a traditional membership organization.'"  *Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57, 69 (D.D.C. 2005) (emphasis supplied), *quoting Fund Democracy*, 278 F.3d at 25. "Three main characteristics must be present for an entity to meet the test of functional equivalency: (1) it must serve a specialized segment of the community; (2) it must represent individuals that have all the "indicia of membership" including (i) electing the entity's leadership (ii) serving in the entity, and (iii) financing the entity's activities; and (3) its fortunes must be tied closely to those of its constituency," *Basel Action Network*, 370 F. Supp. 2d at 69.

The alleged relationship between the WLF and its alleged for-purposes-of-this-case-only members does not satisfy any of these criteria, much less all of them.

-20-

First, the WLF does not serve some specialized segment of the community such as apple growers. Rather, its "one goal," according to its website, is "to defend and promote the principles of freedom and justice."[6] All Americans share an interest in freedom and justice. WLF is thus a "<u>public</u> interest law firm," Complaint ¶ 1 (emphasis supplied), not a specialized segment of the community's law firm. *See American Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987).

Second, the alleged for-purposes-of-this-lawsuit-only members play no role in electing WLF's leadership. Rather, under the corporate by-laws a small self-perpetuating circle of leaders elects itself. The directors of the firm apparently originally chose themselves (*see* Def. Exs. D-F). When the firm decided to have a "very limited" number of actual members, the directors appointed the original members. Pl's Interrog. Answers (Def. Ex. A) at 5; WLF by-laws (Def. Ex. F). That "very limited" number of director-chosen members (and members chosen by the director-appointed members and their successors) in turn choose the directors if there are any vacancies. WLF by-laws (Def. Ex. F). *Cf. Hunt*, 432 U.S. at 344.

Third, the alleged for-purposes-of-this-lawsuit-only members of the WLF do not serve in the WLF (unless being recruited to create standing counts as service): "Interrogatory No. 11: What obligations, including, but not limited to, paying dues or other membership fees, do members have to the firm? Answer: None." Pl's Interrog. Answers (Def. Ex. A) at 8 (punctuation added; paragraph breaks and bold

---

[6] http://www.wlf.org/Resources/WLFMission/ (visited February 8, 2007).

font omitted). At most, persons are deemed members by WLF for purposes of this lawsuit if they "express[ ] an interest in work[ing] with the WLF in achieving common goals." *Id.* at 5. But, as the Court of Appeals explained in *Fund Democracy*, 278 F.3d at 25, an organization's merely working together with like-minded individuals toward common goals is not enough to make those individuals the organization's members.

Fourth, the alleged for-purposes-of-this-lawsuit-only members do not finance the firm's activities. They pay no dues and there is no requirement that they ever make any monetary contribution. Pl's Interrog. Answers (Def. Ex. A) at 8. According to WLF's own website, 86% of its funding comes from foundations, corporations, and investments, and only 14% comes from "individuals."[7] Even that small proportion of the firm's funding that comes from "individuals" does not come entirely (and perhaps does not even come mostly[8]) from persons WLF deems members for purposes of this suit. *See* Pl's Interrog. Answers (Def. Ex. A) at 3; *cf. Hunt*, 432 U.S. at 337 (assessments levied on apple growers and dealers constituted sole source of Apple Growers' Association funding). Associational standing is founded on a premise that organizations are likely to be relatively single-minded champions of the specialized interests of their members. *See Auto Workers v. Brock*, 477 U.S.

---

[7] http://www.wlf.org/Resources/WLFMission/support.asp (visited February 8, 2007).

[8] There has not, except for the question about membership dues, been any discovery to date on the sources of WLF's funding.

274, 289-90 (1986). Organizations funded by persons other than their members may be more susceptible than member-funded organizations to confusing interests of their members with interests of their donors.

Finally, given the corporate and foundation funding of the WLF, its fortunes are not tied to any particular constituency of members as defined for purposes of this lawsuit.

Accordingly, Ms. Fox and Mr. and Mrs. Edward Samp are neither members of the WLF nor the functional equivalent of members.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Defendants do not get much out of litigation. But one thing fundamental fairness entitles them to get is repose. If they have been sued once by Party A over a matter, the litigation settles the dispute once and for all. So it is not "formalism," or at least not empty and pointless formalism, to pay attention to who the parties in a lawsuit are. Knowing who the parties are is necessary to knowing who will be entitled to the benefit of a judgment and who will be bound by its reach.

Those concerns do not disappear merely because an association is the plaintiff. In a proper associational standing case, the association's members will be bound by the result. *See Auto Workers v. Brock*, 477 U.S. 274, 290 (1986). The litigation will count. For both sides. It is thus vital that, just as Rule 23 class members must be identifiable, in an associational standing case, there must be enough "formalism" of membership that members are at least identifiable. The *ad hoc* and amorphous nature of plaintiff's alleged "membership" – people the WLF is

-23-

working with who "only irregularly" might have gotten some correspondence that mentioned "membership" – would not give defendants here any assurance that they could rely on a judgment in this case against anyone, while (judging from plaintiff's proposed order) everyone could rely on a judgment against defendants.

Plaintiff's approach of not paying attention to the "formalis[m]" of who an association actually represents would deprive defendants of the right to have this litigation not be a waste of their time and effort. Only because defendants took the somewhat unusual step of seeking discovery on standing, plaintiff now claims that it was all somehow only defendants' "incorrect[ ] assum[ption]" that WLF was suing on behalf of members other than Rebecca Fox, Mary Samp, and Edward Samp. Pl's Interrog. Answers (Def. Ex. A) at 12-13. That "incorrect[ ] assum[ption]" was fostered by the complaint and the motion for preliminary injunction which give an impression that WLF was suing on behalf of "numerous" members. Pl's PI Mem. at 1 *et passim*.

### 3. The Interests WLF Seeks To Protect Are Not Germane To Its Purpose

The interests WLF seeks to protect are not germane to its purpose.

In its attempt to show that the germaneness requirement is met, WLF asserts that "litigation in support of the First Amendment rights of its members to receive truthful information regarding health care issues" is "a principal focus" of the WLF. Pl's PI Mem. at 52.

-24-

Even if that assertion were accurate (as we show below, it is not), the WLF would still be far different from the kind of organizations like the apple growers that function generally to serve a specialized segment of a community. With the WLF, the situation is the exactly the reverse: the community served is general and it is a function, litigation, that WLF claims as its particular focus.

The organization in *Hunt* served the general, apple-industry related interests of a specific community, apple growers, in ways beyond litigation. *Hunt*, 432 U.S. at 344 ("its purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research"). Litigation was not the purpose of the organization, but one function that became necessary to support its overall purposes to serve a specific community.

By contrast, the WLF focuses on litigation. It does not have any function in helping its members choose health care plans. It is not a go-to source for information on the differences among Part D plans and provides its members with no information on the features of different plans. As WLF admitted in its discovery responses: "Providing health insurance information is not part of WLF's mission," and no "action WLF has taken can accurately be described as an effort to disseminate to its members information about Medicare Part D insurance." Pl's Interrog. Answers (Def. Ex. A.) at 13.

Where the apple growers' association served apple grower interests and only litigated to serve those interests, WLF does not claim that it serves a specific

community of persons trying to find health care information and that litigates <u>about</u> the interests of the specific community it serves.  Rather, it claims that litigation is its interest.  There is, of course, nothing wrong with an organization having litigation as its interest and serving a diverse clientele.  Such organizations are called "law firms."  That's what WLF is.  Complaint ¶ 1.  But it is not a "law firm[ ] with standing."  *Humane Soc'y v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988).[9]

In any event, WLF's claim (Pl's PI Br. at 52) that "litigation in support of the First Amendment rights of its members to receive truthful information regarding health care issues" is "a principal focus" of the organization is not accurate, unless the emphasis is entirely on "a" and both "principal" and "focus" are drained of their ordinary meanings.  Among the wide variety of other activities engaged in by WLF are its "vigorously oppos[ing] wrongful criminal prosecution of free enterprise," advocating against "plaintiffs' attorneys" seeking "to impose new restraints on the securities industry" (entry for "featured litigation"), opposing the "erosion" of attorney-client privilege ("this week's featured publication"), supporting an Arizona "immigration-control initiative," and opposing District of Columbia price controls on prescription drugs.[10]  The publications listed on its website homepage address such

---

[9] Law firms, of course, file suits all the time.  There is nothing wrong with that either.  But, except in the rare case where the firm's or its attorneys' own interests are at stake, a law firm does not have standing to bring the suit in its own name, but in the <u>client</u>'s name on behalf of the client.  *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125 (2004).

[10] The examples given in the text prior to the next footnoted sentence are all (continued...)

varied subjects as "windfall damages" for environmental plaintiffs, Sarbanes-Oxley whistleblower risks, surgeon-owned devices, and "[s]urrendering energy independence." A click on WLF's listing of cases in its "Criminalization of Free Enterprise – Supporting Business Civil Liberties Program" reveals efforts by WLF to address the weight to be given the criminal sentencing guidelines, to support alleged rights of businesses to enforce non-prosecution agreements, to oppose increased California taxes on flavored malt beverages, to support Ohio tax credits, and to support an Oregon ballot measure to protect landowners' rights. WLF lists a wide variety of cases and interests under other "projects" with the headings "Protecting America's Freedom: National Security and Defense"; "Civil Justice Reform"; "Class Action Reform"; "Environmental Law Project"; "Reining in the Plaintiffs' Bar"; "Health Care Project" (which includes this case); and "Limiting Punitive Damages."[11] What WLF calls "support of the First Amendment rights of its members to receive truthful information regarding health care issues" may be one view advocated by WLF, but it is only one of a large number of diverse views on a wide range of topics. It is certainly not "a principal focus" of the WLF.

---

[10](...continued)
from WLF's website (http://www.wlf.org/) as visited on January 31, 2007.

[11] The projects are as listed on WLF's website (http://www.wlf.org/) as visited on February 5, 2007.

If WLF has "a principal focus," it is at much higher level of generality. Indeed, the WLF says it "has one goal: to defend and promote the principles of freedom and justice."  http://www.wlf.org/Resources/WLFMission/.

The germaneness prong of associational standing is not a vestigial or tooth-less requirement.  *See, e.g., Fleck & Associates v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006).  But we recognize that in the leading case of *Humane Society v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988), the Court of Appeals held that the germane-ness requirement should have a "modest functional" interpretation, 840 F.2d at 56, that would preclude only "a narrow class of cases," *id.* at 57.  The Court of Appeals gave one textual example of the narrow class of cases where the germaneness requirement, modest hurdle though it may be, would bar suit.  That example was: "*McKinney v. United States Department of the Treasury*, 799 F.2d 1544 (Fed. Cir. 1986), one of only two cases of which we are aware in which a federal court denied standing on germaneness grounds.  In *McKinney*, the Federal Circuit held that the Washington Legal Foundation, a self-described 'non-profit public interest law firm,' could not sue to require the Customs Service to bar the importation of Soviet-made goods in an effort to protect the economic interests of producers and workers because these goals were not pertinent to the Foundation's purpose."  840 F.2d at 58.  The D.C. Circuit went on in *Humane Society* to explain that "[t]he germaneness prong serves as a backstop against such suits. It ensures a modicum of concrete adverseness by reconciling membership concerns and litigation topics by preventing associations from being merely law firms with standing."  *Id.*

Indeed, if the germaneness requirement were interpreted otherwise, what lawsuit would not be "germane" to an association that says it serves the "public" interest and claims a purpose of defending freedom and justice?  The apple growers' association could represent the interests of apple growers in litigation because that representation was germane to its specific purpose.  But it does not follow that an everything-under-the-sun organization serving a generalized public interest may sue in its own name on behalf of its members *du jour* merely by claiming that, there being a just outcome to every case, <u>any suit</u> it chooses to file would necessarily be "germane" to the association's purpose of favoring justice.

        \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Defendants do not challenge standing in this case because WLF's approach to a wide range of issues is to "defend . . . the rights of individuals to go about their affairs without undue interference from government regulators," Complaint ¶ 7, but because it is the case before us.  If this case were filed by a mirror-image Citizens For A Nanny State, which saw its mission as defending powerless individuals from greedy corporations by assuring vigorous government regulation, we would make the same points.  For that matter, we would make the same points about a wholly non-ideological Experts For A Better World, with a mission of filing suits to make a better world.  Those three "public interest law firms" could have the "public" as members, could even have the <u>same</u> members (say, the first twenty-thousand people in the phone book), and file three substantively quite different suits against the same split-the-difference agency action, all making dueling but equally sincere

claims that the organizations' self-appointed elites were representing the "members." Under what seems to be plaintiff's view, they could file such suits without bothering (as plaintiff did not bother here) to ask members first whether the suits were a good idea or even to wait for any input at all that the <u>members</u> perceived a problem (plaintiff here received no such input before deciding to sue anyway, Pl's Interrog. Answers (Def. Ex. A) at 13), since, after all, the experts who appoint themselves to lead the organizations would know what is best for the members. Under what must be plaintiff's view (given its actions in this case), if no one of their current "members" had sustained injury in fact, the organizations could hunt around until they found other persons who could be deemed "members" just in time for the lawsuit. The associational standing doctrine ought not and does not permit such suits, no matter how well intentioned or sincere the public interest law firms filing them are in their beliefs that such suits are in the public interest.

II.     Plaintiff Has Not Demonstrated That It
        <u>Would Be Likely To Prevail On The Merits</u>

If there were any likelihood that the merits would be reached in this case, it would be evident that plaintiff has little or no likelihood of success on the merits.

The Marketing Guidelines For Plans[12] address "marketing," defined as "[s]teering, or attempting to steer, an undecided potential enrollee towards a plan,

---

[12] Since none of the only three persons plaintiff now claims to represent resides in a nursing home, we do not address the Survey and Certification Memorandum, which applies only to nursing homes, that plaintiff had discussed in its pre-discovery-response motion.

or limited number of plans, and for which the individual or entity performing marketing activities expects compensation directly or indirectly from the plan for such marketing activities." Marketing Guidelines For Plans at 8. "'Assistance in enrollment' and 'education' do <u>not</u> constitute marketing." *Id*. (emphasis supplied).

The Marketing Guidelines For Plans are not, or at least not merely, an exercise of purely sovereign or regulatory power over providers. Indeed, the Marketing Guidelines For Plans do not directly regulate providers at all, but are part of <u>contractual</u> arrangements between the government and <u>the plans</u>, which are governed by the Guidelines.[13] And it is well established that the government may (as here) have interests in agreeing on the scope of speech in the context of its own contracts distinct from and beyond those that might support free-standing regulation. *See Rust v. Sullivan*, 500 U.S. 173 (1991); *United States v. Snepp*, 444 U.S. 507 (1980). In this sense, the anti-steering provisions of the Guidelines are no different than similar conditions that the Medicare program places upon health care providers or suppliers in other contexts and which are designed to protect

---

[13] We do not deny that, since the Guidelines address what marketing activities plans may engage in, they do <u>indirectly</u> affect providers who may have contracts with the plans and for whose actions on the plans' behalf the plans may be responsible.

Plaintiff seems to express puzzlement that, since the Marketing Guidelines For Plans address marketing by plans and their agents, they would address marketing by physicians and hospitals that do not generally contract with Part D plans or receive payment from those plans, Pl's PI Mem. at 26, 40. However, although plaintiff focuses on Part D, the Marketing Guidelines For Plans also cover Medicare Advantage Plans, the HMO-like plans that <u>do</u> contract with and pay doctors and hospitals.

beneficiaries. For example, in order to protect beneficiaries from fraud and other abusive practices, Medicare regulations require that suppliers of durable medical equipment, including any physicians who sell such equipment, agree as a condition of payment that they will not directly contact a beneficiary by telephone unless certain conditions apply. *See* 42 C.F.R. § 424.57(c)(11). Similarly, the Secretary recently promulgated a final rule with comment which establishes as a condition of Medicare participation that independent diagnostic testing facilities agree not to directly solicit or recruit patients, but does not prohibit public advertising. *See* 71 Fed. Reg. 69624, 69785 (Dec. 1, 2006) (to be codified at 42 C.F.R. § 410.33(g)(7)).

Not even plaintiff seems to contend that the plans' speech, which is what the Guidelines directly address, is not commercial. Marketing by the plans is still commercial speech by the plans when a provider or other plan subcontractor is the agent who does the marketing.

Even if one divorced the provider from any role as agent of a plan with whom the government has a contractual relationship, and viewed any sales pitch he might make to a patient solely as his own speech, it is speech that proposes a commercial transaction. Plaintiff argues, however, that even if that is so, the speech is not "commercial" because the transaction in question is not "between the speaker and the listener." Pl's PI Mem. at 26. However, a Part D plan is generally called a "third-party payer" for a reason. If the "speaker and the listener" are the provider and patient, they are by definition the <u>first</u> and <u>second</u> parties to commercial trans-actions they are contemplating entering into with that third party. There is

nothing ignoble about providers having commercial interests when they sell drugs or services to patients, but they undoubtedly do have such interests.

Even if one ignored the government's contractual interests and treated this case as if it involved regulation of speech involving purely private speech concerning private commercial arrangements to which the government was not a party, the narrowly focused and carefully tailored Marketing Guidelines For Plans would easily pass constitutional muster under the test set forth in *Central Hudson Gas v. Public Service Comm'n*, 447 U.S. 557 (1980).

The Marketing Guidelines For Plans address "marketing," defined as "[s]teering, or attempting to steer, an undecided potential enrollee towards a plan, or limited number of plans, and for which the individual or entity performing marketing activities expects compensation directly or indirectly from the plan for such marketing activities." Marketing Guidelines For Plans at 8.  The government has a patently substantial interest in protecting Medicare beneficiaries from providers who, for financial gain, may steer a patient into a plan that is not in the best interest of the patient.  The Secretary has explained that "[p]roviders may face conflicting incentives when acting as a plan representative.  For example, some providers may gain financially from a beneficiary's selection of one plan over another plan.  Additionally, providers generally know their patients' health status. The potential for financial gain by the provider steering a beneficiary's selection of a plan could result in recommendations that do not address all of the concerns or needs of a potential plan enrollee." Marketing Guidelines For Plans at 123.

-33-

Providers may not have contracted with all plans or may have contracted with various plans on different terms.  And some plans may be more advantageous to the provider than others.  For example, a provider might receive more payment from one plan than from another to furnish the same item or service to a Medicare beneficiary.  Similarly, it might be easier for a provider to deal with plan A over plan B because of the way plan A files claims or performs other administrative tasks.  Therefore there are often incentives for providers to recommend that a beneficiary enroll in the plan that has the most favorable contract terms with the provider, rather then the plan that is best suited to the beneficiary given his or her specific health care needs.  Block Decl. ¶ 11.

These concerns are particularly relevant in the nursing home context, where residents are less likely to be able to make independent decisions about their own medical care, and are more susceptible to influence by their providers.  Nursing home residents also have access to a smaller pool of pharmacy providers and must rely on the facility pharmacy to meet their drug needs.  Nursing facilities contract with long term care pharmacies, and by law must retain the services of a licensed pharmacist who provides service consultation on all aspects of the provision of pharmacy services in the facility.  See Block Decl. ¶¶ 14-16.

Long-term pharmacies often negotiate with drug manufacturers to get rebates on particular drugs.  The pharmacy stands to gain from recommending such drugs over others. This creates an unavoidable conflict of interest for the consultant pharmacists who "have an incentive to persuade the facility to use certain drugs

manufactured by certain manufacturers, because the long term pharmacy has

negotiated with those manufacturers to get rebates on those particular drugs."

Block Decl. ¶15.

The Secretary has a substantial interest in ensuring that Medicare bene-

ficiaries have access to a range of plan options so that the beneficiary can freely

select the plan that best suits his or her unique medical needs.  Medicare

beneficiaries should be free to exercise their choice of plan without undue influence

from financially motivated providers who may provide misleading information in

order to steer a beneficiary into the plan that is best for the provider but not for the

beneficiary.

Forbidding providers to "steer" patients into particular drug plans does not,

as plaintiff contends, amount to a restriction on "truthful" information.  An attempt

to steer a beneficiary toward a particular plan is not "true" any more than it is in a

narrow sense "false."  The Marketing Guidelines For Plans are addressed to

providers' recommendations that may be influenced by the benefits to <u>the provider</u>

of the patient's choosing one plan over another, without the provider, much less the

patient, being fully aware of the extent of that influence.   Thus, by precluding a

plan from compensating providers directly or indirectly for steering patients toward

the plan, the Marketing Guidelines For Plans directly advance significant govern-

ment interests.

Finally, the Marketing Guidelines For Plans are not more restrictive than is

necessary to serve the government's significant interests.  While they do seek to

prohibit "steering, or attempting to steer an undecided potential enrollee toward a plan, or a limited number of plans, offered either by the plan sponsor or another plan sponsor, based on the financial interest of the provider or agent, (or their subcontractors)," Marketing Guidelines For Plans at 123, the Guidelines in equally explicit terms encourage providers to give objective information to beneficiaries and to help patients choose the plan that best suits their needs.  Specifically, the Marketing Guidelines For Plans state that "[t]o the extent that a provider can assist a beneficiary in an objective assessment of the beneficiary's needs and potential plan options that may meet those needs, providers are encouraged to do so."  Marketing Guidelines For Plans at 123.  Walgreen's, for example, provides extensive information to its customers about the various plans, information that can be customized to address each customer's circumstances.  *See* http://www.walgreens.com/pharmacy/medicare_d/default.jsp?ban=bil_hpb_medicare _0107.

III.    Rebecca Fox, Edward Samp, And Mary Samp Would Suffer
        Little Or No Irreparable Harm If A Preliminary Injunction
        Were Denied, And Any Such Harm Is Clearly Outweighed
        By The Harm That Would Be Imposed Upon Defendants And
        The Public By Plaintiff's Proposed Preliminary Injunction

As we have shown above, it is doubtful whether any of the only three persons WLF now claims to represent, Rebecca Fox, Edward Samp, and Mary Samp, have even sustained injury in fact sufficient to support standing.  They have certainly made no showing that they are facing any imminent and <u>irreparable</u> harm <u>due to</u> the challenged views of the agency.

-36-

First, <u>no one</u> represented by the plaintiff is even arguably affected by the Survey and Certification Group memorandum, which is one of the two statements of agency views discussed in plaintiff's memorandum and might (or might not) be part of whatever it is plaintiff's draft order would purport to enjoin. The Survey and Certification Group memorandum applies only to nursing homes and neither the plaintiff nor anyone it represents lives in a nursing home. That memorandum threatens plaintiff with no harm at all, much less irreparable harm.

The Marketing Guidelines For Plans cause no irreparable harm to plaintiff either.

Alleged member Mary Samp admits that she is following the "strong" recommendation of the Harvard retirees' association not to sign up for <u>any</u> plan. Samp Decl. Unless and until she changes her mind on that threshold point, which her declaration does not say she anticipates in the absence of change in her health, the Marketing Guidelines For Plans have no effect on her. They address only steering to particular plans, a point not relevant given her current decision not to sign up for any plan. On the continued propriety of that decision, nothing in the Marketing Guidelines For Plans could even remotely be thought to preclude provider advice.

Alleged member Edward Samp likewise is not affected by any restrictions on the ability of pharmacists he might know to be paid to steer him to a particular plan. He expresses "confusion" about whether to choose <u>any</u> plan, since the City of Cambridge says he should let it choose a plan for him, and TRICARE says that

(with an exception that does not seem to apply to him) its beneficiaries should not join <u>any</u> Part D plan.  Samp Decl.  If he is confused about whether the City or TRICARE or both are right, nothing in the Marketing Guidelines For Plans precludes asking a pharmacist for advice (though nothing about the situation suggests that the pharmacist would be a plausible source of that advice).  Only if Edward Samp decided to ignore what the City and TRICARE are telling him would the question of <u>which</u> plan to sign up for arise, and only in that unlikely eventuality would the Marketing Guidelines For Plans have any possible impact.

Finally, WLF argues that "Ms. Fox's inability to obtain requested information from her pharmacist cause her to incur substantial drug expenditures in 2006 that she would have not incurred but for the CMS speech restrictions.  [Fox Decl.] ¶¶ 15-16."  Pl's PI Mem. at 44.  That's not what those paragraphs or any other paragraphs of the Fox Declaration say.  What the declaration actually says is that the Commonwealth of Pennsylvania promised to enroll her in a Part D plan for 2006, that she relied on that promise, and that the Commonwealth broke that promise.

 Not only is that alleged injury beside the supposed point of <u>this</u> lawsuit, it is in the past and cannot be cured by a prospective injunction.  For the current year, 2007, Ms. Fox admits that she did get "helpful information," Fox Decl. ¶ 16, that she used to pick a Part D plan.  She does not indicate that she is unhappy with that plan or has any current need for information about whether to switch plans.

Even if Ms. Fox and Mr. Edward Samp were thinking of switching plans or Mrs. Samp were thinking of joining a plan, the next period during which they any of

them could change enrollment from one Part D plan to another is November 15, 2007 through December 31, 2007, effective January 1, 2008.  42 C.F.R. § 423.38.[14] In light of the possibility that plans will change their offerings for next year (indeed, the possibility that there will be more, fewer, or different plans), it would make little or no sense to seek specific advice <u>now</u> on which plans to choose for 2008. Thus, even if some injury that would be cured by allowing a plan to pay for pharmacist steering toward that particular plan could be teased out of the declarations, it will be many months before the declarants, their pharmacists, or anyone else will have specific information to choose any plan for 2008.  A <u>preliminary</u> injunction is simply not needed.

Indeed, the alleged necessity of preliminary relief is belied by the relatively leisurely pace at which it was sought.  The open season for the current year – the time when information about particular plans would have been most relevant – was November 15, 2006 through December 31, 2006.  42 C.F.R. § 423.38.  If there was to be any preliminary injunction, it would have made sense for the motion to have been filed in time for a decision before that open season that has just passed.  The

---

[14] Ms. Fox and Mr. and Mrs. Edward Samp would have until March 31, 2007, to switch for this year from a stand-alone Part D plan to an "MA-PD" plan, a managed care organization that provides not just part D drug coverage but all medical coverage usually obtained under Medicare parts A and B.  *See* 42 USC 1395w-21(e)(2)(C).  However, plaintiff's brief focuses exclusively on standalone Part D plans, and does not suggest that Ms. Fox or Mr. and Mrs. Edward Samp have any interest in switching their overall Medicare coverage to a managed care organization.  Mrs. Samp might also have a special election period if she disenrolled from Harvard's plan, but her declaration gives no indication that she is thinking of doing so.

case, after all, was filed in August.  Defendants' counsel had asked for a Rule 26

conference on October 17, 2006, at plaintiffs' counsel's earliest convenience, Def. Ex.

H, which turned out not to be until December.  Rebecca Fox's declaration was dated

November 9, 2006.  If Ms. Fox was truly faced with irreparable harm, it was by then

at the latest that a preliminary injunction motion should have been filed to permit

response, consideration, and decision prior to the December 31 end of the open

season on choosing a plan.

On the other side of the balance of hardships, the injuries are substantial.

Even though WLF now admits that it represents only Ms. Fox and Mr. and Mrs.

Edward Samp, its proposed preliminary injunction would gratuitously enjoin the

agency with respect to everyone in the world, not just with respect to steering of Ms.

Fox and Mr. and Mrs. Edward Samp.  That would inflict substantial injuries on the

Secretary and the public interest, because it would open the door to providers

steering beneficiaries toward a plan, or a limited number of plans, based (at least

potentially) on the provider's financial interests, rather than the beneficiaries' own

interests.  Unlike Ms. Fox and Mr. and Mrs. Edward Samp, the other beneficiaries

who are protected by the agency's Marketing Guidelines For Plans have not been

participants in a litigation process that focuses their attention on the possibility

that a pharmacist may be steering them toward a plan because he expects direct or

indirect compensation for doing so.  Enjoining the agency from protecting members

of the public other than Ms. Fox and Mr. and Mrs. Edward Samp from such

inappropriate steering would harm both the Secretary and the public interest, while doing absolutely nothing to help the only three people plaintiff says it represents.

Plaintiff argues that its proposed injunction focuses "*solely* on *truthful* speech" and would not "prevent CMS from taking steps against commercial speakers that supply false or misleading information." Pl's PI Mem. at 47 (first emphasis added). Given plaintiff's view that pharmacists and other providers who sell services to beneficiaries are somehow not "commercial" speakers, the injunction would still tear a huge hole out of the agency's ability to protect beneficiaries from being misled even if plaintiff's characterization of its proposed order were accurate.

But that's not what the proposed order would provide in any event. It would not be limited to allowing "truthful" speech, but would enjoin any and all applications of "any rule or regulation designed to prevent health care providers and professionals from supplying truthful information to Medicare beneficiaries regarding their choice of a health care plan."

It is not clear what "rule[s] or regulation[s]" the proposed order would apply to. Neither of the two documents discussed at length in plaintiff's paper (the Survey and Certification Memorandum and the Marketing Guidelines For Plans) is either a "rule or regulation" to begin with. Moreover, the design of the Survey and Certification Memorandum and the Marketing Guidelines For Plans is not to suppress truthful information (at most, plaintiff argues that such suppression is one effect) but to prevent plans from compensating providers to steer providers' customers to the plans. Such steering would not be "truthful," but would be, at

best, an opinion that, similar to a product endorsement, could be influenced by financial incentives that the plans, in the absence of the Guidelines, might otherwise offer for steering.

The proposed order would not identify which particular "rule[s] and regulation[s]" it would cover, but would leave defendants to guess about whatever rules or regulations might meet whatever is meant by a loose description that does not take its terms ("design," *e.g.*) seriously. The indeterminacy of the proposed injunction's terms is itself a sufficient reason for it to be denied. Rule 65 requires injunctions to be specific and clear, *e.g.*, *Pasadena Board of Education v. Spangler*, 427 U.S. 424 (1976), and plaintiff's proposal is neither.

Even if one could guess what "rule[s] and regulation[s]" the proposed order would enjoin from being enforced, the proposed order would apparently go far beyond "solely" allowing truthful speech. If <u>any</u> part of whatever rules and regulations the injunction is addressed to could be deemed to reach "truthful" speech, then <u>any</u> use of those rules and regulations would be enjoined, even with respect to untruthful and misleading commercial speech. The proposed order's terms are directed against enforcement as a whole of whatever rules or regulations it covers, not merely against enforcement to whatever limited extent those rules and regulations are directed at truthful speech. Thus, even if plaintiff's position on the merits were sounder, such injunctive overbreadth that would preclude enforcement against false and misleading speech of whatever rules or regulations

the proposed injunction is referring to would impose serious harms on the Secretary

and the public interest.

<u>CONCLUSION</u>

For the reasons stated above, plaintiff's motion for a preliminary injunction

should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

<u>/s/ Brian G. Kennedy</u>
Sheila M. Lieber
Brian G. Kennedy (D.C. Bar 228726)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204
Washington, D.C.  20530
Tel.: (202) 514-3357
Fax: (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants