## DECLARATION OF ABBY BLOCK

Abby Block, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1. I am the Director of the Center for Beneficiary Choices ("CBC") within the Centers for Medicare & Medicaid Services ("CMS"). CMS is the federal agency within the United States Department of Health and Human Services ("HHS") responsible for administering the Medicare and Medicaid programs. As the Director of CBC, I am directly responsible for overseeing all aspects of implementation of the Medicare Part D drug benefit.

2. I am familiar with the subject matter of the above-captioned lawsuit, which involves the implementation of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003), signed into law by President Bush on December 8, 2003. The statements made in this Declaration are based on my personal knowledge, information contained in agency files, and information furnished to me by CMS staff and contractors.

### Background – Medicare Part D Drug Coverage

3. Medicare, the federal medical insurance program for the aged and disabled, is contained in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg (the "Medicare statute"). The Medicare Act is divided into several parts. Parts A of the Medicare program, called in the statute "Hospital Insurance Benefits for the Aged and Disabled," provides medical insurance coverage for institutional services such as hospital and skilled nursing care. See 42 U.S.C. §§ 1395c, 1395d. Part B of the Medicare program, called in the statute "Supplementary Medical Insurance Program for the Aged and Disabled," is voluntary supplemental medical insurance covering certain outpatient services such as physician services, medical supplies, x-

rays and laboratory tests. 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medical insurance for eligible

individuals under Parts A and B of Medicare is delivered on a fee-for-service model; in other

words, Medicare directly reimburses participating health care providers who furnish Medicare

Part A and B beneficiaries a covered medical service. See 42 U.S.C. §§ 1395d(a); 1395k(a).

Thus, Parts A and B of Medicare are often referred to as "traditional" or "fee-for-service"

Medicare.

     4. In the Balanced Budget Act of 1997, Pub. L. No.105-33, 111Stat. 251, 426-32 (Aug. 5,

1997), Congress added a new Part C to the Medicare statute. This Part, referred to in the statute

as the "Medicare+Choice Program" and found at 42 U.S.C. §§ 1395w-21- 1395w-28, increased

beneficiary choice by authorizing Medicare beneficiaries to obtain covered Medicare services

through health maintenance organizations, preferred provider plans, and other "managed care"

arrangements offered by private health insurers. See 42 U.S.C. §1395w-21(a)(1). Under Part C,

Medicare does not make direct payment to health care providers as it does in the Parts A and Part

B, "fee-for-service" context. Rather, Medicare contracts with private health insurers who agree

to provide covered services to Part C beneficiaries through their own network of health care

providers. Medicare makes periodic payments to these organizations, who share in the risk of

providing covered services to the Part C beneficiaries. In turn, these private insurers are

responsible for reimbursing providers in their organization, network or plan.

     5. On December 8, 2003, the President signed into law the Medicare Prescription Drug,

Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42

U.S.C. § 1395w-101 et seq. (2003). Title I of the MMA amended the Medicare Act by inserting

a new Part D, the "Voluntary Prescription Drug Benefit Program," which for the first time

established Medicare coverage of prescription drugs. See 42 U.S.C. §§ 1395w-4 et seq. (117

Stat. 2066, 2071-2176). CMS has described Medicare Part D as "the most significant change to the Medicare program since its inception in 1965." 70 Fed. Reg. 4,194, 4,197 (Jan. 28, 2005).

6. The effective date of Medicare Part D was January 1, 2006. See 42 U.S.C. § 1395w-101(a)(2) (117 Stat. 2066, 2072) ("Coverage . . . shall first be effective on January 1, 2006."). Like Medicare Part C coverage, Medicare Part D coverage must generally be elected by the beneficiary and is offered through private insurance plans operating in various regions of the country. See 42 U.S.C. § 1395w-101. These plans are offered through stand-alone prescription drug plans ("PDPs"), Medicare Advantage plans offering qualified prescription drug plans ("MA-PDs")(MA plans were formerly known as M+C plans), PACE plans offering qualified prescription drug coverage, and cost plans offering qualified prescription drug coverage.    Thus, in one important respect, Part D insurance is like Part C.  Under Part D Medicare does not directly pay providers of prescription drugs, such as pharmacies, under a fee-for-service model. Rather Medicare makes periodic capitated payments to the Part D plans that share in the risk of providing prescription drug coverage. See 42 U.S.C. § 1395w-115. In turn, the Plans are responsible for reimbursing their network pharmacies for their services.

7. Title II of the MMA, 117 Stat. 2176-2221, renamed the Medicare+Choice program contained in Medicare Part C "Medicare Advantage" ("MA") and made certain other revisions in that program. See MMA §201(a), 117 Stat. 2176, ("There is hereby established the Medicare Advantage program. The Medicare Advantage program shall consist of the program under Part C of Title XVIII of the Social Security Act (as amended by ths Act.)"). An MA organization may not offer an MA plan to individuals in an area "unless either that plan (or another MA plan offered by the organization in that same service area) includes required prescription drug coverage . . . ." 42 U.S.C.§ 1395w-131(a).  Such plans, under which MA organizations offer

both medical insurance usually available under Parts A and B and prescription drug coverage under Part D, are referred to as "MA-PD plans."

8. In addition to these capitated payments from Medicare, the insurance provided by Part D plans is also funded through monthly beneficiary premiums – that is, the beneficiary's share of the cost of providing insurance. 42 U.S.C. §§ 1395w-113(a), 1395w-115(a), (b), and (e). These premiums are paid to the Part D plans, which they then use to fund coverage of their enrollees' prescription drug needs. See 42 U.S.C. § 1395w-116(b)(3).

9. In order to promote a wide choice of Medicare Part D plan options for Medicare beneficiaries, the Congress granted Part D plans flexibility in designing their Medicare prescription drug offering, provided the plans meet the minimum requirements set forth in the Medicare statute and the Part D Final Rule. 42 U.S.C. §§ 1395w-102(a), 1395w-111(e)(2)(D). Consequently, Part D plans differ from one another in several respects, including enrollee cost-sharing requirements (i.e., copays, coinsurance), premiums, the prescription drugs covered under the plan, the pharmacies included in the plan's pharmacy network, and the amounts the plan pays to its network pharmacies for dispensing covered drugs to the plan's enrollees.

<p style="text-align:center">Potential Part D Provider Conflict of Interest</p>

10. As in any managed care delivery system, plan choice is at the heart of the Medicare Part D drug benefit. Each beneficiary eligible for Part D is entitled to choose the plan in which he or she wishes to enroll. CMS believes that it is critical that beneficiaries' choice of plans be exercised freely and without improper influence. CMS offers several resources to assist beneficiaries in making their choice of a plan, including the 1-800-MEDICARE phone line, the Medicare Prescription Drug Plan Finder available on CMS's website, and the Medicare and You handbook, which is distributed to every Medicare beneficiary every year to help explain the

individual's Medicare benefits. The Medicare Prescription Drug Plan Finder, which is reviewed
by CMS to ensure that beneficiaries can understand the language on the website, is an especially
useful tool, as it allows a beneficiary to find and compare Part D drug plans based on the
individual's specific prescription drug needs. Assistance to beneficiaries is also available in the
community from a variety of entities such as public interest law firms and seniors' groups.

11. CMS believes that a health care provider that contracts with a number of Part D plans
to participate in those plans' networks can have a conflict of interest in advising beneficiaries
regarding plan choice. The conflict arises from the fact that the providers contract with various
plans on different terms. Thus, a provider might receive more payment from one plan than
another to furnish the same item or service to a Medicare beneficiary. Or, one plan might be
easier for the provider to deal with in terms of convenient filing of claims and other
administrative matters. As a result, providers have an incentive to recommend that a beneficiary
enroll in a plan that has the most favorable contract terms with the provider, rather than with the
plan that is best for the beneficiary given his or her specific health care needs.

12.    This conflict could cause gaps in the delivery of health care for non-
institutionalized limited income beneficiaries or could cause non-institutionalized limited income
beneficiaries to spend more money than they otherwise would have had they joined a plan that
suited their needs. CMS's guidance protects all Medicare Parts C and D beneficiaries, whether
institutionalized limited income beneficiaries or not.

13.    Although the foregoing concerns apply to all relevant care settings, including
community pharmacies, they are particularly acute in the nursing home context. Frail elderly
Medicare beneficiaries residing in long term care facilities constitute a vulnerable population due
to their often serious medical conditions and potential lack of ability to participate in their own

care due to cognitive impairment. Because they are institutionalized, they also lack access to a wide variety of pharmacy providers and the reality is that they are generally in a position of having to rely on the facility pharmacy to meet their drug needs.

14. The evolution of a variety of financial relationships among entities involved in delivering drugs to nursing facility residents raises serious concerns about those residents' freedom to choose a Part D plan. Nursing facilities contract with long term care pharmacies to provide services such as prescription processing, dispensing, and delivery, medication administration, and ongoing medication management regarding the facility's residents. In addition, federal law enacted in 1987, and implementing regulations, require that nursing facilities must employ or retain the services of a licensed pharmacist who provides service consultation on all aspects of the provision of pharmacy services in the facility; establishes a record-keeping system that tracks the receipt and disposition of all controlled substances; and determines that medication records are in order. See 42 U.S.C. §§1395i-3(b)(4)(A), 1396r(b)(4)(A)(iii); 42 C.F.R. §483.60. At least once a month this so-called consultant pharmacist must perform a drug regimen review for each of the facility's residents. Id. Since the implementation of the statute, however, the role of the consultant pharmacist in nursing facilities has developed well beyond the requirements of the 1987 statute. Today, most consultant pharmacists are in a nursing facility more often than once a month. In fact, consultant pharmacists are often full-time employees of the long term care facility's pharmacy. Some long term care facility pharmacies offer the services of consultant pharmacists to nursing facilities at reduced rates as an incentive for the facility to utilize the full range of services provided by the pharmacy.

15. A consultant pharmacist's position allows him or her to promote formulary

compliance – that is, to persuade the facility to utilize certain drugs as opposed to others to furnish to its residents – which contributes to the pharmacy's ability to negotiate rebates from drug manufacturers. In other words, consultant pharmacists often have an incentive to persuade the facility to use certain drugs from specific manufacturers, because the long term pharmacy has negotiated with those manufacturers to get rebates on those particular drugs. The more the facility's residents use those particular drugs, as opposed to others that might treat the same condition, the better financially for the pharmacy. With great power over drug selection in a nursing facility, consultant pharmacists who are employed by a long term care pharmacy that is motivated by maximizing available rebates face an unavoidable conflict of interest in making recommendations about drug selection when their employer stands to gain or lose financially from that selection. This same conflict of interest might influence the consulting pharmacist to persuade a facility's residents to choose one Part D plan over another, in order to maximize use of plans that provide drugs that will generate rebates for the long term care pharmacy or will reimburse a pharmacy for a given drug more than another plan. This conflict of interest could result in over-utilization or inappropriate utilization of prescription drugs, potentially to the harm of the Medicare beneficiary residing in the facility. Ultimately, in this situation, often it is the contract between the manufacturer and the long-term care pharmacist's employer that drives the plan selection.

16. The concerns outlined above are not merely theoretical. In March 2006 it came to CMS's attention that Omnicare, a large nationwide provider of long term pharmacy services, was requesting that some facilities change the Part D plans in which some of their residents were enrolled. Omnicare requested that the residents be switched to Part D plans that had entered into what Omnicare considered optimal contracts with Omnicare. Omnicare threatened to charge the

nursing facility additional fees if the residents were not switched.

<center>The Marketing Guidelines</center>

17. As a result of the concerns described above, CMS issued the portions of the Medicare Marketing Guidelines ("Guidelines") at issue in this lawsuit pursuant to its authority to regulate the marketing practices of participating Part D plan sponsors. See 42 U.S.C. §§ 1395w-101 and 104; 42 C.F.R. § 423.50. The Guidelines apply to PDPs, MA-PDs, cost plans offering qualified prescription drug benefits and PACE plans offering qualified prescription drug benefits. The Guidelines state that "[p]roviders may face conflicting incentives when acting as a plan representative. For example, some providers may gain financially from a beneficiary's selection of one plan over another plan. Additionally, providers generally know their patients' health status. The potential for financial gain by the provider steering a beneficiary's selection of a plan could result in recommendations that do not address all of the concerns or needs of a potential plan enrollee." Guidelines (July 25, 2006) at 123. For example, as noted above, a pharmacy may receive better reimbursement from one of many plans with which the pharmacy contracts. The plan that reimburses more may not be the best plan for the beneficiary because the plan may not have as many of a particular beneficiary's drugs on its formulary as other plans with which the pharmacy contracts. But because the plan will reimburse the pharmacy more for the drugs that are on the plan's formulary, providers have an incentive, without proper controls, to steer a beneficiary to the plan that reimburses them more, regardless of the beneficiary's needs. Enrollment in a plan that does not meet a beneficiary's needs could cause a beneficiary to pay more for prescriptions, and could lead to an interruption in health care, to the detriment of a beneficiary.

18. The Guidelines allow providers contracted with a plan sponsor to assist beneficiaries

in enrolling in a plan and to educate beneficiaries. Specifically, the "Provider Activities in the

Health Care Setting" section of the Guidelines state that

> To the extent that a provider can assist a beneficiary in an objective
> assessment of the beneficiary's needs and potential plan options that
> may meet those needs, providers are encouraged to do so. To this end,
> providers may certainly engage in discussions with beneficiaries when
> patients seek information or advice from their provider regarding their
> Medicare options. Providers are permitted to make available and/or
> distribute plan marketing materials for all plans with which the provider participates
> (including PDP enrollment applications, but not MA or
> MA-PD enrollment applications) and display posters or other materials announcing plan
> contractual relationships.

Id. at 123; see also id. at 127-28 (*Sample Can/Cannot List for Provider Interactions with*

*Potential Plan Enrollees*). As a result, providers are free to offer a great deal of information to

their patients who are looking to enroll in Part D drug plan. The provider can offer information

regarding matters such as plan formularies, premium costs, and claims filing procedures in order

to allow the beneficiary to make an informed choice of plan. The provider cannot, however,

make the ultimate recommendation as to which plan the beneficiary should choose.

19. The Guidelines clearly do not prevent providers from disseminating useful factual

information regarding various Part D plans in the provider's area. For example, in October and

November 2005, Walgreens requested that CMS review and comment on information regarding

Part D plans that it proposed to make available to its customers. Walgreens advisory program

would match a patient's current drug product profile against the drug formularies of all PDPs and

MA-PDs in the patient's area. To the best of our knowledge, Walgreens is in fact currently

distributing that information.

### Industry Support for the Guidelines

20. When CMS promulgated the Guidelines, it first distributed them in draft to

stakeholders in the industry to solicit their comments and recommendations. While several

pharmacy providers responded by noting their disagreement with the portions of the Guidelines

at issue in this case, the Guidelines also drew considerable industry support. For example, an

attorney for the law firm McDermott Will & Emery commented that "[a]s noted in the Draft

Guidelines, providers may not be fully aware of all PDP benefits and costs, and their 'education'

efforts may also cause patient confusion. Therefore, CMS should clarify that provider assistance

to patients refers to assisting patients in completing the application **only** after the patient has

made his or her Plan decision." (Emphasis in original.) Similarly, Pacificare Health Systems,

Inc. commented that "Although it is clear that CMS intended fair marketing practices by

pharmacies, it is possible that a Medicare beneficiary may be indirectly induced to enroll by the

[Part D plan] Sponsor reimbursing the pharmacy provider at a higher rate." Finally, even

Omnicare, while quibbling with CMS's view of what activities might constitute "steering" of

beneficiaries into a Part D plan, commented that it agreed that "Medicare beneficiaries should not

be improperly directed or offered inducements to join 'preferred'" Part D plans. (The comments

quoted in this paragraph are attached hereto as Exhibit 1.)

 21. Industry representatives have continued to express their approval of the portions of

the Guidelines at issue in this case. The American Association of Homes and Services

("AAHSA") represents not-for-profit aging services providers, including nursing facility

operators. On August 1, 2006, AAHSA wrote to the Administrator of CMS expressing its

support for the Guidelines. AAHSA stated that "we find these guidelines to be very helpful in

providing our member facilities with useful instructions on how staff can assist their residents in

choosing a Part D plan, while steering clear of inappropriately dictating beneficiaries' choices."

Letter from William L. Minnix, Jr. to Mark B. McClellan, August 1, 2006 (attached hereto as

Exhibit 2). The letter goes on, "We believe these instructions outline the right role for nursing home staff – making clear that inappropriate 'steering' is not permitted for any reason, yet allowing and positively encouraging staff to help assure that beneficiaries and their families have the objective information and resources needed to choose a plan." Id.

_Abby Block_

Abby Block
Director of the Center for Beneficiary Choices
Centers for Medicare and Medicaid Services

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Joel L. Michaels
Attorney at Law
jmichaels@mwe.com
202.756.8375

July 8, 2005

**VIA E-MAIL**

Sonia Eaddy
Mail Stop C1-25-05/Location C1-025-04
Attn: Part D Marketing Guideline Comments
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Re:    Installment II Comments

Dear Ms. Eaddy:

In accordance with Mr. Donnelly's June 28, 2005 memorandum, we are submitting the following comments on the draft of the second installment of the Part D Medicare Prescription Drug Coverage Marketing Guidelines (the "Draft Guidelines"). We hope CMS will consider our comments in preparing the final guidelines.

The Draft Guidelines provide helpful insight into what CMS is considering as permissible and impermissible marketing activities by Part D Plans ("PDPs") as well as third parties, including health care providers and agents and brokers. However, clarification is needed with respect to the application of certain proposed requirements of the Draft Guidelines to PDPs versus third parties. Moreover, we request that CMS re-evaluate its use of the terms "agents" and "brokers." The Draft Guidelines appear to use the two interchangeably, which may make compliance with the final guidelines confusing. Clarification is also required regarding the activities that health care providers may engage in as well as enrollment activities by PDPs at certain provider sites.

Set forth below are specific comments on the Draft Guidelines.

**1.      Use of Comparative Information.**

The Draft Guidelines require clarification with respect to the use of comparative information. Currently, the Draft Guidelines specifically address the use of comparative information by PDPs (pages 6 and 52) and by providers (page 55). However, the Draft Guidelines are not clear on the applicability of these provisions to independents agents and brokers. Unlike comparative information that a PDP might develop, which would clearly be intended to promote that PDP, comparative information prepared by a broker, for example, would arguably not be intended to promote a particular PDP (although it could result in the selection of a particular PDP by the

Sonia Eaddy
July 8, 2005
Page 2

individual receiving the information and a commission may still be paid). Does the PDP
prohibition on comparisons to another PDP apply in the context of an independent broker?

**2.    CMS Review And Approval of Broker Materials.**

Another area in the Draft Guidelines that requires clarification relates to the scope of CMS
review and approval of materials used by brokers. Brokers may use materials that range from
general written descriptions of the services they offer to Medicare beneficiaries to personalized
communications to broker clients regarding specific recommendations by the broker. The Draft
Guidelines are unclear as to what extent these materials must be approved by CMS and the
process for seeking approval if it is required. Similarly, since brokers engage in telephonic or in-
person discussions with clients, it is not clear whether CMS intends that such communications
follow a "script" that must be approved by CMS. To provide additional uncertainty, under the
Draft Guidelines, broker materials arguably appear to constitute non-benefit / service providing
third party marketing materials, which according to the Draft Guidelines are not subject to CMS
review and approval (see page 42).

**3.    Marketing of Multiple Lines of Business.**

Page 40 of the Draft Guidelines addresses the inclusion of marketing materials for multiple lines
of business with PDP materials. The second paragraph under "Direct Mail Exception" provides
that Plans may not include enrollment applications for non-PDP lines of business in any package
marketing its Plan products. The third paragraph indicates that Plans may combine enrollment
and application materials for non-competing lines of business. Clarification is needed on the
extent to which independent agents and brokers may also combine enrollment applications for
non-competing lines of business (e.g., PDP from sponsor A and Medigap from sponsor A or B).

**4.    Third Party Marketing Materials.**

As noted above, materials used by agents and brokers may qualify as non-benefit / service
providing third party marketing materials. As such, these materials are not subject to CMS
review, but must contain the disclaimer "Medicare has neither reviewed, nor endorses this
information." However, such a disclaimer would not appear to be appropriate if, in fact, broker
and agent materials are subject CMS review and approval. In such case, this section of the Draft
Guidelines should clearly identify or describe the third parties that are subject to these
provisions.

**5.    Specific Guidance about Provider Activities.**

The Draft Guidelines acknowledge the important role that providers can have in educating their
patients regarding their coverage options, but also identify potential concerns regarding providers
assisting their patients in evaluating the merits of individual plans given the providers' other
responsibilities. In this regard, it would appear that the definition of "Assisting in Enrollment" in
the context of provider activities may be too broad and go beyond providers educating their

Sonia Eaddy
July 8, 2005
Page 3

patients. "Assisting in Enrollment" is defined in the Draft Guidelines as "assisting a potential enrollee with the completion of an application or discussing characteristics of different Plans to assist a beneficiary with appraising the merits of individual Plans, provided the individual performing these activities does not steer a potential enrollee towards a specific Plan or limited number of Plans."

As noted in the Draft Guidelines, providers may not be fully aware of all PDP benefits and costs, and their "education" efforts may also cause patient confusion. Therefore, CMS should clarify that provider assistance to patients refers to assisting patients in completing the application **only** after the patient has made his or her Plan decision. Moreover, the definition of marketing could be expanded to include "discussing characteristics of different plans to assist a beneficiary with appraising the merits of individual plans."

This same section of the Draft Guidelines addresses marketing activities and materials in the health care setting. The Draft Guidelines (page 54) distinguish between "common areas" and "areas where patients primarily intend to receive health care services." Under the Draft Guidelines, PDPs may conduct sales presentations and distribute and accept enrollment applications in health care settings provided that the activity occurs in common areas and patients are not misled or pressured. The Draft Guidelines generally define "common areas" as separate physical spaces that allow patients to easily opt in and opt out of such marketing presentations. In the pharmacy context, the Draft Guidelines provide that if the pharmacy counter is located within a retail store, then the common areas would include the space "outside" of where patients wait for the medications or interact with pharmacy providers. This provision of the Draft Guidelines may be inadequate because, in the retail pharmacy setting, there is typically no clear demarcation as to what is inside as opposed to outside of where patients wait for their prescriptions. The common areas identified by CMS with respect to other providers, such as hospitals, are areas where the patient can easily opt in or opt out of the presentation. If the intent of this provision is to restrict PDP presentations to an area where patients can freely enter or exit so they do not feel pressure, then further guidance and clarification is required with respect to what constitutes the common area at a retail pharmacy or what could otherwise be described as a separate educational area.

6.    **Specific Guidance Regarding the use of Brokers and Independent Insurance Agents.**

The Draft Guidelines (page 59) require Plans to disclose "to potential enrollees that brokers are paid a commission upon beneficiary enrollment…" However, the Draft Guidelines would not appear to require such a disclosure by either captive or independent agents who also receive commission-based compensation. It is not clear why CMS would impose a disclosure obligation on brokers but not agents particularly when the Draft Guidelines otherwise appear to view the two interchangeably.

Sonia Eaddy
July 8, 2005
Page 4

Your consideration of these comments is appreciated.

Sincerely,

Joel L. Michaels

WDC99 1105731-4.073668.0010

# *PacifiCare®*

July 8, 2005

Ms. Sonia Eaddy
Centers for Medicare & Medicaid Services
Mail Stop C1-25-05/Location C1-25-04
7500 Security Boulevard
Baltimore, MD 21244-1850

Attn: Part D Marketing Guideline Comments

Dear Ms. Eaddy:

Attached please find the Part D Marketing Guideline Comments on behalf of PacifiCare
Health Systems, Inc. We appreciate the opportunity to review these draft guidelines and
provide our comments and recommendations to the Agency.

We have submitted an electronic copy to drugbenefitimpl@cms.hhs.gov per the June 28,
2005 instructions. If you have any questions about our comments or recommendations,
please give me a call at 714/226-3697 or Janice Harter at 714/226-3971.

Sincerely,

Steve Tucker
Vice President
Federal Government Affairs

Attachment: 1

Cc:     David Spivack
        Janice Harter
        Gretchen Smith

# Medicare Part D Commentary

## *Draft Part D – Medicare Prescription Drug Coverage Marketing Guidelines Installment II*

Submitted by
PacifiCare Health Systems, Inc.
and Prescription Solutions

**OVERVIEW:**

The second installment of the draft Medicare Prescription Drug Benefit Program – Marketing Materials Guidelines for MA-PDs and PDPs, provides guidelines specific to the Medicare Prescription Drug Benefit. As the guidelines are intended to meet multiple objectives, among which include, expediting the process for CMS' review of marketing materials; conserve Part D Plan resources by avoiding multiple submissions/review of marketing material prior to final approval; and enabling Part D Plans to develop accurate, consumer friendly marketing materials that will assist beneficiaries in making informed health care choices, we appreciate the opportunity to review this draft document and provide comments for the Agency's consideration.

We have several general comments which are outlined as follows:

*Wet Signatures and Plan Owned Web Enrollments:*
A concern we continue to have relates to the ability of sponsors to utilize streamlined marketing/enrollment processes through telephonic and/or web-based means without a wet signature. Also, the phase II guidelines do not address whether an online enrollment interface would be an acceptable element through plan sponsored web sites. We feel strongly that the capability to conduct these activities is critical to the success of our national marketing and enrollment activities and is in line with CMS' goal to reach as many beneficiaries as possible with a Part D Plan. There are a number of mechanisms and processes that can be employed by the Agency and Sponsors to ensure that alternative marketing/enrollment mechanisms are utilized effectively in a manner that promotes informed choice by beneficiaries, while maintaining the integrity of the enrollment process.

*Marketing October 1 – No Holding Election Forms:*
Sponsors who have received approval to market may begin marketing activities beginning October 1, 2005. We believe the overwhelming response to these activities will be immediate requests for more information, and pre-enrollment kits. We believe that Medicare beneficiaries will want to complete and submit their enrollment forms, upon receipt to avoid late enrollment penalties. Prior guidance from CMS indicates that plans must return election forms received prior to November 15, 2005. We strongly believe that this policy will result in unintended confusion for Medicare beneficiaries and that Sponsors should be permitted to hold election forms received prior to November 15, 2005. To ensure that beneficiaries understand the enrollment process, we propose that sponsors who receive election forms early provide beneficiaries with an acknowledgement letter indicating that their application will be processed on November 15th. With the overarching message of the program to ensure beneficiaries make a Part D election early and avoid the assessment of late enrollment penalties, we believe that the Medicare beneficiaries will become frustrated and confused if plans are required to return election forms received prior to November 15th. We urge the Agency to permit the holding of election forms only during the period between October 1, 2005 and November 14th as a one time exception.

Our specific comments are outlined in the following pages. We look forward to reviewing the final installment of these draft Marketing Materials Guidelines in the coming weeks.

## COMMENTARY:

### Page 3, Advertising – Page 5, Advertising – Page 6 – Required Disclaimers

- *Page 3 - "Advertising materials are primarily intended to attract or appeal to a potential Part D Plan enrollee.  Advertising materials are intended for quick view; thus, they do not contain the same level of detail expected in other marketing materials."*
- *Page 5 – "The guidelines in this section apply to all Part D Plan advertising materials."*
- *Page 7 – "1. For banner ads, banner-like ads and ODA, Plans are not required to include any disclaimers or disclosures (e.g., premium information) on the ads."*

***Comment:***
Within this section and the subsequent section, the draft outlines the guidelines for the inclusion of certain disclaimers. Those disclaimers are:  1) standard federally contracting disclaimer, 2) Low-Income Subsidy disclaimer, 3) Network disclaimer if number of pharmacies in the network is used and 4) eligibility for LIS disclaimer as well as the usual plan disclaimers. It is unclear whether the guidelines are requiring these disclaimers in TV/Radio advertising as well as marketing materials. Due to very limited time and space for such disclaimers in TV/Radio spots, our strong preference is that the disclaimer be limited to the federally contracting disclaimer.

### Page 5, Guidelines for Advertising Materials

- *"The "Must Use/Must Not Use" chart for advertising materials (Forthcoming)."*

***Comment:***
This is a very important document that we very much look forward to receiving.  We request that this document be issued shortly for comment so that it may be included in the final draft of the marketing guidelines.  Also noted within this section are numerous model documents and letters.  We would greatly appreciate receiving these as soon as possible to meet required distribution deadlines.  We greatly appreciate the Agency's efforts in reaching out to plans with draft documents and materials for comment and look forward to receiving the model documents referenced.

### Page 11, Pre-Enrollment Materials, Language Requirements, Network Limitations

- *"Part D Plans must include a statement that indicates that they must use network pharmacies to access their prescription drug benefit. If members utilize pharmacies outside of the network, Plans must also include a statement that indicates that the members may obtain prescriptions from pharmacies outside the network at a reduced benefit."*

***Comment:*** We recommend that such a disclaimer be more specific to indicate out-of-network use of pharmacies is limited to certain circumstances as defined by Medicare.  In addition, out-of-network use of pharmacies may result in reduced benefits or higher cost-sharing for those plans that require the use of network pharmacies.  In support of this disclaimer clarification we note that within the preamble to Title I of the final regulations related to section 423.124, CMS specifies the following examples of out-of-network usage that Part D plans should allow:  (1) member's traveling outside of the service area and runs out of or loses his/her covered Part D drugs or becomes ill and needs a covered Part D drug, and cannot access a network pharmacy; (2) cannot obtain a covered Part D drug in a timely manner within his or her service area because there is no network pharmacy within a reasonable driving distance that provides 24/7 services; (3) must fill a prescription for a covered Part D drug, and that particular drug (for example, an orphan drug or other specialty pharmaceutical) is not regularly stocked at accessible network retail or mail-order pharmacies; and (4) is provided covered Part D drugs

dispensed by an out-of-network institution-based pharmacy while a patient is in an emergency department, provider-based clinic, outpatient surgery, or other outpatient setting.

We suggest a more accurate disclaimer for plans that require the routine use of network pharmacies such as, "Network pharmacies must be used to fill prescriptions except under certain circumstances where a Network pharmacy is not reasonable. Please refer to plan disclosure documents for specific details on the use of non-network pharmacies and additional costs associated with the use of these pharmacies."

## Page 14, Footnote Placement

- *"Part D Plans must adopt a standard procedure for footnote placement. Footnotes should appear either at the end of the document or the bottom of each page and in the same place throughout the document."*

### Comment:

While this guidance is specifically listed under the Pre-Enrollment Materials subheading, we would appreciate clarification as to whether this statement actually applies to all other materials in which footnotes are used.

## Page 15, Online Enrollment Center for MA-PDs and PDPs

- *"PDPs and MA-PDs can choose to facilitate enrollment into their Plan through CMS's Online-Enrollment Center (OEC). Plans that opt to participate in the OEC can promote this enrollment feature in their pre-enrollment materials and direct Part D eligible individuals to www.medicare.gov for further information."*

### Comment:

In order to assist beneficiaries who may have questions about the use of the OEC, is there a way that plans can test an OEC enrollment to ensure that the plans can appropriately respond to prospective member questions and help direct them through the OEC screens for enrollment? If not, is it possible to obtain screen shots of each of the OEC screens for plan customer service education? We would greatly appreciate the ability to view the screens prospective enrollees will see when attempting enrollment through the OEC.

## Page 16, Low-Income Subsidy Premium Disclaimer

- *"In all marketing materials where PDP monthly premium and other member costs are described, the PDP sponsor must include the following language with any such discussion: "If you have qualified for additional assistance for your Medicare Prescription Drug Plan costs, the amount of your premium and cost at the pharmacy will be less. Once you have enrolled in [name of PDP], Medicare will tell us how much assistance you are receiving, and we will send you information on the amount you will pay. If you are not receiving this additional assistance, you should contact...."*

### Comment:

In marketing materials, the above referenced disclaimer poses a very real challenge for sponsors in terms of real estate within marketing pieces. Considering the above disclaimer and the fact that other disclaimers also apply when cost-sharing and premiums are referenced, the end result may be very short marketing pieces, with disclaimers that are longer than the marketing content within the piece. We recommend that the above disclaimer be limited to "pre-kit" materials and the other "marketing" materials, reference to additional assistance disclaimer be shortened e.g., "Some individuals may qualify for additional assistance with premiums and cost-sharing. Please contact [name of plan] for more details." Another valuable approach may be the development of a model document that outlines eligibility and additional assistance information. This would allow Sponsors to produce this piece, for inclusion in the pre-enrollment kits, as appropriate and provide to any prospective enrollee upon request. The model document could be referenced in marketing pieces in lieu of the

long disclaimer (e.g., Some individuals may qualify for additional assistance. Please call {Sponsor} and request the [document name] that includes information on how you may qualify for additional assistance).

**Page 23, Media Type**

- *"With respect to the Summary of Benefits (SB), the Evidence of Coverage (EOC), and the Pharmacy Directory, Part D Plans have the option of contacting members to determine in what format they would like to receive the materials (e.g., hardcopy, CD ROM), Part D Plans that choose this option must contact members in writing (e.g., by letter, postcard, newsletter article, etc.) to determine whether they would like to receive the SB, EOC, and/or the Pharmacy Directory in another format."*

***Comment:***
We would appreciate clarification as to whether the media type outlined within this section might also apply to other materials outside of post-enrollment kits? Beneficiaries may also wish to receive pre-enrollment information in alternative media (e.g., email, CD ROM, hard copy).

**Page 26, Low-Income Subsidy for Part D**

- *"Persons eligible for Medicaid, Supplemental Security Income (SSI), or a Medicare Saving Program qualify for the extra help automatically and do not need to apply."*

***Comments:***
We would appreciate clarification as to whether the above statement means that any individual that has already qualified/applied for Medicaid (full or partial), SSI or an MSP will automatically be deemed eligible for the low-income subsidy and will not need to separately apply.

**Page 27, Low-Income Subsidy for Part D**

- *"PDPs must: Provide information in marketing materials regarding the availability of the low-income subsidy for Part D eligible individuals. The following marketing materials targeted to this population must include eligibility requirements for Medicare Part D subsidies..."*

***Comment:***
While we completely understand the need to provide eligibility and low income subsidy information to beneficiaries and support this, requiring the plans to provide income and eligibility details in multiple pieces is overly burdensome. Instead we would propose that CMS develop a model Low Income Subsidy Information document that plans could include in pre-enrollment materials and have available upon request. In this way, the shorter disclaimers reference on the prior page could be used where premium and cost-sharing is noted in marketing and other materials.

**Page 30, Required Marketing Materials**

- *"Part D Plans may begin marketing on October 1, 2005. At a minimum, the following materials must be reviewed and approved and/or appropriately submitted to CMS under File and Use Certification in accordance with the Marketing Guidelines..."*

***Comment:***

The guidelines specify that the Evidence of Coverage and Member Identification Card be submitted to and approved by CMS prior to 10/1/05. Since the ID Card and EOC will not be distributed until closer to the end of

Case 1:06-cv-01490-RMC    Document 9-3    Filed 02/16/2007    Page 23 of 32

Medicare Part D Commentary: Draft Part D – Medicare Prescription Drug Coverage Marketing Guidelines Final Installment
July 8, 2005

the year following enrollment, we recommend that these two documents be removed from the bullet pointed list or otherwise noted with an extended time frame for submission and approval.

## Page 40, Direct Mail Exception

- *"Plans must not include enrollment applications for non-PDP lines of business in any package marketing its plan products, as beneficiaries might mistakenly enroll in the other option thinking they are enrolling in a Part D benefit."*

### Comment:

Market testing and focus groups have made it clear that Medicare beneficiaries would be very interested in health related supplemental products offered along side of a Prescription Drug Plan. The prohibition of including enrollment forms and information for supplemental health related programs along with PDP enrollment forms and information creates the need for multiple packages of information from a single organization to a single individual. We believe strongly that plans should be permitted to include multiple health related product offering pre-enrollment kits within the same envelope as the Medicare Part D pre-enrollment kits. This streamlines and simplifies communications to beneficiaries who often do not appreciate multiple mailings from a single entity. We acknowledge the importance of ensuring beneficiaries understanding that supplemental product materials are different and separate from Medicare Part D enrollment materials. There are a number of mechanisms plans can employ to ensure that multiple product enrollment kits in a single envelope are not confused with Part D materials. One option would be to include additional products (that are not Part D) in a separate envelope within the same package of Part D materials. Another might include printing a statement on the supplemental product enrollment forms that clearly states "This is not a Medicare Prescription Drug Plan enrollment form." Sponsors should be guided to ensure that all materials that are not PDP materials are clearly indicated as such and allowed the flexibility to market and distribute materials (including enrollment forms) for multiple product lines along with Medicare Part D materials.

## Page 45, Employer/Retiree Groups

- *"CMS has waived the Part D Plan material marketing review requirements for all Employer Group Part D Plans. Therefore, Employer Group Part D Plans do not need CMS approval of marketing materials designed for members of the employer groups."--→*

### Comment:

We greatly appreciate the ability to enjoy the same flexibility with these materials as we have in the past with our Medicare Advantage products. An internal review and information filing process will greatly facilitate our ability to be responsive to our group's needs for plan materials describing the products they offer to their enrollees.

## Page 54, Provider Activities and Materials in the Health Care Setting

- *"Providers are permitted to make available and or distribute PDP marketing brochures (including enrollment applications) and display posters announcing PDP contract relationships. However, providers cannot accept enrollment applications or offer inducements to persuade beneficiaries to join PDPs or to steer beneficiaries to a specific PDP. In addition, providers cannot offer anything of value to induce PDP enrollees to select them as their providers.*

### Comment:

We are concerned that a competitor PDP through a more closely held contractual relationship may cause to have displayed and/or distribute or otherwise promote its PDP's brochures more prominently by a contracted pharmacy that may contract with multiple plan sponsors. Although it is clear that CMS intended fair marketing practices by pharmacies, it is possible that a Medicare beneficiary may be indirectly induced to enroll by the PDP Sponsor reimbursing the pharmacy provider at a higher rate. Will CMS be monitoring for such activities

Case 1:06-cv-01490-RMC    Document 9-3    Filed 02/16/2007    Page 24 of 32

**Medicare Part D Commentary:** Draft Part D – Medicare Prescription Drug Coverage Marketing Guidelines Final Installment
July 8, 2005

or is the obligation of PDP sponsors to bring this information to the Agency's attention as they determine it has occurred?

Also, the ability of pharmacies to provide enrollment applications without the accompanying Statement of Benefits and other mandatory descriptive material seems inconsistent with direction given elsewhere that the enrollment forms are not to be distributed separately from the back-up materials. If providers are obligated to adhere to fair marketing practices, this could mean that each pharmacy location would need a steady supply of enrollment forms and SOBs from every PDP with which it contracts. This seems unmanageable in practical terms. We recommend that providers be allowed to distribute plan marketing materials (brochures, flyers, etc.) that describe the application process, but that do not include the actual plan enrollment applications.

### Page 59, Specific Guidance Regarding the Use of Brokers and Independent Insurance Agents

- "*Uses state licensed brokers and independent agents. A Part D Plan sponsor may only employ or contract with a marketing representative for the purpose of marketing a Part D Plan, if the marketing representative meets state licensure, certification or registration requirements, if a state has such a requirement.*"

#### Comments:

We previously received clarification from CMS indicating the "appointment" process insurance companies typically follow for brokers and sales representatives was determined to be plan regulation and therefore would be considered federally preempted. It is not clear whether the "registration" process noted above conflicts with that guidance. We recommend that this section specifically address "appointments" to clarify that the appointment process is different than registration. This is especially important with the entrance of many new insurance companies participating in Medicare Part D who would normally have to follow state required sales representative "appointment" processes.

Additionally, the above statement addresses brokers and independent agents but does not address representatives directly employed by the Part D sponsor. We would appreciate the Agency providing clarification in the final guidance whether the above noted statement applies to sales representatives directly employed by the Part D plan sponsor.

- "*Discloses to potential enrollees that brokers are paid a commission upon beneficiary enrollment, if that is the compensation arrangement.*

#### Comment:

Since CMS indicates that disclosure is required to potential enrollees, in what documents will CMS require this disclosure? Would the disclosure be limited to the Summary of Benefits documents? We would greatly appreciate this clarification for placement of this information.

### Page 60, Specific Guidance Regarding the Use of Brokers and Independent Insurance Agents

- "*Withhold or withdraw payment if an enrollee disenrolls within an unreasonably short time frame (i.e., rapid disenrollment).*

#### Comment:

We would appreciate clarification as to what time frame would be considered short in this context (e.g., one month, one week, etc).

### Page 60, Unsolicited E-mail Policy

7

**Medicare Part D Commentary:** Draft Part D – Medicare Prescription Drug Coverage Marketing Guidelines Final Installment
July 8, 2005

- *"PDPs are prohibited from renting e-mail lists to distribute information about the Part D benefit. PDPs may not acquire e-mail addresses through any type of directory."*

8

Medicare Part D Commentary: Draft Part D – Medicare Prescription Drug Coverage Marketing Guidelines Final Installment
July 8, 2005

*Comment:*

Current Medicare Advantage Marketing Guidelines permit sponsors to purchase mailing lists for purposes of direct mail marketing efforts. From a plan perspective, the purchasing of email addresses for the same purpose would further outreach efforts to encourage enrollment in Medicare Part D. We recommend that plans be permitted to purchase email addresses for marketing purposes. For those individuals who wish to discontinue receiving emails, Sponsors could maintain "Do Not Email" lists along with "Do Not Call" lists in order to ensure that beneficiaries who no longer wish to receive emails can opt out of receiving them.

### Page 69, Card Design

- *"Usage of the Medicare Prescription Drug Benefit program mark on any item must follow the guidelines. On the card, the mark must be positioned within the bottom third of the card. Included on the card must be the words: "Prescription Drug Plan." It must be in no smaller than 10-point type and should be positioned within the top third of the card. The type must not bleed and it must be legible."*

*Comment:* We have two clarifying questions:

1. With regard to Medicare Advantage Part D Plans, must these sponsors include the "Prescription Drug Plan" statement or is this requirement specific to PDPs?

2. With regard to the Medicare logo placement, we request confirmation that there is no flexibility for alternative placement of the logo on MAPD and/or PDP identification cards.

July 8, 2005

**VIA ELECTRONIC MAIL (drugbenefitimpl@cms.hhs.gov)**
**AND OVERNIGHT COURIER**

Ms. Sonia Eaddy
Department of Health and Human Services
Centers for Medicare & Medicaid Services
Mail Stop C1-25-05 / Location C1-25-04
Attn: Part D Marketing Guideline Comments
7500 Security Boulevard
Baltimore, Maryland 21244-1850

        Re:    Installment II Comments

Dear Ms. Eaddy:

Omnicare, Inc. ("Omnicare") is pleased to submit these comments concerning the June 27, 2005 draft publication by the Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS") entitled "Medicare Prescription Drug Benefit Program – Marketing Materials Guidelines for MA/PDs and PDPs" (the "Guidelines"). Omnicare is the nation's leading institutional pharmacy serving residents in skilled nursing, assisted living, and other health care facilities throughout the United States. With enactment of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Omnicare is actively participating in the new Medicare Part D voluntary prescription drug benefit. We join HHS and CMS in their goal to significantly improve the health care coverage available to Medicare beneficiaries.

**I.    INTRODUCTORY REMARKS**

On January 28, 2005, CMS issued its final rule for the new Medicare prescription drug benefit which will become available to beneficiaries on January 1, 2006, with enrollment beginning on November 15, 2005. The drug benefit will be offered to beneficiaries through private Prescription Drug Plans ("PDPs") and Medicare Advantage Prescription Drug Plans ("MA-PDs") (collectively "Part D Plans"), among others.

On June 1, 2005, CMS published Installment I of its guidelines to assist Part D Plans in their efforts to market the Part D benefit to Medicare beneficiaries. This guidance is Installment II of CMS's guidelines.

We applaud CMS for its efforts to provide marketing guidance to Part D Plans and others. We agree with CMS's goals of developing accurate, consumer friendly marketing materials to assist Medicare beneficiaries in making informed prescription benefit choices and ensuring consistent marketing throughout the program. As discussed below, however, we note several elements of the Guidelines which may be improved upon to better reflect the relationships among institutional pharmacies, "long-term care facilities,"[1] and Medicare beneficiaries.

## II.   GLOBAL COMMENTS

While we recognize that the Guidelines mention (primarily in the "Note" sections) "long-term care facilities," it appears that the Guidelines are primarily directed towards the relationship between Part D Plans/providers[2] and Medicare beneficiaries. For example, the relationship between a Part D Plan and a beneficiary, or a local pharmacist and a beneficiary. The Guidelines, however, do not adequately address the relationships among institutional pharmacies, long-term care facilities, and Medicare beneficiaries. Stated differently, the Guidelines fail to provide marketing advice readily and properly applicable to Medicare beneficiaries residing in institutional settings.

Historically, long-term care facilities have relied upon institutional pharmacies to provide a wide range of information concerning the delivery of high-quality health care services to their residents. Beyond simply filling prescriptions, institutional pharmacies have: (1) assisted in determining the most appropriate drug regimen for beneficiaries; (2) developed health management programs to assist in the early detection of illness; and (3) assisted in treating both diagnosed and undiagnosed diseases. Given the expertise institutional pharmacies have developed over time, long-term care facilities, their staff, and their residents have found the information provided by these pharmacies invaluable. Ensuring the selection, delivery, and utilization of prescription drugs in an efficient, high-quality manner is a complex task in which institutional pharmacies play a continuing, vital role.

---

[1]   In these Comments, we utilize the phrase "long-term care facility" to refer to skilled nursing, assisted living and similar health care facilities providing long-term care to Medicare beneficiaries.

[2]   The Guidelines state that the term "provider" refers to "all providers contracted with the PDP, including but not limited to: physicians, hospitals, pharmacists, pharmacies, long-term care facilities, and social workers." (Guidelines, p.53).

As discussed in detail below, the Guidelines fail to recognize these relationships and the necessary role played by institutional pharmacies. While difficult to do, if the Guidelines were applied to the institutional setting, the Guidelines would effectively stifle communication among institutional pharmacies, long-term care facilities, and beneficiaries – diminishing the quality of health care services delivered to these same beneficiaries. As applied, the Guidelines would remove the best source of information – the institutional pharmacy – from the equation, leaving long-term care facilities and beneficiaries alone to muddle their way through the many options available under the Part D benefit. Anecdotal information supports the conclusion that long-term care facilities are eager for institutional pharmacies to provide insights into the new prescription drug program. In no way do we support marketing efforts which are improper, but simply suggest that institutional pharmacies should be allowed and indeed encouraged to provide a wide range of information relevant to the new drug benefit as they have historically done. This is consistent with comments made by CMS Administrator Dr. Mark McClellan at the April 2005 annual meeting of the American Pharmaceutical Association – "CMS is committed to making sure that pharmacists have the information they need to help seniors make the best decisions possible about their drug coverage under the new Part D benefit."

III.   **COMMENTS ON "SPECIFIC GUIDANCE ABOUT PROVIDER ACTIVITIES"
(Guidelines pp. 52-58)**

A.   The Guidelines

In describing provider activities, the Guidelines provide the following definitions:

Marketing: Activities that steer an undecided potential enrollee towards a Plan, or limited number of Plans, and for which the individual performing marketing activities expects compensation or other consideration based upon the enrollment.

Assisting in Enrollment: Assisting a potential enrollee with the completion of an application or discussing characteristics of different Plans to assist a beneficiary with appraising the merits of individual Plans, provided the individual performing these activities does not steer a potential enrollee towards a specific Plan or limited number of Plans.

Education: Activities that inform a potential enrollee about Plans and Plan characteristics, generally or specifically, but do not steer a potential enrollee towards a specific Plan or a limited number of Plans by presenting only selective information.

(Guidelines, pp. 52-53). With these definitions in mind, the Guidelines state that all marketing efforts describing a PDP must adhere to all of CMS's marketing guidelines. Further, providers

may "only provide assistance in enrollment and education in their capacity as a member of the PDP's network and only in coordination with the PDP." (Guidelines, p.53).

As noted in the Guidelines, CMS apparently is concerned with provider activities for the following reasons: (1) providers are usually not fully aware of all Part D Plan benefits and costs; and (2) providers may confuse beneficiaries if the provider is viewed as acting as an agent of the Part D Plan rather than acting as the beneficiary's provider. As such, the Guidelines limit the information that providers may deliver to Medicare beneficiaries.

Specifically, providers may supply information regarding Part D options to those patients seeking such information from their own provider. Providers may make available and/or distribute PDP marketing brochures and posters announcing PDP contractual relationships, but may only distribute and not accept enrollment applications. Further, providers may not offer inducements to persuade beneficiaries to join PDPs or steer beneficiaries to a specific PDP. While providers may distribute printed information to their patients comparing the benefits of different PDPs with which they contract, such materials are subject to CMS review and prior approval. Lastly, PDPs may supply providers with printed information comparing the benefits of different PDPs only if the provider displays materials from all PDPs in the service area.

### B.    Comments

As a general matter, it appears that the guidance in this section is not directly applicable to the institutional setting. For example, the Guidelines do not appear to address the typical instance where an institutional pharmacy provides information to a long-term care facility, rather than the beneficiary directly. Further, the Guidelines do not appear to address communications developed by institutional pharmacies or other providers on their own and without involvement of PDPs. As discussed above, institutional pharmacies have traditionally prepared internally a wide-range of beneficial information to be shared with long-term care facilities and their residents.

Given the above, we offer the following specific suggests. First, additional guidance should be developed specifically for the institutional setting recognizing the vital role of institutional pharmacies. Institutional pharmacies should be afforded the flexibility to provide long-term care facilities, without CMS prior approval, both listings of all PDPs in the service area and comparisons of the benefits offered by the PDPs. Institutional pharmacies have unique

- 4 -

expertise in evaluating formularies and drug regimens, and should be afforded the opportunity to continue to provide its analyses to long-term care facilities and their residents. In this context, CMS's two concerns are inapplicable – institutional pharmacies likely will be fully aware of all Part D Plan benefits and costs, and it is unlikely that that comparative and descriptive information prepared by institutional pharmacies would confuse Medicare beneficiaries.

Second, the Guidelines discuss the concept of "steering," but do not provide a definition of the term. While we agree that Medicare beneficiaries should not be improperly directed or offered inducements to join "preferred" PDPs, we do not believe the activities discussed above can be properly categorized as steering. We fully expect that long-term care facilities will rely upon institutional pharmacies to provide assessments of Part D Plans so that the facilities can educate and assist their residents in selecting the option which best suits their needs. Any definition of steering must not be so broad as to prohibit a process which offers clear benefits to residents and has been utilized to great success in the past.

## IV.    CONCLUSION

We appreciate the opportunity to submit these comments to CMS. We hope the information provided is helpful as you finalize the Guidelines. Should you require any additional information, please do not hesitate to contact us.

Sincerely,

Timothy E. Bien
Senior Vice President
Professional Services & Purchasing

- 5 -

 *CBC* 606 361

**aahsa**
creating the future of aging services

August 1, 2006

Mark B. McClellan, MD, PhD
Administrator
Center for Medicare & Medicaid Services
Room 309-G, Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

2006 DEC -6 PM 4:12

Dear Dr. McClellan:

On behalf of the American Association of Homes and Services for the Aging (AAHSA), I would like to express our support for the 2007 Part D Marketing Guidelines as revised on May 22, 2006. We find these guidelines to be very helpful in providing our member facilities with useful instructions on how staff can assist their residents in choosing a Part D plan, while steering clear of inappropriately dictating beneficiaries' choices.

We believe that the guidelines outline appropriate procedures enabling and encouraging providers to assist beneficiaries with objective information regarding all available plan options that best meet each beneficiary's needs. The clear instructions (page 123-124 of the guidelines) on what providers can and cannot do when assisting and educating a resident on available Part D plans are especially helpful. We believe these instructions outline the right role for nursing home staff—making clear that inappropriate "steering" is not permitted for any reason, yet allowing and positively encouraging staff to help assure that beneficiaries and their families have the objective information and resources needed to choose a plan. These guidelines protect beneficiaries and also protect nursing home staff by clearly setting forth appropriate boundaries of responsibility. With the revised marketing guidelines in place, AAHSA will continue to encourage our member facilities to follow the guidelines' conditions while providing quality assistance to their residents.

We appreciate the opportunity to work with CMS on this and other important issues related to Medicare Part D.

Sincerely

William L. Minnix, Jr.
President and CEO

cc: Dr. Jeffrey Kellman

American Association of Homes and Services for the Aging
www.aahsa.org | 202 783 2242