# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **WASHINGTON LEGAL FOUNDATION,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CA No. 1:06cv01490 (RMC) |
| | ) | Judge Collyer |
| | ) | |
| **MICHAEL O. LEAVITT,** in his official | ) | |
| capacity as Secretary, U.S. Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| **LESLIE V. NORWALK**, in her official | ) | |
| capacity as Acting Administrator, Centers | ) | |
| for Medicare and Medicaid Services, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

Daniel J. Popeo
Richard A. Samp
  (D.C. Bar No. 367194)

WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave, NW
Washington, DC  20036
(202) 588-0302

Dated:  February 28, 2007

Counsel for Plaintiff

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      CMS's Content-based Restrictions on Noncommercial Speech Are Subject to
        Strict Constitutional Scrutiny, a Scrutiny CMS Cannot Withstand . . . . . . . . . . . . . . . . . 2

II..    The CMS Speech Restrictions Cannot Survive Intermediate First Amendment
        Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    WLF's Members Are Suffering Injury-in-Fact and Will Be Irreparably Harmed if
        a Preliminary Injunction Is Denied  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     WLF Has Standing to Pursue This Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*American Legal Found. v. FCC,*
  808 F.2d 84 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16
*Ashcroft v. ACLU,*
  542 U.S. 656 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Basel Action Network v. Sierra Club,*
  370 F. Supp. 2d 57 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Bd. of Trustees of State University of N.Y. v. Fox,*
  492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Buckley v. Valeo,*
  424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (DC. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Competitive Enter. Inst. v. NHTSA,*
  901 F.2d 107 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Fund Democracy, LLC v. SEC,*
  278 F.2d 21 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Getman v. Drug Enforcement Administration,*
  290 F.3d 430 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
*Hunt v. Washington Apple Advertising Comm'n,*
  432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
*NAACP v. Alabama,*
  357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,*
  123 F.3d 111 (3d Cir. 1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Rust v. Sullivan,*
  500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
*Telecommunications Research & Action Center v. Allnet Commun. Servs., Inc.,*
  806 F.2d 1093 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Washington Legal Found. v. Friedman,*
  13 F. Supp. 2d 51 (D.D.C. 1998),
  *appeal dism'd,* 202 F.3d 331 (D.C. Cir. 2000)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Washington Legal Found. v. Henney,*
  202 F.3d 331 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

**Page(s)**

**Statutes and Constitutional Provisions:**

U.S. Const., amend. i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1320a-7b(b) (the "anti-kickback statute") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Miscellaneous:**

CMS, *Nursing Homes and Medicare Part D* (the "S&C Memo") (May 11, 2006) . . . . . . . . 4, 11

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
ITS MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Defendants' opposition brief speaks volumes about their lack of confidence that their speech-suppression policies can withstand First Amendment analysis.  The Washington Legal Foundation (WLF) has provided a detailed critique of those policies, yet Defendants have seen fit to respond with a merits defense that covers only six pages at the tail-end of their brief.  CMS Br. 30-36.  Instead, Defendants devote nearly their entire brief to arguing that three individuals who view themselves as members of WLF and who are viewed by WLF as members nonetheless should not be deemed "members" of WLF for purposes of determining WLF's standing to file suit on their behalf against Defendants (hereinafter "CMS").

CMS is correct, of course, that a preliminary injunction should not be issued if WLF cannot demonstrate that it is likely to succeed on its standing claims.  But as WLF demonstrates hereinafter, case law uniformly supports WLF's claim that it has standing to represent the interests of its members:  Rebecca Fox, Edward Samp, and Mary Samp.  More importantly, even if CMS ultimately prevails on its standing claim, all it will have accomplished will be the substitution of WLF's members for WLF as the plaintiffs.[1]  Under those circumstances, one would have expected CMS to have made more than a half-hearted effort to explain why it believes that its speech-suppression policies do not violate the First Amendment – an issue on which CMS bears the burden of proof.  But not only does CMS fail to respond to any of the

---

[1] As WLF made clear at the initial status conference on January 4, 2007, we seek early adjudication of CMS's standing claims so that, if necessary, the case can proceed in the names of WLF's members.  CMS's claims that those individuals lack standing in their own right are wholly insubstantial.

declarations submitted by WLF demonstrating the devastating impact of CMS's policies on

truthful speech, but CMS makes *no* effort whatsoever to defend the merits its particularly

onerous restrictions on speech by nursing homes –  instead relying *solely* on procedural defenses.

Under those circumstances, the evidence before the Court demonstrates that WLF is

likely to succeed on the merits of its First Amendment claims and that WLF's members will be

irreparably harmed unless an injunction is issued.

## ARGUMENT

**I.    CMS's Content-Based Restrictions on Noncommercial Speech Are Subject to Strict Constitutional Scrutiny, a Scrutiny CMS Cannot Withstand**

WLF's opening brief demonstrated at length that CMS's speech restrictions are subject to

strict scrutiny because they are content-based and are targeted at noncommercial speech.  WLF

Br. 23-33.[2]  CMS's entire response consists of a single paragraph.  CMS Br. 32-33.  CMS

asserts, "There is nothing ignoble about providers having commercial interests when they sell

drugs or services to patients, but they undoubtedly do have such interests."  *Id.*

CMS's response is without merit.  The products whose sales are at issue in this case are

Part D prescription drug benefit plans.  Those whose *speech* is at issue – health care providers

and professionals such as physicians, hospitals, nursing homes, pharmacies, and pharmacists –

are not in the business of offering Part D plans for sale.[3]  Because the speech being regulated by

---

[2]  WLF argued alternatively that even if the speech at issue were deemed commercial, the restrictions would still be subject to strict constitutional scrutiny because they seek to prohibit the dissemination of truthful information that is of public concern.  WLF Br. 27-30. CMS failed to respond to that alternative argument.

[3]  To the extent that there may be a very few health care professionals who are also employed as sales representatives of Part D plans, this lawsuit has not raised any First Amendment objections to speech restrictions imposed on such individuals.

CMS is not speech that proposes a commercial transaction between the speaker and the target of that speech, it is not properly categorized as commercial speech. The fact that the speaker has a commercial relationship with the listener does not by itself make the speech anything other than fully protected noncommercial speech, so long as the speech in question does not propose a commercial transaction between the parties to the conversation. For example, a theater review published by the *Washington Post* is not deemed commercial speech when the reviewer recommends that readers buy tickets to the play being reviewed, even though most readers are regular newspaper subscribers and have paid money to the *Post* to obtain a copy of the review. As the Supreme Court has emphasized, "Some of our most valued forms of fully protected speech are uttered for a profit. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) [contents of a paid advertisement in a newspaper are fully protected by the First Amendment]; *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)." *Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 482 (1989).

CMS argues that some providers and health care professionals may stand to profit substantially if a patient chooses a particular Part D plan and thus may make biased recommendations in hopes of financial gain. CMS Br. 33-35. If there are such providers and health care professionals, WLF is unaware of them. Certainly, the record before this Court does not support CMS's claim. As consulting Pharmacist Ross Brickley explained in his declaration:

> There is no realistic financial incentive for a consulting pharmacist such as myself to encourage a patient or his/her financially responsible party to enroll in a particular Part D prescription drug plan. There are negligible differences in the ingredient charges and dispensing fees (the compensation my employer, the pharmacy, receives from a Part D plan for dispensing a particular prescription drug) payable by the different Part D plans with which my pharmacy has contracted. My pharmacy contracted with all Part D plans

in each area where it provides services.  The only real financial interest which the pharmacy has in selection of Part D plans is finding the plan that will cover the patient's medications, rather than imposing that cost on the patient.

Brickley Decl. ¶¶ 12-13 (WLF Br., Exh. D).

Moreover, CMS's speech restrictions are not limited to prohibitions against providers steering patients to a specific plan for their own financial gain.  Rather, CMS's Marketing Guidelines state categorically that "[p]roviders also cannot direct, urge or attempt to persuade beneficiaries to enroll in a specific plan."  Marketing Guidelines 123-24.  Furthermore, CMS has stated:

> Under no circumstances should a nursing home require, request, coach or steer any resident to select or change a plan for any reason.  Furthermore, a nursing home should not knowingly and/or willingly allow the pharmacy servicing the nursing home to require, request, coach, or steer any resident to select or change a plan….

WLF Br., Exh. A (the "S&C Memo") at 3.  There is no plausible basis for suggesting that *all* such speech, particularly when not motivated by a desire for financial gain, is properly categorized as commercial speech.

Such content-based censorship of noncommercial speech cannot stand unless the government carries its burden of demonstrating that the speech restrictions are narrowly tailored to serve a "compelling" government interest.  *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2005).  Yet, CMS's brief makes no effort to demonstrate that the CMS speech restrictions serve any sort of compelling government interest.  In the absence of any such demonstration, WLF is highly likely to prevail on its First Amendment claims.

CMS also attempts to justify its speech restrictions under the rationale set forth in *Rust v. Sullivan,* 500 U.S. 173 (1991).  CMS Br. 31.  *Rust* is wholly inapposite.  That decision upheld federal government abortion-related speech restrictions imposed on family-planning service

providers as a condition for their receipt of federal subsidies. The Court explained that the federal government's goal in providing funding was to encourage family planning methods *other than* abortion, and thus the provision restricting fund recipients from advocating abortion as a family planning method directly served the government's goal. 500 U.S. at 193-94. But the Court upheld the speech restrictions at issue on the explicit understanding that they were limited to speech paid for by government funding and did not restrict speech paid for by the family-planning service providers themselves using non-federal funds as part of separate programs:

> [T]he government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The [HHS] Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require the grantee to keep such activities separate and distinct from Title X activities.

*Id.* at 196.

CMS's speech restrictions are not at all analogous to the restrictions upheld in *Rust*. They are not tied to any specific government appropriation; they apply without regard to whether the provider or health care professional is receiving *any* specific appropriation from the federal government. Moreover, CMS has provided no mechanism by which providers and health care professionals can avoid the speech restrictions by establishing a program that is separate and independent from programs that receive federal funds; such a mechanism is a prerequisite to any *Rust* defense. In sum, *Rust* provides no support for CMS's efforts to restrict truthful, noncommercial speech by providers and health care professionals.

II.    **The CMS Speech Restrictions Cannot Survive Intermediate First Amendment Scrutiny**

WLF's opening brief demonstrated that even if CMS's speech restrictions were judged under the intermediate scrutiny applicable to commercial speech, they still could not withstand First Amendment scrutiny.  WLF Br. 33-44.  CMS's response fails to articulate any substantial interests directly advanced by its restrictions, and includes no coherent explanation regarding why the restrictions should be deemed no broader than necessary to advance any such interests. CMS Br. 33-36.

CMS asserts, "The government has a patently substantial interest in protecting Medicare beneficiaries from providers who, for financial gain, may steer a patient into a plan that is not in the best interest of the patient."  CMS Br. 33.  WLF does not dispute that contention; and if the CMS speech restrictions were limited to such situations, it is unlikely that we would be in court at all.  But the CMS speech restrictions are far broader; they are not limited to providers who are acting "for financial gain" and *against* the best interests of their patients.  Rather, CMS states categorically that "[p]roviders also cannot direct, urge or attempt to persuade beneficiaries to enroll in a specific plan."  Marketing Guidelines 123-24.  That broad-brush speech prohibition does not directly advance CMS's articulated interest and certainly is far broader than necessary to serve that interest.  Moreover, as numerous declaration submitted in support of the motion attest, the speech prohibitions are making it very difficult for patients and their relatives to receive the information they most desire:  which Part D plan best serves their medical needs.  *See* England Decl. ¶ 7; White Decl. ¶¶ 7-8; Brickley Decl. ¶ 10; Fox Decl. ¶ 13; Samp Decl. ¶ 8.

CMS also asserts that some providers *may* be biased in their recommendation because they *may* stand to gain financially if one Part D plan is chosen over another.  CMS Br. 34.

6

CMS's Abby Block states that "a provider might receive more payment from one plan than another to furnish the same item or service to a Medicare beneficiary." Block Decl. ¶ 11. In other words, CMS's policy is based on speculation regarding what "might" happen. The evidence before the Court contradicts that speculation. As consulting pharmacist Ross Brickley explained in his declaration:

> There is no realistic financial incentive for a consulting pharmacist such as myself to encourage a patient or his/her financially responsible party to enroll in a particular Part D prescription drug plan. There are negligible differences in the ingredient charges and dispensing fees (the compensation my employer, the pharmacy, receives from a Part D plan for dispensing a particular prescription drug) payable by the different Part D plans with which my pharmacy has contracted. My pharmacy contracted with all Part D plans in each area where it provides services. The only real financial interest which the pharmacy has in selection of Part D plans is finding the plan that will cover the patient's medications, rather than imposing that cost on the patient.

Brickley Decl. ¶¶ 12-13 (WLF Br., Exh. D). CMS's speculation is insufficient to carry its burden of proving that its speech restrictions are justified, even under the somewhat relaxed standards applicable to commercial speech restrictions.

CMS also speculates that a provider's recommendation of a specific Part D plan might be motivated by its conclusion that the plan is "easier to deal with in terms of convenient filing of claims and other administrative matters." Block Decl. ¶ 11; CMS Br. 34. We fail to understand how such a motivation might create a conflict of interest between providers and patients; one would assume that providers and patients would be equally pleased to do business with a Part D plan that is "easier to deal with."

CMS asserts that the potential for a conflict of interest is "particularly relevant in the nursing home context, where residents are less likely to be able to make independent decisions about their own medical care, and are more susceptible to influence by their providers." CMS

Br. 34.  CMS speculates that pharmacists affiliated with nursing home might steer patients toward use of particular drugs whose manufacturers offer rebates to the pharmacists.  *Id.* 34-35. This speculation is irrelevant.  First, it is doctors who prescribe specific drugs to their patients, not pharmacists.  Moreover, even if it were true that pharmacists could influence which drugs are prescribed in nursing homes, the choice of which drugs to prescribe has nothing to do with the issue in this case – which is whether the First Amendment permits CMS to prohibit all providers from recommending *Part D plans* to their patients.

CMS takes issue with WLF's assertion that the speech restrictions apply to "truthful" recommendations that a particular Part D plan best serves a patient's needs; CMS argues that such recommendations are inherently subjective and thus cannot objectively be labeled either "true" or "false."  CMS Br. 35.  WLF views that argument as a damaging admission by CMS that its speech restrictions are not designed to prevent false or misleading speech – which is, after all, the primary (and perhaps the exclusive) rationale supporting government regulation of commercial speech.  As the Supreme Court has explained:

> When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review.  However, when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands.

*44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501 (1996).

Finally, CMS asserts that its speech restrictions "are not more restrictive than necessary to serve the government's significant interests."  CMS Br. 35.  But to support that assertion, CMS points solely to the fact that its censorship might have been broader still; *e.g.,* it might have

8

(but did not) bar providers from supplying patients with "objective information" about available plans. *Id.* at 35-36. The fact that one could dream up more draconian regulatory regimes does not make an existing regime narrowly tailored. Rather, to meet its burden of proof in this regard, CMS is required to demonstrate that less restrictive regulatory regimes would not adequately serve CMS's interests. CMS has not attempted any such demonstration. For example, WLF's brief pointed out that federal criminal law prohibits giving or receiving payments to steer patients toward a particular Part D plan. WLF Br. 43 (citing 42 U.S.C. § 1320a-7b(b)). CMS has failed to explain why that anti-kickback statute is not adequate to serve the government's interest in preventing providers from steering patients to a particular Part D plan for financial gain.

### III. WLF's Members Are Suffering Injury-in-Fact and Will Be Irreparably Harmed if a Preliminary Injunction Is Denied

CMS contends that the three members whose interests WLF is representing – Rebecca Fox, Edward Samp, and Mary Samp – have not suffered and/or are not suffering injury-in-fact and thus would lack standing to sue CMS in their own right. CMS Br. 15-18. CMS's contention is incorrect and is based on a fundamental misunderstanding of the nature of the injury the three WLF members have suffered and continue to suffer.

CMS says that Ms. Fox has adequately alleged financial injury at the hands of CMS during 2006 but that any future financial injury (for purposes of providing standing to seek injunctive relief) is too conjectural. CMS Br. 17, 38. Similarly, CMS argues that Edward and Mary Samp's injury is "only a possible hypothetical future injury that is not at all imminent or concrete at this time" and "merely conjectural and hypothetical." *Id*. at 17, 18.

CMS is correct that Ms. Fox and the Samps do not know for sure that they will suffer

financial injury at the hands of CMS in the future. But financial injury has never been the basis of their injury-in-fact claims. Rather, they claim that CMS's speech suppression policies are injuring their First Amendment speech rights. It is well settled that the First Amendment protects not only the right to speak but also the right to receive information. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756-57 (1976); *Washington Legal Found v. Henney*, 202 F.3d 331, 333-34 (D.C. Cir. 2000). Ms. Fox and the Samps have more than adequately alleged that they have been injured and will continue to suffer injury as a result of CMS's speech suppression policies: they allege that various of their health care providers are unwilling to provide them information about Part D plans as a result of CMS's policies. Fox Decl. ¶ 13; Samp Decl. ¶ 8. Moreover, although not necessary to establish their injury-in-fact, they have demonstrated why they have a particular need for the information being denied them as a result of CMS's policies. Fox Decl. ¶¶ 7-18; Samp Decl. ¶¶ 5-12.

CMS's assertion that Ms. Fox and the Samps would not suffer irreparable injury if a preliminary injunction were denied, CMS Br. 36-40, is similarly misguided. The issue is not whether they will suffer immediate and irreparable *financial* harm if an injunction is denied; rather, the issue is whether they will continue to suffer irreparable harm to their First Amendment rights. CMS may be correct that Ms. Fox and the Samps may not be in a position to switch Part D plans until late 2007, even if they were to discover in the near future that a switch would be financially advantageous. CMS Br. 39-40. But the harm to their speech rights is ongoing and irreparable. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (denial of First Amendment speech rights constitutes irreparable injury where First Amendment interests are either threatened or in fact being impaired at the time relief is

10

sought). They are interested in receiving advice as soon as possible from their providers and health care professionals regarding which Part D plan is best for them. CMS's speech suppression policies are continuing to prevent them from receiving that information.

CMS argues alternatively that WLF's members lack standing to challenge the CMS speech suppression policy that is directed solely at nursing homes -- the S&C Memo (WLF Br., Exh. A). CMS Br. 16. CMS is mistaken. Edward and Mary Samp have clearly alleged: (1) they live in an independent living facility in Cambridge, Massachusetts that has attached to it a rehabilitation center; (2) the Samps' medical personnel at the rehabilitation center have told them that, in light of CMS restrictions, they are not in a position to advise them regarding the Part D plan in which they should enroll. Samp Decl. ¶ 8. Such rehabilitation centers are subject to the speech constraints imposed by the S&C Memo. Given the advanced age of Edward and Mary Samp (ages 88 and 86, respectively) it is hardly speculative to assume that they will again in the near future be receiving medical care in the rehabilitation center.

## IV.    WLF Has Standing to Pursue This Claim

Having essentially abdicated a merits-based First Amendment defense, CMS rests virtually its entire opposition to the preliminary injunction motion on its claim that WLF lacks standing to represent the interests of its members Rebecca Fox, Mary Samp, and Edward Samp. Although there is no dispute that they view themselves as members of WLF and are viewed as members by WLF, CMS argues that that is not good enough for standing purposes – because, CMS asserts, WLF's membership structure is insufficiently formal. WLF notes, however, that CMS has not cited any cases in which an organization was denied standing to represent the interests of its members under even remotely similar circumstances.

WLF has openly acknowledged throughout this litigation – at the initial status conference, in its responses to discovery requests, and in its court filings – that it lacks a formal membership structure.  Except in limited circumstances not relevant here, WLF's members do not elect its board of directors, and there are no official meetings of the membership.  WLF's members receive regularly mailings from WLF and are encouraged to participate in its activities and to contribute their time and money to the organization (*see* WLF Response to Defendants' First Set of Interrogatories), but they are under no obligation to do so.  But although the case law in the area is not uniform, the weight of authority supports WLF's standing to represent the interests of its members under the circumstances of this case.

An organization may file suit on behalf of its members if:  (1) the organization's members would have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation of its members.  *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

CMS does not contend that WLF fails to meet the third requirement; the suit does not seek monetary relief, the form of relief generally deemed to require individual participation of members.  CMS's claims that WLF fails to meet the second requirement (germaneness) are insubstantial, as noted below.  Thus, the crux of CMS's challenge to WLF's standing is that WLF fails to meet the first requirement – that members of WLF would not have standing to sue on their own.  As demonstrated above, Rebecca Fox, Mary Samp, and Edward Samp would indeed have standing to sue on their own; so if CMS is to prevail on its challenge to WLF's standing, it will have to be on the basis that those three individuals do not qualify as members for purposes

of determining associational standing.

CMS is correct that Ms. Fox and the Samps do not meet the definition of the word "member" as set forth, for corporate purposes, in WLF's Articles of Incorporation.  But courts have rarely looked to such corporate formalities in determining whether an organization has "members" for purposes of determining the organization's standing to represent the interests of such individuals.  Rather, they have looked to the actual relationship between the organization and the individuals involved in making that determination.

For example, the Third Circuit recently rejected standing challenges to two large environmental groups that regularly litigate on behalf of their members:  Public Interest Research Group of New Jersey, Inc. ("PIRG") and Friends of the Earth ("FOE").  The defendant challenged their standing by pointing out that their corporate charters absolutely forbid them from having members.[4]  The Third Circuit rejected the challenge as "formalistic" and "lacking merit."  *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 119 (3d Cir. 1997).  Rather, in demonstrating that individuals it seeks to represent are members for standing purposes, an organization "need only prove that their members possess the 'indicia of membership' in their organization."  *Id.* (quoting *Hunt,* 432 U.S. at 344).  Of course, the two most significant "indicia of membership" are whether the individuals view themselves as members of the organization and whether they are viewed by the organization as members. Because all concerned view Ms. Fox and the Samps as members of WLF, it would be incongruous for the court to decide otherwise for purposes of determining standing.

---

[4]  A large percentage of non-profit organizations have such provisions in their articles of incorporation, to make clear that the board of directors is self-perpetuating.

13

In support of its challenge to WLF's standing, CMS cites several D.C. Circuit decisions in which the appeals court rejected an organization's assertion that it had standing based on its claim to represent the interests of third parties.  But none of the cases is even remotely similar to this case; in particular, in none of the cases did the organization actually claim that it was representing members.  For example, in *Fund Democracy, LLC v. SEC,* 278 F.3d 21 (D.C. Cir. 2002), the plaintiff organization sought to challenge an SEC order granting an investment company an exemption from certain provisions of the securities laws.  The plaintiff did not claim to be representing the interests of any members who might have been injured by the SEC order; rather, it claimed to "represent" an "informal consortium" of various groups with an interest in the SEC order.  *Id.* at 25.  The D.C. Circuit acknowledged that the plaintiff's lack of members was not automatically disqualifying; it nonetheless held that the plaintiff could not assert associational standing given that:  (1) it lacked even the "functional equivalent" of a membership structure; (2) it could not identify "even a single individual investor" willing to vouch that it represented the investor's views; and (3) it could not identify anyone associated with any of its "informal consortium" of groups who could claim to have been affected by the SEC order.  *Id.* at 25-27.

Similarly, in *Getman v. Drug Enforcement Administration*, 290 F.3d 430 (D.C. Cir. 2002), the plaintiff organization did not claim to be representing the interests of any members and did not claim to have members.  Rather, it based its assertion of associational standing on a claim that it represented the interests of its "readers and subscribers."  *Id.* at 435.[5]  It claimed that

---

[5]  The organization at issue in *Getman* was *High Times* magazine, a publication dedicated to promoting legalization of marijuana.  Its suit sought review of a DEA decision denying the magazine's petition to reschedule marijuana under federal drug laws to permit its

14

"many of its readers and subscribers are dependent on marijuana to treat medical illnesses," but it did not name any such individuals. *Id.* The D.C. Circuit rejected the organization's associational standing claims. While acknowledging that an organization without members could still assert associational standing in appropriate circumstances, the court held that "readership is not the same as membership." *Id.*

Finally, CMS cites *American Legal Found. v. FCC*, 808 F.2d 84 (D.C. Cir. 1987), in which the plaintiff (which did not claim to have any members) sought associational standing on behalf of "all members of the public who regularly watch ABC News (and other network broadcast news)." *Id.* at 88.[6] In holding that the plaintiff (the American Legal Foundation, or "ALF") lacked standing, the D.C. Circuit observed:

> With its broadly defined mission as a "media watchdog," ALF serves no discrete, stable group of persons with a definable set of common interests. To the contrary, ALF's constituency is completely open-ended; ALF could, consistent with this "institutional commitment," purport to serve all who read newspapers, watch television, or listen to the radio.

*Id.* at 90. The Court also noted that it could "discern no linkage between ALF's interest in the outcome of this kind of litigation and those of its supporters." *Id.* In sum, none of the D.C. Circuit decisions cited by CMS bear even the remotest of similarity to the facts of this case, in which an organization seeks to represent the interests of acknowledged members.[7]

---

use for medicinal purposes.

[6] The plaintiff organization sought judicial review of an FCC decision denying its petition asking the FCC to investigate ABC News for alleged violations of the "fairness doctrine" in connection with its coverage of CIA activities.

[7] CMS also cites a district court decision, *Basel Action Network v. Sierra Club*, 370 F. Supp. 2d 57 (D.D.C. 2005), with even less similarity to the facts of this case. The organization seeking associational standing in *Basel* claimed an extremely extenuated relationship with others who might have had standing in their own right; the organization did not claim to have

As noted in *ALF*, one concern frequently raised by courts reviewing associational standing claims is that there be a linkage between the organization's interest in the outcome of the litigation and that of its members/supporters.  When there is little linkage – as in *ALF*, where the organization could not possibly represent the "interests" of everyone who watches ABC News, given that such viewers undoubtedly hold a wide assortment of views – courts are understandably reluctant to find associational standing.  But here, there is a very close linkage: WLF, Ms. Fox, and the Samps share a very similar interest in an expansive interpretation of First Amendment rights in connection with Medicare programs.  Indeed, WLF is not asserting any First Amendment rights except those possessed by Ms. Fox and the Samps.  As the D.C. Circuit has explained, associational standing is entirely appropriate where the organization asserting standing "'is but the medium through which individual members seek to make more effective the expression of their own views.'"  *Telecommunications Research & Action Center v. Allnet Communications Servs., Inc.*, 806 F.2d 1093, 1096 (D.C. Cir. 1986) (quoting *NAACP v. Alabama*, 357 U.S. 449 (1958)).  Nor (as in *ALF*) is there any concern here that WLF's membership is "completely open-ended"; it is limited to those who have explicitly agreed to become members.  Obviously, that self-selecting group will be limited to those who support WLF's commitment to expansive First Amendment rights.

We also note that CMS has accused us of making "false" assertions regarding past court

---

any members but claimed that it was a "project" of a group (also lacking members) which itself was a "project" of a nonprofit organization (also lacking members) which could not point to any associated individuals who themselves might have had standing.  *Id.* at 68-70.  Given that convoluted state of facts, it is hardly surprising that the Court denied associational standing to the organization.  *Id.*  Nonetheless, the Court allowed the case to go forward on the basis of the associational standing claims of a separate organization.  *Id.* at 68 n.7.

decisions that have upheld WLF's associational standing on behalf of its members. CMS Br. 14. To the contrary, it is CMS's accusations that are inaccurate. In response to our citation of *Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000), CMS asserts that "the case was dismissed for lack of a constitutional case or controversy." CMS Br. 14. That is incorrect. WLF was awarded a permanent injunction against FDA by the district court in that case to restrain FDA violations of the First Amendment. *Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51 (D.D.C. 1998). The D.C. Circuit did not dismiss the case. Rather, it dismissed *FDA's appeal* – meaning that WLF's district court victory stands; except for a portion of the injunction that was vacated as moot, the injunction against FDA remains in place. Moreover, FDA explicitly challenged WLF's standing in the case; while the D.C. Circuit's *Henney* opinion did not address the standing issue, one must conclude that the court resolved the issue in WLF's favor, or else it would not have allowed the injunction to remain in place.[8]

Finally, CMS claims that advocacy of First Amendment rights is somehow not "germane" to WLF's mission. That claim is without merit. Over the past 30 years, WLF devoted much of its resources to advocating for broad free speech rights. While WLF also is involved in other issues, First Amendment advocacy is not thereby in some manner rendered non-germane. As we noted in our initial brief, the "germaneness" requirement is very undemanding. WLF Br. 53 n.20 (citing *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 111 (D.C. Cir. 1990)). WLF does not simply litigate in the First Amendment area; it has released

---

[8] WLF does not recite this lengthy history for the purpose of suggesting that the *Henney* decision is somehow binding on this Court with respect to the standing question. To the contrary, we recognize that every standing claim rests on its unique set of facts. Rather, we raise the issue to ensure that the court does not credit CMS's claim that we have provided "false" accounts of case law.

17

hundreds of publications that touch upon First Amendment issues, and regularly hosts forums

featuring leading experts in the field.  Given the close identification between WLF and First

Amendment issues, it is hardly up to CMS to second-guess the importance of such issues to the

organization.

## CONCLUSION

The Washington Legal Foundation respectfully requests that the Court grant its motion

for a preliminary injunction, and bar enforcement of CMS speech restrictions against health care

providers.

Respectfully submitted,


  /s/ Richard A. Samp
Daniel J. Popeo
Richard A. Samp (D.C. Bar No. 367194)
  (Counsel of Record)
Washington Legal Foundation
2009 Massachusetts Ave., N.W.
Washington, DC 20036
Tel.: (202) 588-0302
Fax: (202) 588-0386
Email: rsamp@wlf.org

Dated:  February 28, 2007                Attorneys for Plaintiff

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of February, 2007, a copy of the foregoing motion

for preliminary injunction, along with the accompanying memorandum of points and authorities

and all exhibits, was served on the following counsel of record via the court's electronic filing

system:

Brian G. Kennedy, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Room 7204
Washington, DC 20530


    <u>/s/ Richard A. Samp</u>
Richard A. Samp