UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON LEGAL FOUNDATION,<br>2009 Massachusetts Ave., NW<br>Washington, DC 20016,<br><br>   Plaintiff,<br><br> v.<br><br>MICHAEL O. LEAVITT, in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>200 Independence Ave., S.W.<br>Washington, DC 20201<br><br>   and<br><br>LESLIE V. NORWALK, in her official capacity as Acting Administrator, Centers for Medicaid and Medicare Services,<br>7500 Security Blvd.<br>Baltimore, MD 21244,<br><br>   Defendants. | Case No. 1:06CV01490 (RMC) |

## DECLARATION OF ROSS W. BRICKLEY

I, Ross W. Brickley, do hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1. My name is Ross W. Brickley. I am a resident of North Carolina, over eighteen (18) years of age, and I am of sufficient competence to make this declaration. I make this declaration upon my personal knowledge and in support of the Plaintiffs' Motion for Preliminarily Injunction.

2. I have been a consultant pharmacist for a number of years and am the

former President of the American Society of Consultant Pharmacists (ASCP). During the implementation of the Medicare Part D prescription drug benefit (Part D), I provided consultant pharmacy services to nursing homes and their patients in North Carolina, South Carolina, Virginia, and Kentucky.

3. In my experience as a consultant pharmacist, many nursing home patients eligible for Part D benefits have significant prescription drug needs.

4. I find that comparing and analyzing the varying formularies and cost-sharing obligations of numerous Part D plans, and then applying such information to the prescription drug needs and financial ability of a given patient, is a very complex process which confuses most of my nursing home patients and their responsible parties (typically family members).

5. Approximately thirty to forty percent (30-40%) of Part D-eligible nursing home patients suffer from dementia and other significant cognitive impairments. These patients need considerable assistance with daily activities and maintaining their prescribed drug regimens.

6. Many Part D-eligible nursing home patients do not have family members or friends who can assist with financial or health care decisions, including choosing a Part D prescription drug plan that best meets the prescription drug needs of the individual patient.

7. Approximately sixty-five percent (65%) of the Part D-eligible nursing home patients for whom I have provided consulting services are also eligible for benefits under a state Medicaid program; these patients are commonly referred to

as "dual-eligible" patients. When the Part D program was implemented, all dual-eligible patients were randomly assigned by the Centers for Medicare & Medicaid Services (CMS) to a Part D prescription drug plan. This random assignment was made irrespective of the prescription drug needs of the individual patient and without consideration of whether drugs then covered by Medicaid would be covered under the assigned Part D plan. As a result, many Part D-eligible patients were assigned to prescription drug plans with very restrictive formularies based upon the needs of the patient.

8. Especially after the transition period requiring Part D prescription drug plans to provide coverage for non-formulary drugs ended on March 31, 2006, many nursing home patients no longer had Part D coverage for the prescription drugs that were prescribed to them and which had previously been covered under Medicaid. I have heard numerous grievances from the financially-responsible parties or family members of such patients who receive invoices for prescription drugs because they are not covered by the assigned Part D plan, but which were previously covered under Medicaid. The most common complaint asserted is that these persons thought that the patient's prescriptions drugs would continue to be covered (i.e. by Medicaid) and that, had these persons been able to obtain reasoned input from the nursing home staff, physicians, and pharmacists as to which Part D plan was best suited for the patient's needs, they would have selected a more appropriate Part D plan.

9. My understanding of the CMS Part D Marketing Guidance and CMS nursing home survey guidance is that I am not permitted to "steer" patients or their financially-responsible parties towards any particular Part D plan, even if the patient is in a plan which will not cover most of their medications and a different plan would clearly be more suitable for the patient based upon the patient's prescription drug needs and financial situation. I am limited to providing certain information if asked. CMS's restrictions on providing written materials that compare Part D plans have made it extremely difficult for me to communicate relevant information about the relative merits of Part D plans to patients and their responsible parties.

10. Since the Part D program became effective, I have participated in over forty (40) "family night" events at various nursing homes designed to apprise patient family members and other concerned individuals of important information regarding the care of their loved ones. At these "family night" events, the most common inquiry is: "Which plan is best for my loved one?" Although my research and analysis had identified Part D plans that provided far more inclusive formularies without additional financial obligations to the patients, I was unable to highlight or discuss these particular plans with the "family night" participants because of the restrictions contained in the Part D Marketing Guidelines. Many of the "family night" attendees expressed dissatisfaction with not being able to receive this information.

11. Many important differences between Part D plans are not indicated by the information on the Medicare.gov plan comparison website. For example, many plans vary widely in their willingness to grant "prior authorization" to cover drugs for nursing home patients. Similarly, some plans almost never approve medical exceptions to provide coverage of non-formulary drugs.

12. There is no realistic financial incentive for a consultant pharmacist such as myself to encourage a patient or his/her financially-responsible party to enroll in a particular Part D prescription drug plan. There are negligible differences in the ingredient charges and dispensing fees (the compensation my employer, the pharmacy, receives from a Part D plan for dispensing a particular prescription drug) payable by the different Part D plans with which my pharmacy has contracted. My pharmacy contracted with all Part D plans in each area where it provides services.

13. The only real financial interest which the pharmacy has in selection of Part D plans is finding the plan that will cover the patient's medications, rather than imposing that cost on the patient – or, if the patient cannot pay, as is true for most dual-eligibles, upon the patient's nursing home or the pharmacy. Since the transition period requiring plans to provide coverage for non-formulary drugs ended on March 31, 2006, I have written off approximately $8,000 - $10,000 in accounts receivable arising from claims for Part D drugs which the Part D plans did not cover. Generally, these drugs would have been covered had the patient been in a more suitable Part D plan – that is, I see the bulk of the denials coming from

certain plans. In dealing with many of these patients' family members and responsible parties, most express great frustration that providers, including myself and the prescribing physician, are not permitted to appropriately advise them as to which Part D plans cover the necessary drugs in their formularies or are likely to be more willing to grant medical exceptions as they arise.

Under penalty of perjury, I state that I have read the foregoing declaration consisting of thirteen (13) numbered paragraphs, and the statements herein are true and correct to the best of my knowledge, information and belief.

Ross W. Brickley