UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REBECCA E. FOX, MARY A. SAMP,** and **EDWARD J. SAMP**,<br><br>    Plaintiffs,<br><br>    v.<br><br>**MICHAEL O. LEAVITT**, in his official capacity as Secretary, U.S. Department of Health and Human Services,<br><br>    and<br><br>**LESLIE V. NORWALK**, in her official capacity as Acting Administrator, Centers for Medicare and Medicaid Services,<br><br>    Defendants. | Case No. 1:06CV01490 (RMC) |

### DECLARATION OF RICHARD A. SAMP

I, Richard A. Samp, do hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. My name is Richard A. Samp. I am an attorney for Plaintiffs in this matter. I make this declaration upon my personal knowledge and in support of the Plaintiffs' Motion for Summary Judgment.

2. Attached to this declaration are excerpts of the Deposition of Abby Block, the Director of CMS's Center for Beneficial Choices and the CMS official responsible for approving the Marketing Guidelines at issue in this case. Excerpted are Pages 10-17, 30-41, and 54-57 of the deposition.

3. Also attached to this declaration are excerpts of the Deposition of Thomas Hamilton, the Director of CMS's Survey and Certification Group and the CMS official

responsible for approving what has been referred to in this case as the "S&C Memo." Excerpted are Pages 34-37 of the deposition.

4. Also attached is an accurate copy of a two-page letter dated September 27, 2007, sent by U.S. Rep. Fortney Pete Stark to the Comptroller General of the United States.

Under penalty of perjury, I state on this 15th day of October, 2007, that I have read the foregoing declaration consisting of four (4) numbered paragraphs, and the statements herein are true and correct to the best of my knowledge, information, and belief.

*/s/ Richard A. Samp*
Richard A. Samp

BRADFORD ASSOCIATES
ABBY BLOCK

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - x
                        :
WASHINGTON LEGAL FOUNDATION :
2009 Massachusetts Avenue, N.W. :
Washington, D.C. 20036  :
                        :
    Plaintiffs          :
                        :
    v.                  : Case No.:
                        : 1:06-CV-01490
MICHAEL O. LEAVITT, et al   : (RMC)
                        :
    Defendants          :
                        :
- - - - - - - - - - - - x

            Wednesday, July 27, 2007
            Washington, D.C.

Deposition of
        ABBY BLOCK
a witness, called for examination by counsel
for plaintiffs, pursuant to notice, held at the
Offices of U.S. Department of Health and Human
Services, 200 Independence Avenue, S.W.,
Washington, D.C., 20201, beginning at 2:10 p.m.,
before Rosemary C. Keane, a Notary Public in and
for the District of Columbia, when were present
on behalf of the respective parties:

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 30

1  that receive rebates from drug companies.
2     A  I assume you're talking about
3  consulting pharmacists who perform services in
4  the facilities?
5     Q  I'm talking about any pharmacist.  Do
6  retail pharmacists generally get rebates, to your
7  knowledge?
8     A  Retail pharmacists certainly have
9  arrangements if not directly with manufacturers,
10 with wholesalers or intermediaries, yes.  They
11 may very well get rebates or discounts.
12    Q  Is the issue of rebates part of your
13 concern with regard to allowing any pharmacist to
14 provide steering advice?
15    A  Rebates would, clearly, fall in the
16 category of financial interest.  So to that
17 degree, yes, it would be one of our concerns.
18    Q  As I understand your last answer to
19 the question, you're not necessarily sure what
20 sort of rebates might be available to retail
21 pharmacists?
22    A  I'm not an expert on the pharmacy

BRADFORD ASSOCIATES
ABBY BLOCK

Page 31

1  industry.  So I'm not going to opine on how they
2  operate in terms of rebates, but I believe that
3  they do get rebates.
4     Q  Am I correct that, in general, the
5  choice of a drug to prescribe is made by the
6  patient's doctor and not by the pharmacist?
7     A  That's correct.
8     Q  So that a pharmacist, in general, would
9  not necessarily have the ability to steer
10 patients to drugs that would provide them with
11 greater rebates?
12    A  They certainly would because in looking
13 at a plan's formulary, they could
14 determine -- based on and assuming they're
15 familiar with the drugs that a patient takes,
16 they could determine which plan had most of that
17 patient's drugs on their formulary that, also,
18 happened to reimburse the pharmacist at a higher
19 rate than another plan for the dispensing of
20 that particular drug.  So, yes, they certainly
21 could.
22    Q  I'm confused.  We were talking about

BRADFORD ASSOCIATES
ABBY BLOCK

Page 32

1  rebates from manufacturers.
2     A  Yes.
3     Q  Not from -- not the amount that they
4  get from Part D plans themselves, is that
5  correct?
6     A  Both.  Certainly, in terms of Part D
7  plans, Part D plans negotiate dispensing fees
8  with the pharmacist.  So those reimbursement
9  rates can differ from plan to plan.
10    Q  Has CMS, to your knowledge, ever done a
11 study about the extent to which they vary from
12 plan to plan?
13      MR. KENNEDY:  Objection to the
14 question, which is a pet-peeve of mine, I never
15 know what to your knowledge means.  The question
16 is ambiguous to me.  Maybe not to the witness,
17 but as far as you know, or what it means to you;
18 I think it probably means that, but I'm not sure
19 it means that to everyone.
20      MR. SAMP:  I apologize; and, if I use
21 the phrase, again.
22      MR. KENNEDY:  It's my pet-peeve, not

BRADFORD ASSOCIATES
ABBY BLOCK

Page 33

1  hers.
2       BY MR. SAMP:
3     Q  As far as you know is what I mean when
4  I ask the question.
5     A  As far as I know, no.
6     Q  Are you aware that the plaintiffs
7  exhibited a declaration from a consulting
8  pharmacist in this case who said that those
9  differences are insignificant?
10    A  I'm not aware of that.
11    Q  Do you have any reason to doubt his
12 statement?
13    A  I have no reason to either accept
14 or doubt his statement.  I have no knowledge of
15 his statement.
16    Q  But his statement is that there are
17 insignificant differences.  Do you have any
18 reason to doubt that there are no significant
19 differences?
20    A  I have no knowledge on which to opine
21 on that subject.  I'm not the pharmacy expert
22 here.

BRADFORD ASSOCIATES
ABBY BLOCK

Page 34

1   Q   Now, let's assume that our hypothetical
2   pharmacist has contracted with every Part D plan
3   in the area.
4   A   Okay.
5   Q   Would it be improper, in your view,
6   for the pharmacist to steer the patient to a
7   particular Part D plan?
8   A   Yes, it would be.
9   Q   At the risk of being repetitive, if you
10  could just explain to me all of your reasons why
11  it would be inappropriate, both as a matter of to
12  violate the regulations, which I understand, but,
13  also, the policy reasons behind those regulations?
14  A   Number one, it might be in his
15  financial or other interest to do so; and, that
16  certainly would be undesirable. Secondly, it is
17  best for a patient to get complete and objective
18  information and that individual is not in a
19  position to provide complete and objective
20  information that would allow that person to
21  specifically steer. That person certainly could
22  provide objective information about the features

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

---

BRADFORD ASSOCIATES
ABBY BLOCK

Page 35

1   of various plans and that would be appropriate
2   education and guidance.
3   Q   Are you aware whether CMS has received
4   objections from some pharmacists to the
5   restrictions on steering as they appear in the
6   marketing guidelines?
7   A   As I understand it, when the guidelines
8   were put out for comment CMS received both
9   favorable supportive comments, and unfavorable
10  comments.
11  Q   The guidelines were last changed
12  sometime in the middle of 2006, is that correct?
13  A   I believe that's correct.
14  Q   Is there any plan in the works to
15  revise them, again, in the near future?
16  A   We always look at our guidance and see
17  if it needs updating or clarification; and, we
18  will certainly do that prior to the giving of
19  marketing for the 2008 benefit year which starts
20  October 1.
21  Q   Are you aware of any plan to conduct a
22  study between now and then with regard to whether

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

---

BRADFORD ASSOCIATES
ABBY BLOCK

Page 36

1   pharmacists would have strong financial
2   incentives to steer patients towards a particular
3   Part D plan?
4   A   I'm not aware of any such plan.
5   Q   If a Part D plan were to offer a
6   pharmacist $5,000 for every patient that that
7   pharmacist switched from a different Part D plan
8   to the offering Part D plan, would that
9   arrangement violate the federal anti-kickback
10  statute?
11  A   It's my opinion that it would, but,
12  again, I don't -- it is not within my purview to
13  enforce the anti-kickback provision. So that
14  would be a question for the IG to determine.
15  Q   In formulating the guidelines, are you
16  aware of any discussion about whether or not the
17  prohibitions contained in the anti-kickback
18  statute would be sufficient to deter pharmacists
19  from improperly steering a patient to a
20  particular plan even without the restrictions
21  that exist within the marketing guidelines?
22  A   I would guess not, simply because those

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

---

BRADFORD ASSOCIATES
ABBY BLOCK

Page 37

1   provisions really address direct remuneration
2   such as, you know, in the example you just gave
3   me. Our concern is broader than that. It goes,
4   also, to indirect interest.
5   Q   Well, one of your concerns, as I
6   understand it, is that a particular plan might
7   provide pharmacists with greater payments
8   for their particular drug. Would there come a
9   point where those payments by themselves might
10  violate the anti-kickback statute if they were
11  sufficiently greater than what was offered by
12  other Part D plans?
13  A   Again, I am not the expert on the
14  anti-kickback statute. Those are questions
15  for the IG to determine.
16  Q   It's fair to say that nobody at CMS
17  focuses on the anti-kickback statute as being
18  within their purview?
19  A   The people in the Office of Financial
20  Management who have jurisdiction over program
21  integrity and who are the direct links to the IG.
22  Certainly, if anyone, CMS does. That's where it

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 38

1 would be, over in the integrity office in the
2 Office of Financial Management.
3    Q  Am I correct that the program integrity
4 office had nothing to do with putting together
5 the marketing guidelines?
6    A  I am quite sure that they reviewed and
7 cleared them.
8    Q  They were not directly involved in the
9 actual drafting of them, is that correct?
10    A  I don't believe so. Although, there's
11 a whole list of people in the first Interrogatory
12 and I, frankly, don't remember whether someone
13 from program integrity is on this list. I know
14 that's a long list.
15    Q  I want to ask you just a few questions
16 about how patients go about obtaining information
17 to help them decide which is the Part D plan that
18 is best for them. Could you just, briefly,
19 describe for me where a typical Medicare
20 beneficiary might turn for information?
21    A  Yes. There are various sources. First
22 of all, every Medicare beneficiary receives a

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 39

1 copy of the Medicare Handbook every year. So
2 that's one source. Every Medicare beneficiary
3 can call 1-800-MEDICARE and a customer service
4 representative will assist them.
5     Every Medicare beneficiary has access
6 to the www.medicare.gov website where the
7 plan-finder tool is available. The tool,
8 basically, allows the beneficiary or anybody
9 working with that beneficiary assisting them to
10 input a whole variety of information. The plan
11 will do a mathematical calculation which will in
12 descending order give that beneficiary a choice
13 of plans from the least costly, you know, to the
14 most costly given their parameters.
15    Q  Now besides cost, what are the factors
16 that a Medicare Part D patient needs to keep in
17 mind in trying to decide what might be the best
18 plan for them?
19    A  Well, they certainly should be
20 concerned with plan performance. In that regard,
21 CMS has already made available publicly
22 information on the plan's performance. For the

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 40

1 upcoming enrollment period, we're going to
2 have report cards on our website that will,
3 specifically, give people quality performance
4 information.
5    Q  What about prior authorization
6 requirements. Are those something that should be
7 a concern to patients?
8    A  Yes.
9    Q  Why is that? If you can just briefly
10 describe it to me.
11    A  Well, if the patient is taking a
12 particular medication and if they are already on
13 it, they're taking a regime, it should certainly
14 be of some interest. I wouldn't say not
15 necessarily defining interest, but of interest as
16 to whether they will have access to that
17 medication; and, whether that access will require
18 prior authorization by the plan that they choose.
19    Q  What about quantity limit restrictions?
20    A  The same thing. I mean, all of the
21 things, quantity limits, step-therapy, certainly,
22 those are things that a person making an informed

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 41

1 choice would want to know.
2    Q  Isn't it, generally, true that if a
3 particular Part D plan imposes prior
4 authorization or step-therapy that the plan will
5 not pay for the drugs if the patient does not
6 meet the prior authorization or step-therapy
7 criteria in using those drugs?
8    A  The plan will not pay for those drugs
9 and, then, the patient has appeal rights and can
10 appeal that decision.
11    Q  Is there any readily available place
12 where a Medicare beneficiary can obtain
13 comparative information showing the criteria that
14 must be satisfied for granting coverage for drugs
15 that are subject to prior authorization or
16 step-therapy restrictions for the various Part D
17 plans?
18    A  Yes, the plan-finder tool will clearly
19 indicate if any of those requirements are in
20 place, but may not spell out the criteria.
21 However, by regulation we require plans to make
22 that information readily available to the

BRADFORD ASSOCIATES
ABBY BLOCK

Page 54

1  studies that focus on whether long-term
2  pharmacies might have significant financial
3  incentives to push one Part D plan over another?
4      A   I have not, myself, done any studies.
5  I can't speak for others at CMS who may have
6  expertise in that area.
7      Q   But as the head of the program that
8  administers Part D, you are unaware of any such
9  study having been conducted?
10     A   I think it depends on how you define
11  study.
12     Q   Well, let's define it broadly to mean
13  anything that has entailed somebody looking at
14  the subject and, then, putting pen to paper and
15  writing something more than three pages on the
16  subject.
17     A   I have not seen anything in writing of
18  more than three pages.
19     Q   We discussed earlier the S&C memo.
20     A   Yes.
21     Q   Did you have any role at all in
22  preparing that memo?

TOLL FREE: 877-718-1850 · LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 55

1      A   I did not.
2      Q   Do you have an understanding as to what
3  that memo requires?
4      A   I read the memo just last week. I had
5  never seen it before then.
6      Q   Do you know what it was that prompted
7  this memo to be issued?
8      A   No, I don't.
9      Q   Who would you say would know the most
10  on that subject?
11     A   The person who signed the memo.
12     Q   Do you know Thomas Hamilton, I
13  believe the person who signed it?
14     A   No, actually, I don't.
15     Q   Is he in Baltimore?
16     A   He's in Baltimore.
17     Q   And he is still with CMS?
18     A   Yes, I believe he is.
19     Q   Can you give me your understanding of
20  what the memo requires based simply on having
21  read the memo?
22     A   Well, my understanding of what the memo

TOLL FREE: 877-718-1850 · LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 56

1  requires is, it's structured around a provision
2  that I believe is in the statute that says that a
3  facility, a nursing home, cannot require a
4  Medicare beneficiary or a Medicaid
5  beneficiary, for that matter, to relinquish
6  their Medicare or Medicaid rights.
7      Q   Why don't I hand you a copy of it. So
8  that, as we discuss it, if you want to refer to
9  it, you may. There is a provision in the memo
10  that says, quote, under no circumstances should a
11  nursing home require --
12        MR. KENNEDY:  Which page are you
13  reading from?
14        MR. SAMP:  I'm sorry.
15        MR. KENNEDY:  I have a copy. I just
16  don't know what page it is.
17        MR. SAMP:  It's the third page, third
18  paragraph.
19        MR. KENNEDY:  Yes. Okay.
20        BY MR. SAMP:
21     Q   Let me go back to quoting from this
22  memo. It says:  Under no circumstances should a

TOLL FREE: 877-718-1850 · LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 57

1  nursing home require, request, coach or steer any
2  resident to select or change a plan for any
3  reason. Can you give me your understanding of
4  that provision?
5      A   Well, I think it's clear on its face.
6  It says under no circumstances should a nursing
7  home require, request, coach, or steer any
8  resident to select a plan or change their plan
9  for any reason. So it says a nursing home cannot
10  steer a beneficiary to a particular plan or even
11  beyond steer actually require them to be enrolled
12  in a particular plan. I think that would be
13  based on the fact that they have a right to make
14  the choice; and, that a nursing home cannot
15  deprive them of their right to make that choice.
16     Q   If a nursing home were to request that
17  a resident change plans, in your view would that
18  deprive the resident of their right to choice a
19  plan?
20     A   Given the nature of nursing home
21  residents and their, you know, generally frail
22  condition I would say yes.

TOLL FREE: 877-718-1850 · LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WASHINGTON LEGAL FOUNDATION,       *

      Plaintiff       *

vs.       * Case Number:

MICHAEL O. LEAVITT,       * 1:06CV01490(RMC)
SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND       *
HUMAN SERVICES,
             *

      Defendant
*       *       *       *       *       *

THE DEPOSITION OF THOMAS HAMILTON

The Deposition of Thomas Hamilton, taken in the above-captioned case on Friday, August 24, 2007, commencing at 2:15 p.m., at the Offices of the Center for Medicare Services, 7500 Security Boulevard, Baltimore, Maryland 21244 and reported by Cathelyn Matthews, Court Reporter and Notary Public.

EVANS REPORTING SERVICE
The Munsey Building, Suite 705
Seven North Calvert Street
Baltimore, Maryland 21202
410-727-7100

Page 30

A To do what, again? To request that they change a plan?

Q To request, coach or steer any resident to change a plan?

A All right. That is grounded in the resident's right to choose and the nursing home's responsibility to respect the resident's choices and a right to make those choices.

Q Would it be appropriate if I as the head of the nursing home said to one of my residents "You are free to choose any plan that you want, however I find that for your particular purposes the best plan is plan A. Therefore I request that you choose that plan."

Would that be an appropriate statement?

A We would not endorse that particular statement, but the bottom from a Survey and Certification point of view is that when we go out and do the surveys we're looking at the outcomes.

And so the thing that we would be looking at is whether or not the resident believed

Page 31

that they had been coached, steered or required to make a particular choice.

And despite whatever suggestions we might make to nursing homes as to how they should handle their responsibilities, in the end our enforcement is based on whether or not the facts support a conclusion that the resident was denied their choice.

So even if a nursing home had said "You know, between you and me, I'd recommend that you go with plan A."

When we're doing the survey and we're talking to residents in our survey sample, if that resident is completely satisfied and doesn't feel like they had been coerced or required to choose a particular plan, then we would not be taking an enforcement action.

Q Now quite apart from whether you would be taking enforcement action, would you find it a violation of your guidance for a nursing home to respond to a resident's request of the name of the

Page 32

best plan if the nursing home were then to say "We think plan A is the best for you?"

A We would say that the nursing home is treading on dangerous territory, but we would not make a definitive conclusion without talking to the resident. And if the resident said, you know, this is fine, then again we would not site.

But it's dangerous for the nursing home in the sense that the nursing home is populated with very vulnerable individuals who rely upon that nursing home for their very existence, their ability to live, their medications, their food, their daily support, being able to get out of bed. Or if they're immobile, being able to be turned so they don't develop a pressure ulcer.

In that very dependent situation it's very easy for people to feel suddenly coerced.

And so our advice to nursing homes is to make sure that they are providing good information that is -- that doesn't step over the line in something that the nursing home resident

Page 33

might feel is coercion or a requirement.

Q If the nursing home resident says to one of the surveyors "I didn't feel coerced, but there's absolutely no doubt that I chose plan A because that was the one plan that they recommended to me and that recommendation made sense to me. And I was following their advice when I signed up for plan A."

Would that be evidence of improper conduct by the nursing home?

A In that hypothetical situation again, and usually there is a lot of facts involved. So it's hard to respond to hypotheticals.

But if the nursing home resident did not feel that they had been coerced or required or denied their right, then we would not issue a citation.

Again we're looking at the ultimate outcome of the transaction.

Q And putting aside the question of, would you issue a citation, under that same

9 (Pages 30 to 33)

Court Reporting in Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of award-winning service
8037f761-e334-40fc-a534-18827395f70a

**Page 34**

1 hypothetical do you believe that those hypothetical
2 facts are evidence of a violation of the terms of
3 this particular memo?
4    A  They are certainly in the danger zone
5 and may violate the spirit. But whether or not
6 that would trigger action on our part with a
7 citation, it would not unless the resident felt
8 that their rights had been denied. Their choice
9 had been denied or they had been required to
10 exercise a particular choice.
11       So keep in mind that these are -- this
12 is not a memorandum directed to the nursing home
13 industry. It is directed to the surveyors, and
14 their actions are quite important. And it's a
15 guide to their ultimate actions.
16    Q  During the course of your discussions
17 with Ms. Graunke and Ms. Simmons or any other
18 people involved in the preparation of this
19 particular memo, do you recall any discussions at
20 all about the First Amendment Rights of the nursing
21 homes?

**Page 35**

1    A  We stick to our laws and regulations
2 and so --
3    Q  So the answer is that there were no
4 specific discussions about the First Amendment that
5 you can recall?
6    A  Not that I can recall.
7    Q  Was this particular memo posted on the
8 Internet after its issuance in May of 2006?
9    A  Yes.
10    Q  What reactions did you receive to the
11 memo that you can recall?
12    A  A number of different reactions. We
13 got a lot of thanks for clarifying things from the
14 state survey agencies, from our regional office,
15 individuals, and from many nursing homes and
16 consumer groups.
17       We did hear from the two major nursing
18 homes associations that said they did not like the
19 tone. They felt that the tone of the letter
20 implied that nursing homes were doing wrong things,
21 and they would have preferred, you know, a

**Page 36**

1 different tone. And that there were other issues
2 that had not been addressed in the memorandum.
3    Q  Did you see a legal analysis that was
4 prepared by the law firm of Mintz Levin that
5 discussed the memo?
6    A  Quite some time later. I don't know.
7 But, you know, when I saw it, it was well after
8 this would have been issued.
9    Q  What do you recall, if anything, about
10 that particular legal memo by Mintz Levin?
11    A  I thought it was a remarkable piece of
12 work.
13    Q  In what sense?
14    A  Well, it seemed to me to proport to be
15 a legal memo, but rambled a great length with a
16 great number of complaints.
17    Q  Do you recall what, if any, were the
18 gist of those complaints?
19    A  If I recall correctly and, you know,
20 it's been quite some time, they also objected to
21 the tone and objected to a number of things that

**Page 37**

1 hadn't been put in the memo. And, you know,
2 generally took issue with it, but I can't recall
3 too many of the specifics.
4       If you want to pursue it, maybe my
5 memory will come back.
6    Q  That's okay. I don't need to get into
7 it.
8       In response to these various comments
9 that you received regarding the memo, has there
10 been any subsequent memo issued by your group that
11 has attempted to clarify this memo in any way?
12    A  We've had verbal discussions which we
13 had immediately after the issuance of the
14 memorandum. Conference calls particularly with our
15 regions to discuss it and make sure everyone
16 understood.
17       But, you know, that would have been in
18 June, thereabouts. June, July -- May, June, July
19 of 2006.
20       And then after that people felt that
21 the questions had been addressed. And we really

10 (Pages 34 to 37)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

8037f761-e334-40fc-a534-18827395f70a

**FORTNEY PETE STARK**
13TH DISTRICT, CALIFORNIA

COMMITTEE ON
WAYS AND MEANS

JOINT COMMITTEE
ON TAXATION

WWW.HOUSE.GOV/STARK

**CONGRESS OF THE UNITED STATES**
**HOUSE OF REPRESENTATIVES**
WASHINGTON, DC 20515

239 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225–5065

39300 CIVIC CENTER DRIVE, SUITE 220
FREMONT, CA 94538
(510) 494–1388

PETEMAIL@MAIL.HOUSE.GOV

September 25, 2007

The Honorable David M. Walker
Comptroller General of the United States
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Walker:

Providing quality services to all beneficiaries is an essential component of the Medicare program. The Centers for Medicare & Medicaid Services (CMS) has emphasized that improving its communications with beneficiaries is an important goal.

Past reports—including some from GAO—have, however, raised concerns about the quality of the information provided to beneficiaries who contact Medicare call centers with questions. For example, in December 2004 you reported on problems associated with the completeness and accuracy of information provided by these call centers. In May 2006 you reported similar concerns with call center responses to beneficiaries who had questions about the then new Part D benefit. Both reports demonstrated that CMS had a long way to go to provided beneficiaries with important and much needed information.

Although I continue to remain concerned with the completeness and accuracy of information provided to beneficiaries who contact these call centers, I am also troubled by recent reports that suggest the level of customer service is inadequate. These reports note that beneficiaries are waiting long periods of time on hold before reaching a customer service representative (CSR) and that some are having difficulty reaching a CSR who can assist them, especially if English is not their first language.

It is my understanding that CMS has recently changed the contractor operating these calls centers.

Given the involvement of a new contractor, I am now interested in an assessment that would explore the key aspects of the call centers' customer service. This assessment should feature an evaluation of both caller wait times and the ability of the centers to assist non-English speaking callers. It should also assess the accuracy and completeness of call center responses and include any other elements of customer service that you consider important.

As part of your assessment, I ask that you also review CMS's oversight of these call centers.

Your assistance in this matter is greatly appreciated. If you or your staff has any questions, please do not hesitate to contact Marci Harris of my staff at (202) 225-5065.

Sincerely yours,

Pete Stark
Chairman