IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REBECCA FOX, *et al.*,                    )
                                          )
    Plaintiffs                        )
                                          )
       v.                         )   Civil Action No. 1:06-01490-RMC
                                          )   Judge Collyer
MICHAEL O. LEAVITT, *et al.*,             )
                                          )
    Defendants                        )
_____   )

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Brian G. Kennedy
SHEILA M. LIEBER
BRIAN G. KENNEDY (D.C. Bar No. 228726)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel.: (202) 514-3357
Fax: (202) 616-8470
Email: Brian.Kennedy@usdoj.gov

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

Introduction and Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    1.    Circumstances Of Plaintiff Rebecca Fox . . . . . . . . . . . . . . . . . . . . . . . .  3

    2.    Circumstances of Plaintiffs Mary and Edward Samp . . . . . . . . . . . .  6

    3.    Medicare's Guidelines For Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    4.    Agency Policy Against Nursing
           Homes Coercing Residents' Plan Choices . . . . . . . . . . . . . . . . . . . . . .  14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    1.    The Agency's Marketing Guidelines For Plans And
           Anti-Coercion Policy For Nursing Homes Do Not
           Cause Any Injury In Fact To The Three Plaintiffs . . . . . . . . . . . . . .  16

           A.    Plaintiffs' Burden Of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

           B.    The Undated Declarations From
                 Providers Who Are Not Plaintiffs' Providers . . . . . . . . . . . . . .  17

           C.    Mrs. Fox's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

           D.    Mrs. Samp's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

    2.    The Agency's Marketing Guidelines For Plans And
           Anti-Coercion Policy For Nursing Homes Do Not
           Violate The First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

           A.    Marketing Guidelines For Plans . . . . . . . . . . . . . . . . . . . . . . . .  29

                 1.    Standard Of Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

2.      Medicare's Other Substantial Interests  . . . . . . . . . . .  33

3.      The Narrowly Crafted Guidance
Against Steering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

B.    The Anti-Coercion Policy For Nursing Homes . . . . . . . . . . . .  38

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REBECCA FOX, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-01490-RMC |
| | ) | Judge Collyer |
| MICHAEL O. LEAVITT, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

<u>Introduction and Summary</u>

Plaintiffs' attorneys have chosen to complain about two policies of the Centers for Medicare & Medicaid Services ("CMS"). Neither policy has been shown to have caused any injury to persons who have been named as plaintiffs.

One policy is set forth in part in the Marketing Guidelines for Plans (Ex. A hereto). The government contracts with private entities to deliver Medicare services through Medicare Advantage plans and Medicare prescription drug plans. Such plans bear the government's own Medicare name as well as the private entities' names, and the contracts and Marketing Guidelines for Plans address how and how aggressively plans may be marketed. A corporate plan can only act through employees and other agents, so the Marketing Guidelines for Plans address marketing activities of medical providers and other agents with whom plans sub-contract. Although the Marketing Guidelines for Plans do preclude plans from

using their providers to "steer" patients to or from particular Medicare Advantage or Medicare prescription drug plans, CMS recognizes that providers can be one source of information and thus encourages providers to give patients objective and detailed information concerning plans.  Marketing Guidelines for Plans at 123; Deposition of Abby Block at 13, 19-20, 34-35, 48.  These narrowly tailored guidelines, addressing commercial transactions to which the government, the plans, the providers, and the beneficiaries would all be parties, would plainly pass constitutional muster if there were an actual case or controversy here.

The other policy plaintiffs' attorneys choose to attack is CMS's view that nursing homes may not coerce their patients into signing up for a particular Medicare plan.  Deposition of Thomas Hamilton at 30-34, 49-50.  Even if words are used in coercing away patients' rights to free choice, agency attempts to bar such coercion are no more prohibited than government regulation of "speech" like "your money or your life."

Neither of these policies affects the persons named as plaintiffs in any event.  Plaintiffs' counsel argue that, but for the CMS policies, plaintiffs' pharmacists would have been willing to provide them information about which prescription drug plan to choose.  Pls' SJ Mem. at 46-47.  However, the evidence developed in discovery and presented on summary judgment fails to sustain plaintiffs' burden of proof on that point.  Although a handful of providers say that they would be willing to steer patients to plans were it not for CMS policies, they are not plaintiffs' providers.  Two of the three plaintiffs, Mary and Edward Samp, have no need for

advice on which Medicare prescription drug plan to choose, because they have no reason to be choosing among such plans to begin with.    They are both covered by retiree health benefit plans, and their former employers have strongly advised them "NOT" to choose any Medicare prescription drug plan on their own.  They have no reason to conclude (and expressed none) that their former employers are wrong on that point and no desire to abandon their retiree health benefits in favor of some independently purchased Medicare drug benefit plan.  Moreover, Edward Samp, the only one of the Samps who uses prescription drugs at all, also has free prescription drug coverage from the Department of Defense's TRICARE program, which would, if he chose to submit bills, cover most or all of the prescription drug co-pays left by his employer's retiree health benefit program.  Although he does not use that TRICARE coverage, its availability likewise makes paying for Medicare coverage no better than what TRICARE would provide for free an entirely moot point.

STATEMENT OF THE CASE

1.    <u>Circumstances Of Plaintiff Rebecca Fox</u>

Like many men and women in their eighties, plaintiff Rebecca Fox (it appears from her deposition) is articulate, capable, and intelligent.  She lives independently in her family home, and, like many of her friends, prides herself on being "fully capable of making [her] own decisions."  Oct. 9, 2007 Fox Decl. ¶¶ 2, 22. She also has at least one family member very familiar with health care issues.  Her son, Thomas, is an attorney at Reed Smith, a law firm that was already involved in

this case before Mrs. Fox was named as a plaintiff.[1]  Thomas Fox is a co-author of Thomas C. Fox, Carol Colburn, Carl Krasik, & Joseph W. Metro, HEALTH CARE FINANCIAL TRANSACTIONS MANUAL (West Publishing 2007).

Mrs. Fox takes two prescription drugs.  Oct. 9, 2007, Fox Decl. ¶ 4.  Before May 2006, she participated in, and was very pleased with, the "Lilly Answers" program.  Nov. 9, 2006 Fox Decl. ¶ 4.  That program ended in May 2006.  *Id.* ¶ 6. She received letters from the Commonwealth of Pennsylvania advising her to stay enrolled in the Commonwealth's PACE or PACE NET programs, which would help her sort through her Medicare prescription drug program options, and later advising her that her PACE NET coverage was as good as the Medicare drug benefit and counted as "'cred[it]able coverage.'"  *Id.*  ¶ 8; October 9, 2007 Fox Decl. ¶ 8.  She stayed enrolled in the PACE NET program, as she "thought she would be enrolled in it, and would be enrolled in any Medicare program."  Nov. 9, 2006 Fox Decl. ¶ 14.

In September 2006, her local pharmacist "informed [her] that [she] owed him $129 because he was not aware that the 'Lilly Answers' program had been discontinued."  *Id.* ¶ 15.[2]  She says that at that point, she called PACE NET and was told

---

[1] Mrs. Fox identified her son at pages 48 and 49 of her deposition.  The preliminary injunction motion filed before Mrs. Fox became a plaintiff included a declaration of Jessie England, which she had faxed to Kevin Madagan, an attorney at Reed Smith.  England Declaration at fax cover page.

[2] By the time of her deposition on May 29, 2007, Mrs. Fox was no longer able to remember either that her pharmacist had or that he had not stated that he was unaware that the Lilly Answers program had been discontinued, Fox Dep. at 42-44, and her 2007 declaration understandably does not repeat or contradict that

(continued...)

that she needed to pick a Medicare plan as "PACE NET had not enrolled [her] in any Medicare Part D plan as the Governor's letter said would happen." *Id*. ¶ 16.

Either before (according to her declarations) or after (according to her deposition) her pharmacist told her in September 2006 that she owed him more money, Mrs. Fox says that she tried to ask him for advice on which prescription drug plan to choose.[3] Her original declaration did not set forth her pharmacist's name. At her deposition, she testified that her pharmacist's name is "Ron Decy. Q. Decy? A. Decy, D-e-c-y." Fox Dep. at 9. There are no licensed pharmacists surnamed Decy in Mrs. Fox's home state of Pennsylvania. *See* http://www.licensepa.state.pa.us/default.asp?bpoaNav=|(last visited Oct. 25, 2007). In her latest declaration, she refers to her "local pharmacist, Ron Orvick." Oct. 9, 2007 Fox Decl. ¶ 11. There are no licensed pharmacists surnamed Orvick in Pennsylvania. *See* http://www.licensepa.state.pa.us/default.asp?bpoaNav=|(last visited Oct. 25, 2007). (There is a Ronald P. Ocvirk. *Id*.) According to Mrs. Fox, the first time (whenever it was) that she attempted to speak to her local pharmacist (whatever his name is) about which prescription drug plan to choose, he was too busy to talk to her. Fox Dep. at 39. The second and last time, according to Mrs.

---

[2](...continued)
assertion of her 2006 declaration.

[3] On the timing, *compare* Nov. 9, 2006 Fox Decl ¶¶ 12-15 *and* Oct. 9, 2007 Fox Decl. ¶¶ 12-14 *with* Fox Dep. at 34-35, 40.

Fox, he said he did not know what to tell her and could not speak specifically to her. *Id.* at 40.

After getting "helpful information" from PACE NET, Nov. 9, 2006 Fox. Decl. ¶ 16, Mrs. Fox choose the AARP Medicare prescription drug plan and remains "reasonably happy" with it.  Oct. 9, 2007 Fox Decl. ¶ 20.  Her 2007 declaration says that she would like to be able to receive information on whether other plans would better serve her needs, particularly "[w]ith the open enrollment period approaching at the end of the year."  *Id.* ¶ 24.

2.    <u>Circumstances of Plaintiffs Mary and Edward Samp</u>

Like Rebecca Fox, plaintiff Mary Samp (it appears from her deposition), is articulate, capable, and intelligent.[4]  She handles health care insurance decisions for herself and her husband.  Samp Dep. at 5; Oct. 5, 2007 Mary Samp Decl. ¶ 6.  She "pride[s]" herself in her "ability to continue to handle" her family's personal affairs.  *Id.* ¶ 2.  Also like Rebecca Fox, she has a family member who is familiar with issues concerning Medicare prescription drug plans.  Her son is plaintiffs' counsel of record.

Mrs. Samp does not take, and for the past few years has not taken, any prescription drugs.  Samp. Dep. at 11.  She has retiree health benefits from Harvard University.  *Id.* at 6.  She concluded that she was "better off continuing to

---

[4] We do not mean by omission to imply that Edward Samp is not also intelligent, articulate, and capable, but since his wife is the relevant decision-maker, his deposition was not taken.

obtain prescription drug coverage" for herself "through Harvard." Oct. 5, 2007
Mary Samp Decl. ¶ 6. She reached that conclusion based primarily on a Harvard
Retirees' Association newsletter, *id*, which reported that a Harvard official "urged"
Harvard retirees "NOT to sign up for" a Medicare prescription drug plan, since
"'[n]ot only are Harvard retirees already covered . . . but enrolling in Medicare Part
D would create an additional expense–with very little or no additional benefit.'"[5]
Mrs. Samp "probably" talked directly to officials at Harvard and received the same
advice. Samp Dep. at 26-27. Harvard's prescription drug coverage is "creditable,"
*i.e.*, it is at least as good as the standard Medicare prescription drug coverage Mrs.
Samp could buy separately at her own expense. *See* Defs' SJ Ex.B.

 Mary Samp's husband, Edward Samp, takes about eight to twelve
prescription drugs on a regular basis. Samp Dep. at 12, 21-22. He receives retiree
health benefits, including prescription drug benefits, from his former employer, the
City of Cambridge. *Id*. at 7; Oct. 5, 2007 Mary Samp Decl. ¶ 5. Shortly before the
Medicare prescription drug program took effect, Cambridge City Manager Robert
W. Healy sent Mr. Samp a letter explaining how the City's health retirements
related to that program and explained that "**Blue Cross/Blue Shield will
automatically enroll you in Medicare Part D coverage, so you should NOT
sign up for any Medicare Part D additional coverage on your own, as it**

---

 [5] Attachment to Jan. 2007 Mary Samp Decl., *quoting* Vicki Boone, Acting
Associate Director of Benefits, Harvard University Benefits Service Group
(emphasis newsletter's, unclear whether also Boone's).

**could put your enrollment with the City of Cambridge plan in jeopardy.**"
Attachment to Oct 5, 2007 Mary Samp Decl. (bold face and all-caps emphases in
original).  Healy's letter provided telephone numbers of three employee benefits
staff members who could help answer any questions.  Healy is "a good city man-
ager," and Mrs. Samp "probably" talked to him or someone on his staff.  Samp Dep.
at 32.  She does not recall receiving any advice that would contradict Healy's warn-
ing that Mr. Samp's choosing a Medicare prescription drug plan on his own would
jeopardize his retiree health benefits.  *Id*. at 32-33.  Mrs. Samp would not want to
choose a Medicare prescription drug plan outside the City's plan if Healy is correct
that doing so would jeopardize her husband's retiree health benefits.  *Id*. at 35.

    The prescription drug coverage provided by the City of Cambridge through
Blue Medicare Rx pays most of Edward's prescription cost, but, given the number of
drugs he takes, he is left with about $100 - $150 dollars a month in co-pays.  *Id*. at
21-23.

    According to the Department of Defense and Mary Samp's declarations,
Edward Samp is entitled to prescription drug benefits under the Defense Depart-
ment's TRICARE program.  Oct. 5, 2007 Mary Samp Decl. ¶ 9; Jan. 2007 Mary
Samp Decl. ¶ 7; Declaration of Major Travis Watson (filed herewith) ¶13; *but see*
Samp Dep. at 19 ("My recollection is that we do not have TRICARE prescription
drug coverage").  Edward Samp does not need to pay any premiums for his
TRICARE coverage.  Samp Dep. at 18; Watson Decl. ¶ 6.  Where, as here, a
beneficiary has coverage from Medicare or private health insurance policy,

TRICARE is a "secondary" payer. Watson Decl. ¶ 9; Attachment to Oct. 5, 2007 Mary Samp. Decl.; Thomas C. Fox, Carol Colburn, Carl Krasik, & Joseph W. Metro, HEALTH CARE FINANCIAL TRANSACTIONS MANUAL § 19.4 (West Publishing 2007); MEDICARE AND YOU 2008 at 67-68 (CMS 2007) (explaining interaction between TRICARE and Medicare coverage). As a practical matter this means that Mr. Samp's Blue Medicare Rx would be the primary payer for his prescription drugs, and that, if the Samps or their pharmacist submitted Mr. Samp's prescription bills to TRICARE, as the secondary payer TRICARE would pay most or even all of the co-pays that Edward's Blue Medicare Rx coverage leaves him to pay. *See* Watson Decl. ¶ 10.

The Samps have not been submitting Mr. Samp's pharmacy co-pay bills to TRICARE for payment. Watson Decl. ¶ 13; Samp Dep. at 23-24. Mrs. Samp does not know whether she has made her pharmacist aware that Mr. Samp is covered by TRICARE, *id*. at 20, 24, and does not know whether her pharmacist has been submitting claims to TRICARE on Mr. Samp's behalf, *id*. at 23-24. Although the Samps' pharmacy is a member of TRICARE's pharmacy network, and could thus submit bills for payment electronically, it has not been doing so for Mr. Samp. Watson Decl. ¶ 13.

If Mr. Samp were to withdraw from the City's health care benefit program and strike out on his own to choose a Medicare prescription drug plan, the government, which sponsors both Medicare and TRICARE prescription drug programs, has told people eligible for both programs that TRICARE, not Medicare,

is the better deal.[6]  As then Assistant Secretary of Defense for Health Affairs, Dr.
William Winkenwerder, Jr., explained in the letter he wrote to Mr. Samp attached
to the Samp declarations, "[t]here will almost always be no advantage to enrolling
in a Medicare prescription drug plan for most TRICARE beneficiaries."[7]  *See also*
Watson Decl.  ¶ 18.

Mary Samp does not live in a nursing home.  Except for three weeks in
August 2007 and (we are informed off the record by plaintiffs' counsel) for an
unknown period beginning on or about October 18, 2007, Edward Samp has not
been living in a nursing home.  *See* Oct 5, 2007 Mary Samp Decl. ¶ 4.[8]

Mary Samp's declarations do not state that she has sought any information
about Medicare options from the nursing homes at which Edward has stayed.  She
attempted to talk about her family's options with personnel at the Youville House
and attached rehabilitation center (neither of which is a nursing home), Oct 5, 2007

---

[6] In order to remain eligible for TRICARE coverage, Mr. Samp would have to
retain his coverage for Medicare Part B, which covers physician bills rather than
prescription drugs.  *See* 10 U.S.C. § 1086(d).

[7] The exceptional circumstance, where someone else is paying Medicare pre-
miums on behalf of the beneficiary. would not apply to Mr. Samp if he no longer
received his Medicare drug benefit as part of the package of benefits provided by
Cambridge.

[8] Mr. Samp has also resided in the Youville Rehabilitation Center ("YRC")
from August until at least early October.  Oct 5, 2007 Mary Samp Decl. ¶ 4.  Plain-
tiffs' memorandum expresses uncertainty whether the YRC is a nursing home
within the meaning of the nursing home enforcement policies plaintiffs' attorneys
write about.  Pls' SJ Mem. at 46 n.19.  The YRC is not a nursing home to which
those policies apply.  Declaration of Thomas Hamilton, filed herewith.

Mary Samp Decl. ¶ 10. Those personnel are not familiar with the Samps' coverage

from Harvard, Cambridge, and TRICARE, Samp Dep. at 30, and had no thoughts

about what decisions would be best for the Samps' situation, *id.* Mrs. Samp has not

sought her pharmacist's advice on her prescription drug insurance options either.

Samp Dep. at 37, 40. Subject to a hearsay objection, she stated that others in her

building told her that the pharmacist had told them that he would not help them

make their decisions of what to do. Samp Dep. at 40-41.

3.    Medicare's Guidelines For Plans

The Marketing Guidelines For Plans "Providers contracted with plans (and

their contractors) cannot . . . [d]irect, urge, or attempt to persuade, any prospective

enrollee to enroll in a particular plan or to insure with a particular company based

on financial or any other interest of the provider (or subcontractor)." Marketing

Guidelines for Plans (Def. Ex.A) at 128. As Abby Block, Director of Medicare's

Center for Beneficiary Choices, explained both in the declaration filed with

defendants' preliminary injunction opposition and in her deposition, the anti-

steering provision is intended to protect enrollees from an inherent conflict of

interest in which the provider may be tempted to promote a specific plan that is

better aligned with its own financial interests than with the interests of the

enrollee. Block Dep. at 23-24, 28, 34; Block Decl. ¶¶ 11-16. The agency also noted

that providers, while experts on medical issues, are not likely to have all the

information (or even as much as their customers may be prone to think they have)

about the financial and commercial considerations involved in choosing an insurer

for a particular patient's situation.  Block Dep. at 23, 28-29, 34.

The guidelines against "steering" or "promoting" do not prohibit providers

from furnishing a range of objective, truthful information about plans, or otherwise

assisting their customers in learning about their Medicare options.  The Marketing

Guidelines For Plans encourage these activities so that enrollees can make fully

formed decisions as to which plans are best for them.  *See* Marketing Guidelines For

Plans at 123; Block Dep. at 13, 19, 20, 34-35, 48.   The definition of "marketing" set

forth above specifies that neither "[a]ssisting in enrollment" nor "education" consti-

tute "marketing."  Marketing Guidelines For Plans at 123.  For example, a phar-

macist could tell his customer information such as "this is what Plan A's formulary

looks like, and this is what Plan B's formulary looks like; and, you know, here are

the medications you take.  This is how, in my experience, Plan A does prior author-

ization.  This is how Plan B does it."  Block Dep. at 19-20.  The Marketing Guide-

lines for Plans nowhere preclude a provider from advising a customer whether to

sign up for any Medicare prescription drug plan (as opposed to "steering" them

toward a particular plan given an antecedent decision to sign up for some plan) and

nowhere preclude a provider from advising customers about TRICARE coverage or

from comparing the respective benefits of TRICARE and Medicare.

As part of the assistance in enrollment activities the Marketing Guidelines

For Plans indicate is permitted, pharmacists and other providers who have con-

tracted with plans may provide customers with written information that they or

third parties develop that does not constitute marketing.  For example, Walgreens

provides extensive information to its customers about the various plans.

http://www.walgreens.com/pharmacy/medicare_d/default.jsp?ban=bil_hpb_medicare

_0107 (last visited October 23, 2007).

      Many other sources of information are available to Medicare beneficiaries.

One source is the State Health Insurance Assistance Program, or SHIP, is a state-

based program that offers local one-on-one counseling and assistance to Medicare

beneficiaries and their families.  *See* http://www.cms.hhs.gov/Partnerships/

10_SHIPS.asp (last visited October 23, 2007).  The phone number of the SHIP in

each beneficiary's state is prominently featured on the back cover of the MEDICARE

& YOU handbook that CMS mails to beneficiaries.  Medicare's own plan finding

information, available both on the internet, http://www.medicare.gov/MPDPF

/Public /Include/DataSection/Questions/MPDPFIntro.asp (last visited October 23,

2007),  and through Medicare's 1-800-Medicare phone number, has been updated

and improved for the 2008 open season to be more user-friendly and more

comprehensive, *see* http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=

2509&intNumP (last visited Oct. 25, 2007).  In addition, CMS will publish plan

quality data on its web site beginning this month (November), "report cards . . . that

will, specifically, give people quality performance information," they can use along

with raw cost and benefit data when making 2008 selections.  Block Dep. at 40.

-13-

4.    Agency Policy Against Nursing
Homes Coercing Residents' Plan Choices

Plaintiffs' attorneys also criticize memorandum S&C 06-16 (Pls' SJ Exs. 1a
and 1b) written by Thomas Hamilton, Director of the Survey and Certification
Group within CMS.  Although made available to the public, Hamilton Dep. at 11,
the memorandum, as the "To" line indicates, is not directed to plaintiffs (or other
beneficiaries) and is likewise "not a memorandum directed to the nursing home
industry," but is instead "directed to the surveyors," *id*. 34, "who go in and do
surveys of nursing homes," *id*. at 6-7.  Approximately 45 to 60 such memoranda a
year are one means the Survey and Certification group uses to discuss enforcement
policies within the community of federal and state nursing home surveyors.  *Id*. at
11.

The policy at issue here is "grounded in the resident's right to choose" a
Medicare plan "and the nursing home's responsibility to respect the resident's
choices and a right to make those choices."  *Id*. at 30.  *See* 42 C.F.R. §§ 483.10(a)(2),
483.12(d)(1).  "[E]ven if a nursing home had said 'You know, between you and me,
I'd recommend that you go with plan A,' [w]hen we're doing the survey and we're
talking to residents in the survey sample, if that resident is completely satisfied and
doesn't feel like they [*sic*] had been coerced or required to choose a particular plan,
then we would not be taking an enforcement action."  Hamilton Dep. at 31 (tran-
scriber's paragraph and sentence break omitted).  Of course, it may be "dangerous
territory" for a nursing home to steer patients, since a "nursing home is populated

-14-

with very vulnerable individuals who rely upon that nursing home for their very existence, their ability to live, their medications, their food, their daily support, being able to get out of bed," or "if they're immobile, being able to be turned so they don't develop a pressure ulcer." *Id.* at 32. "In that very dependent situation it's very easy for people to feel suddenly coerced.  And so our advice to nursing homes is to make sure they are providing good information . . . that doesn't step over the line in something that the nursing home resident might feel is coercion or a require-ment." *Id.* at 32-33.  But the agency looks at the "ultimate outcome" of the trans-action, and even if a resident received and followed a nursing home's recommenda-tion to choose a particular plan, "if the nursing home resident did not feel that they had been coerced or required or denied their right, then we would not issue a citation." *Id.* at 33.

The agency's anti-coercion policy leaves "tremendous opportunity" for nursing homes "to provide good information to nursing home residents" and their families, *id.* at 40, including information about which plans have a resident's current prescription drugs in their formularies and which plans do or do not require prior authorization for those drugs, *id.* at 40-41, 72-74.

When memorandum S&C 06-16 was sent to surveyors in May 2006, nursing home associations expressed concern that the "tone" implied nursing home wrong-doing.  *Id.* at 35.  Hamilton meets regularly with associations representing the nursing home industry, and they have not subsequently raised concerns with him about the substance or actual implementation of the anti-coercion policy.  *Id.* at 38.

-15-

ARGUMENT

1.    The Agency's Marketing Guidelines For Plans And
      Anti-Coercion Policy For Nursing Homes Do Not
      <u>Cause Any Injury In Fact To The Three Plaintiffs</u>

      A.    <u>Plaintiffs' Burden Of Proof</u>

The three plaintiffs do not claim, and could not claim, that defendants have

placed any restrictions on their speech.  Instead, they argue that defendants have

restricted their health care providers from giving plaintiffs information they need

that the providers, but for the challenged policies, would be willing to share.

As the parties invoking federal jurisdiction, plaintiffs bear the burden of

supporting their claim to standing with evidence.  *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561 (1992).  And because plaintiffs' claim to standing here hinges on a

contention of how <u>non-parties</u> – their providers – react to government regulation,

plaintiffs bear the burden of showing how those non-parties are affected by the

challenged policies:

> When the suit is one challenging the legality of government
> action or inaction, the nature and extent of facts that must be averred
> (at the summary judgment stage) or proved (at the trial stage) in order
> to establish standing depends considerably upon whether the plaintiff
> is himself an object of the action (or forgone action) at issue.  If he is,
> there is ordinarily little question that the action or inaction has caused
> him injury, and that a judgment preventing or requiring the action will
> redress it.  <u>When, however, as in this case, a plaintiff's asserted injury
> arises from the government's allegedly unlawful regulation (or lack of
> regulation) of someone else, much more is needed</u>.  In that
> circumstance, causation and redressability ordinarily hinge on the
> response of the regulated (or regulable) third party to the government
> action or inaction – and perhaps on the response of others as well.  The
> existence of one or more of the essential elements of standing "depends
> on the unfettered choices made by independent actors not before the

> courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and <u>it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury</u>.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (emphasis supplied; citations omitted).  In particular, "in order to maintain a 'right to listen' claim, a <u>plaintiff</u> must <u>clearly</u> establish the existence of" an otherwise willing speaker and that the challenged policies are a "but for" cause of that potential speaker's un-willingness to speak.  *Pennsylvania Family Inst. v. Black*, 489 F.3d 156, 166 (3d Cir. 2007) (emphasis supplied).  *See also American Library Ass'n v. Odom*, 818 F.2d 81, 87 (D.C. Cir. 1987) (R.B. Ginsburg, J.) (affirming dismissal of claim to listener standing for lack of  "solid basis" to conclude that non-party would be "willing com-municator" in the absence of challenged government action).

 Plaintiffs' evidence falls far short of sustaining that burden.  They have not shown that <u>their</u> health care providers have declined to provide them with needed advice or assistance <u>because</u> of the agency's Marketing Guidelines for Plans or anti-coercion policy for nursing homes.

        B.    The Undated Declarations From
                <u>Providers Who Are Not Plaintiffs' Providers</u>

The only direct evidence plaintiffs present from providers that their speech has been in any way chilled are undated declarations, apparently recycled from the preliminary injunction motion, from a nurse and nursing home administrator in Ohio and a pharmacist in North Carolina who provides services to nursing homes.

White, Brickley, and England Declarations. Even if these declarations were more current,[9] none of these declarants says that Mrs. Fox or Mr. Edward Samp or Mrs. Samp has ever sought any advice from the declarant, let alone that he or she declined to give such advice because of agency guidance. Two other undated declarations that also seem to be recycled from the preliminary injunction motion are from corporate officials who, though pharmacists, appear to be involved in overseeing the corporation's pharmacies that provide services to nursing homes rather than involved in direct pharmacist-patient interactions. Wood and Donatelli Declarations. In any event, neither corporate official claims that, but for the challenged agency actions, he would have given advice to Mrs. Fox or either of the Samps.

The one declaration plaintiffs present from one of their providers, a declaration from the administrator of a nursing home at which Edward Samp briefly stayed, does not say either that the nursing home's speech has been chilled or that the Samps sought any advice on their Medicare options. Pls' Ex. F, Flaherty Decl.

---

[9] There is no guarantee that the declarations were even signed in close proximity to the filing of the preliminary injunction motion in January 2007. One of the declarations filed with that motion that was dated had been executed back in November 2006. Nov. 9, 2006 Fox Decl. Given Mr. Hamilton's testimony that nursing home associations that had originally expressed displeasure with the "tone" of one memorandum have not been challenging the actual subsequent implementation of the anti-coercion policy, Hamilton Dep. at 35, 38, if the declarations were otherwise material, then the undisclosed dates of these nursing home industry declarations would also be material. Whether or not material, the dates should have been set forth. 28 U.S.C. § 1746.

C.    Mrs. Fox's Testimony

Mrs. Fox does not state that she would like to, or did, seek advice from

declarants White, Brickley, England, Wood, Donatelli, or Flaherty.  Instead,

plaintiffs' brief argues that Mrs. Fox wanted to seek advice from "the one person

within the health care field with whom she regularly interacts – her pharmacist."

Pls' SJ Mem. at 19.  How close a relationship she has with her pharmacist may best

be gauged by the patent fact that she did not know his last name when she was

deposed.  She did not provide any name in the first declaration she filed.  At her

deposition, she testified that the pharmacist's name is Ron Decy, and she spelled

out Decy.  Fox Dep. at 9.  In her newest declaration, without attempting to explain

her contrary testimony at the deposition, she says that the pharmacist's name is

Ron Orvick.  Nov. 9, 2007 Fox Decl. ¶ 11.  There are no licensed pharmacists in

Pennsylvania named Decy or Orvick.

http://www.licensepa.state.pa.us/default.asp?bpoaNav=| (last visited Oct. 25, 2007).

In any event, whether Mrs. Fox's pharmacist is Ron Decy, or Ron Orvick, or

perhaps Ronald P. Ocvirk (who is licensed in McKees Rocks, where Mrs. Fox shops,

Fox Dep. at 10), there is no declaration or other evidence from the pharmacist

stating that, but for the Marketing Guidance for Plans, he would have steered Mrs.

Fox to a particular plan.

Nor does Mrs. Fox's own testimony support plaintiffs' brief's contention that

'[w]hen Ms. Fox sought such advice from her pharmacist, she was told that he was

not <u>permitted</u> to provide such advice." Pls' SJ Mem. at 45 (emphasis supplied).

What Mrs. Fox actually said in her deposition was this:

> Q. And when you did decide to enroll in Part D, or find out about enrolling in Part D, from whom did you seek information?
>
> [sources other than pharmacist discussed]
>
> Q. Did you talk to your pharmacist about it?
>
> A.  Not at that time.  As I said, I asked my son, and he said he didn't know any more than I did.
>
> Q. Did you talk to your pharmacist at another time?
>
> A.  Yes.  I probably did.
>
> . . . .
>
> Q. Do you remember what you told him, and then what you asked him?
>
> A. I said, "I am going to have do something.  Would I be able to have a few minutes of your time?"
>
> Well, he was busy at that time.  He probably forgot about it for a while.
>
> Q. And did you talk to him later?
>
> A. Well, then I said, "Ron, what am I going to do?"  And he said, "Mrs. Fox, I don't know what to tell you.  I just can't speak specifically to you."
>
> Q. Did he say anything else?
>
> A. No.
>
> Q. Did you say anything else to him?
>
> A. No.
>
> . . . .

Q.  Other than those two times, have you asked him for anything else, for other advice on prescription drug insurance?

A.  Probably not.  I can't remember exactly.

Fox Dep. at 38-40.

The point of the pharmacist that he "didn't <u>know</u> what to tell" Mrs. Fox and <u>could</u> not speak specifically to her actually makes a point similar to the one <u>defendants</u> have made in the Marketing Guidelines for Plans, namely, that, because providers are unlikely to be fully aware of both the plans' benefits and costs and the patients' relevant financial circumstances, they may not be able to provide an adequately informed recommendation to a particular plan.  Marketing Guidelines for Plans at 123, 124; Block Dep. at 23, 28-29, 34.  That the pharmacist was not in fact familiar enough with these issues to advise Mrs. Fox is obvious from Mrs. Fox's own original declaration, signed while the events were relatively fresh in her mind. Even though a program that had paid for some of Mrs. Fox's drugs and was run by one of the largest pharmaceutical manufacturers in the country had ended and stopped paying part of Mrs. Fox's prescription costs in May 2006, the pharmacist did not learn of this until September 2006.  Nov. 9, 2006 Fox Decl. ¶¶ 6, 15. Pharmacists are experts in medications and their interactions, but that does not mean that they must take the time to become experts on health insurance as well, let alone learn each customer's financial circumstances.  The pharmacist was too busy to step out of his role as a pharmacist and become a health insurance advisor the first time Mrs. Fox allegedly tried to get him to play that role, Fox Dep. at 39,

and when Mrs. Fox allegedly later tried to insist, it is not surprising that he would disclaim the knowledge needed to advise her which health insurance plan to choose, *id.* at 40.  The Marketing Guidelines for Plans would have <u>permitted</u> him to have been far more helpful than (according to Mrs. Fox) he actually was and to have provided Mrs. Fox with information about, for example, which plans do or do not include her drugs in their formularies.  Marketing Guidelines for Plans at 123; Block Dep. at 19-20.  But the Marketing Guidelines for Plans do not <u>compel</u> a pharmacist to double as a health insurance advisor.  (Each state's Health Insurance Assistance Program offers one-on-one counseling for Medicare beneficiaries from people who are experts on such issues.)

   D. <u>Mrs. Samp's Testimony</u>

  The Samps do not allege that they have attempted to talk to their pharmacist or to any nursing home personnel about which Medicare prescription drug plan to choose.

  Mary Samp does allege that personnel at the Samps' residence and the attached rehabilitation center (neither of which is a nursing home, *see* Hamilton Decl.) told the Samps "that they were not in a position to provide advice."  Oct. 5, 2007 Mary Samp Decl. ¶ 10.  Even if one assumed *arguendo* that the residence or rehabilitation center have contracts with Medicare plans subject to the Guidelines for Plans, that reported statement does not unambiguously indicate that those unnamed persons (from whom plaintiffs present no direct evidence) were dissuaded by defendants from providing advice; it seems rather to indicate that, like Mrs.

Fox's pharmacist, they were not able to provide it.[10]  The Marketing Guidelines for

Plans, we reiterate, do not preclude people who <u>are</u> in a position to provide advice

from doing so, as long as they do not steer to a particular plan.  Marketing

Guidelines For Plans at 123.  If Mrs. Samp's report of conversations with her

building's personnel is correct, those personnel did not feel themselves in a position

to provide even the extensive kinds of advice that the Guidelines permit.  There is

no sufficient evidence to conclude that, but for the Guidelines, they would have

steered the Samps to or from a particular plan.

Mrs. Samp has never attempted to seek any advice from her pharmacist

concerning which Medicare prescription drug plans would be best for her or her

husband.  Samp Dep. at 37, 40.  Plaintiffs offer no direct evidence from the pharma-

cist that, but for the Marketing Guidelines for Plans, he would have steered the

Samps to a plan if only they had asked.  Instead, Mrs. Samp alleges that other

people in her building talked to the pharmacist and reported that "he had told them

that he would not help them make their decision of what to do."  *Id*. at 40-41.  That

is inadmissible hearsay if used to prove that the pharmacist said any such thing.[11]

---

[10] To the extent "not in a position" is ambiguous on this point, the ambiguity does not help plaintiffs even with respect to defendants' cross-motion for summary judgment, both because plaintiffs bear the burden of coming forward with some admissible evidence sufficient to show their own standing and because they had the better opportunity to avoid ambiguity in drafting their own statements.

[11] A hearsay objection was interposed to the question at the deposition. Samp Dep. at 40.  If the issue were Mrs. Samp's state of mind that led her not to seek advice from her pharmacist, the statement would not be hearsay.  But to prove
(continued...)

Even if this twice-removed recounting of what the pharmacist said were accurate and admissible, it would be no proof that Mrs. Samp's pharmacist would not help <u>because</u> of the challenged Marketing Guidelines for plans rather than that he would not help because, like Mrs. Fox's pharmacist, he lacked the requisite knowledge or because he was busy enough being a pharmacist that he could not take on the extra duties of analyzing the financial affairs and health insurance options of numerous customers. Thus, as in *Pennsylvania Family Institute v. Black*, 489 F.3d 156 (3d Cir. 2007), there is no statement by the allegedly otherwise willing speaker that the challenged policy is the but-for cause of a decision not to speak, merely plaintiffs' speculation that, of the many reasons why he might have declined to speak, the one reason is defendants' policy. That is not enough to sustain plaintiffs' burden to show listener standing. *Id*. at 166.

That a pharmacist, expert though he may be on drugs and their interactions, is not necessarily also an expert on his customers' health insurance and health insurance options is made obvious by the Samps' own circumstances. Although Edward Samp has Medicare prescription drug coverage through the City of Cambridge, he takes so many medicines that he still pays more than $100 a month

---

[11](...continued)
standing, the plaintiffs must show the effects of the Marketing Guidelines for Plans on the pharmacist, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Instead of offering evidence directly from the pharmacist, plaintiffs attempt to offer as one building block of such proof the truth of the out-of-court statements of people in the Samps' building that the pharmacist said he would not help them.

in co-pays out of his own pocket.  Mary Samp Dep. at 21-23.  TRICARE would pay

for most or all of those co-pays for Mr. Samp if only the pharmacist (who is part of

TRICARE's network) would submit the bills to TRICARE on Mr. Samp's behalf.

Watson Decl. ¶ 10.  Yet the pharmacist has not done so, *id*. ¶ 13, presumably

because he is not familiar enough with the Samps' circumstances to know that

Edward is eligible for TRICARE.  *See* Samp Dep. at 20 (Mrs. Samp does not know

whether their pharmacist has been told that Mr. Samp is eligible for TRICARE).[12]

In any event the Samps could not have been prevented from getting needed

advice on which Medicare prescription drug plan they should choose because it is

obvious – for reasons a pharmacist or anyone else <u>is</u> permitted to discuss – that

they should not be choosing among such plans in the first place.

Mrs. Samp does not take any prescription drugs, Samp Dep. at 11, and

already receives (unused) prescription drug benefits as part of the package of

Harvard retiree health benefits, *see id*. at 6.  Because that Harvard coverage is

"creditable," *see* Def's Ex. B, it is at least as good as the average Medicare plan Mrs.

Samp could pay extra money to buy on her own, and there will be no penalty if Mrs.

Samp's circumstances ever change and she later needs to buy Medicare prescription

drug coverage.  Harvard "urged" Harvard retirees "NOT to sign up for" a Medicare

prescription drug plan, since "'[n]ot only are Harvard retirees already covered . . .

---

[12] Nothing in Medicare's Marketing Guidelines for Plans could even begin to
be construed as precluding the Samps and their pharmacist from communicating
about Mr. Samp's TRICARE coverage.

but enrolling in Medicare Part D would create an additional expense–with very little or no additional benefit.'"[13]  Mrs. Samp "probably" talked directly to officials at Harvard and received the same advice.  Samp Dep. at 26-27.  It is no wonder then that she concluded that she was "better off continuing to obtain prescription drug coverage" for herself "through Harvard."  Oct. 5, 2007 Mary Samp Decl. ¶ 6.  Since she has no interest in disenrolling herself from Harvard's retiree health benefit plan, Samp Dep. at 10, she is simply not in the market for any Medicare prescription drug plan.  Any question concerning what kinds of advice she could or could not receive about which Medicare prescription drug plan to choose in the hypothetical world in which she would have a reason to make such a choice does not present any live case or controversy.

Edward Samp receives retiree health benefits from the City of Cambridge.  In no uncertain terms (the emphases are original) the City told him that "**Blue Cross/Blue Shield will automatically enroll you in Medicare Part D coverage, so you should NOT sign up for any Medicare Part D additional coverage on your own, as it could put your enrollment with the City of Cambridge plan in jeopardy.**"  Attachment to Oct 5, 2007 Mary Samp Decl.  If the City is right, the Samps would not want to jeopardize Mr. Samp's retiree health care benefits by going out and choosing a Medicare prescription drug program other

_____

[13] Attachment to Jan. 2007 Mary Samp Decl., *quoting* Vicki Boone, Acting Associate Director of Benefits, Harvard University Benefits Service Group (emphasis newsletter's, unclear whether also Boone's).

than the one provided by the City as part of its benefits package.  Samp Dep. at 35.

And they have no reason to believe the City is wrong.  Mary Samp knows that the

author of that warning is a good city manager, Samp Dep. at 32, she probably

talked to him or his staff and received the same warning as the letter provided, *id*.,

and she has no information that would contradict what he told her.[14]  Accordingly, it

is clear that the Samps have no reason to be choosing among Medicare prescription

drug plans for Mr. Samp's coverage.

Even with the Medicare prescription drug plan in which the Samps are

enrolled as part of the City's package of retiree health benefits, the Samps incur

significant out-of-pocket costs in co-pays because of the number of different drugs

Mr. Samp takes.  Oct. 5, 2007 Mary Samp Decl. ¶ 13.  But that is no reason to shop

for a Medicare prescription drug policy.  Edward Samp cannot be enrolled in two

such Medicare policies simultaneously, *see* 42 C.F.R. § 423.32(e)(i), so choosing and

paying for such a policy on his own would cancel his enrollment in the policy he has

as part of the City's package of benefits, and he would then have the new policy's co-

pays to deal with.  But one can have – and Edward Samp already does have –

simultaneous prescription drug coverage under both Medicare and TRICARE.  The

solution to paying for Mr. Samp's Medicare prescription co-pays is obvious, and it

has absolutely nothing to do with risking his coverage from the City in order to

comparison shop among Medicare plans.  He can simply let his pharmacist know

---

[14] Nothing in defendants' Marketing Guidelines for Plans precludes the
Samps from asking anyone they want anything they want about the <u>City's</u> plan.

that he is covered by TRICARE and then let TRICARE cover most or even all of the

costs he has been paying out of pocket. Any injury in fact to Edward Samp is thus

eminently solvable: the solution is TRICARE rather than this beside-the-point-of-

any-real-injury lawsuit.[15]

---

[15] The usual lawsuit is a means to an end. First, there is an injury or a threatened injury to a client, and then the lawsuit is called into existence to solve that injury. Here, however, the alleged injuries seem to be the means to an end of allowing plaintiffs' law firm to submit its essay to a federal judge rather than a law review editor. That the usual temporal order of injury/lawsuit was reversed we already know from plaintiffs' law firm's answers to interrogatories: The law firm first decided to file suit and only then began looking for clients with injuries that the lawsuit could solve. Defs' Ex. C at 12-13.

The conclusion that the usual means/end relationship between lawsuit and injury has been reversed is reinforced by plaintiffs' proposed order. If one were to indulge the notion that plaintiffs were injured in fact by defendants' actions, the injury would be an inability to receive information about choices among Medicare prescription drug plans. Pls' SJ Mem. at 4. To correct that alleged injury it should be important for Rebecca Fox and Edward Samp that relief be granted before January 1. See Oct. 9, 2007 Fox Decl. ¶ 24. The open season for choosing a Medicare drug plan runs every year from November 15 to December 31. 42 C.F.R. § 423.38. (In the unlikely event that Mary Samp were to drop her Harvard coverage, she would have a special election period.) Plaintiffs' proposed order is inconsistent with the urgency that would be required if the alleged injuries were real. After plaintiffs asked for an extension of the agreed-upon briefing schedule that pushed the close of summary judgment briefing back to December 7, they now ask for a proposed order that, once the Court rules on the summary judgment motions, would "have the parties report back to the Court within two weeks if they cannot agree on language for an injunction, at which point the Court will hear arguments on the proper scope of injunctive relief." The likelihood that this will result in relief for the three plaintiffs in time for the upcoming open season is slight. This proposed order is of a piece with plaintiffs' timing of their preliminary injunction motion. Although the case was filed in August 2006, the preliminary injunction motion was not filed until January 2007, just in time to miss last year's open season.

2.      The Agency's Marketing Guidelines For
Plans And Anti-Coercion Policy For Nursing
<u>Homes Do Not Violate The First Amendment</u>

A.      <u>Marketing Guidelines For Plans</u>

The Marketing Guidelines for Plans permit plans that contract with Medi-

care to use their providers to dispense a wide range of information about the var-

ious Medicare plans.  The constraint against providers "steering" customers to or

from a particular plan is narrowly crafted and directly advances substantial govern-

ment interests.  Plaintiffs' attacks on the Guidelines go wrong at every turn: They

mistake the level of scrutiny, understate or overlook entirely the government's sub-

stantial interests, and exaggerate the narrow reach of the challenged snippets of

the Guidelines.

1.      <u>Standard Of Scrutiny</u>

Plaintiffs contend that strict scrutiny is required because the speech at issue

would address matters of "public concern."  Pls' SJ Mem. at 27-31.  However, the

kind of speech at issue here would be an effort to steer a particular individuals to a

particular plan.  Which plan would be best for Rebecca Fox is a matter of private

concern to Mrs. Fox, not a question of any concern at all to the public at large.  Of

course, such questions as whether the prescription drug program is working well

may be of public concern, but the Guidelines do nothing to prevent speech on those

issues.  Under plaintiffs' theory almost <u>any</u> speech could be characterized as of

"public concern" no matter how parochial or particularized since some theme or

premise of the speech would, writ large, be of public concern.  However, the

Supreme Court has rejected efforts by speakers who addressed private, particularized concerns to claim the protection accorded speech on issues of "public concern" merely because the speech was a retail example of what, at a wholesale level, might be an issue of public concern. *City of San Diego v. Roe*, 543 U.S. 77 (2004); *Connick v. Myers*, 461 U.S. 138 (1983).

Plaintiffs also argue that a pharmacist's urging a customer to choose a particular plan acceptable to the pharmacist to pay the customer's pharmacy bills is not commercial speech because it does not "propose a commercial transaction between the speaker and the listener." Pls' Mem. at 26.[16]  However, a health insurer is generally called a "third-party payer" for a reason. If the "speaker and the listener" are the provider and his customer, they are by definition the first and

---

[16] Plaintiffs also argue that, unlike pharmacists, physicians, hospitals, and nursing homes rarely contract with prescription drug plans. Nursing homes we address in the next section. As to doctors and hospitals, what plaintiffs determinedly ignore is that the Marketing Guidelines for Plans not only address marketing of prescription drug plans but also address marketing of Medicare Advantage plans. (Indeed, the Marketing Guidelines <u>first</u> addressed marketing of Medicare Advantage plans. When it enacted the prescription drug benefit, Congress told CMS to use "rules similar to (and coordinated with)" the pre-existing rules dealing with Medicare Advantage "[m]arketing material." 42 U.S.C. § 1395w-101.) Physicians and hospitals do contract with Medicare Advantage plans. Outside plaintiffs' brief, marketing of Medicare prescription drug plans does not occupy some world separate and apart from marketing of Medicare Advantage plans. Indeed, although Medicare Advantage plans make sense for many people and there is good reason why CMS allows providers to let customers know about Medicare Advantage plans, probably the most frequent Medicare marketing complaints concern marketing of Medicare Advantage plans to beneficiaries who had been only interested in Medicare prescription drug plans. *See, e.g.*, *Hearing on Medicare Advantage Private Fee for Service Plans Before the House Subcomm. on Health, House Ways and Means Comm.* (May 22, 2007) (testimony of Wisconsin Commissioner of Insurance Sean Dilweg).

second parties to commercial transactions they are contemplating entering into

with that third party insurer. There is nothing ignoble about pharmacists having

commercial interests when they sell drugs to customers, but (as we will explain in

more detail in the next section) they undoubtedly do have such interests, which the

Secretary wisely considers in implementing the prescription drug program.

Thus, at most, the Marketing Guidelines for Plans need satisfy only the test

set forth for commercial speech in *Central Hudson Gas v. Public Service Comm'n*,

447 U.S. 557, 566 (1980), *i.e.*, even if the speech in question concerns lawful activity

and is not misleading, the government may impose restrictions that advance a

substantial government interest and are no more extensive than is necessary to

serve that interest. *See*, *e.g.*, *Whitaker v. Thompson*, 353 F.3d 947 (D.C. Cir.)

(rejecting First Amendment challenge to FDA disapproval of proposed marketing

label), *cert. denied*, 543 U.S. 925 (2004).

We say "at most," because in one respect this case does differ from the usual

"commercial speech" case. The government is here not merely a regulator of speech

in which private parties seek among themselves to enter into commercial arrange-

ments. Rather, the government, through its contracts with plans and providers, is

itself one of the parties to the transactions being proposed. "[F]or Plans" is not a

merely decorative flourish in the title of the Marketing Guidelines For Plans. The

Marketing Guidelines for Plans do not directly regulate pharmacists or other

providers at all. They are part of the contractual terms that address what plans,

whether acting through employees, commissioned brokers, providers, or other

agents, may do.[17]  And it is well established that the government may have

interests in agreeing on the scope of speech in the context of its own contracts

distinct from and beyond those that might support free-standing regulation of

transactions to which the government is a stranger.  *Rust v. Sullivan*, 500 U.S. 173

(1991); *United States v. Snepp*, 444 U.S. 507 (1980); *United States v. Kokinda*, 497

U.S. 720, 725 (1990) (plurality opinion); *see Davenport v. Washington Educ. Ass'n*,

127 S. Ct. 2372, 2381 (2007) ("our cases recognize that the risk that content-based

distinctions will impermissibly interfere with the marketplace of ideas is sometimes

attenuated when the government is acting in a capacity other than as regulator").

When someone shills for the Aetna Medicare prescription drug plan or the Blue

Cross Medicare prescription drug plan, it is not just Aetna and Blue Cross who are

potential parties and it is not just Aetna and Blue Cross whose good names would

be affected when a plan is pushed because it suits the provider's needs rather than

the buyer's.  Medicare has every contractual right to protect its own commercial

interests and to control how its own official Medicare endorsement is marketed by

plans with whom it chooses to partner in offering prescription drug plans.  This

freely entered contractual limitation does not violate the First Amendment.  *See*

*Rust*, 500 U.S. at 196.[18]

---

[17]  The agency's only recourse if a plan does not comply with the guidelines is to take the issue up with the plan.  It is for the plans to decide how to assure that their providers and other agents do not compromise the plans' commitments.

[18] The anti-steering provisions of the Guidelines are similar to other condi-
(continued...)

2.    Medicare's Other Substantial Interests

The Marketing Guidelines for Plans point out (at 123) that some providers may stand to gain financially if they can steer a customer to one drug plan rather than another.  Pharmacists in particular have four distinct kinds of possible financial incentives to favor some plans over others.  Plaintiffs wholly ignore two of those possibilities and unconvincingly deny a third.  The only one of those incentives plaintiffs deign to acknowledge is (one would hope) the least common, kickbacks from a plan to the pharmacist precisely for steering a patient to a plan.  Even then, plaintiffs argue that there is no need for the Guidelines since the government could instead crank up the machinery of criminal law and impose the "absolutely ruinous," Pls' SJ Mem. at 3, consequences of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b).  But the mere fact that the government could drop an atom bomb is no reason to disallow resort to a more measured response.  *See Methodist Hosp. v. Shalala*, 38 F.3d 1225, 1233-34 (D.C. Cir. 1994).

The possible pharmacist financial interest plaintiffs unconvincingly deny is that some plans may pay pharmacists more than others for the same drugs.  Plaintiffs deny this possibility based on merely one undated (but by now, in a different sense, dated) declaration of one of their three pharmacist declarants.  Pls' SJ Mem.

_____

[18](...continued)

tions that the Medicare program places upon health care providers or suppliers to protect beneficiaries.  For example, physicians who bill Medicare for the sale of certain equipment must agree as a condition of payment that they will not directly contact a beneficiary by telephone unless certain conditions apply.  42 C.F.R. § 424.57(c)(11).

at 40-41.  Plaintiffs' other two pharmacist declarants are silent on this very point, and for good reason: The pharmacy that employs them, and that has by far the largest pharmacy market share among nursing home patients, has stated as a matter of public record that there are significant differences in reimbursement rates that prescription drug plans pay that pharmacy.  First Supplemental and Amended Complaint ¶¶ 55, 56, 64, *Omnicare, Inc. v. United Health Group, Inc.*, Civil Action No. 06-6235 (N. D. Ill.) (Docket # 47, Nov. 14, 2006).

One of the pharmacy financial interests plaintiffs wholly overlook is that even if two plans did pay the same amount for each drug, differences in their formularies will have different profit implications for pharmacists.  If, for example, a pharmacy customer could take either Brand A or Brand B for one condition and either Brand X or Brand Y for another, a pharmacy with a higher profit margin on Brands A and X will have an incentive to steer the customer toward a plan that features A and X in its formulary and away from a plan that features Brands B and Y.  As Dr. Jeffrey A. Kellman sets out in his declaration (filed herewith), pharmacies can and do have very different profit margins for different drugs.  And, as the son of one of the plaintiffs has explained, "pharmacies . . . have implemented more aggressive formularies [and] therapeutic substitution programs . . . to leverage deeper discounts from pharmaceutical manufacturers."  Thomas C. Fox, Carol Colburn, Carl Krasik, & Joseph W. Metro, HEALTH CARE FINANCIAL TRANSACTIONS MANUAL § 5.7 (West Publishing 2007).  Such pharmacies have every

incentive to steer patients toward plans whose formularies are most similar to the "aggressive formularies" that will maximize the pharmacies' profits.

Plaintiffs also overlook that even if plans marched in lockstep to pay pharmacists the same amount for a given drug and all had identical formularies, plans may still differ in the trade-off between premium costs and co-pays. Some plans might feature relatively low premiums and the standard 25% co-pay, *see* 42 U.S.C. § 1395w-102(b), while others might offer a reduction in co-pays but charge a correspondingly higher premium, *see* 42 U.S.C. §§ 1395w-102(a)(2)(i), 1395w-113(a)(1)(C). A pharmacist will know that he is likely to do more business with customers who can be steered to the second kind of plan where the customers will pay high premiums up front and then have lower marginal costs when they are deciding whether to buy more drugs.

Profit-seeking makes the real commercial world go round. Plaintiffs err in supposing that pharmacists inhabit some separate sphere from which they can dispense disinterested advice to their own customers.

The Marketing Guidelines for Plans also note that a pharmacist's advice is unlikely to be fully informed. Market Guidelines at 123. Plaintiffs' own descriptions of their interactions with their pharmacists illustrate the point. Mrs. Fox's pharmacist did not learn until September 2006 that one of the largest pharmaceutical companies in America had ended a program to assist customers with drug purchases in May. Nov. 9, 2006 Fox Decl. ¶ 15. The Samps' pharmacist is apparently still unaware that Mr. Samp has prescription drug coverage from

TRICARE.  Samp Dep. 20, 23-24; Watson Decl. ¶ 13  That pharmacists may be experts in drugs and drug interactions does not also make them experts in either the variations among the insurance options available to their customers or in the customers' financial and insurance circumstances.

Plaintiffs do not so much deny that pharmacists will not know enough to make a fully informed recommendation as argue that "*nobody*" else will know enough either.  Pls' SJ Mem. at 39 (emphasis original).  The supposedly "compelling evidence" of this is a "recent" study of the agency information efforts published in June 2006, *i.e.*, after only one of the program's open seasons.  *Id*.  For a program that did not begin operating until January 2006, that "recent" study is more than half a lifetime ago.  As the program now enters its third open season, the agency has learned from experience and has both increased the kinds of information made available and improved the presentation.  See http://www.medicare.gov/MPDPF/ Public/Include/DataSection/Questions/MPDPFIntro.asp (last visited October 23, 2007); http://www.cms.hhs.gov/apps/media/press/release.asp?Counter= 2509&intNumP (last visited Oct. 25, 2007); Block Dep. at 38-40.  Moreover, plaintiffs wholly ignore the State Health Insurance Assistance Programs that offer personalized counseling on choosing a Medicare prescription drug plan.  *See* MEDICARE AND YOU 2008 at 54 (CMS 2007).  In addition, "there are quite a few advocacy organizations, consumer organizations, and they make a strong  effort to provide good impartial information."  Hamilton Dep. at 44.

3.     The Narrowly Crafted Guidance Against Steering

Of course, the mere fact that providers are neither disinterested nor omniscient does not imply that they cannot be worthwhile sources of information for a Medicare beneficiary to consult.  The agency recognizes this and permits and encourages providers to share a wide range of information with their customers. Marketing Guidelines For Plans at 123; Block Dep. at 13, 19-20, 34-35, 48; Hamilton Dep. at 40-45.

To be sure, the Marketing Guidelines for Plans also contain a narrow con-straint on "steering" customers toward a particular plan.  Plaintiffs label this a "blanket ban on all speech on a topic." Pls' SJ Mem. at 35.  The actual "ban" is more potholder than blanket.  Providers contracted with plans (and their contractors) cannot . . . [d]irect, urge, or attempt to persuade, any prospective enrollee to enroll in a particular plan or to insure with a particular company based on financial or any other interest of the provider (or subcontractor)."  Marketing Guidelines for Plans at 128.   While this protects beneficiaries from being burned by inappropriate pushing of a particular plan, it does not cover all, or even most,  potential speech on the topic of drug plan choices.  The Marketing Guidelines for Plans permit both "[a]ssisting in enrollment" and "education" by providers.  *Id*. at 123.  The agency expressly "encourage[s] providers to "assist a beneficiary in an objective assessment of the beneficiary's needs and potential plan options that may meet those needs." *Id*. (emphasis supplied).  The agency says that "providers may certainly engage in discussions with beneficiaries when patients seek information or advice from their

provider regarding their Medicare options." *Id.* (emphasis supplied).  For example, a pharmacist could tell his customer information such as "this is what Plan A's formulary looks like, and this is what Plan B's formulary looks like; and . . . here are the medications you take.  This is how, in my experience, Plan A does prior authorization.  This is how Plan B does it."  Block Dep. at 19-20; *accord*, Marketing Guidelines For Plans at 128; *contra,* Pls' SJ Mem. at 5-6.  Moreover, providing the information people like the Samps actually seem to need – involving not a comparison among Medicare plans, but rather information about the interaction between Medicare, TRICARE, and employer sponsored health benefits – is not in any way prohibited by the Guidelines.  In short, the agency permits and encourages pharmacists to share truthful and objective information with their customers so that the customers can make their own choices among prescription drug plans. Nothing in the First Amendment bars this narrowly crafted policy.

## B.    The Anti-Coercion Policy For Nursing Homes

Most of the reasons we have just reviewed for why the Marketing Guidelines for Plans are constitutional apply as well to the agency's anti-coercion policy for nursing homes.  But plaintiffs' challenge to that policy fails for an additional, threshold reason.  The agency's anti-coercion policy for nursing homes does not prohibit speech.  It prohibits coercion.  42 C.F.R. §§ 483.10(a)(2), 483.12(d)(1).

Plaintiffs discuss one memorandum, memorandum S&C 06-16, that discussed that policy in May 2006.  Fifteen months later, on August 24, 2007,

plaintiffs took the deposition of the memorandum's author, Thomas Hamilton, Director of the CMS Survey and Certification Group.

Hamilton's deposition leaves no doubt that the agency's policy is "grounded in the resident's right to choose" a Medicare plan, "and the nursing home's responsibility to respect the resident's choices and a right to make those choices." Hamilton Dep. at 30. Hamilton makes it clear that it is <u>coercion</u>, not speech *per se*, that is prohibited. The agency looks at the "ultimate outcome" of the transaction, and even if a resident received and followed a nursing home's recommendation to choose a particular plan, "if the nursing home resident did not feel that they had been coerced or required or denied their right, then we would <u>not</u> issue a citation." *Id.* at 33 (emphasis supplied). Hamilton explained that "even if a nursing home had said 'You know, between you and me, I'd recommend that you go with plan A,' [w]hen we're doing the survey and we're talking to residents in the survey sample, if that resident is completely satisfied and doesn't feel like they [*sic*] had been coerced or required to choose a particular plan, then we would <u>not</u> be taking an enforcement action." *Id.* at 31 (transcriber's paragraph and sentence break omitted; emphasis supplied).[19]

---

[19] Citing 42 C.F.R. § 488.406, plaintiffs argue that an enforcement action could impose penalties up to a termination of the nursing home's participation in Medicare and Medicaid. Pls' SJ Mem. at 11. What penalties are imposed depends on the severity and frequency of any violations. 42 C.F.R. § 488.406. In another part of the Hamilton deposition plaintiffs ignore, Hamilton explained that a violation of the right to choose a Medicare plan would ordinarily be a violation of relatively low severity. Hamilton Dep. at 75-76.

Plaintiffs' nursing home industry declarants do not rebut this point. Their declarations are undated but probably no more recent than some time in 2006. In his August 24, 2007, deposition, Hamilton acknowledged that some within the nursing home industry had expressed concern about the "tone" of the May 2006 memorandum discussing the anti-coercion policy, Hamilton Dep. at 35, but he meets regularly with associations representing the nursing home industry, and they have not subsequently raised concerns with him about the substance or actual implementation of the anti-coercion policy. *Id.* at 38.

The Medicare Act provides that <u>beneficiaries</u> may exercise <u>their</u> "choice" of plans, 42 U.S.C. § 1395w-21(c) (incorporated by reference in Medicare Part D, 42 U.S.C. § 1395w-101(b)(1)(B)(ii)). This is, at the very least, a reasonable construction of this provision under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). As Hamilton explained, a "nursing home is populated with very vulnerable individuals who rely upon that nursing home for their very existence, their ability to live, their medications, their food, their daily support, being able to get out of bed," or "if they're immobile, being able to be turned so they don't develop a pressure ulcer." Hamilton Dep. at 32. Given that enormous power over vulnerable residents, nursing homes are required to respect patients' rights, and in particular, not to coerce them in their exercise of Medicare rights. 42 C.F.R.

§§ 483.10(a)(2), 483.12(d)(1).[20]  Plaintiffs do not even attempt to argue that nursing homes may coerce beneficiaries to choose a particular plan.

If, as here, coercion is not permitted, it does not matter that the <u>means</u> by which coercion may be accomplished include speech.  Pointing a gun at someone is expressive.  "Your money or your life" is in a literal sense speech.  It does not, however, violate the First Amendment for the government to punish such demands even though expressive conduct or speech is an instrumentality used in making them.  *E.g.*, Akhil Reed Amar, *The Case of the Missing Amendments*, 106 HARV. L. REV. 124, 140 (1992); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 616-20 (1969) (no First Amendment protection for employer's anti-union comments constituting "a threat of retaliation based on misrepresentation and coercion" ).

To be sure, a nursing home's speech may be <u>evidence</u> of coercion.  Hamilton Dep. at 50-51 ("nursing home policy that instructed certified nurse assistants to coach, steer, coerce the residents, . . . would be evidence that we would rely upon in making a final determination" that would "hone in on the question of . . . are individuals denied their right to choose"); *compare id.* at 32-33 ("our advice to nursing homes is to make sure they are providing good information . . . that doesn't step over the line in something that the nursing home resident might feel is coer-

---

[20] Where a nursing home patient is not competent to make his own choices, the right of choice belongs to his or her legal representative, and the nursing home may not coerce the representative's choice.  If, of course, the nursing home is itself the representative (which is not always the case), then the question of nursing home coercion or advice does not arise since the nursing home is itself the decision-maker.

cion") *with Gissell Packing*, 395 U.S. at 620 ("an employer, who has control over that relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior.  He can easily make his views known without engaging in '"brinkmanship"' when it becomes all too easy to 'overstep and tumble (over) the brink,' *Wausau Steel Corp. v. NLRB*, 377 F.2d 369, 372 (C.A.7th Cir. 1967)").  Such evidentiary use of speech to prove an element of a non-speech violation such as coercion is permissible under the First Amendment.  *E.g.*, *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir.) (rejecting First Amendment challenge to FDA disapproval of proposed label where label was evidence of the nature of claims made on behalf of drug), *cert. denied*, 543 U.S. 925 (2004).

<u>CONCLUSION</u>

For the reasons stated above, plaintiffs' motion for summary judgment should be denied and defendants' motion for summary judgment should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

-42-

/s/ Brian G. Kennedy
SHEILA M. LIEBER
BRIAN G. KENNEDY (D.C. Bar No. 228726)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel.:  (202) 514-3357
Fax:  (202) 616-8470
Email:  Brian.Kennedy@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REBECCA FOX, *et al.*,                    )
                                          )
          Plaintiffs                      )
                                          )
          v.                              )    Civil Action No. 1:06-01490-RMC
                                          )    Judge Collyer
MICHAEL O. LEAVITT, *et al.*,             )
                                          )
          Defendants                      )
_____    )

## DEFENDANTS' STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 56.1, defendants, by their undersigned attorneys, hereby submit the following statement of genuine issues.  Paragraph numbers are the same as in plaintiffs' statement of material facts not in genuine dispute.

1.  Disputed in part.  While the Marketing Guidelines For Plans tell plans that providers with whom they contract may not "[d]irect, urge, or attempt to persuade, any prospective enrollee to enroll in a particular plan or to insure with a particular company based on financial or any other interest of the provider (or subcontractor)," Marketing Guidelines For Plans at 128, the Guidelines expressly permit providers to give beneficiaries objective information on plan costs and benefits, including information on plan benefits, costs, formularies, cost sharing, and utilization management tools.  *Id.*

2.  Disputed.  The cited memorandum, which was not directed to plaintiffs or to nursing homes and does not "impose" anything, discusses agency policy set forth in regulations.  42 C.F.R. §§ 483.10(a)(2), 483.12(d)(1).  Neither those regulations

nor the memorandum impose any restrictions at all on speech. The agency policy instead is that nursing home <u>coercion</u> of what should be a resident's free right to choose among Medicare plans is prohibited. Hamilton Dep. at 30-33. Nursing home "speech" that is an instrumentality of coercion may be evidence of that coercion, *id*. at 50-51, but speech that does not result in coercion will not result in any sanctions. *Id*. at 30-33, 50-51.

3. Disputed. Plaintiffs' evidence that "many" providers have declined to provide their patients with advice that they would otherwise be willing to provide is a grand total of three declarations from providers – who are not plaintiffs' providers – associated with nursing home patients. None of these declarations is dated, but all of which seem to be at least nearly a year old. Mr. Hamilton testified in late August 2007 that nursing home associations that had originally expressed displeasure with the "tone" of a May 2006 memorandum have not been challenging the actual subsequent implementation of the agency's policy, which proscribes coercion, not speech, by nursing homes. Hamilton Dep. at 35, 38.

4. Disputed. There are numerous sources from which senior citizens can get informed advice on their Medicare options. the agency has learned from experience and has both increased the kinds of information made available and improved the presentation. These sources include

> CMS's web and telephone based plan information, newly improved for the 2008 open season, *see*
>
> http://www.medicare.gov/MPDPF/Public/Include/DataSection/Questions/MPD

PFIntro.asp (last visited October 23, 2007);

http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=2509&intNu

mP (last visited Oct. 25, 2007); Block Dep. at 38-40.

State Health Insurance Assistance Programs that offer personalized

counseling on choosing a Medicare prescription drug plan. *See* MEDICARE

AND YOU 2008 at 54 (CMS 2007); Defs' SJ Ex. B (Harvard letter referring

Samp plaintiffs to that source);

Many few advocacy organizations and consumer organizations provide good

impartial information." Hamilton Dep. at 44.

5. Disputed. The sources identified in paragraph 4 are among the sources

likely to be better able than providers to dispense informed and disinterested

advice. Providers who are medical experts are not automatically also experts either

in insurance or in the financial circumstances of their customers. Plaintiffs' own

descriptions of their interactions with their pharmacists illustrate the point. Mrs.

Fox's pharmacist did not learn until September 2006 that one of the largest

pharmaceutical companies in America had ended a program to assist customers

with drug purchases in May. Nov. 9, 2006 Fox Decl. ¶ 15. The Samps' pharmacist

is apparently still unaware that Mr. Samp has prescription drug coverage from

TRICARE. Samp Dep. 20, 23-24; Watson Decl.

6. It is undisputed that Mrs. Fox is 88 years old. Whether she is extremely

confused or not is subjective; no objective evidence suggests that she is. It is

undisputed that there are no providers other than her pharmacist whom she

regards as possible sources of advice on which Medicare plan to choose. It is disputed that her relationship with her pharmacist is close, as it is evident that she did not know his last name. *Compare* Fox Dep. at 9 (giving pharmacist's name as Ron "Decy") *with* Nov. 9, 2007 Fox Decl. ¶ 11 (giving name as Ron "Orvick") *and* http://www.licensepa.state.pa.us/default.asp?bpoaNav=| (last visited Oct. 25, 2007) (no licensed pharmacists in Pennsylvania under either name). And it is most certainly disputed that her pharmacist "declined to provide a recommendation, <u>in light of the Marketing Guidelines</u>." Emphasis supplied. According to Plaintiff Fox's own deposition, when the pharmacist declined to provide advice he made no reference to the Marketing Guidelines and instead indicated that he did not "know" what to tell her. Fox Dep. at 38-40.

7. Edward and Mary Samp's ages are undisputed. It is disputed that they have any objective reason to seek advice or guidance on which Medicare Part D plan to choose for they have no reason to make such a choice, and since those objective reasons are all patent to Mary Samp, who makes health insurance decisions on their behalf, there is no basis for any confusion about which Part D plan to choose. First, she knows that she has retiree health benefits from Harvard, she knows that she does not want to drop that coverage, she knows that Harvard advises her not to choose a separate Medicare plan, and she has no reason not to follow that advice. Samp Dep. at 6, 10, 26-27. Second, she knows that her husband has retiree health care coverage from the City of Cambridge, she knows that the City of Cambridge has said that choosing a different Medicare plan than the one provided by the City

as part of its benefits would risk her husband's entitlement to those benefits, she knows that she doesn't want her husband to lose those benefits, and she knows that she does not disbelieve the City's warning.  *Id.* at 32, 35; Attachment to Oct 5, 2007 Mary Samp Decl.  In addition, she also knows that Edward Samp has free prescription drug coverage, secondary to Cambridge and Medicare, from TRICARE. Oct. 5, 2007 Mary Samp Decl. ¶ 9; Jan. 2007 Mary Samp Decl. ¶ 7.

It is also denied that the Samps' pharmacist has declined to recommend a Part D plan in light of the Guidelines.  Neither of the Samps has talked to the pharmacist on this point, Samp Dep. at 37, 40.  Even if hearsay statements of others about what the pharmacist told them were admissible – and defendants object to their admissibility – those statements do not indicate that the pharmacist declines to give advice <u>because</u> of defendants Guidelines.

8.  For the reasons stated in paragraph 7, it is disputed that the Samps have any reason to choose a Part D Medicare plan for Edward Samp, so it is irrelevant what advice they could or could not get on a topic that they know or should know simply does not arise.  Moreover, while there is an objective reason to believe that a nursing home would be dissuaded from <u>coercing</u> Edward Samp's choice of a Part D plan – in the entirely hypothetical world in which such a choice was to be made – there is no reason to believe that a nursing home could not offer advice and information about such plans.  *See* Hamilton Dep. at 30-33, 50-51.

9.  Disputed.  Plans do not all offer the same financial terms to pharmacists. First Supplemental and Amended Complaint ¶¶ 55, 56, 64, *Omnicare, Inc. v. United*

*Health Group, Inc.*, Civil Action No. 06-6235 (N. D. Ill.) (Docket # 47, Nov. 14, 2006) (statement by pharmacy employing majority of plaintiffs' pharmacist declarants). In addition, pharmacies have different profit margins for different drugs, Kellman Decl.; Thomas C. Fox, Carol Colburn, Carl Krasik, & Joseph W. Metro, HEALTH CARE FINANCIAL TRANSACTIONS MANUAL § 5.7 (West Publishing 2007) (statement co-authored by plaintiff Fox's son), and will have their profits affected by differences in plan formularies. In addition, plans may either offer relatively low premiums and the standard 25% co-pay, *see* 42 U.S.C. § 1395w-102(b), or a reduction in co-pays with a correspondingly higher premium, *see* 42 U.S.C. §§ 1395w-102(a)(2)(i), 1395w-113(a)(1)(C). A pharmacist will know that he is likely to do more business with customers who can be steered to the second kind of plan where the customers will pay high premiums up front and then have lower marginal costs when they are deciding whether to buy more drugs.

10. Disputed. Plans do not all offer the same financial terms to pharmacists. First Supplemental and Amended Complaint ¶¶ 55, 56, 64, *Omnicare, Inc. v. United Health Group, Inc.*, Civil Action No. 06-6235 (N. D. Ill.) (Docket # 47, Nov. 14, 2006) (statement by pharmacy employing majority of plaintiffs' pharmacist declarants). In addition, pharmacies have different profit margins for different drugs, Kellman Decl.; Thomas C. Fox, Carol Colburn, Carl Krasik, & Joseph W. Metro, HEALTH CARE FINANCIAL TRANSACTIONS MANUAL § 5.7 (West Publishing 2007) (statement co-authored by plaintiff Fox's son), and will have their profits affected by differences in plan formularies. In addition, plans may either offer relatively low premiums and

the standard 25% co-pay, *see* 42 U.S.C. § 1395w-102(b), or a reduction in co-pays with a correspondingly higher premium, *see* 42 U.S.C. §§ 1395w-102(a)(2)(i), 1395w-113(a)(1)(C).  A pharmacist will know that he is likely to do more business with customers who can be steered to the second kind of plan where the customers will pay high premiums up front and then have lower marginal costs when they are deciding whether to buy more drugs.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Brian G. Kennedy
SHEILA M. LIEBER
BRIAN G. KENNEDY (D.C. Bar No. 228726)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel.:  (202) 514-3357
Fax:  (202) 616-8470
Email:  Brian.Kennedy@usdoj.gov