BRADFORD ASSOCIATES
ABBY BLOCK

Page 2

1   APPEARANCES:
2
3   For Plaintiffs, Washington Legal Foundation:
4
5       RICHARD A. SAMP, ESQUIRE
        Washington Legal Foundation
6       2009 Massachusetts Avenue, N.W.
        Washington, D.C. 20036
7
    For Defendants, Michael O. Leavitt, et al:
8
        BRIAN G. KENNEDY, Senior Trial Counsel
9       Federal Programs Branch
        U.S. Department of Justice, Civil Division
10      20 Massachusetts Avenue, N.W., Room 6104
        Washington, D.C. 20530
11
    Also Present: Tracey W. Glover, Esquire
12  Department of Health & Human Services
    CMS Division
13
14
15
16
17
18
19
20
21
22

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 3

1              C O N T E N T S
2           Examination by Counsel
3
4   Witness
5
6   ABBY BLOCK           Mr. Samp      4
7                        Mr. Kennedy   75
8
9              EXHIBITS
10
    Deposition Exhibit No.          Page
11
        Block Deposition Exhibit No. 1    60
12
13
14
15
16
17
18
19
20
21
22

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 4

1           P R O C E E D I N G S
2   Thereupon
3           ABBY BLOCK
4   a witness, called for examination by
5   counsel for the plaintiff, and after having
6   been first duly sworn or affirmed by the
7   Notary Public, was examined and testified as
8   follows:
9           EXAMINATION ON BEHALF
10  OF PLAINTIFF, WASHINGTON LEGAL FOUNDATION
11      BY MR. SAMP:
12      Q   Good afternoon, Miss Block. My name
13  is Richard Samp. I'm going to be asking you a
14  few questions this afternoon with regard to the
15  lawsuit that our organization has filed against
16  CMS, and Mr. Leavitt.
17          Sometimes I talk a little bit too fast;
18  and, I apologize in advance. Please if, at any
19  time, I'm talking too fast or you don't
20  understand my question, I would ask you just
21  simply to ask me to slow down or ask it over
22  again.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 5

1       A   Okay.
2       Q   Did you read any documents with regard
3   to this lawsuit in preparation for your
4   deposition today?
5       A   Yes. I re-read the Interrogatories and
6   my own statements.
7       Q   Anything else that you read?
8       A   I read the directive from CMSO to the
9   nursing homes.
10      Q   Is that the document that I refer to as
11  the S&C memo?
12      A   The S&C memo, yes.
13      Q   After reading the Interrogatory Answers
14  and your declaration, is there anything in there
15  that you would like to change that you may have
16  said before?
17      A   No.
18      Q   So you think those documents accurately
19  state your position?
20      A   Yes.
21      Q   Can you give me a brief synopsis of
22  your professional background.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 10

1  arrived here, the first thing they did was put
2  piles of regulations on my desk and asked me to
3  look at them.
4      Q   In addition to the regulations,
5  there are some documents called the marketing
6  guidelines. What process brought about their
7  creation, was the decision already made to have
8  marketing guidelines by the time you arrived?
9      A   Yes. As I understand it, there have
10 been marketing guidelines in place for the
11 Medicare Plus Choice Program, which was the
12 Part C program that preceded Medicare Advantage.
13 Those guidelines were already in place. So the
14 first step in terms of creating new guidelines
15 that took place was to write Part D guidelines
16 that would in some way parallel the Part C
17 guidelines that already existed.
18     Q   Now under those existing guidelines, I
19 assume that companies that offered what I'll
20 refer to as MA plan had some restrictions on what
21 they could do for marketing; is that correct?
22     A   Yes.

BRADFORD ASSOCIATES
ABBY BLOCK

Page 11

1      Q   Were there any restrictions on what
2  providers could do in terms of marketing at
3  that point?
4      A   Yes, there were.
5      Q   Can you, briefly, describe for me, if
6  you can, what those sort of restrictions were?
7      A   Providers, specifically, were
8  precluded -- or plans in their contracts with
9  providers were required to have provisions in
10 those provider contracts that would preclude
11 providers from steering beneficiaries to a
12 particular plan choice.
13     Q   The marketing guidelines were, first,
14 issued when?
15     A   The marketing guidelines -- as I best
16 recall, I was involved in the development of the
17 Part D marketing guidelines during 2005.
18 Ultimately, the marketing guidelines for Part C
19 and Part D of the guidelines, which had
20 originally been issued as separate documents
21 because the C ones already existed, were
22 consolidated into a single document.

BRADFORD ASSOCIATES
ABBY BLOCK

Page 12

1      Q   Were you directly involved in the
2  creation of the marketing guidelines?
3      A   Well, I was certainly involved during
4  2005. I was not the primary author of the
5  guidelines. Staff in Baltimore were, but I was
6  aware of what was in the guidelines and consulted
7  on the contents, yes.
8      Q   Were you one person whose approval was
9  required in order to put them in final form?
10     A   My approval was certainly required once
11 I became the Director of the Center for
12 Beneficiary Choices. So subsequent to October of
13 2005, yes, my approval was required.
14     Q   During the course of this approval
15 process, what discussions, if any, did you take
16 part in that discussed what restrictions ought to
17 be imposed on speech by providers?
18     A   Well, there were no discussions about
19 imposing restrictions on speech by providers.
20 There are no restrictions on speech by providers.
21 What's in the guidelines are restrictions on
22 steering to specific plans by providers.

BRADFORD ASSOCIATES
ABBY BLOCK

Page 13

1      Q   I assume that restriction on steering
2  means you can't say to a patient if you are
3  covered by the marketing guidelines, this is the
4  plan that you ought to enroll in; is that correct?
5      A   You can't say to a patient this is the
6  only choice for you, this is the plan for you.
7  You can say many other things to a patient, you
8  can give a patient all kinds of advice, guidance,
9  education. You can use factual information with
10 a patient. You can give objective information to
11 a patient. The one thing that you cannot say is
12 there's only one plan that's good for you; and,
13 that's this plan.
14     Q   As a shorthand, I'll refer to that as
15 steering people. Is that fair?
16     A   Yes, that would be how we would define
17 steering.
18     Q   Now can you describe for me what
19 discussions, if any, you were involved with
20 during 2005 and 2006 with regard to how this
21 prohibition on steering ought to be implemented
22 and how it should be phrased?

BRADFORD ASSOCIATES
ABBY BLOCK
Page 18

1  physician who has a patient who is eligible
2  for Medicare.
3      MR. KENNEDY: Is that a medical
4  physician or a real physician?
5      MR. SAMP: This is a hypothetical
6  physician.
7      BY MR. SAMP:
8   Q  Let's assume that that physician is not
9  contracted with any MA plan or a Section 1876
10 cost plan, or any base plan, but instead the only
11 services that that doctor provides to Medicaid
12 or Medicare beneficiaries is under traditional
13 Medicare. Is that physician in any way
14 prohibited by CMS from steering his or her
15 patient to a particular Part D plan?
16     A  If the physician has a relationship
17 with the patient, we would say that the physician
18 is precluded from steering a beneficiary to a
19 particular plan because of the way we structured
20 this in terms of a provider who has financial
21 or other interest. So that's very broad; and, I
22 appreciate that is very broad.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK
Page 19

1      However, if that physician has no
2  contractual relationship with the plan, there
3  isn't a plan that we could sanction for that
4  physician's behavior, assuming it was a physician
5  and not another type of provider.
6   Q  So let me make this clear. You
7  consider that kind of steering inappropriate?
8      A  I would consider it inappropriate, yes.
9   Q  What statute or regulation would you
10 point to that suggests that it's inappropriate?
11     A  Well, it's not a statute or
12 regulation. It's really in accordance with this
13 guidance in the best interest of the beneficiary;
14 and, we believe the beneficiaries should get
15 information from an objective source.
16     Again, you know, I have to make the
17 distinction in terms of what that physician said
18 to the beneficiary. Any objective information,
19 you know, such as this is what Plan A's formulary
20 looks like and this is what Plan B's formulary
21 looks like; and, you know, here are the
22 medications that you take. This is how, in my

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK
Page 20

1  experience, Plan A does prior authorization.
2  This is how Plan B does it. All of that we
3  would consider legitimate, objective information.
4  It's always the case of whether the individual,
5  the provider, be it a physician or any
6  other provider, specifically says you need to be
7  in this particular plan. That's what we consider
8  steering.
9   Q  So we'll agree that that's what
10 steering means for my future questions. I'm
11 mostly going to be asking you about the very
12 small number of pieces of information that would
13 constitute steering to the specific plan. I'm
14 not sure I fully understood your answer.
15 Assuming that the physician says things that
16 constitute steering, what would be your basis
17 for saying that it's inappropriate for the
18 physician to steer the patient to a specific
19 Part D plan, assuming that that doctor is not
20 contracted with any plan; and, all the various
21 types of plans that I mentioned before.
22     A  My basis for saying it is, that it's

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK
Page 21

1  not in the best interest of the beneficiary
2  because that doctor is not really privy to every
3  piece of information that would go into the
4  beneficiary necessarily making the best possible
5  decision for that individual.
6   Q  All right. Let's assume, now, that the
7  doctor is contracted with one particular Medicare
8  Advantage Program and he steers that patient to a
9  particular Part D plan. My question is the same,
10 would that steering be a violation of the
11 guidelines?
12     A  Yes, it would.
13     MR. KENNEDY: Objection. I don't think
14 that is, actually, the same question translated
15 with a different --
16     MR. SAMP: I apologize. I tried to
17 make it the same.
18     BY MR. SAMP:
19  Q  Everything is the same in the two
20 situations, except, now, the doctor is contracted
21 with one particular MA.
22     A  Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 22

1  Q  And he now engages in steering to a
2  particular Part D plan. Please give me your best
3  assessment of the situation.
4  A  That would certainly be considered
5  steering. It would be considered a violation of
6  the guidelines; and, since that doctor does have
7  a contractual relationship with a Part D plan,
8  that plan would be considered responsible for
9  that action on the part of this contracted
10 provider.
11 Q  Now, would it make any difference if
12 the Part D plan that was recommended had no
13 relationship whatsoever to the MA plan with which
14 the doctor was contracted?
15 A  No. It truly would not make any
16 difference because where we're coming from,
17 philosophically, is that it is in the best
18 interest of the beneficiaries for them to examine
19 either personally, or with the assistance of
20 their own family members who are available to
21 help or others in the community who can provide
22 objective assistance to examine the provisions of

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 23

1  various plans that are available to them; and,
2  make their own decision as to what is the best
3  choice for them.
4  Q  And just perhaps I'm plowing old ground
5  here, but assuming, now, that the doctor is
6  not contracted with anybody, your principle basis
7  for thinking that it's improper to steer the
8  patient to a particular plan is that the doctor
9  may not have access to all relevant information
10 as to which is the best plan?
11 A  That's right. They may not have
12 complete information about that particular
13 patient.
14 Q  Is there any other reason at all
15 other than the potential that the doctor might
16 not be fully informed why it might be considered
17 improper for this non-contracted doctor to steer?
18 A  In my mind, that would be the primary
19 reason. The other reason would be, as we have
20 said, in the marketing guidelines we talk about
21 financial or other interest. We don't know what
22 other interest that doctor might have that might

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 24

1  be influencing the advice that he is giving the
2  patient.
3  Q  I would like to, then, turn from
4  doctors to long-term care facilities, if I may.
5  MR. KENNEDY: I'll object on the
6  grounds that none of the plaintiffs in this case
7  are involved in long-term care facilities; and,
8  I have a continuing objection to the relevance and
9  materiality of the testimony.
10 BY MR. SAMP:
11 Q  Am I correct that the marketing
12 guidelines, also, apply to long-term care
13 facilities that are contracted with a plan?
14 A  Yes.
15 Q  And the same restrictions on steering
16 that we discussed before would apply to long-term
17 care facilities?
18 A  Well, they apply to whoever a plan
19 subcontracts with. Plans don't subcontract with
20 long-term care facilities. So in that sense
21 there is no direct relationship between a plan
22 and a long-term care facility.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 25

1  Q  Is there any -- generally, any
2  contractual relationship between long-term care
3  facilities and MA plans?
4  A  No, not that I know of.
5  Q  So can you imagine any situation in
6  which a long-term care facility would fall within
7  the definition of a provider as it's defined
8  within the marketing guidelines?
9  A  Long-term care facilities; and, let me
10 think this through carefully. Long-term care
11 facilities fall under the jurisdiction of the
12 Center for Medicaid and state operations. So
13 they are the experts in terms of long-term care
14 facilities and all of the requirements of
15 long-term care facilities. They have specific
16 jurisdiction over that group of providers.
17 Q  And that organization you just
18 mentioned, are they under your supervision?
19 A  No, they are not.
20 Q  I would like to turn to the subject of
21 pharmacies. Am I correct that any pharmacy that
22 is contracted with a plan would be considered a

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 26

1  provider under the marketing guidelines?
2      A    Yes.
3      Q    They would, then, be subject to the
4  same restrictions on steering that we discussed
5  before?
6      A    Yes, that's correct.
7      Q    Am I correct that pharmacies must
8  contract with a Part D plan in order to receive
9  reimbursement under Part D?
10     A    Yes.
11     Q    So it's fair to assume that it's
12  relatively common for pharmacies to be contracted
13  with one or more Part D plans?
14     A    Yes.
15     Q    Let's assume that there are twenty Part
16  D plans offered in a particular community and a
17  pharmacy is contracted with ten out of those
18  twenty; and, a patient comes to the pharmacy and
19  says which one plan do you think would be best
20  for me. Are there any situations in which it
21  would be proper for that pharmacist to recommend
22  which one plan is best for the patient?
TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 27

1      A    No.
2      Q    Let's assume that the pharmacist says
3  the best plan for you is Plan X, even though I am
4  not contracted with Plan X, would that
5  nonetheless be a violation of the marketing
6  guidelines?
7      A    It certainly would be inconsistent with
8  the guidelines, yes.
9      Q    Why would that be a bad thing for a
10  pharmacist to do from a policy standpoint in
11  your mind. If they're not contracted with this
12  plan and, therefore, don't have any sort of
13  incentive to make this recommendation other than
14  perhaps they think it's the right answer.
15         MR. KENNEDY: Objection to the
16  assumptions about no incentive.
17         BY MR. SAMP:
18     Q    If you could answer by telling me,
19  first, if you think there might be an incentive
20  to make that recommendation.
21     A    For the same reason I gave you before.
22  We do not believe that it is desirable for any

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 28

1  single individual with a relationship to a
2  patient to steer that patient to one specific
3  plan.
4      Q    Can you explain to me why you think it
5  would be inappropriate for a contracted
6  pharmacist to recommend a particular plan. What
7  would be the policy reasons for not allowing
8  those kind of recommendations?
9      A    Well, I mean, certainly a particular
10  pharmacist who was contracted with a plan could
11  have a very direct financial interest based on,
12  you know, the reimbursement schedule of that
13  particular plan that he's recommending. So, you
14  know, there is clearly a potential for a
15  provider steering a patient based on the
16  provider's financial interest. That would,
17  clearly, be a violation of the guidelines.
18     Q    Any other concerns?
19     A    Certainly, and, again, the same general
20  concern I expressed repeatedly, no single
21  individual. A pharmacist does not know that
22  individual's whole medical history. They don't

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 29

1  know their financial situation. There are all
2  kinds of pieces of information that that
3  individual doesn't have. So that an individual
4  recommending a single choice to a beneficiary
5  could lead to the person ending up in a plan
6  that, in fact, does not truly meet their needs.
7      Q    Would you think it would be appropriate
8  if the patient had a child who had done some
9  research on plans to recommend to his or her
10  parent I think Plan X is the best plan for you.
11  Would that be a good thing?
12     A    Well, I'm not in a position to really
13  opine on the relationship between a parent and
14  child. That's truly outside my purview.
15     Q    Would you think in your experience that
16  it would be more likely that a patient's
17  pharmacist would have more accurate information
18  about the Part D plan that best meets the needs
19  of the patient or that the patient's child has
20  that sort of information?
21     A    I really can't opine on that.
22     Q    What can you tell me about pharmacists

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 34

1  Q  Now, let's assume that our hypothetical
2  pharmacist has contracted with every Part D plan
3  in the area.
4  A  Okay.
5  Q  Would it be improper, in your view,
6  for the pharmacist to steer the patient to a
7  particular Part D plan?
8  A  Yes, it would be.
9  Q  At the risk of being repetitive, if you
10 could just explain to me all of your reasons why
11 it would be inappropriate, both as a matter of to
12 violate the regulations, which I understand, but,
13 also, the policy reasons behind those regulations?
14 A  Number one, it might be in his
15 financial or other interest to do so; and, that
16 certainly would be undesirable. Secondly, it is
17 best for a patient to get complete and objective
18 information and that individual is not in a
19 position to provide complete and objective
20 information that would allow that person to
21 specifically steer. That person certainly could
22 provide objective information about the features

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 35

1  of various plans and that would be appropriate
2  education and guidance.
3  Q  Are you aware whether CMS has received
4  objections from some pharmacists to the
5  restrictions on steering as they appear in the
6  marketing guidelines?
7  A  As I understand it, when the guidelines
8  were put out for comment CMS received both
9  favorable supportive comments, and unfavorable
10 comments.
11 Q  The guidelines were last changed
12 sometime in the middle of 2006, is that correct?
13 A  I believe that's correct.
14 Q  Is there any plan in the works to
15 revise them, again, in the near future?
16 A  We always look at our guidance and see
17 if it needs updating or clarification; and, we
18 will certainly do that prior to the giving of
19 marketing for the 2008 benefit year which starts
20 October 1.
21 Q  Are you aware of any plan to conduct a
22 study between now and then with regard to whether

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 36

1  pharmacists would have strong financial
2  incentives to steer patients towards a particular
3  Part D plan?
4  A  I'm not aware of any such plan.
5  Q  If a Part D plan were to offer a
6  pharmacist $5,000 for every patient that that
7  pharmacist switched from a different Part D plan
8  to the offering Part D plan, would that
9  arrangement violate the federal anti-kickback
10 statute?
11 A  It's my opinion that it would, but,
12 again, I don't -- it is not within my purview to
13 enforce the anti-kickback provision. So that
14 would be a question for the IG to determine,
15 Q  In formulating the guidelines, are you
16 aware of any discussion about whether or not the
17 prohibitions contained in the anti-kickback
18 statute would be sufficient to deter pharmacists
19 from improperly steering a patient to a
20 particular plan even without the restrictions
21 that exist within the marketing guidelines?
22 A  I would guess not, simply because those

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

## BRADFORD ASSOCIATES
## ABBY BLOCK

Page 37

1  provisions really address direct remuneration
2  such as, you know, in the example you just gave
3  me. Our concern is broader than that. It goes,
4  also, to indirect interest.
5  Q  Well, one of your concerns, as I
6  understand it, is that a particular plan might
7  provide pharmacists with greater payments
8  for their particular drug. Would there come a
9  point where those payments by themselves might
10 violate the anti-kickback statute if they were
11 sufficiently greater than what was offered by
12 other Part D plans?
13 A  Again, I am not the expert on the
14 anti-kickback statute. Those are questions
15 for the IG to determine.
16 Q  It's fair to say that nobody at CMS
17 focuses on the anti-kickback statute as being
18 within their purview?
19 A  The people in the Office of Financial
20 Management who have jurisdiction over program
21 integrity and who are the direct links to the IG.
22 Certainly, if anyone, CMS does. That's where it

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 38

1  would be, over in the integrity office in the
2  Office of Financial Management.
3      Q   Am I correct that the program integrity
4  office had nothing to do with putting together
5  the marketing guidelines?
6      A   I am quite sure that they reviewed and
7  cleared them.
8      Q   They were not directly involved in the
9  actual drafting of them, is that correct?
10     A   I don't believe so. Although, there's
11 a whole list of people in the first Interrogatory
12 and I, frankly, don't remember whether someone
13 from program integrity is on this list. I know
14 that's a long list.
15     Q   I want to ask you just a few questions
16 about how patients go about obtaining information
17 to help them decide which is the Part D plan that
18 is best for them. Could you just, briefly,
19 describe for me where a typical Medicare
20 beneficiary might turn for information?
21     A   Yes. There are various sources. First
22 of all, every Medicare beneficiary receives a

BRADFORD ASSOCIATES
ABBY BLOCK

Page 39

1  copy of the Medicare Handbook every year. So
2  that's one source. Every Medicare beneficiary
3  can call 1-800-MEDICARE and a customer service
4  representative will assist them.
5          Every Medicare beneficiary has access
6  to the www.medicare.gov website where the
7  plan-finder tool is available. The tool,
8  basically, allows the beneficiary or anybody
9  working with that beneficiary assisting them to
10 input a whole variety of information. The plan
11 will do a mathematical calculation which will in
12 descending order give that beneficiary a choice
13 of plans from the least costly, you know, to the
14 most costly given their parameters.
15     Q   Now besides cost, what are the factors
16 that a Medicare Part D patient needs to keep in
17 mind in trying to decide what might be the best
18 plan for them?
19     A   Well, they certainly should be
20 concerned with plan performance. In that regard,
21 CMS has already made available publicly
22 information on the plan's performance. For the

BRADFORD ASSOCIATES
ABBY BLOCK

Page 40

1  upcoming enrollment period, we're going to
2  have report cards on our website that will,
3  specifically, give people quality performance
4  information.
5      Q   What about prior authorization
6  requirements. Are those something that should be
7  a concern to patients?
8      A   Yes.
9      Q   Why is that? If you can just briefly
10 describe it to me.
11     A   Well, if the patient is taking a
12 particular medication and if they are already on
13 it, they're taking a regime, it should certainly
14 be of some interest. I wouldn't say not
15 necessarily defining interest, but of interest as
16 to whether they will have access to that
17 medication; and, whether that access will require
18 prior authorization by the plan that they choose.
19     Q   What about quantity limit restrictions?
20     A   The same thing. I mean, all of the
21 things, quantity limits, step-therapy, certainly,
22 those are things that a person making an informed

BRADFORD ASSOCIATES
ABBY BLOCK

Page 41

1  choice would want to know.
2      Q   Isn't it, generally, true that if a
3  particular Part D plan imposes prior
4  authorization or step-therapy that the plan will
5  not pay for the drugs if the patient does not
6  meet the prior authorization or step-therapy
7  criteria in using those drugs?
8      A   The plan will not pay for those drugs
9  and, then, the patient has appeal rights and can
10 appeal that decision.
11     Q   Is there any readily available place
12 where a Medicare beneficiary can obtain
13 comparative information showing the criteria that
14 must be satisfied for granting coverage for drugs
15 that are subject to prior authorization or
16 step-therapy restrictions for the various Part D
17 plans?
18     A   Yes, the plan-finder tool will clearly
19 indicate if any of those requirements are in
20 place, but may not spell out the criteria.
21 However, by regulation we require plans to make
22 that information readily available to the

BRADFORD ASSOCIATES
ABBY BLOCK

Page 46

1  A  Yes.
2  Q  So the provider would be permitted to
3  say this particular plan provides the best
4  benefits for people in your particular situation
5  so long as the provider doesn't specifically say,
6  therefore, we recommend that you sign up with
7  that plan?
8  A  Again, we mean exactly what we say. If
9  they're not acting on behalf of the sponsor,
10 they're not required to submit the material to
11 us, we would encourage them to do so. I gave the
12 example of Walgreens, which did submit some
13 materials to us and we informally approved those
14 materials, but there is no requirement.
15 Q  Is it CMS's position that providers are
16 not subject to any of the restrictions on
17 provider activities, as set forth in the
18 marketing guidelines, if those activities are not
19 undertaken by the provider on behalf of any Part
20 D plan?
21 A  No, that's not our position.
22 Q  Explain to me your position, then. If

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 47

1  the provider is not undertaking activity on
2  behalf of any specific plan.
3  A  I guess maybe you need to clarify for
4  me what you mean by engaging in activity not on
5  behalf of any particular plan.
6  Q  On pages 122 to 128 of -- I guess 126
7  of the marketing guidelines, there are set forth
8  a number of guidelines about provider promotional
9  activity. We briefly touched on steering.
10 A  Okay.
11 Q  I understand from all of our
12 discussions that we've had to this point that
13 steering is never permitted regardless of
14 whether you're doing that in conjunction with a
15 particular Part D plan other than steering.
16 A  Okay. That's what I need you to
17 clarify.
18 Q  Other than steering, is it CMS's
19 position that providers are free to engage in the
20 activities that are subject to regulation on
21 pages 122 to 126 so long as they're not doing it
22 in conjunction with a particular Part D plan?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 48

1  A  Well, I have to look carefully at
2  what's on these pages, but to the degree that a
3  provider is, again, providing objective
4  information, they can provide objective
5  information about specific plans. Like it says
6  here, such as covered benefits, cost-sharing,
7  drugs on formulary, utilization management tools.
8  All of those things are objective information and
9  provide -- certainly not only can they, but we
10 would encourage them to provide all that kind of
11 information.
12    They can distribute plan marketing
13 materials, provided that's not limited to the
14 marketing materials for a single plan. They can
15 certainly tell the beneficiary what plans they
16 contract with. That's important and useful
17 information that they can provide. They can
18 tell beneficiaries where they can go for
19 additional information and that would be all of
20 the CMS resources that we discussed a moment ago.
21 So there are many things that providers can and
22 are encouraged to do.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 49

1  Q  And that would be true regardless of
2  whether they are acting on behalf or in concert
3  with a particular Part D plan, is that correct;
4  the things that you've just discussed that
5  they're encouraged to do doesn't make any
6  difference if they're doing it with the
7  encouragement of a particular plan, is that
8  correct?
9  A  Well, if they're distributing marketing
10 materials, for example, then, certainly they, you
11 know, would have to have the approval of all the
12 plans for whose marketing materials they're
13 distributing.
14 Q  Even if they're not doing it at the
15 behest of any particular plan, they would still
16 need to get that approval?
17 A  Yes. I think it would be appropriate
18 for them to ensure that every plan whose
19 marketing materials they were distributing
20 actually wanted them to do that.
21 Q  To be clear, Part D plan is never going
22 to be keen on approving materials that are

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 79

1
2   (I have read the foregoing pages,
3   4-78, which contain a correct
4   transcription of the answers given
5   by me to the questions therein
6   recorded, as noted on the attached
7   errata sheet.)
8   _____*Abby Block*_____
9       Abby Block
10
11
12      *with noted Corrections*
13
14
15
16
17
18
19
20
21
22

ERRATA SHEET FOR: ABBY BLOCK

RE: WASHINGTON LEGAL FOUNDATION VS. LEAVITT

CASE OR CIVIL ACTION NO: 1:06-CV-01490 (RMC)

COURT: UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DATE: WEDNESDAY, JULY 27, 2007

| PAGE | LINE | CORRECTION |
|---|---|---|
| 6 | 2 | presidential (not personnel) |
| 6 | 6 | Federal Employees Health etc. |
| 7 | 22 | "needs" to delete can't be right but don't know what I actually may have said |
| 15 | 15 | plan (not planning) |
| 20 | 20 | prime (not first) |
| 35 | 18 | beginning (not [illegible]) |
| 37 | 20 | insert "in" between "engage" + "CMS" |
| 38 | 1 | insert "program" before "integrity" |
| 39 | 1 | insert "[illegible]" between "medicine" and "[illegible]" |
| 39 | 10 | insert "finding" after "plan" |
| 40 | 3 | insert "[illegible]" [illegible] "quality" and "performance" |
| 70 | 15 | assistance (not [illegible]) |
| 73 | 21 | CMSO (not CMS) |
| 77 | 20 | "advisory" can't be right (would have to be "[illegible]") |

DATE: _____  SIGNATURE: _____
                          **ABBY BLOCK**