Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 20

1      A.    We do have -- my husband has a card,

2    and I have a card, a separate card.

3      Q.    Are you covered by TRICARE as well as

4    your husband?

5      A.    I believe so, however, that -- I'm

6    not sure of that.  I should be because they

7    gave me a card, but when I call them, they're

8    never quite sure.

9      Q.    But your husband is covered?

10     A.    Yes.

11     Q.    And do you know if you have let

12   Skenderian Pharmacy know that he's covered by

13   TRICARE?

14     A.    I'm not sure.

15     Q.    The statements you get that maybe you

16   have upstairs or maybe you don't, do those show

17   payments by the City of Cambridge and by

18   TRICARE for Edward's medication or just by one

19   or the other?

20     A.    My recollection is that it shows what

21   is covered by insurance and then what we have

22   to pay and then what the final...

23     Q.    Does it break it down between what

24   the City of Cambridge pays and what TRICARE

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 21

1    pays?

2         A.    I'm not sure.

3              MR. SAMP:  Let me interrupt.  I do

4    have one such statement.  It might be easier to

5    do this questioning if you take a look at the

6    statement, although it's my only copy that I

7    have.  And just to correct something, I don't

8    think it shows payments by the City of

9    Cambridge.  It shows payments by Blue Cross RX.

10             MR. KENNEDY:  By the City of

11   Cambridge's health care provider.

12        A.    Yes, that's it.

13        Q.    So this is from Blue Cross/Blue

14   Shield of Massachusetts which is the carrier

15   the City of Cambridge uses?

16        A.    The City of Cambridge, yeah.

17        Q.    Is this a fairly typical...

18        A.    It's approximately the same amount

19   each -- when I say approximately, I mean

20   it's...

21        Q.    Let me just read it off here.

22             MR. KENNEDY:  Do you mind if I

23   read it off?

24             MR. SAMP:  No.

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 22

1        Q.   It seems to show that for the month

2    of September 2006, which is one of the months

3    you have here, that Edward had one, two, three,

4    four, five, six, seven, eight drugs, namely,

5    Lipitor, Spironolact, Metolazone, Chlorcon 10,

6    Actonel, Terazosin, Finasteride and

7    Metoprolol.  And that the amount paid by Blue

8    Cross was $229.28 for that month of September

9    and the amount indicates was paid by you was

10   $105.50.  And then for December the amounts go

11   up to $279.71 by Blue Cross/Blue Shield and by

12   you it says $140.80, and that's for December

13   2006.  There's probably a drug on here that

14   wasn't on the other one.  Lipitor is on twice,

15   and Fluoxetine is on here also, and Furosemide

16   is on here.

17        A.   Furosemide?

18        Q.   Furosemide.

19        A.   That's the Lasix, I think.

20        Q.   And the quantity dispensed was 60,

21   that's why it doesn't show up on the other

22   month.  Does he take that once a day?

23        A.   What?

24        Q.   Does he take Furosemide once a day?

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 23

1      A.    I think he takes two --

2      Q.    Okay.  Well...

3      A.    -- a day.  Sometimes they change

4  that.

5      Q.    Right.  So in December it says your

6  payment that Blue Cross didn't pay was $105.50,

7  I'll let you look at it, and then 140, whatever

8  I said, for December.  Is that about average?

9      A.    Right around that, yeah.

10     Q.    And then how much does TRICARE pay of

11 that?

12     A.    I don't think -- I don't think

13 TRICARE pays.

14     Q.    Do you submit the bills to TRICARE?

15     A.    No.

16     Q.    Does Skenderian submit them to

17 TRICARE?

18     A.    I can't tell you.  I didn't

19 realize -- I didn't think that TRICARE was

20 paying anything.  I think -- my recollection is

21 that TRICARE does not -- it says, if you do

22 decide to enroll in a Medicare prescription

23 drug plan, TRICARE will pay secondary to

24 Medicare, and I can't tell you what happens.  I

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 24

```
 1    don't know the answer.

 2        Q.    Have you tried to submit the bills to

 3    TRICARE?

 4        A.    Not I.   Whenever -- no, I have never

 5    submitted anything to TRICARE myself.

 6        Q.    And you don't know if Mr. Skenderian

 7    is aware that Edward is eligible for TRICARE?

 8        A.    I don't know.

 9        Q.    Do you recall whether, and, if so,

10    when, you began investigating whether either

11    you or Edward or both of you should enroll in

12    Medicare Part D?

13        A.    If I began to inquire or when?

14        Q.    If and if so, when you began to think

15    about, should I be enrolled in Medicare Part D,

16    should Edward be enrolled in Medicare Part D?

17        A.    I did when it became a subject of

18    discussion in general because...

19        Q.    Okay.  What did you conclude with

20    respect to whether you should join Medicare

21    Part D?

22        A.    I had great difficulty trying to

23    decide.  It seemed to me that I didn't take

24    many -- I didn't take medication, therefore, it
```

Page 25

1    didn't seem as important as it did for my

2    husband.  And it was at the time -- many of us

3    here in this building are not young, and we're

4    all trying to figure out what we should do, and

5    so I was wondering what I should do for my

6    husband.

7        Q.   And for yourself?

8        A.   I figured that I probably didn't need

9    to worry about it that much.

10       Q.   You had in your Declaration, you

11   attached a newsletter of the Harvard University

12   Retirement Association.

13       A.   Who said don't.

14       Q.   Did that make sense to you?

15       A.   Well, I had to take them at their

16   word really.

17       Q.   Is the Harvard University Retirement

18   Association, is that officially associated with

19   Harvard or is that a retirees' association

20   that --

21       A.   I could not tell you.

22       Q.   Did you get any other newsletters or

23   information from Harvard University or from the

24   Harvard University Retirees Association that

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 26

1    also influenced your decision about whether to

2    sign up for Part D for yourself?

3          A.    I can't tell you who I heard from,

4    but I can remember getting information from

5    different places and one being the retirees.

6          Q.    And was this newsletter that you

7    attached to your Declaration, was that the most

8    influential information you received?

9          A.    Probably.

10         Q.    Do you recall what other information

11   you received?

12         A.    I don't recall.

13         Q.    Did you -- see, I have in my notes

14   here to ask you whether you looked at the

15   Harvard Web site, but I bet you didn't look at

16   a Web site.

17         A.    I did not look at a Web site.

18         Q.    That really is going to shorten the

19   deposition, by the way.

20         A.    I'm sure that they have one.

21         Q.    Did you call anybody at the Harvard

22   University Retirees Association?

23         A.    I can't remember who I called.

24         Q.    Did you call anybody at Harvard?

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 27

```
 1       A.    Probably.

 2       Q.    Do you recall who -- do you recall

 3   what advice you got from them or information?

 4       A.    No.  My recollection was that their

 5   thing was that I should leave it alone.

 6       Q.    And that made sense to you?

 7       A.    As much as anything.

 8       Q.    Does it still make sense to you?

 9       A.    As much -- again, I am still confused

10   about what I should be or should not be doing.

11   It's not easy.  I'm too old, I guess.

12       Q.    Did you call Medicare?

13       A.    I cannot remember.

14       Q.    Did you look at any material from a

15   Part D plan?

16       A.    Did I?

17       Q.    Look at any material from a Part D

18   plan, brochure, something like that?

19       A.    Oh, yeah, I'm sure I did.

20       Q.    Do you recall which plans?

21       A.    No.

22       Q.    Did you talk to any representatives

23   of a Part D plan?

24       A.    Not that I know of.
```

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 28

1          Q.    With respect to whether you should

2    join a Part D plan or not or sign up for Part

3    D, did you get any advice that you recall being

4    influential either from friends or neighbors or

5    relatives?

6          A.    Mostly that one should leave it alone

7    was the thing I think both the City and Harvard

8    were recommending, that we leave it as they had

9    it.

10          Q.    Did what they say make sense to you?

11          A.    As much as anything.

12          Q.    And your Declaration also said that

13    you talked to an attorney at a local volunteer

14    agency?

15          A.    I talked to Somerville/Cambridge

16    Elder Services.

17          Q.    Do you recall when that conversation

18    took place?

19          A.    There was a deadline, I think, and I

20    can't remember when that was by which we were

21    supposed to decide, and it was at that point

22    that I turned to Somerville/Cambridge Elder

23    Services.

24          Q.    Do you recall what advice they gave

Page 29

```
 1   you?

 2        A.   I can't tell you what it was, but

 3   they tried to give me something specific.

 4        Q.   About joining Part D?

 5        A.   Mm-hmm.

 6        Q.   Did you take their advice?

 7        A.   I think probably that's what I did.

 8        Q.   Did you seek information from any

 9   other source?

10        A.   Probably.

11        Q.   Can you recall what that source was?

12        A.   Well, of course, this place here.

13        Q.   What did you ask them?

14        A.   They couldn't, they couldn't advise.

15        Q.   But what did you ask them?

16        A.   Asked them what they would recommend.

17        Q.   For joining Part D or --

18        A.   Mm-hmm.

19        Q.   And they told you that they couldn't

20   advise you whether to sign up for Part D or

21   not?

22        A.   That's right.

23        Q.   Do they know about Edward's TRICARE

24   coverage?
```

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 30

1      A.   I don't know.  I can't tell you what
2   they knew.

3      Q.   So they don't know necessarily the
4   details --

5      A.   No.

6      Q.   -- of either his TRICARE coverage or
7   your coverage from Harvard or his coverage from
8   Cambridge?

9      A.   That's correct.

10     Q.   And when you said, people here, who
11  would that be?

12     A.   Youville House.

13     Q.   Did you talk to anyone else?

14     A.   We have a nursing office here.

15     Q.   A nursing office?

16     A.   Mm-hmm.  And I talked with the nurse.

17     Q.   What did you ask her?

18     A.   Him.

19     Q.   Him.  What did you ask him?

20     A.   If he had any thoughts about what we
21  should do, and he said no.

22     Q.   Did he say anything else?  Did he say
23  anything else?

24     A.   No.

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 31

1      Q.    What did you tell him about your

2    situation?

3      A.    Same thing that everybody else in

4    this building had been telling him, I guess,

5    which was we wondered what we should be doing.

6      Q.    And did you tell him about what

7    health retirement benefits you already had?

8      A.    No.

9      Q.    Did he say why he couldn't tell you

10   what the answer was?

11     A.    He said he couldn't discuss it with

12   us.

13     Q.    Okay.  Did you talk with anybody

14   else?

15     A.    I probably did, but I don't know.  I

16   can't tell you.  I was -- there were many

17   things that I wanted to know.

18     Q.    If we can turn back to your

19   Declaration again.  There's a letter from the

20   City of Cambridge from City Manager Healy and

21   Deputy City Manager Rossi.  Do you know these

22   gentlemen?  Do you know those gentlemen?  I

23   know your husband was election commissioner for

24   awhile.

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 32

1      A.    What's the name?

2      Q.    Healy is the city manager.

3      A.    I do happen to know him, yes.  He's a

4  good city manager.

5      Q.    Did you talk to him or to anybody

6  else at the City of Cambridge after you got

7  this letter?

8      A.    I probably did, but I can't tell you

9  with whom.

10      Q.    On the third page of the letter which

11  is the signature page, there's an indication of

12  members of the Employee Benefit staff and their

13  phone numbers who could help.  Do you know if

14  you talked to any of them?

15      A.    I couldn't tell you if I did.  I

16  probably did because they were given as the

17  people to call, so I probably did call one or

18  another of them.

19      Q.    Now, the second page -- you don't

20  recall whether you talked to them?  You might

21  have called?  I'm sorry, I was thinking about

22  my next question without listening to your

23  answer to my last question which is a very bad

24  habit.

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 33

1              But you said, could you repeat,

2   did you talk to any of them?

3        A.    I believe I did, but I cannot tell

4   you which one of them.  I probably called one

5   or another of the people that are listed here.

6        Q.    Do you recall what you asked them?

7        A.    If they -- what they recommended, if

8   they had any recommendations for what we should

9   do or what I should do for my husband.

10       Q.    Do you recall what they told you?

11       A.    No.

12       Q.    The second page of the letter which

13  is, I think, the page we're looking at

14  actually --

15       A.    It says you should not sign up for

16  any Medicare Part D.

17       Q.    The part that is underlined and bold

18  print?

19       A.    Yes.

20       Q.    And the not is also capitalized too.

21       A.    Yes.

22       Q.    It says, Blue Cross/Blue Shield will

23  automatically enroll you in Part D -- Medicare

24  Part D coverage, so you should not sign up for

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 34

1    any Medicare Part D additional coverage on your

2    own, as it could put your enrollment with the

3    City of Cambridge plan in jeopardy.

4                    Did you do anything to find out

5    whether that was accurate or not?

6        A.    You mean other than talk with this

7    office?  No, I don't believe so.

8        Q.    Did you talk, for example, to the

9    Youville House about that?

10       A.    I don't believe I ever talked with

11   Youville House further because they said they

12   couldn't advise us.  And my thing was that I

13   believe that we did whatever the City of

14   Cambridge suggested that we should do.

15       Q.    If the City of Cambridge is right

16   that signing up for Medicare Part D additional

17   coverage on your own would put Edward's

18   enrollment with the City of Cambridge plan in

19   jeopardy, are there any circumstances in which

20   you would have signed up for a Part D plan

21   anyway?

22       A.    What we did -- he now has, I believe,

23   Managed Blue for Seniors.  I believe that's

24   right.

Page 35

1     Q.   Is that through the City of

2  Cambridge?

3     A.   Mm-hmm.

4     Q.   So if the City of Cambridge is right,

5  they're saying here that if you sign up for

6  Medicare Part D on your own, it could put your,

7  in this case, Edward's rather, enrollment with

8  the City of Cambridge plan in jeopardy, if

9  they're right about that, are there any

10  circumstances in which you would consider

11  signing up for Part D anyway and risking --

12     A.   Not really, no.

13     Q.   -- losing your husband's coverage

14  from the City of Cambridge?

15     A.   So his thing does come under the City

16  of Cambridge I'm sure.  Whatever they

17  recommended is what we did.

18     Q.   Would you be interested in a plan, a

19  Medicare Part D plan that you would sign up for

20  your own if that meant losing the City of

21  Cambridge coverage?

22     A.   I would be quite careful before I did

23  that.

24     Q.   Do you know if any of the people you

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 36

1    talked to other than the City of Cambridge told

2    you whether the City of Cambridge was right

3    about this or not?

4        A.    No.

5        Q.    Did you talk to anybody at Blue Cross

6    about the plans?

7        A.    That's the thing that my husband...

8        Q.    That your husband is in now.  Did you

9    talk to -- when you were deciding what to do

10   about joining or not joining Part D, did you

11   talk to anybody at Blue Cross?

12       A.    Well, we took the advice of the City

13   of Cambridge really.

14       Q.    Did you talk to anybody at TRICARE?

15       A.    About -- no..

16       Q.    About Medicare Part D.

17             Did you talk to anybody at

18   Medicare?

19       A.    No.

20       Q.    What about any representative of a

21   Part D plan other than Blue Cross?

22       A.    No, not that I know of.

23       Q.    With respect to Edward's coverage,

24   did you talk to anybody in addition to the

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 37

1    people that you already mentioned that you

2    talked to before about your coverage?

3        A.    I could have, but I can't tell you

4    that truly.

5        Q.    Did you talk to your pharmacist about

6    either your or Edward's -- about the decision

7    whether to have you or Edward sign up for a

8    Part D plan?

9        A.    No.  The thing that -- I just have

10   used the pharmacist regularly.

11       Q.    When did you talk to someone at --

12   first talk to anyone at the Washington Legal

13   Foundation about the difficulties you had in

14   determining what to do about your health

15   coverage?

16       A.    I think it was probably -- well, I

17   can't tell you exactly when.  Washington Legal

18   Foundation could probably tell you better than

19   I could.

20       Q.    What occasioned that conversation?

21       A.    Probably when I was wondering what I

22   should be doing.

23       Q.    And did you initiate the

24   conversation?

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 38

1      A.    I wouldn't be able to tell you who

2   initiated it.  Probably I would.

3      Q.    And do you know if you got any

4   information from TRICARE other than the letter

5   from the Assistant Secretary of Defense that

6   pertained to prescription drug coverage, not to

7   hospital or doctor coverage, other than this

8   letter?

9      A.    No, this letter that you have here is

10  probably the only one that I had.

11     Q.    So I take it that you have never

12  visited the TRICARE Web site?

13     A.    No, I have not.  And they moved.  The

14  thing that I can remember is discovering that

15  TRICARE had moved to Madison, Wisconsin.  From

16  where, I can't remember, but I know that they

17  moved their headquarters, and I don't know why.

18     Q.    I don't know why either, ma'am.

19     A.    I think there's a university in that

20  town isn't there?

21     Q.    University of Wisconsin.

22            I may almost be out of questions.

23            How easy would it be for you to

24  determine what your deductions are for your

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 39

1    health insurance and for Edward's health

2    insurance?  Would you have documents upstairs

3    that would show that?

4        A.   It probably should show when they

5    send my statement that they have deposited the

6    pension, I would believe that it might show how

7    much they deduct from it for health.

8        Q.   Do you know if you contacted the

9    Massachusetts State Health Insurance Assistance

10   Program for any information or assistance?

11       A.   Massachusetts State Health?

12       Q.   Yes.  Maybe it's Commonwealth.  Every

13   state is supposed to have a health insurance

14   assistance program that gives counseling about

15   insurance.  Do you know if you talked to them?

16       A.   I don't remember doing that.

17       Q.   I'm trying to cover all the bases.

18            I don't think I have anymore

19   questions.  Thank you.

20            MR. SAMP:  All right.  Can we have

21   a minute just to chat and I may have a question

22   or two afterwards?

23            MR. KENNEDY:  Sure.

24            (Short recess taken.)

Page 40

```
 1                  CROSS EXAMINATION
 2   BY MR. SAMP:
 3        Q.    You mentioned that Mr. Skenderian is
 4   your pharmacist.  Have you ever spoken to
 5   Mr. Skenderian to ask his recommendation as to
 6   which plan for prescription drugs would be best
 7   for you?
 8        A.    No, I haven't.
 9        Q.    Have you ever talked to anybody else
10   who has spoken to Mr. Skenderian?
11        A.    Well, yes, there are a number of
12   people in this building who use Skenderian.
13        Q.    And did any of them tell you anything
14   about their conversations with Mr. Skenderian?
15        A.    Only --
16             MR. KENNEDY:  Objection.  I want
17   to object to the question, and then you can
18   answer.  I object to the question on the
19   grounds of hearsay.
20        A.    My answer is that we talked to people
21   here in this building about what Mr. Skenderian
22   could help us with, and they had -- other
23   people had asked Skenderian, and he had told
24   them that he would not help them make their
```

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 41

1    decision of what to do, and so I took it that

2    if they had asked, I was not going to go back

3    to Mr. Skenderian and ask myself, so I have not

4    asked Mr. Skenderian what his recommendation

5    is.

6              He's a very knowledgeable person I

7    suspect, but I have not asked him, therefor.

8              MR. SAMP:   I have no further

9    questions.

10

11              REDIRECT EXAMINATION

12   BY MR. KENNEDY:

13        Q.   Okay.  I don't think I have any

14   further questions, but I just having done some

15   Internet research myself, I pulled a few pages

16   off the TRICARE Web site, and I know you don't

17   look at the Internet, but I'm wondering if you

18   recognize any of that material from any other

19   communications from TRICARE?  And if you don't,

20   you don't, and there will be no more

21   questions.  You can hold on to those, by the

22   way.  They're extras.

23              (Witness reviewing documents.)

24        A.   I don't know express script.

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 42

```
 1       Q.    None of that looks familiar to you?

 2       A.    No.  I don't remember...

 3             (Witness reviewing documents.)

 4       A.    It says, contact your local State

 5   Health Insurance Assistance Program.

 6       Q.    That's where I was reading it from

 7   earlier.

 8       A.    What's that?

 9       Q.    That's where I was reading that from

10   earlier to tell you the truth.

11       A.    Yeah.  I don't remember seeing this

12   before.

13       Q.    Okay.  You mentioned talking to other

14   residents here about your situation.  Are there

15   other residents in this plan -- in this

16   community that belong to TRICARE?

17       A.    There could be.  In other words,

18   there are some veterans here.

19       Q.    Have you ever talked to any of them

20   about what coverage they get from TRICARE?

21       A.    No, I have not.

22       Q.    Okay.  Thank you.  No more

23   questions.

24       A.    Many of them do not run their own
```

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 43

1    affairs.   The older they get, the more likely

2    they turn their affairs over to somebody else.

3    There are two people here who are 100, so it's

4    a pretty good place taking care of us really.

5        Q.   That's great.  Do you like it here?

6        A.   Yes.  They do a pretty good job.

7        Q.   I wish you well, ma'am.  Thank you

8    very much for your time this afternoon.

9        A.   I appreciate having you come over

10   here.  It's much easier for me than having me

11   have to go somewhere else.

12       Q.   That's fine.

13            (Whereupon the deposition

14   concluded at 1:30 p.m.)

15

16

17

18

19

20

21

22

23

24

Page 44

```
 1                    CERTIFICATE

 2    Commonwealth of Massachusetts

 3    Suffolk ss.

 4

 5        I, Julie A. Mercier, Registered

 6    Professional Reporter, CSR and Notary Public in

 7    and for the Commonwealth of Massachusetts, do

 8    hereby certify that MARY A. SAMP, the witness

 9    whose deposition is hereinbefore set forth, was

10    duly sworn by me and that such deposition is a

11    true record of the testimony given by the

12    witness.

13        I further certify that I am neither

14    related to or employed by any of the parties in

15    or counsel to this action, nor am I financially

16    interested in the outcome of this action.

17        In witness whereof, I have hereunto set my

18    hand and seal this _____ day of

19    _____, 2007.

20                               _____

21                               Notary Public

22                               CSR No. 120993

23    My commission expires:

24    September 26, 2008
```

Page 45

```
 1          ERRATA SHEET DISTRIBUTION INFORMATION

 2          DEPONENT'S ERRATA SHEET & SIGNATURE

 3                    INSTRUCTIONS

 4

 5          ERRATA SHEET DISTRIBUTION INFORMATION

 6               The original of the Errata Sheet has

 7     been delivered to Richard A. Samp, Esq.

 8               When the Errata Sheet has been

 9     completed by the deponent and signed, a copy

10     thereof should be delivered to each party of

11     record and the ORIGINAL forwarded to Brian G.

12     Kennedy, Esq. to whom the original deposition

13     transcript was delivered.

14

15               INSTRUCTIONS TO DEPONENT

16               After reading this volume of your

17     deposition, please indicate any corrections or

18     changes to your testimony and the reasons

19     therefor on the Errata Sheet supplied to you

20     and sign it.  DO NOT make marks or notations on

21     the transcript volume itself. Add additional

22     sheets if necessary.  Please refer to the above

23     instructions for errata sheet distribution

24     information.
```

Mary Samp 5/4/2007
Washington Legal Foundation v. Michael O. Leavitt, et al.

Page 46

1   PLEASE ATTACH TO THE DEPOSITION OF

2   MARY A. SAMP

3   CASE:  WASHINGTON LEGAL v. LEAVITT

4   DATE TAKEN:  MAY 4, 2007

5                    ERRATA SHEET

6   Please refer to page 45 for errata sheet

7   instructions and distribution instructions.

8   PAGE        LINE        CHANGE        REASON

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16          I have read the foregoing transcript

17  of my deposition and except for any corrections

18  or changes noted above, I hereby subscribe to

19  the transcript as an accurate record of the

20  statements made by me.

21          Executed this ____ day of _____,

22  2007.

23          _____

24              MARY A. SAMP