BRADFORD ASSOCIATES
ABBY BLOCK

Page 2

APPEARANCES:

For Plaintiffs, Washington Legal Foundation:

RICHARD A. SAMP, ESQUIRE
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, D.C. 20036

For Defendants, Michael O. Leavitt, et al:

BRIAN G. KENNEDY, Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W., Room 6104
Washington, D.C. 20530

Also Present: Tracey W. Glover, Esquire
Department of Health & Human Services
CMS Division

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 3

CONTENTS
Examination by Counsel

| Witness | | |
|---|---|---|
| ABBY BLOCK | Mr. Samp | 4 |
| | Mr. Kennedy | 75 |

EXHIBITS

| Deposition Exhibit No. | Page |
|---|---|
| Block Deposition Exhibit No. 1 | 60 |

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 4

PROCEEDINGS

Thereupon
ABBY BLOCK
a witness, called for examination by counsel for the plaintiff, and after having been first duly sworn or affirmed by the Notary Public, was examined and testified as follows:

EXAMINATION ON BEHALF
OF PLAINTIFF, WASHINGTON LEGAL FOUNDATION
BY MR. SAMP:

**Q Good afternoon, Miss Block. My name is Richard Samp. I'm going to be asking you a few questions this afternoon with regard to the lawsuit that our organization has filed against CMS, and Mr. Leavitt.**

**Sometimes I talk a little bit too fast; and, I apologize in advance. Please if, at any time, I'm talking too fast or you don't understand my question, I would ask you just simply to ask me to slow down or ask it over again.**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 5

A Okay.

**Q Did you read any documents with regard to this lawsuit in preparation for your deposition today?**

A Yes. I re-read the Interrogatories and my own statements.

**Q Anything else that you read?**

A I read the directive from CMSO to the nursing homes.

**Q Is that the document that I refer to as the S&C memo?**

A The S&C memo, yes.

**Q After reading the Interrogatory Answers and your declaration, is there anything in there that you would like to change that you may have said before?**

A No.

**Q So you think those documents accurately state your position?**

A Yes.

**Q Can you give me a brief synopsis of your professional background.**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 10

arrived here, the first thing they did was put piles of regulations on my desk and asked me to look at them.

**Q In addition to the regulations, there are some documents called the marketing guidelines. What process brought about their creation, was the decision already made to have marketing guidelines by the time you arrived?**

A Yes. As I understand it, there have been marketing guidelines in place for the Medicare Plus Choice Program, which was the Part C program that preceded Medicare Advantage. Those guidelines were already in place. So the first step in terms of creating new guidelines that took place was to write Part D guidelines that would in some way parallel the Part C guidelines that already existed.

**Q Now under those existing guidelines, I assume that companies that offered what I'll refer to as MA plan had some restrictions on what they could do for marketing; is that correct?**

A Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 11

**Q Were there any restrictions on what providers could do in terms of marketing at that point?**

A Yes, there were.

**Q Can you, briefly, describe for me, if you can, what those sort of restrictions were?**

A Providers, specifically, were precluded -- or plans in their contracts with providers were required to have provisions in those provider contracts that would preclude providers from steering beneficiaries to a particular plan choice.

**Q The marketing guidelines were, first, issued when?**

A The marketing guidelines -- as I best recall, I was involved in the development of the Part D marketing guidelines during 2005. Ultimately, the marketing guidelines for Part C and Part D of the guidelines, which had originally been issued as separate documents because the C ones already existed, were consolidated into a single document.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 12

**Q Were you directly involved in the creation of the marketing guidelines?**

A Well, I was certainly involved during 2005. I was not the primary author of the guidelines. Staff in Baltimore were, but I was aware of what was in the guidelines and consulted on the contents, yes.

**Q Were you one person whose approval was required in order to put them in final form?**

A My approval was certainly required once I became the Director of the Center for Beneficiary Choices. So subsequent to October of 2005, yes, my approval was required.

**Q During the course of this approval process, what discussions, if any, did you take part in that discussed what restrictions ought to be imposed on speech by providers?**

A Well, there were no discussions about imposing restrictions on speech by providers. There are no restrictions on speech by providers. What's in the guidelines are restrictions on steering to specific plans by providers.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 13

**Q I assume that restriction on steering means you can't say to a patient if you are covered by the marketing guidelines, this is the plan that you ought to enroll in; is that correct?**

A You can't say to a patient this is the only choice for you, this is the plan for you. You can say many other things to a patient, you can give a patient all kinds of advice, guidance, education. You can use factual information with a patient. You can give objective information to a patient. The one thing that you cannot say is there's only one plan that's good for you; and, that's this plan.

**Q As a shorthand, I'll refer to that as steering people. Is that fair?**

A Yes, that would be how we would define steering.

**Q Now can you describe for me what discussions, if any, you were involved with during 2005 and 2006 with regard to how this prohibition on steering ought to be implemented and how it should be phrased?**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 18

**physician who has a patient who is eligible for Medicare.**

MR. KENNEDY: Is that a medical physician or a real physician?

MR. SAMP: This is a hypothetical physician.

BY MR. SAMP:

**Q Let's assume that that physician is not contracted with any MA plan or a Section 1876 cost plan, or any base plan, but instead the only services that that doctor provides to Medicaid or Medicare beneficiaries is under traditional Medicare. Is that physician in any way prohibited by CMS from steering his or her patient to a particular Part D plan?**

A If the physician has a relationship with the patient, we would say that the physician is precluded from steering a beneficiary to a particular plan because of the way we structured this in terms of a provider who has financial or other interest. So that's very broad; and, I appreciate that is very broad.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 19

However, if that physician has no contractual relationship with the plan, there isn't a plan that we could sanction for that physician's behavior, assuming it was a physician and not another type of provider.

**Q So let me make this clear. You consider that kind of steering inappropriate?**

A I would consider it inappropriate, yes.

**Q What statute or regulation would you point to that suggests that it's inappropriate?**

A Well, it's not a statute or regulation. It's really in accordance with this guidance in the best interest of the beneficiary; and, we believe the beneficiaries should get information from an objective source.

Again, you know, I have to make the distinction in terms of what that physician said to the beneficiary. Any objective information, you know, such as this is what Plan A's formulary looks like and this is what Plan B's formulary looks like; and, you know, here are the medications that you take. This is how, in my

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 20

experience, Plan A does prior authorization. This is how Plan B does it. All of that we would consider legitimate, objective information. It's always the case of whether the individual, the provider, be it a physician or any other provider, specifically says you need to be in this particular plan. That's what we consider steering.

**Q So we'll agree that that's what steering means for my future questions. I'm mostly going to be asking you about the very small number of pieces of information that would constitute steering to the specific plan. I'm not sure I fully understood your answer. Assuming that the physician says things that constitute steering, what would be your basis for saying that it's inappropriate for the physician to steer the patient to a specific Part D plan, assuming that that doctor is not contracted with any plan; and, all the various types of plans that I mentioned before.**

A My basis for saying it is, that it's

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 21

not in the best interest of the beneficiary because that doctor is not really privy to every piece of information that would go into the beneficiary necessarily making the best possible decision for that individual.

**Q All right. Let's assume, now, that the doctor is contracted with one particular Medicare Advantage Program and he steers that patient to a particular Part D plan. My question is the same, would that steering be a violation of the guidelines?**

A Yes, it would.

MR. KENNEDY: Objection. I don't think that is, actually, the same question translated with a different --

MR. SAMP: I apologize. I tried to make it the same.

BY MR. SAMP:

**Q Everything is the same in the two situations, except, now, the doctor is contracted with one particular MA.**

A Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 22

**Q And he now engages in steering to a particular Part D plan. Please give me your best assessment of the situation.**

A That would certainly be considered steering. It would be considered a violation of the guidelines; and, since that doctor does have a contractual relationship with a Part D plan, that plan would be considered responsible for that action on the part of this contracted provider.

**Q Now, would it make any difference if the Part D plan that was recommended had no relationship whatsoever to the MA plan with which the doctor was contracted?**

A No. It truly would not make any difference because where we're coming from, philosophically, is that it is in the best interest of the beneficiaries for them to examine either personally, or with the assistance of their own family members who are available to help or others in the community who can provide objective assistance to examine the provisions of

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 23

various plans that are available to them; and, make their own decision as to what is the best choice for them.

**Q And just perhaps I'm plowing old ground here, but assuming, now, that the doctor is not contracted with anybody, your principle basis for thinking that it's improper to steer the patient to a particular plan is that the doctor may not have access to all relevant information as to which is the best plan?**

A That's right. They may not have complete information about that particular patient.

**Q Is there any other reason at all other than the potential that the doctor might not be fully informed why it might be considered improper for this non-contracted doctor to steer?**

A In my mind, that would be the primary reason. The other reason would be, as we have said, in the marketing guidelines we talk about financial or other interest. We don't know what other interest that doctor might have that might

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 24

be influencing the advice that he is giving the patient.

**Q I would like to, then, turn from doctors to long-term care facilities, if I may.**

MR. KENNEDY: I'll object on the grounds that none of the plaintiffs in this case are involved in long-term care facilities; and, I have a continuing objection to the relevance and materiality of the testimony.

BY MR. SAMP:

**Q Am I correct that the marketing guidelines, also, apply to long-term care facilities that are contracted with a plan?**

A Yes.

**Q And the same restrictions on steering that we discussed before would apply to long-term care facilities?**

A Well, they apply to whoever a plan subcontracts with. Plans don't subcontract with long-term care facilities. So in that sense there is no direct relationship between a plan and a long-term care facility.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 25

**Q Is there any -- generally, any contractual relationship between long-term care facilities and MA plans?**

A No, not that I know of.

**Q So can you imagine any situation in which a long-term care facility would fall within the definition of a provider as it's defined within the marketing guidelines?**

A Long-term care facilities; and, let me think this through carefully. Long-term care facilities fall under the jurisdiction of the Center for Medicaid and state operations. So they are the experts in terms of long-term care facilities and all of the requirements of long-term care facilities. They have specific jurisdiction over that group of providers.

**Q And that organization you just mentioned, are they under your supervision?**

A No, they are not.

**Q I would like to turn to the subject of pharmacies. Am I correct that any pharmacy that is contracted with a plan would be considered a**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 26

**provider under the marketing guidelines?**
A Yes.
**Q They would, then, be subject to the same restrictions on steering that we discussed before?**
A Yes, that's correct.
**Q Am I correct that pharmacies must contract with a Part D plan in order to receive reimbursement under Part D?**
A Yes.
**Q So it's fair to assume that it's relatively common for pharmacies to be contracted with one or more Part D plans?**
A Yes.
**Q Let's assume that there are twenty Part D plans offered in a particular community and a pharmacy is contracted with ten out of those twenty; and, a patient comes to the pharmacy and says which one plan do you think would be best for me. Are there any situations in which it would be proper for that pharmacist to recommend which one plan is best for the patient?**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 27

A No.
**Q Let's assume that the pharmacist says the best plan for you is Plan X, even though I am not contracted with Plan X, would that nonetheless be a violation of the marketing guidelines?**
A It certainly would be inconsistent with the guidelines, yes.
**Q Why would that be a bad thing for a pharmacist to do from a policy standpoint in your mind. If they're not contracted with this plan and, therefore, don't have any sort of incentive to make this recommendation other than perhaps they think it's the right answer.**
MR. KENNEDY: Objection to the assumptions about no incentive.
BY MR. SAMP:
**Q If you could answer by telling me, first, if you think there might be an incentive to make that recommendation.**
A For the same reason I gave you before. We do not believe that it is desirable for any

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 28

single individual with a relationship to a patient to steer that patient to one specific plan.
**Q Can you explain to me why you think it would be inappropriate for a contracted pharmacist to recommend a particular plan. What would be the policy reasons for not allowing those kind of recommendations?**
A Well, I mean, certainly a particular pharmacist who was contracted with a plan could have a very direct financial interest based on, you know, the reimbursement schedule of that particular plan that he's recommending. So, you know, there is clearly a potential for a provider steering a patient based on the provider's financial interest. That would, clearly, be a violation of the guidelines.
**Q Any other concerns?**
A Certainly, and, again, the same general concern I expressed repeatedly, no single individual. A pharmacist does not know that individual's whole medical history. They don't

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 29

know their financial situation. There are all kinds of pieces of information that that individual doesn't have. So that an individual recommending a single choice to a beneficiary could lead to the person ending up in a plan that, in fact, does not truly meet their needs.
**Q Would you think it would be appropriate if the patient had a child who had done some research on plans to recommend to his or her parent I think Plan X is the best plan for you. Would that be a good thing?**
A Well, I'm not in a position to really opine on the relationship between a parent and child. That's truly outside my purview.
**Q Would you think in your experience that it would be more likely that a patient's pharmacist would have more accurate information about the Part D plan that best meets the needs of the patient or that the patient's child has that sort of information?**
A I really can't opine on that.
**Q What can you tell me about pharmacists**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 34

**Q Now, let's assume that our hypothetical pharmacist has contracted with every Part D plan in the area.**

A Okay.

**Q Would it be improper, in your view, for the pharmacist to steer the patient to a particular Part D plan?**

A Yes, it would be.

**Q At the risk of being repetitive, if you could just explain to me all of your reasons why it would be inappropriate, both as a matter of to violate the regulations, which I understand, but, also, the policy reasons behind those regulations?**

A Number one, it might be in his financial or other interest to do so; and, that certainly would be undesirable. Secondly, it is best for a patient to get complete and objective information and that individual is not in a position to provide complete and objective information that would allow that person to specifically steer. That person certainly could provide objective information about the features

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 35

of various plans and that would be appropriate education and guidance.

**Q Are you aware whether CMS has received objections from some pharmacists to the restrictions on steering as they appear in the marketing guidelines?**

A As I understand it, when the guidelines were put out for comment CMS received both favorable supportive comments, and unfavorable comments.

**Q The guidelines were last changed sometime in the middle of 2006, is that correct?**

A I believe that's correct.

**Q Is there any plan in the works to revise them, again, in the near future?**

A We always look at our guidance and see if it needs updating or clarification; and, we will certainly do that prior to the giving of marketing for the 2008 benefit year which starts October 1.

**Q Are you aware of any plan to conduct a study between now and then with regard to whether**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 36

**pharmacists would have strong financial incentives to steer patients towards a particular Part D plan?**

A I'm not aware of any such plan.

**Q If a Part D plan were to offer a pharmacist $5,000 for every patient that that pharmacist switched from a different Part D plan to the offering Part D plan, would that arrangement violate the federal anti-kickback statute?**

A It's my opinion that it would, but, again, I don't -- it is not within my purview to enforce the anti-kickback provision. So that would be a question for the IG to determine,

**Q In formulating the guidelines, are you aware of any discussion about whether or not the prohibitions contained in the anti-kickback statute would be sufficient to deter pharmacists from improperly steering a patient to a particular plan even without the restrictions that exist within the marketing guidelines?**

A I would guess not, simply because those

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 37

provisions really address direct remuneration such as, you know, in the example you just gave me. Our concern is broader than that. It goes, also, to indirect interest.

**Q Well, one of your concerns, as I understand it, is that a particular plan might provide pharmacists with greater payments for their particular drug. Would there come a point where those payments by themselves might violate the anti-kickback statute if they were sufficiently greater than what was offered by other Part D plans?**

A Again, I am not the expert on the anti-kickback statute. Those are questions for the IG to determine.

**Q It's fair to say that nobody at CMS focuses on the anti-kickback statute as being within their purview?**

A The people in the Office of Financial Management who have jurisdiction over program integrity and who are the direct links to the IG. Certainly, if anyone, CMS does. That's where it

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 38

would be, over in the integrity office in the Office of Financial Management.

**Q Am I correct that the program integrity office had nothing to do with putting together the marketing guidelines?**

A I am quite sure that they reviewed and cleared them.

**Q They were not directly involved in the actual drafting of them, is that correct?**

A I don't believe so. Although, there's a whole list of people in the first Interrogatory and I, frankly, don't remember whether someone from program integrity is on this list. I know that's a long list.

**Q I want to ask you just a few questions about how patients go about obtaining information to help them decide which is the Part D plan that is best for them. Could you just, briefly, describe for me where a typical Medicare beneficiary might turn for information?**

A Yes. There are various sources. First of all, every Medicare beneficiary receives a

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 39

copy of the Medicare Handbook every year. So that's one source. Every Medicare beneficiary can call 1-800-MEDICARE and a customer service representative will assist them.

Every Medicare beneficiary has access to the www.medicare.gov website where the plan-finder tool is available. The tool, basically, allows the beneficiary or anybody working with that beneficiary assisting them to input a whole variety of information. The plan will do a mathematical calculation which will in descending order give that beneficiary a choice of plans from the least costly, you know, to the most costly given their parameters.

**Q Now besides cost, what are the factors that a Medicare Part D patient needs to keep in mind in trying to decide what might be the best plan for them?**

A Well, they certainly should be concerned with plan performance. In that regard, CMS has already made available publicly information on the plan's performance. For the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 40

upcoming enrollment period, we're going to have report cards on our website that will, specifically, give people quality performance information.

**Q What about prior authorization requirements. Are those something that should be a concern to patients?**

A Yes.

**Q Why is that? If you can just briefly describe it to me.**

A Well, if the patient is taking a particular medication and if they are already on it, they're taking a regime, it should certainly be of some interest. I wouldn't say not necessarily defining interest, but of interest as to whether they will have access to that medication; and, whether that access will require prior authorization by the plan that they choose.

**Q What about quantity limit restrictions?**

A The same thing. I mean, all of the things, quantity limits, step-therapy, certainly, those are things that a person making an informed

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 41

choice would want to know.

**Q Isn't it, generally, true that if a particular Part D plan imposes prior authorization or step-therapy that the plan will not pay for the drugs if the patient does not meet the prior authorization or step-therapy criteria in using those drugs?**

A The plan will not pay for those drugs and, then, the patient has appeal rights and can appeal that decision.

**Q Is there any readily available place where a Medicare beneficiary can obtain comparative information showing the criteria that must be satisfied for granting coverage for drugs that are subject to prior authorization or step-therapy restrictions for the various Part D plans?**

A Yes, the plan-finder tool will clearly indicate if any of those requirements are in place, but may not spell out the criteria. However, by regulation we require plans to make that information readily available to the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 46

A Yes.

**Q So the provider would be permitted to say this particular plan provides the best benefits for people in your particular situation so long as the provider doesn't specifically say, therefore, we recommend that you sign up with that plan?**

A Again, we mean exactly what we say. If they're not acting on behalf of the sponsor, they're not required to submit the material to us, we would encourage them to do so. I gave the example of Walgreens, which did submit some materials to us and we informally approved those materials, but there is no requirement.

**Q Is it CMS's position that providers are not subject to any of the restrictions on provider activities, as set forth in the marketing guidelines, if those activities are not undertaken by the provider on behalf of any Part D plan?**

A No, that's not our position.

**Q Explain to me your position, then. If**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 47

**the provider is not undertaking activity on behalf of any specific plan.**

A I guess maybe you need to clarify for me what you mean by engaging in activity not on behalf of any particular plan.

**Q On pages 122 to 128 of -- I guess 126 of the marketing guidelines, there are set forth a number of guidelines about provider promotional activity. We briefly touched on steering.**

A Okay.

**Q I understand from all of our discussions that we've had to this point that steering is never permitted regardless of whether you're doing that in conjunction with a particular Part D plan other than steering.**

A Okay. That's what I need you to clarify.

**Q Other than steering, is it CMS's position that providers are free to engage in the activities that are subject to regulation on pages 122 to 126 so long as they're not doing it in conjunction with a particular Part D plan?**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 48

A Well, I have to look carefully at what's on these pages, but to the degree that a provider is, again, providing objective information, they can provide objective information about specific plans. Like it says here, such as covered benefits, cost-sharing, drugs on formulary, utilization management tools. All of those things are objective information and provide -- certainly not only can they, but we would encourage them to provide all that kind of information.

They can distribute plan marketing materials, provided that's not limited to the marketing materials for a single plan. They can certainly tell the beneficiary what plans they contract with. That's important and useful information that they can provide. They can tell beneficiaries where they can go for additional information and that would be all of the CMS resources that we discussed a moment ago. So there are many things that providers can and are encouraged to do.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ABBY BLOCK

Page 49

**Q And that would be true regardless of whether they are acting on behalf or in concert with a particular Part D plan, is that correct; the things that you've just discussed that they're encouraged to do doesn't make any difference if they're doing it with the encouragement of a particular plan, is that correct?**

A Well, if they're distributing marketing materials, for example, then, certainly they, you know, would have to have the approval of all the plans for whose marketing materials they're distributing.

**Q Even if they're not doing it at the behest of any particular plan, they would still need to get that approval?**

A Yes. I think it would be appropriate for them to ensure that every plan whose marketing materials they were distributing actually wanted them to do that.

**Q To be clear, Part D plan is never going to be keen on approving materials that are**

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

- - -

(I have read the foregoing pages, 4-78, which contain a correct transcription of the answers given by me to the questions therein recorded, as noted on the attached errata sheet.)

Abby Block
________________________________
Abby Block

with noted corrections

**ERRATA SHEET FOR:** ABBY BLOCK

**RE:** WASHINGTON LEGAL FOUNDATION VS. LEAVITT

**CASE OR CIVIL ACTION NO:** 1:06-CV-01490 (RMC)

**COURT:** UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**DATE:** WEDNESDAY, JULY 27, 2007

| PAGE | LINE | CORRECTION |
|---|---|---|
| 6 | 2 | presidential (not personnel) |
| 6 | 6 | Federal Employees Health etc. |
| 7 | 22 | "records" / delete can't be right but don't know what I actually may have said |
| 15 | 15 | plan (not planning) |
| 20 | 20 | prime (not [illegible]) |
| 35 | 18 | beginning (not [illegible]) |
| 37 | 20 | insert "[illegible]" between "[illegible]" + "CMS |
| 38 | 1 | insert "program" before "integrity" |
| 39 | 1 | insert "[illegible]" between "Medicare" and "[illegible]" |
| 39 | 10 | insert "[illegible]" after "plan" |
| 40 | 3 | insert "[illegible]" bet. "quality" and "performance" |
| 70 | 15 | assistance (not [illegible]) |
| 73 | 21 | CMSO (not CMS) |
| 77 | 20 | "advisory" can't be right (would have to be "[illegible]") |

DATE: SIGNATURE:

**ABBY BLOCK**