```
                        th082407hamilton80 - Vol I (4).txt
0001
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
     WASHINGTON LEGAL FOUNDATION,    *
 3
                 Plaintiff           *
 4
     vs.                             *   Case Number:
 5
     MICHAEL O. LEAVITT,             *   1:06CV01490(RMC)
 6   SECRETARY, UNITED STATES
     DEPARTMENT OF HEALTH AND        *
 7   HUMAN SERVICES,
                                     *
 8              Defendant
     *       *        *        *         *         *
 9
                THE DEPOSITION OF THOMAS HAMILTON
10
                The Deposition of Thomas Hamilton,
11
     taken in the above-captioned case on Friday, August
12
     24, 2007, commencing at 2:15 p.m., at the Offices
13
     of the Center for Medicare Services, 7500 Security
14
     Boulevard, Baltimore, Maryland 21244 and reported
15
     by Cathelyn Matthews, Court Reporter and Notary
16
     Public.
17
18
19            EVANS REPORTING SERVICE
           The Munsey Building, Suite 705
20            Seven North Calvert Street
              Baltimore, Maryland 21202
21                   410-727-7100
0002
 1   APPEARANCES:
 2
 3   RICHARD SAMP, ESQUIRE
 4         Washington Legal Foundation
 5         2009 Massachusetts Avenue, NW
 6         Washington, D.C. 20036
 7         202-588-0302
 8         rsamp@wlf.org
 9         On Behalf of the Plaintiff
10
11   BRIAN KENNEDY, ESQUIRE
12         U.S. Department of Justice
13         Civil Division
14         Federal Programs Branch
15         Room 7342
16         20 Massachusetts Avenue, NW
17         Washington, D.C. 20530
18         202-514-3357
19         brian.kennedy@usdoj.gov
20         On Behalf of the Defendant
21
0003
                            Page 1
```

th082407hamilton80 - Vol I (4).txt

```
18      repeat it.
                    And I'll assume that if you do answer
19
        it that you understood what I've said.
20
                    Is that fair?
21
0005
 1          Q    Okay.  Could you state your name for
 2      the record?
 3          A    My name is Thomas Hamilton.
 4          Q    And can you tell me what your current
 5      job position is?
 6          A    I'm the Director of the Survey and
 7      Certification Group within CMS, the Centers for
 8      Medicare and Medicaid Services.
 9          Q    And what is the function of the Survey
10      and Certification Group?
11          A    The Survey and Certification Group in
12      CMS has responsibility to provide the policies and
13      procedures governing the certification surveys and
14      complaint investigations for almost all of the
15      provider types that participate in Medicare and
16      Medicaid and get funding from Medicare or Medicaid
17      except for certain categories and providers or
18      suppliers such as the Medicare Advantage, the
19      Managed Care Plans, or Physicians.
20                    But examples would be hospitals,
21      dialysis facilities, nursing homes, home health
0006
 1      agencies, hospices, transplant centers.
 2          Q    You mentioned several that you don't
 3      provide the guidance for such as the Advantage
 4      Programs.  Who does provide the guidance to those
 5      programs?
 6          A    Oh, it's another component within CMS
 7      that provides the regulations and policy guidance
 8      on Medicare Advantage Plans.
 9          Q    And which is that?  What is that group?
10          A    Well, I think they've moved, so I'm not
11      sure exactly.  But I believe it's CBC.
12          Q    And the CBC stands for what?
13          A    The Center for Beneficiary Services, or
14      it used to be Choices.
15          Q    Choices, yeah.
16          A    Well, again they've changed their
17      names.
18          Q    But nursing homes generally take their
19      guidance from your group; is that correct?
20          A    No.  Not nursing homes.  The surveyors
21      who go in and do the surveys of nursing homes take
0007
 1      their guidance from me -- from the Survey and
 2      Certification Group.
 3          Q    And are there surveyors directly
 4      employed by CMS, or are they employees of various
 5      state governments?
 6          A    The preponderance of the surveys are
 7      conducted by state employees whereby we have an
 8      arrangement under Section 1864 of the Social
 9      Security Act that directs us to engage with the
10      state survey agencies to do CMS surveys where they
```

Page 3

```
                          th082407hamilton80 - Vol I (4).txt
11   are capable of doing so.
12             When the states do their surveys, they
13   do so using federal policies and federal procedures
14   at our direction, unless they're doing a state
15   only, you know, survey such as a state licensure
16   survey.
17             CMS does have surveyors housed in the
18   10 regional offices, and their job is to provide
19   oversight of the state operations and to insure
20   that the states are faithfully carrying out our
21   policies.
0008
 1             And they also do what's called
 2   validation surveys. Particularly in the nursing
 3   home arena whereby the regional office staff may
 4   either accompany a state survey team on a sample of
 5   cases to observe conditions in the nursing home and
 6   observe the work of the state surveyors and compare
 7   the federal results with the results that the state
 8   gets as a matter of internal quality assurance.
 9             Or the regional federal surveyors may
10   go in behind the state survey team within 60 days
11   of completion of the state survey, and the federal
12   surveyors would do a full survey and then use that
13   to compare the results against what the state team
14   found.
15             And again that's part of an internal
16   quality check on the adequacy and accuracy of the
17   state surveyors.
18        Q    Are there any states that don't have
19   their own surveyors because they've not entered
20   into any sort of contractual arrangement with you?
21        A    All 50 states, as well as the District
0009
 1   of Columbia and the Virgin Islands and Puerto Rico
 2   have an agreement with us in the nature that I
 3   described.
 4        Q    Let me back up and ask you a couple of
 5   questions about your background.
 6             How long have you been with CMS?
 7        A    Since November 8, 1999.
 8        Q    Can you give me a brief summary of your
 9   professional background before then?
10        A    Prior to coming to CMS, for almost a
11   quarter of a century, I worked at the state
12   government in Wisconsin primarily in a variety of
13   long-term care roles.
14             For example, I ran the home and
15   community based services system as an alternative
16   to nursing homes, as well as at one point being the
17   deputy director of a bureau of alternate care that
18   provided certification and licensure for certain
19   types of human service providers.
20        Q    When you came to CMS in 1999 what
21   position did you take?
0010
 1        A    I took a position of the director of
 2   the Disabled and Elderly Health Programs Group.
 3   And that group had the responsibility for
 4   formulating policies governing Medicaid payment and
 5   services for adults. Particularly elderly and
 6   people with disabilities.
 7        Q    And how long did you stay in that
                                  Page 4
```

th082407hamilton80 - Vol I (4).txt

```
 8  position?
 9       A    I stayed in that position until
10  approximately August 18, 2003, at which time the
11  prior director of the Survey and Certification
12  Group took a different position.
13            And the director of the Center for
14  Medicaid and State Operations called me up and
15  asked me, as a member of the Senior Executive
16  Service, to move over and assume the
17  responsibilities of the Survey and Certification
18  Group immediately.
19       Q    And have you been in that position
20  since 2003?
21       A    I have.
0011
 1       Q    The memo that I'm mostly going to be
 2  asking you about today is labeled S&C-06-16.
 3            Does that mean that it is the 16th
 4  memorandum that you issued in 2006?
 5       A    In the fiscal year of 2006.  Yes.
 6       Q    Which runs from?
 7       A    October 1, 2005 through September 30,
 8  2006.
 9       Q    And about how many of these memorandums
10  do you issue per year?
11       A    Typically we issue 45 to 60 survey and
12  certification memoranda each year, and we publish
13  those on our website so that they are publicly
14  available as well as being available to the state
15  and federal surveyors.
16       Q    So this is the 16th one from 2006
17  fiscal year and it was May already.  So were you
18  falling behind in terms of the number for that year
19  or --
20       A    We don't have a quota system.  We issue
21  those on an as needed basis.
0012
 1       Q    Okay.  Could you describe for me the
 2  needs that led to the eventual issuance of the
 3  memorandum we've been talking about, number 16?
 4       A    We'd had quite a few reports that there
 5  was a lack of understanding with regard to the
 6  responsibilities of nursing homes as well as the
 7  rights of nursing homes in terms of what they were
 8  permitted to do in the context of implementation of
 9  a Part D prescription drug plan.
10            We'd heard complaints from consumer
11  groups that resident rights were being violated.
12  And so it's our responsibility to take those
13  complaints seriously and to ensure that there's
14  clear interpretation of the laws and regulation.
15            In particular we'd gotten a
16  communication from some of our regional offices
17  indicating that there had been complaints from
18  consumers that -- from residents of nursing homes
19  that they had been required by nursing homes to
20  pick a particular Part D prescription drug plan,
21  and that was of a concern.
0013
 1            Of equal concern was an interpretation
 2  from that particular regional office that residents
 3  would have the right to choose the pharmacy.  And
 4  so we undertook an analysis of the laws and
```

th082407hamilton80 - Vol I (4).txt

```
12      some Part D plan, and I see that I have 30 choices
13      to choose among.
14              And I tell the nursing home I've read
15      all these materials very carefully, and I haven't
16      the slightest idea which is best for me.  Please
17      give me the name of the Part D plan that you think
18      is best for me.
19              Would it be appropriate at that point
20      for the nursing home to say "Yes, Mr. Samp, we
21      believe that this particular Part D plan is best
0028
 1      for you and your spouse?"
 2          A   Well, we advise nursing homes in that
 3      situation to say -- to make it clear that they're
 4      providing information.
 5              They could say "Here is the pharmacy
 6      with whom we do most of our business and here is
 7      why."
 8              But not to say "You should select this
 9      particular PDP."
10          Q   And my response hypothetically is "But
11      I can't choose.  I don't know as much about this as
12      you.  Please choose a particular plan for me."
13              Would that be an appropriate situation
14      for the nursing home to say "We recommend this
15      particular plan?"
16          A   They can describe the implications of a
17      choice, but not to make those kinds of particular
18      recommendations of the PDP.
19          Q   I'd like you to look just briefly at
20      Exhibit 1, and if you can turn to the third page.
21      And let me read that paragraph for you.
0029
 1              "Under no circumstances should a
 2      nursing home require, request, coach or steer any
 3      resident to select or change a plan for any
 4      reason."
 5              Can you explain to me how you
 6      understand that sentence?
 7          A   We understand that sentence in contrast
 8      to the last sentence of that same paragraph that
 9      reads "Nursing homes may and are encouraged to
10      provide information and education to residents on
11      all available Part D plans."
12              So we make -- we're trying to get folks
13      to understand a difference between steering a
14      resident versus providing good information so that
15      residents can make their informed decision.
16          Q   When you and Ms. Graunke and
17      Ms. Simmons were coming up with the language for
18      this particular memo, what led you to decide that
19      it's inappropriate for the nursing home to request,
20      coach or steer a resident to select or change a
21      plan?
0030
 1          A   To do what, again?  To request that
 2      they change a plan?
 3          Q   To request, coach or steer any resident
 4      to change a plan?
 5          A   All right.  That is grounded in the
 6      resident's right to choose and the nursing home's
 7      responsibility to respect the resident's choices
 8      and a right to make those choices.
```

th082407hamilton80 - Vol I (4).txt

```
 9            Q    Would it be appropriate if I as the
10   head of the nursing home said to one of my
11   residents "You are free to choose any plan that you
12   want, however I find that for your particular
13   purposes the best plan is plan A.  Therefore I
14   request that you choose that plan."
15            Would that be an appropriate statement?
16       A    We would not endorse that particular
17   statement, but the bottom from a Survey and
18   Certification point of view is that when we go out
19   and do the surveys we're looking at the outcomes.
20            And so the thing that we would be
21   looking at is whether or not the resident believed
0031
 1   that they had been coached, steered or required to
 2   make a particular choice.
 3            And despite whatever suggestions we
 4   might make to nursing homes as to how they should
 5   handle their responsibilities, in the end our
 6   enforcement is based on whether or not the facts
 7   support a conclusion that the resident was denied
 8   their choice.
 9            So even if a nursing home had said "You
10   know, between you and me, I'd recommend that you go
11   with plan A."
12            When we're doing the survey and we're
13   talking to residents in our survey sample, if that
14   resident is completely satisfied and doesn't feel
15   like they had been coerced or required to choose a
16   particular plan, then we would not be taking an
17   enforcement action.
18       Q    Now quite apart from whether you would
19   be taking enforcement action, would you find it a
20   violation of your guidance for a nursing home to
21   respond to a resident's request of the name of the
0032
 1   best plan if the nursing home were then to say "We
 2   think plan A is the best for you?"
 3       A    We would say that the nursing home is
 4   treading on dangerous territory, but we would not
 5   make a definitive conclusion without talking to the
 6   resident.  And if the resident said, you know, this
 7   is fine, then again we would not site.
 8            But it's dangerous for the nursing home
 9   in the sense that the nursing home is populated
10   with very vulnerable individuals who rely upon that
11   nursing home for their very existence, their
12   ability to live, their medications, their food,
13   their daily support, being able to get out of bed.
14   Or if they're immobile, being able to be turned so
15   they don't develop a pressure ulcer.
16            In that very dependent situation it's
17   very easy for people to feel suddenly coerced.
18            And so our advice to nursing homes is
19   to make sure that they are providing good
20   information that is -- that doesn't step over the
21   line in something that the nursing home resident
0033
 1   might feel is coercion or a requirement.
 2       Q    If the nursing home resident says to
 3   one of the surveyors "I didn't feel coerced, but
 4   there's absolutely no doubt that I chose plan A
 5   because that was the one plan that they
```

Page 12

```
                    th082407hamilton80 - Vol I (4).txt
 6   recommended to me and that recommendation made
 7   sense to me.  And I was following their advice when
 8   I signed up for plan A."
 9              Would that be evidence of improper
10   conduct by the nursing home?
11         A   In that hypothetical situation again,
12   and usually there is a lot of facts involved.  So
13   it's hard to respond to hypotheticals.
14              But if the nursing home resident did
15   not feel that they had been coerced or required or
16   denied their right, then we would not issue a
17   citation.
18              Again we're looking at the ultimate
19   outcome of the transaction.
20         Q   And putting aside the question of,
21   would you issue a citation, under that same
0034
 1   hypothetical do you believe that those hypothetical
 2   facts are evidence of a violation of the terms of
 3   this particular memo?
 4         A   They are certainly in the danger zone
 5   and may violate the spirit.  But whether or not
 6   that would trigger action on our part with a
 7   citation, it would not unless the resident felt
 8   that their rights had been denied.  Their choice
 9   had been denied or they had been required to
10   exercise a particular choice.
11              So keep in mind that these are -- this
12   is not a memorandum directed to the nursing home
13   industry.  It is directed to the surveyors, and
14   their actions are quite important.  And it's a
15   guide to their ultimate actions.
16         Q   During the course of your discussions
17   with Ms. Graunke and Ms. Simmons or any other
18   people involved in the preparation of this
19   particular memo, do you recall any discussions at
20   all about the First Amendment Rights of the nursing
21   homes?
0035
 1         A   We stick to our laws and regulations
 2   and so --
 3         Q   So the answer is that there were no
 4   specific discussions about the First Amendment that
 5   you can recall?
 6         A   Not that I can recall.
 7         Q   Was this particular memo posted on the
 8   Internet after its issuance in May of 2006?
 9         A   Yes.
10         Q   What reactions did you receive to the
11   memo that you can recall?
12         A   A number of different reactions.  We
13   got a lot of thanks for clarifying things from the
14   state survey agencies, from our regional office,
15   individuals, and from many nursing homes and
16   consumer groups.
17              We did hear from the two major nursing
18   homes associations that said they did not like the
19   tone.  They felt that the tone of the letter
20   implied that nursing homes were doing wrong things,
21   and they would have preferred, you know, a
0036
 1   different tone.  And that there were other issues
 2   that had not been addressed in the memorandum.
                              Page 13
```

```
                      th082407hamilton80 - Vol I (4).txt
 3          Q    Did you see a legal analysis that was
 4    prepared by the law firm of Mintz Levin that
 5    discussed the memo?
 6          A    Quite some time later.  I don't know.
 7    But, you know, when I saw it, it was well after
 8    this would have been issued.
 9          Q    What do you recall, if anything, about
10    that particular legal memo by Mintz Levin?
11          A    I thought it was a remarkable piece of
12    work.
13          Q    In what sense?
14          A    Well, it seemed to me to proport to be
15    a legal memo, but rambled a great length with a
16    great number of complaints.
17          Q    Do you recall what, if any, were the
18    gist of those complaints?
19          A    If I recall correctly and, you know,
20    it's been quite some time, they also objected to
21    the tone and objected to a number of things that
0037
 1    hadn't been put in the memo.  And, you know,
 2    generally took issue with it, but I can't recall
 3    too many of the specifics.
 4               If you want to pursue it, maybe my
 5    memory will come back.
 6          Q    That's okay.  I don't need to get into
 7    it.
 8               In response to these various comments
 9    that you received regarding the memo, has there
10    been any subsequent memo issued by your group that
11    has attempted to clarify this memo in any way?
12          A    We've had verbal discussions which we
13    had immediately after the issuance of the
14    memorandum.  Conference calls particularly with our
15    regions to discuss it and make sure everyone
16    understood.
17               But, you know, that would have been in
18    June, thereabouts.  June, July -- May, June, July
19    of 2006.
20               And then after that people felt that
21    the questions had been addressed.  And we really
0038
 1    have not had communications from -- you know, on
 2    this other than this particular lawsuit.
 3               But I meet about every three months
 4    with the heads of the two nursing home
 5    associations, and they prepare an agenda of
 6    important issues that they think, you know, need to
 7    be addressed.  And they have not put this on
 8    agenda.
 9               And we similarly meet with the National
10    Citizens Coalition for Nursing Home Reform, a
11    consumer advocacy organization.  And they haven't
12    raised it.
13               So we haven't felt the need to revisit
14    the issue, and it seemed like the memorandum did
15    its job.
16          Q    Have you seen any of the declarations
17    filed in connection with the lawsuit?
18          A    It was a -- something that I saw
19    relative to an issue of standing, legal standing in
20    the lawsuit.
21               And so it was about an eight-page
                              Page 14
```

```
                         th082407hamilton80 - Vol  I (4).txt
0039
 1    brief, but it didn't get into the substance of
 2    this.  It had to do with the organization that
 3    brought this and whether or not they had standing.
 4              But other than that, I haven't seen
 5    anything relative to the briefs.
 6           Q   So have you not seen anything from,
 7    say, employees of nursing homes with regard to how
 8    they have reacted to the memo number 16?
 9           A   I have not.  Now maybe our regional
10    office has had, but nobody's raised --
11           Q   Well, let's assume hypothetically that
12    some of these nursing home employees have said
13    that, number one, they repeatedly get requests from
14    the relatives of those who are in their nursing
15    homes asking them which one plan should we sign up
16    for.
17              And number two, they wish they could
18    suggest a particular plan.
19              But number three, based on this memo
20    number 16, they believe that they are not entitled
21    to make that kind of recommendation.
0040
 1              If somebody who was a nursing home
 2    resident were to say that to you, what would be
 3    your response?
 4           A   I would say that there's tremendous
 5    opportunity to provide good information to nursing
 6    home residents, to their families, to perspective
 7    nursing home residents and their families without
 8    needing to make their own judgment about a
 9    particular plan to recommend.
10              And it's important that that good
11    information be provided.  Each plan has its own
12    formularies.  They have different cost sharing
13    arrangements, and the best choice for a particular
14    individual really can only be made in reference to
15    that individual's unique needs.
16              So if they need a particular drug, then
17    it's advisable to make sure that that drug is on
18    the formulary.
19              It's also important to examine prior
20    authorization requirements.  Many nursing home
21    residents need quite a few drugs, and if the
0041
 1    nursing home or physician constantly needs to go
 2    back to a particular plan to get prior
 3    authorization for the drugs that the individual
 4    needs then that could slow the responsiveness.
 5              So there are many factors to take into
 6    consideration, but that can well be done.
 7              I don't know if you've had the
 8    experience of hunting for a physician, but when you
 9    go around and ask nurses or go to your clinic or
10    whatever and ask "Tell me who the best physician
11    here is."
12              You generally won't get a response.
13    They will say "Well, I can't tell you that, but I
14    can give you other information about who's in your
15    area.  Who does what and point you to particular
16    resources."
17              So this is not an uncommon situation
18    for people in a healthcare community to be in, of
                                 Page 15
```

th082407hamilton80 - Vol I (4).txt

```
19  wanting to make sure that they're fully respecting
20  people's right to choose.  And also recognizing
21  that we don't always have all the information at
0042
 1  our disposal.
 2              So if I were to -- we know a lot about
 3  -- we hear and see.  We know a lot about
 4  physicians, but I would not advise you on a
 5  particular physician to select as your personal
 6  physician because we don't know everything.
 7              But we can provide you with a lot of
 8  good information.  And we would expect nursing
 9  homes to be in that same kind of position.
10              So if there are nursing home staff who
11  feel that they cannot really respond to a request
12  such as the one that you outlined, we believe that
13  there are plenty of opportunities for them to do
14  that and that perhaps more training and education
15  of the nursing home staff is warranted to empower
16  them with the kinds of -- the many approaches that
17  can be taken to fully respond to that type of
18  request.
19       Q    Hypothetically again, I'm an elderly
20  person whose spouse is in a nursing home, and I'm
21  looking for advice regarding the best Part D plan
0043
 1  to sign her up for.
 2              Would you recommend talking to nursing
 3  homes' staff as among the best sources of
 4  information as to which would be the best Part D
 5  plan for my spouse?
 6       A    If your spouse was going into a
 7  particular nursing home?
 8       Q    Yes.
 9       A    Then certainly.  And not only that,
10  but, you know, the pharmacist may know quite a bit
11  of information about the plans as well.
12       Q    Okay.  Are there sources of information
13  that you think would be better for me to turn to in
14  those situations other than the nursing home or the
15  pharmacist who would be in a position to answer
16  about the needs of my particular spouse?
17       A    Certainly there are many organizations
18  that can provide that kind of assistance.  And, you
19  know, there are area agencies on aging.  State
20  units on aging, for example, play an important
21  role.  Nursing home ombudsman programs.
0044
 1              But that really is getting a little bit
 2  far field from my survey and certification
 3  responsibilities.  I would direct you to the plan D
 4  -- the Part D people.
 5              There's plenty of websites and other
 6  sources of information that people can access.
 7       Q    In your opinion are there sources of
 8  information that would be better for the
 9  hypothetical elderly gentleman other than the
10  pharmacist or the nursing home?
11       A    I would -- my advice would be not to
12  restrict themselves to any one particular source.
13  But there are quite a few advocacy organizations,
14  consumer organizations, and they make a strong
15  effort to provide good impartial information.
```

```
                          th082407hamilton80 - Vol  I (4).txt
16               But I would not rule out the nursing
17    home.  I would actually recommend if they are
18    looking at a particular nursing home, to definitely
19    talk to that nursing home.
20          Q    Can you think of any source of
21    information that would be better than the nursing
0045
 1    home?
 2          A    I couldn't make that judgment.  And
 3    it's not just that it can't be made in the
 4    abstract, it also depends on the particular
 5    circumstances.
 6               What nursing home are you talking
 7    about?  What other resources are available in that
 8    particular community?  What are the PDP plans in
 9    that area?
10          Q    Would you agree that there would be,
11    like, at least some circumstances where the best
12    source of information would be the nursing home?
13          A    It's hypothetically possible.  Yeah.
14          Q    Probable?
15          A    I couldn't answer it.
16          Q    I didn't mention that at the beginning
17    of the deposition if at any point you would like to
18    take a short break, that's fine.
19               My guess is that I will have, at most,
20    a half hour more of questions.  Okay?  Unless if
21    you want to just keep going --
0046
 1          A    Okay.  Well, keep hanging in there.
 2          Q    Okay.  If you turn to page 3 of memo
 3    number 16, there's a reference to Section 483.12D.
 4               Do you see that?
 5          A    I do.
 6          Q    Am I correct that that is the
 7    regulation that provides Medicare recipients with
 8    the right to choose their own plan?
 9          A    That is the area that we direct the
10    surveyors to cite.  This is the part of the memo
11    that is labeled "Surveyor Responsibility".
12               And in terms of our direction to the
13    surveyors, this is the essential communication.  So
14    we say specifically to site 42CFR483.12D if the
15    residents are denied the right to select their
16    prescription drug plan.
17               And encourage the nursing home to
18    develop and implement an effective and timely plan
19    of correction.
20          Q    There were some answers to
21    interrogatories that were provided to me by
0047
 1    attorneys for CMS in this case.
 2               Have you seen or reviewed in any way
 3    those?
 4          A    Sir, I'm not your best source.
 5          Q    In those answers they reference just a
 6    small number of regulations, and I wanted to just
 7    very briefly go over with you what those
 8    regulations might mean.
 9               They've referenced several provisions
10    in 483.10 having to do with resident rights.  And
11    I'm wondering if you could briefly outline for me
12    your understanding of the relevant regulations
                              Page 17
```

th082407hamilton80 - Vol I (4).txt

```
13  within 483.10 that went into your decision to come
14  up with this particular memo?
15       A    Well, that's a very important part of
16  the regulations that outlines a host of resident
17  rights.  Particularly the right to be informed of
18  their care and participate in their care.  And it's
19  a fairly extensive section on rights.
20            And it's certainly pertinent to this
21  question.  And we certainly would point that out to
0048
 1  the nursing home, as part of our educational
 2  efforts, that they are to pay attention to that
 3  entire section.
 4       Q    And assuming that I either requested or
 5  coached or steered a resident to choose a
 6  particular plan, which particular right of
 7  residents do you think that that might in some way
 8  violate?
 9       A    Well, if you examine the memorandum on
10  that section of Surveyor Responsibility, we speak
11  specifically to the question of whether or not the
12  resident believes that they are denied the right to
13  select their prescription drug plan.
14            So that is the focus.  If the resident
15  does not believe that they were denied their right,
16  then we would not be pursuing any kind of
17  consequential action.
18       Q    I believe 483.10 makes reference of a
19  resident's right to be free of interference,
20  coercion, discrimination and reprisal from the
21  facility in the exercising of his or her rights.
0049
 1            Is that your understanding of the
 2  basis, correct?
 3       A    Yes.
 4       Q    Do you see the terms "require" --
 5  scratch that.
 6            Do you see the terms "request, coach or
 7  steer" as being roughly the equivalent of
 8  interference, coercion, discrimination and
 9  reprisal?
10       A    We would look on the question of
11  coercion, for example, as to exactly what was the
12  action that took place.  And so it's not a question
13  of simply labeling something "steering".
14            We would examine exactly what they were
15  doing.  So, for example, if we discovered that
16  there was a nursing home policy that instructed
17  certified nurse assistants to coach, steer, coerce
18  the residents, then that would be evidence that we
19  would rely upon in making a final determination.
20       Q    How was it that in memo number 16 you
21  came up with the words request, coach or steer?
0050
 1            Where did those words come from, if you
 2  recollect?
 3       A    I think they came from the
 4  conversations with the Part D, you know,
 5  individuals when we asked them, you know, what was
 6  the general guidance given to the Part D plans and
 7  to the providers under Part D.
 8            So we were trying to coordinate and
 9  make sure the overall messages were correct.  Not
```

th082407hamilton80 - Vol I (4).txt

```
10  only correct, but coordinated.
11            But that's all pretty much in the way
12  of being able to explain, you know, the context.
13  The crux of the memo comes down to the surveyor's
14  responsibility.  What does the surveyor take action
15  with.
16            And there we specifically hone in on
17  the question of, you know, are individuals denied
18  their right to choose.
19       Q    As I understand your answer then, those
20  words that were used in memo 16 may have come from
21  discussions that you had with other CMS who were in
0051
 1  charge of coming up with guidelines on marketing,
 2  for example?
 3       A    Yes.  And the responsibility of
 4  providers in that context of which nursing homes
 5  would be one provider.
 6       Q    So it's your understanding that a
 7  nursing home is a provider covered generally by the
 8  marketing guidelines of CMS?
 9       A    No.  There is -- well, there's
10  marketing guidelines that CMS put out for the PDP
11  plans, but I believe some of the frequently
12  answered questions and others address the
13  responsibility of providers visa vie the plans.
14       Q    Now do you have any understanding, one
15  way or the other, about whether or not when they
16  referred to providers they mean anybody who was
17  providing healthcare to a Medicare beneficiary, or
18  do they mean some subset of providers?
19       A    Medicare providers.
20       Q    Okay.
21       A    Those who have a participation
0052
 1  agreement with Medicare.
 2       Q    In your mind, in terms of regulation of
 3  the Part D program, does it make any difference
 4  whether the particular provider has entered into a
 5  contract with a particular Part D plan?
 6            MR. KENNEDY:  Now are you asking him
 7  about the marketing guidelines that the centers for
 8  beneficiary choices --
 9            MR. SAMP:  Well, I'm asking him his
10  general understanding of how it was that he was
11  going about his job of coordinating the marketing
12  guidelines with his particular memo being sent to
13  --
14            THE WITNESS:  Well, what this
15  memorandum does is provide some -- first some
16  context to the surveyors so that they understand
17  the context.
18            So we want to make sure that that
19  context is reflecting what is happening in the
20  overall Part D program.
21            But then when we get down to the actual
0053
 1  instructions to the surveyors, which is the
 2  pertinent aspect here, that's the section labeled
 3  "Surveyor Responsibility".  And it describes very
 4  specifically what the surveyors should do in
 5  relationship to the questions at hand.
 6            The rest of this is important for the
```

```
                          th082407hamilton80 - Vol  I (4).txt
 8           Q   Can I ask the nursing home which PDPs
 9   require prior authorization for my spouse's drugs?
10           A   Yes.
11           Q   And the nursing home could answer that?
12           A   Yes.
13           Q   Can I say, you know, some of these
14   plans have -- all these plans have, in my knowledge
15   -- but at least they all have premiums and they
16   have copays and that some have higher premiums and
17   some have higher copays.
18               Can you run the numbers for me with the
19   five drugs my spouse uses and tell me which ones
20   are going to cost how much under which plan?
21           A   I mean, qualify all of my answers are
0074
 1   in relationship to this series of questions.
 2               I'm answering from the perspective of
 3   the nursing home regulations --
 4           Q   Right.  The --
 5           A   -- and the Part D marketing or -- you
 6   really should ask these of someone --
 7           Q   Fair enough.
 8           A   But in terms of under the nursing home
 9   regulations, as particularly expressed under
10   42CFR483, can nursing homes run the numbers with
11   regard to copays and coinsurance on formularies at
12   the request of a resident or family with the regard
13   to a specific family member?  Yes.
14           Q   If the nursing home is -- gives a
15   citation with an F-Tag 208 and the violation is a
16   denial of a right to select a prescription drug
17   plan, what severity is that under the grid?
18           A   We have a fairly well developed scope
19   and a severity grid that is tied to the enforcement
20   of consequences.
21               And the first to mention of that is the
0075
 1   severity of the violation.  How serious is it visa
 2   vie the particular individual or individuals
 3   affected.
 4               And the second to mention is the scope.
 5   Is this an isolated instance or is it a widespread
 6   or systemic.
 7               And so it's impossible to categorize a
 8   particular violation outside of the particular
 9   facts involved.
10               So if an individual were found to be
11   denied their rights of selection, then we would
12   also look at what consequences accrued to figure
13   out the extent to which that individual may have
14   been harmed.
15               We would also then look to see as to
16   whether or not this was an isolated instance or if
17   it were systemic.
18           Q   If there was no harm other than the
19   right to choose, what would the severity be?
20           A   Again it's impossible to answer in the
21   hypothetical, but it would be a -- if there's -- it
0076
 1   would be a lower, you know, level of harm compared
 2   to, you know, certain other possibilities.
 3               I should mention that if there is a
 4   citation, then the nursing home also has ample
                                 Page 27
```

```
                        th082407hamilton80 - Vol I (4).txt
 5    opportunity to appeal and to present countervailing
 6    facts that could affect either the citation itself
 7    or the scope and severity rating of that particular
 8    deficiency.
 9              And that can first occur through an
10    informal dispute resolution. It is very easy and
11    quick to do. Or they can request an administrative
12    law judge to hear that.
13              MR. KENNEDY:  Okay. No more questions.
14              MR. SAMP:  Okay. Thank you.
15              THE COURT REPORTER:  Reading and
16    signing?
17              MR. KENNEDY:  Excuse me. You have the
18    option to -- you can either -- we can give him the
19    option to read the deposition and make corrections
20    before and sign it as your testimony before --
21              THE WITNESS:  Okay.
0077
 1              MR. KENNEDY:  Or you can waive that.
 2    He'll read it.
 3              (Signature being waived, the
 4        deposition concluded at 4:05 p.m.)
 5                        - - -
```

```
0078
 1   State of Maryland
 2   City of Baltimore
 3              I, Cathelyn Matthews, a Notary
 4   Public of the State of Maryland, County of
 5   Baltimore, do hereby certify the within-named
 6   personally appeared before me at the time and place
 7   herein set out, and after having been duly sworn by
 8   me, according to law, was examined by counsel.
 9              I further certify that the examination
10   was recorded stenographically by me, and that this
11   transcript is a true record of the proceedings.
12              I further certify that I am not of
13   counsel to any of the parties, nor an employee of
14   counsel, nor related to any of the parties, nor in
15   any way interested in the outcome of this action.
16              As witness my hand and notarial seal
17   this 24th day of August, 2007.
18
19
                           Cathelyn Matthews
20                         My Commission Expires
                           11-08-08
21
```