# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA FOX, MARY SAMP, and EDWARD SAMP,<br><br>    Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT, in his official capacity as Secretary, U.S. Department of Health and Human Services,<br><br>and<br><br>LESLIE V. NORWALK, in her official capacity as Acting Administrator, Centers for Medicare and Medicaid Services,<br><br>    Defendants. | CA No. 1:06cv01490 (RMC)<br>Judge Collyer |

### DECLARATION OF MICHAEL SCOTT WOOD

I, Michael Scott Wood, do hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. My name is Michael Scott Wood. I am a resident of Utah, over eighteen (18) years of age, and I am of sufficient competence to make this declaration. I make this declaration based upon my personal knowledge and in support of Plaintiffs' Motion for Summary Judgment.

2. I have been a licensed pharmacist for six (6) years and been employed in the long-term care industry for over twenty (20) years and am currently employed as an Omnicare General Manager for a Long Term Care Pharmacy in Salt Lake City and an Area Director for Omnicare Long Term Care Pharmacies in Idaho, Oregon, Nevada and Utah.

3. The pharmacies that I oversee provide services to over twenty thousand individuals, many of whom are enrolled in the Medicare Part D Prescription Benefit program. The majority of these residents are also dual-eligibles, meaning they are Medicaid beneficiaries as well.

4. I find that comparing and analyzing the varying formularies and cost-sharing obligations of numerous Part D plans, and then applying such information to the prescription drug needs and financial ability of a given patient, is a very complex process which confuses a

significant number of patients and their responsible parties.

5. Pharmacists are bothered by the complicated and constantly changing Part D plan formularies. Pharmacists are equally frustrated with the restrictions that the Part D marketing guidelines place on their ability to help a patient understand these formularies and to select Part D plans that are best suited to a particular patient. For example, Medicare Part D coordinators at nursing homes I service are frustrated because they are only permitted to list the number of plans available. Accordingly, the marketing restrictions impede a patient's ability to enroll in an appropriate plan. During the roll out of the Medicare Part D program I am aware of a very few long term care nursing facilities that performed medication list analysis for their residents and, when performed, it was done by a non-clinical staff member using the CMS plan finder tools. I am not aware of any facility currently using any of the CMS plan finder tools on a regular basis and the pharmacy where I work receives very few requests for assistance using this process. During the roll out the pattern I saw most in PDP selection was simply based on ease of enrollment. Some plans would process multiple residents with a single call.

6. Tangentially, the recommended method of choosing a plan is also failing patients. At the start of the Medicare Part D Prescription Benefit program, the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") recommended that patients choose plans based on the available drugs listed on formularies. This method of choosing a plan is ineffective because formularies are constantly evolving – adding and dropping drug coverage – and some patients, due to their condition and circumstances, may not work well with the way a certain plan administers the Medicare prescription program. The current formulary finder tool does not contain comprehensive information to make a proper decision. Although the tool will compile the list of plans that have accommodating formularies, the other cost management strategies (Prior Authorization, Step Therapy, or Quantity Limits) are indicated, but not explained. One usually has to call the plan to find out the details of the restriction. For instance, the formulary plan may list the drug as covered with a QL indicator, but no details of what that quantity limit is. In most instances, the plan's posted formulary does not specify the quantity limit. To get the allowed quantity, one must call the plan and have exact drug detail. Upon occasion, the drug NDC is needed to pin down the exact item. This is a complicated process for even the most adept Medicare beneficiary.

7. While formularies are important in choosing a Part D plan, plan administration is

almost equally as important. I believe the best way to choose a plan is to consider both a plan's formulary and a plan's prescription drug administration, such as the plan's transition and medical exception policies pertaining to place of residence and clinical complexity of the beneficiary.

8. The marketing guidelines prohibit such comprehensive decision making and thereby potentially compromise a Medicare beneficiary's health. Only pharmacists have sufficient institutional knowledge to assess both the formularies and Part D plan administration and to make a recommendation as to which Part D plans would work the best with the particularities of a given patient. Pharmacists have years of experience dealing extensively with Pharmacy Benefit Managers and are best able to match the particularities of a plan with each patient's condition.

9. Preventing pharmacists from being able to communicate freely with patients about which Part D plans have, in the pharmacist's experience, demonstrated capable and professional plan administration encourages plans to neglect this aspect of their business. This is harmful to patients, whose medications may be delayed while they or their healthcare providers attempt to comply with burdensome documentation requirements specific to that plan and communicate with unresponsive plan-representatives to resolve issues, or even precluded altogether where such efforts are unsuccessful. In this way, the marketing guidelines have effectively prevented beneficiaries from being able to make the best consumer choice based on information from their pharmacists who have the knowledge and experience to help them make such a choice and have kept poorly-administered plans in business.

10. In the absence of the marketing guidelines, the fact that certain drugs may be less expensive to a pharmacy group than others would not cause these pharmacies to prefer certain Part D plans, because, in my experience, drugs available to large pharmacies at lower cost are typically generic, less-expensive, and commonly-prescribed drugs that are widely available under every Part D plan formulary. Pharmacies do not get rebates or cost-savings for highly expensive, low-volume drugs, and would thus have no financial incentive to steer beneficiaries toward formularies that offer reimbursement for these drugs based on cost-savings or increased profits to the pharmacy. The driving factors for pharmacies with respect to which plan any given patient should choose are whether a plan covers the patient's prescription drugs, and efficient and effective plan administration.

11. In my view, an individual pharmacist like myself would not have a financial

- 4 -

incentive to steer patients toward plans based on the reimbursement rates offered by those plans in the absence of the marketing guidelines because, as a practical matter, my day-to-day activities do not require me to know what the reimbursement rates are for individual drugs under different plans. If a particular Part D plan's reimbursement rates were, on the whole, significantly lower than those of other Part D plans, I believe that a pharmacy would simply make a strategic decision to stop accepting the plan altogether rather than persuade individual patients to choose a different part D plan.

    Under penalty of perjury, I state that I have read the foregoing declaration consisting of eleven (11) numbered paragraphs, and the statements herein are true and correct to the best of my knowledge, information and belief.

*[signature]*
Michael Scott Wood

Date: December 5, 2007