## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **REBECCA FOX**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | CA No. 1:06cv01490 (RMC) |
| | ) | Judge Collyer |
| | ) | |
| **MICHAEL O. LEAVITT,** in his official | ) | |
| capacity as Secretary, U.S. Department | ) | |
| of Health and Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

Daniel J. Popeo
Richard A. Samp
  (D.C. Bar No. 367194)
WASHINGTON LEGAL
  FOUNDATION
2009 Massachusetts Ave, NW
Washington, DC  20036
(202) 588-0302

Counsel for Plaintiffs

Dated:  December 11, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Plaintiffs Have Standing:  They Are Suffering Injury-in-Fact at the Hands of
        Defendants, and the Injury Will Be Redressed if They Are Granted Their
        Requested Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.     Mary and Edward Samp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.     Rebecca Fox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.     The Death of Edward Samp Does Not Render Plaintiffs' Claims Moot . . . . . . . 10

II.     CMS's Content-based Restrictions on Noncommercial Speech Are Subject to
        Strict Constitutional Scrutiny, a Scrutiny CMS Cannot Withstand . . . . . . . . . . . . . . . 14

II..    The CMS Speech Restrictions Cannot Survive Intermediate First Amendment
        Scrutiny  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*44 Liquormart, Inc. v. Rhode Island,*
 517 U.S. 484 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23
*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,*
 469 F.3d 129 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
*Ashcroft v. ACLU,*
 542 U.S. 656 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Bd. of Trustees of State University of N.Y. v. Fox,*
 492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Buckley v. Valeo,*
 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Edenfield v. Fane,*
 507 U.S. 761 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
*New York Times Co. v. Sullivan,*
 376 U.S. 254 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Rubin v. Coors,*
 514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
*Rust v. Sullivan,*
 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17
*S. Pac. Terminal Co. v. ICC,*
 219 U.S. 498 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Thompson v. Western States Medical Center,*
 535 U.S. 357 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 23

**Statutes and Constitutional Provisions:**

U.S. Const., amend. i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1320a-7b(b) (the "anti-kickback statute") . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

**Miscellaneous:**

CMS, *Nursing Homes and Medicare Part D* (the "S&C Memo") (May 11, 2006) . 10, 11, 13, 16

**PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendants' motion for summary judgment, and their opposition to Plaintiffs' motion for summary judgment, speaks volumes about their lack of confidence that their speech-suppression policies can withstand First Amendment analysis. Plaintiffs have provided a detailed critique of those policies, yet Defendants (collectively, "CMS") have seen fit to respond with a merits defense that covers only the tail-end of their brief. CMS SJ Br. 29-42. Instead, Defendants devote much of their brief to arguing that the three Plaintiffs lack standing because they have not been injured by the challenged policies.

CMS is correct, of course, that it is entitled to summary judgment if Plaintiffs cannot demonstrate that there are no issues of material fact regarding the standing issue. But, quite ironically, CMS's brief serves merely to make clear beyond any doubt that Plaintiffs possess the requisite standing. As Plaintiffs demonstrate hereinafter, case law uniformly supports their claim that they have established standing to raise this First Amendment challenge. Under those circumstances, one would have expected CMS to have made more than a half-hearted effort to explain why it believes that its speech-suppression policies do not violate the First Amendment – an issue on which CMS bears the burden of proof. But CMS simply fails to respond to many of the declarations submitted by WLF demonstrating the devastating impact of CMS's policies on truthful speech.

Under those circumstances, the evidence before the Court demonstrates that there are no issues of material fact and that Plaintiffs are entitled to judgment as a matter of law.

**ARGUMENT**

I.     **Plaintiffs Have Standing:  They Are Suffering Injury-in-Fact at the Hands of Defendants, and the Injury Will Be Redressed if They Are Granted Their Requested Relief**

CMS contends that the three Plaintiffs – Rebecca Fox, Edward Samp, and Mary Samp – have not suffered and/or are not suffering injury-in-fact and thus lack standing to sue.  CMS Br. 16-28.[1]  CMS's contention is incorrect and is based on a fundamental misunderstanding of the nature of the injury the Plaintiffs have suffered and continue to suffer.

A.     **Mary and Edward Samp**

CMS contends that Mary and Edward Samp suffered no injury because:  (1) the Samps have not been deprived of any speech/information they would have received but for the CMS speech restrictions, CMS Br. 22-24; and (2) in any event, the Samps did not need such advice, "because it is obvious . . . that they should not be choosing among [Medicare Part D] plans in the first place."  *Id.* 25, 26-28.  Both contentions are factually incorrect and are symptomatic of the unwarranted, paternalistic mindset that led CMS to the adoption of these unconstitutional speech restrictions in the first place – that CMS knows best what information Medicare beneficiaries should and should not be allowed to hear.

In support of its allegation that the Samps had not been deprived of any speech/ information, CMS asserts that "Mary Samp has never attempted to seek advice from her pharmacist concerning which Medicare prescription drug plan would be best for her or her husband."  CMS Br. 23.  That assertion is incorrect.  As the Samps' long-time pharmacist attests:

---

[1]  Following the filing of both sides' motions for summary judgment, Plaintiff Edward Samp died on November 23, 2007.  Plaintiffs are separately filing a motion pursuant to Fed.R.Civ.P. 25(a) to substitute in his place Mary Samp, as representative of the estate of Edward Samp.

> I have been willing to discuss with the Samps the various options available to them under Medicare Part D. However, I have told them, in response to their requests, that I am not wiling to recommend a specific Part D Plan to them because I am prohibited from doing so by rules promulgated by CMS.

Declaration of Robert Skenderian ("Skenderian Decl.") ¶ 4, attached hereto as Exhibit B.

Plaintiff Mary Samp also attests to such communications. Declaration of Mary Samp ("Samp Decl.") ¶ 10, attached to Plaintiffs' Summary Judgment Motion as Exhibit I; Supplemental Declaration of Mary Samp ("Suppl. Samp Decl.") ¶¶ 6, 7, attached hereto as Exhibit A. The Samps' injury-in-fact could not be clearer: they requested that Mr. Skenderian recommend to them specific Medicare Part D plans, but he declined to do so because (he explained) he was prohibited from doing so by CMS's speech prohibition.[2]

CMS's allegation to the contrary is based on a highly formalistic view of the evidence. As CMS notes, CMS Br. 23-24, Mary Samp testified at her May 2007 deposition that, as of that date, she had not made a direct request to Mr. Skenderian that he recommend specific Part D plans; rather, she testified that she had concluded that he would be unwilling to provide such advice if asked because he had told several friends (also customers of Mr. Skenderian) that he was not permitted to provide such advice. CMS has absolutely no reason to doubt that Mr. Skenderian would have declined to provide such advice if Mary Samp had asked prior to May 2007 for such advice, because it is CMS's own Marketing Guidelines that unequivocally prohibit

---

[2] Moreover, the evidence is unequivocal that the Samps sought advice from Mr. Skenderian both with respect to Edward Samp's choice of a Part D plan and with respect to Mary Samp's choice of a Part D plan. Samp Decl. ¶ 15; Suppl. Samp Decl. ¶ 6; Skenderian Decl. ¶ 4.

3

him from doing so.[3]  In any event, as noted above, the Samps subsequently spoke to Mr. Skenderian about this very issue, and he confirmed what they knew all along:  that he would not recommend a specific Part D plan because he was prohibited from doing so.[4]

Moreover, Mr. Skenderian is not the only health care provider from whom the Samps sought (unsuccessfully) to obtain advice regarding choice of specific Part D plans.  They also specifically requested such advise from medical personnel at the assisted living center at which they have lived and at the rehabilitation center associated with the assisted living center, but were told that those personnel (despite their intimate knowledge of the Samps medical needs) were not in a position to do so.  Samp Decl. ¶ 10.  The Samps also desired to receive such advice from medical personnel at the two nursing homes at which Edward Samp resided during the past several months, but did not do so because of their "understanding that those personnel were prohibited by CMS rules from recommending a specific Part D plan."  Suppl. Samp Decl. ¶ 5. All the evidence introduced in this case indicates that they were 100% correct in their understanding.

---

[3]  Because Mary Samp was unable to get advice from Mr. Skenderian when first confronted with Medicare Part D choices in 2006, she was forced to turn to advice from a local volunteer agency that provides legal assistance to senior citizens.  Samp Decl. ¶ 11.  An attorney with that agency agreed to look at the Samps' material and recommend a particular Part D plan, but with the understanding that she lacked any expertise in medical benefits issues.  *Id.*

[4]  Nor is there any basis for CMS's speculation that perhaps the real reason for Mr. Skenderian's unwillingness to recommend a specific Part D plan is that "he was busy enough being a pharmacist that he could not take on the extra duties of analyzing the financial affairs and health insurance options of numerous customers."  CMS Br. 24.  To the contrary, Mr. Skenderian states, "As an independent, community-based pharmacist, I pride myself in my willingness to speak with my customers and to provide them with advice regarding their prescription drug needs."  Skenderian Decl. ¶ 3.

In addition to claiming that the Samps were not deprived of speech/information by the CMS speech suppression policies, CMS contends that the Samps did not need recommendations regarding the choice of a Part D plan, "because it is obvious . . . that they should not be choosing among [Medicare Part D] plans in the first place." While Plaintiffs appreciate CMS's willingness to provide them with unsolicited advice regarding choice of plans, CMS's belief that it knows best how the Samps should proceed provides no justification for CMS's efforts to prevent the Samps from obtaining similar advice from others. Such paternalistic government decisions that the consuming public can be barred from hearing speech that they have no need to hear have no place in this nation's First Amendment jurisprudence. *See, e.g., Thompson v. Western States Medical Center,* 535 U.S. 357, 374 (2002) (rejecting "the notion that the Government has an interest in preventing the dissemination of truthful information in order to prevent members of the public from making bad decisions with the information.").

Moreover, the "evidence" on which CMS relies, CMS Br. 25-28, starkly illustrates precisely why the Samps *do* need additional advice on choice of plans. At the recommendation of the City of Cambridge, Edward Samp in 2006 signed up for a Medicare Part D plan, Blue Medicare Rx, for which the Samps have been paying a monthly premium and substantial monthly medication fees. Suppl. Samp Decl. ¶ 7. As CMS notes, the City of Cambridge advised that Edward Samp should not sign up for another plan because Blue Medicare Rx was as good or better than other available plans. CMS Br. 26. But now, CMS insists that *the City of Cambridge was wrong*: Edward Samp might well have been better off enrolling in the federal government's

TRICARE program as his primary prescription drug payer,[5] even though that program requires co-payments for drugs purchased.  CMS Br. 9-10; Declaration of Travis W. Watson ("Watson Decl.") ¶ 18.[6]

The unsolicited advice supplied by CMS via TRICARE's Travis Watson seems generally sound.  But even government suppliers of information are fallible:  Watson appears to have based his analysis on two factual errors.  First, Watson appears to be operating under the assumption that Edward Samp received his prescription drug benefit from the City of Cambridge.  Watson Decl. ¶ 16.  In fact, Edward Samp enrolled in a Medicare Part D plan (Blue Medicare Rx), and paid a monthly premium for that plan.  Suppl. Samp Decl. ¶ 7.  Second, Watson (and CMS) state that Skenderian Apothecary is enrolled in the TRICARE program and thus that the pharmacy could have been sending to TRICARE for payment those portions of Edward Samp's monthly bills not covered by Blue Medicare Rx.  Watson Decl. ¶ 13; CMS Br. 9. In fact, Skenderian Apothecary is *not* enrolled in the TRICARE program.  Skenderian Decl. ¶ 5.[7]

---

[5]  Edward Samp has been eligible for TRICARE by virtue of his status as a 100% disabled veteran.  He held that status from 1945 until his death, by virtue of wounds received at the Battle of Okinawa in World War II.  Samp Decl. ¶ 9.

[6]  Somewhat bizarrely, CMS insists that the Marketing Guidelines would have permitted the Samps' health care providers to recommend that Edward Samp use TRICARE as his primary prescription drug payer (apparently because TRICARE is not a Part D Plan), CMS Br. 25, even though those same providers quite clearly were prohibited by the Marketing Guidelines from making the opposite recommendation (*i.e.,* recommending that Edward Samp follow the City of Cambridge's advice to enroll in its preferred Part D plan, Blue Medicare Rx).

[7]  Mr. Skenderian has explained to the Samps that if Edward Samp wished to enroll in the TRICARE program, he would have to do so through a different pharmacy.  *Id.*  There are no other pharmacies in the immediate vicinity of Youville House, the Samps' residence. TRICARE's Watson states that Edward Samp could have elected to receive his pharmaceuticals in the mail from TRICARE, Watson Decl. ¶ 8, but Mary Samp has stated that she "trust[s] Mr. Skenderian's judgment and want[s] to continue [her] relationship with his

Nonetheless, the main point is not which of the contradictory advice the Samps have been receiving is the most accurate, but that the First Amendment protects their right to receive such advice from the widest possible range of sources, without undue government interference. CMS has interfered with the Samps' ability to receive information from their health care providers regarding choice of Part D plans; that interference constitutes injury-in-fact sufficient to establish standing, regardless whether government bureaucrats believe that the Samps have all the information they need to make what CMS apparently believes are the "right" choices.

Moreover, the evidence regarding Mary Samp's injury-in-fact is just as compelling as the evidence regarding Edward Samp. Mary Samp is not now enrolled in a Part D plan; rather, she has chosen to rely on the prescription drug coverage she purchases through her former employer, Harvard University. Samp Decl. ¶ 6.[8] But she nonetheless wishes to consult with Mr. Skenderian regarding whether that choice is correct or whether she should purchase her coverage elsewhere, particularly because, at age 87, her prescription drug needs could change significantly at any time. *Id.*; Suppl. Samp Decl. ¶ 6. CMS's dismisses Mary Samp's injury claims, insisting that she does not need any more information because Mary Samp has declared herself generally satisfied with her current coverage and insisting that it is "obvious" that she "should not be choosing among [Part D] plans in the first place." CMS Br. 25. With all due respect, it is for Mary Samp – not CMS – to decide whether she should be inquiring into enrolling in a Part D

_____

pharmacy." Suppl. Samp Decl. ¶ 6.

[8]  Mary Samp made that decision based on the advice of a newsletter written by the Harvard University Retirees Association. *Id.* She also concluded that she would not devote large amounts of attention to the issue because she currently takes few prescription drugs, and none on a continual basis. *Id.*

plan.  CMS's argument is based on a fundamental misunderstanding of the nature of the claimed injury in this case.  Mary Samp is *not* claiming that CMS policies are causing her to enroll in inappropriate prescription drug plans and thereby to suffer out-of-pocket losses.  Rather, she is being injured because CMS is depriving her of her First Amendment right to receive information from her health care providers regarding which, if any, Part D plan she should be enrolling in. That constitutional injury is in no way lessened simply because CMS insists that Mary Samp has no need to know that information.

###    B.    Rebecca Fox

Rebecca Fox has adequately alleged standing for all the same reasons that Mary Samp has adequately alleged standing.  As explained in more detail in Plaintiffs' opening brief, Pltfs. SJ Br. 17-19, in the spring of 2006 Ms. Fox (then 87 years old) sought assistance from her pharmacist (with whom she had been a customer for many years) regarding which plan to choose, but was told that he "could not" advise her and that the choice of Part D plans would have to be up to her.  Declaration of Rebecca Fox ("Fox Decl.") ¶¶ 11-12.  Later, after Pennsylvania state government officials gave her the names of two Part D plans that she should consider enrolling in, the pharmacist again declined to recommend one or the other.  *Id.* ¶ 17.

CMS insists that Ms. Fox has not adequately demonstrated injury in fact because her pharmacist did not explicitly tell her why he "could not" recommend a specific Part D plan; he did not state explicitly that the reason for his disability was that Marketing Guidelines issued by CMS prohibited from doing so.  CMS Br. 19-22.  CMS speculates that perhaps the pharmacist "could not" do so because he "was too busy in his role as a pharmacist [to] become a health insurance advisor" or that he lacked "the knowledge needed to advise her."  *Id.* 21-22.  That is

the sort of argument only a lawyer could love.  CMS knows full well that Ms. Fox's pharmacist was prohibited by the Marketing Guidelines from recommending that she enroll in a specific Part D plan.  Accordingly, when he told her that he "could not" recommend a plan, the logical conclusion is that he knew that he was prohibited by doing so, and the only such prohibition is the one set forth in the Marketing Guidelines.

The absurdity of CMS's speculation to the contrary is made plain by subsequent events. After her pharmacist declined to recommend a choice between the two Part D plans whose names had been given to Ms. Fox by Pennsylvania (Humana and AARP), Ms. Fox decided to make the choice on her own.  Fox Decl. ¶ 17-19.  In her confusion, Ms. Fox ended up signing up for *both* plans.  *Id.* ¶ 19.  It was only with the assistance of her pharmacist that Ms. Fox was able to straighten out the confusion and cancel her Humana enrollment without penalty.  *Id.*  A pharmacist who voluntarily provides his customers such assistance hardly sounds like a pharmacist who is "too busy in his role as a pharmacist [to] become a health insurance advisor." CMS Br. 21.  Ms. Fox has indicated that her desire to receive advice from her pharmacist -- regarding which Part D plan would best suit her needs -- continues unabated.  Fox Decl. ¶ 24.

Moreover, the evidence indicates that the Plaintiffs' alleged injury will be redressed if they are granted their requested relief.  The cooperation that the Plaintiffs have received from their pharmacists to date, and the pharmacists' statements that the reason they will not recommend specific Part D plans is that they are prohibited from doing so, are strong pieces of evidence that the pharmacists would be willing to provide such recommendations once the prohibition is lifted.

**C.        The Death of Edward Samp Does Not Render Plaintiffs' Claims Moot**

As noted above, Plaintiff Edward Samp died on November 23, 2007, and Plaintiffs will

be moving to substitute Mary Samp, as the representative of the estate of Edward Samp, as a

plaintiff.  Because the only relief being sought by Plaintiffs is injunctive and declaratory relief,

an issue arises regarding whether any of Plaintiffs' claims are rendered moot by Edward Samp's

death.

Clearly, the claims of Mary Samp and Rebecca Fox are not moot.  As described above,

they are continuing to suffer injury as a result of the speech prohibitions imposed by the

Marketing Guidelines.  Accordingly, the death of Edward Samp has no effect on Plaintiffs'

challenge to those speech prohibitions.

However, Plaintiffs are challenging a second set of speech prohibitions as well:  those

imposed by a document referred to by the parties as "the S&C Memo."[9]  The S&C Memo states

that nursing homes and pharmacies may not "coach" or "steer" nursing home residents to a

specific Part D plan "for any purpose."  Edward Samp was in declining health for the past nine

years, and during those years periodically resided in nursing homes.  Samp Decl. ¶ 3.

Specifically, he spent much of the final four months of his life in nursing homes, after breaking

his ankle on July 29, 2007.  After his initial hospitalization, he moved to a nursing home in

Lexington, Massachusetts (Lexington Health Center) beginning on August 3, and he later moved

to a nursing home in Boston (Sherrill House), where he resided until several days before his

death.  Suppl. Samp Decl. ¶¶ 4, 5.  Health care providers at both facilities are subject to the

---

[9]  The S&C Memo (Exhibit A to Plaintiffs' Motion for Summary Judgment) is a
memorandum dated May 11, 2006 and issued by the Director of CMS's Survey and
Certification Group to State Survey Agency Directors, reference no. S&C-06-16.

speech prohibitions of the S&C Memo. *Id.*; Affidavit of Michael G. Flaherty, attached as

Exhibit G to Plaintiffs' Summary Judgment Motion. Mary Samp wished to receive advice from

personnel at those nursing homes regarding choice of a Part D plan for Edward, but did not

explicitly request such advice because she understood that CMS prohibited them from providing

such advice. Suppl. Samp Decl. ¶ 5. Accordingly, Plaintiffs demonstrated that the S&C

Memo's speech prohibitions imposed injury-in-fact on Edward Samp (and on Mary Samp as his

principal caregiver).

        Plaintiffs do not believe that Edward Samp's death should render their challenge to the

S&C Memo moot, for three reasons. First, Mary Samp (age 87) and Rebecca Fox (age 88)

continue to live largely independent lives, but given their advanced ages that independence is

unlikely to continue indefinitely. It is not mere conjecture to predict that they may be required to

move into a skilled nursing facility (whether temporarily or permanently) in the relatively near

future. Such a move would almost certainly be accompanied by increased use of prescription

medicines. As they have repeatedly expressed in this lawsuit, they desire to be able to obtain

advice from all of their health care providers regarding the choice of a Part D plan. Accordingly,

the injury they suffer from the S&C Memo's speech prohibitions are sufficiently imminent to

support their standing to challenge those prohibitions.

        Second, the "capable of repetition, yet evading review" exception to mootness is

applicable here. Most elderly Americans who live in nursing homes do so only at the very end

of their lives. As the experience of Edward Samp demonstrates, a nursing home resident who

seeks to challenge the S&C Memo on First Amendment grounds is not particularly likely to

survive for the multiple years it generally takes to see federal court litigation through a trial and

any appeals.  Accordingly, the First Amendment injuries imposed by the S&C Memo are likely to evade review unless this exception is deemed applicable.  Moreover, as noted above, the First Amendment injuries suffered by the Samps while Edward Samp was in a nursing home are capable of repetition *in this very case*.  Given the advanced ages of Mary Samp and Rebecca Fox, it is highly likely that one or both of them will reside in a nursing home at some point before judgment in this case becomes final in the U.S. Court of Appeals for the District of Columbia Circuit.

In a pending case in which the Washington Legal Foundation (WLF) is a party, the D.C. Circuit recently held that the "capable of repetition, yet evading review" exception was applicable under circumstances highly analogous to this case.  In *Abigail Alliance for Better Access to Developmental Medicine v. von Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006), WLF and the Abigail Alliance (a patients' rights group) are challenging federal government restrictions on the ability of terminally ill patients to gain access to drugs not yet fully approved by FDA, where the patients have no other potentially effective treatment options.[10]  WLF filed suit on behalf of itself and the Abigail Alliance in 2003 on behalf of terminally ill members of those organizations; by 2006 the members on whose behalf the suit was initially filed had all long since died.  The D.C. Circuit nonetheless rejected the federal government's motion to dismiss the suit as moot, noting that a terminally ill individual who herself had standing had joined the Abigail Alliance in the intervening years.  *Abigail Alliance*, 469 F.3d at 136.  The appeal court went on to hold that, even in the absence of such a member, the Abigail Alliance had established standing under the "capable of repetition, yet evading review" exception to mootness.  *Id.*  The

---

[10]  The case is now pending certiorari in the U.S. Supreme Court.  *See* No. 07-444.

court explained:

> Even if the Alliance could not supply a particular terminally-ill member, at each moment, who has exhausted all conventional treatments but has not died, this is a classic case of a situation "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). By the very nature of its membership, the Alliance has a reasonable expectation that its members will continue to suffer the same short-lived injuries that this doctrine addresses.

*Id.*  Similarly, the group of which Plaintiffs Edward and Mary Samp and Rebecca Fox are/were members (the very elderly) has a reasonable expectation that its members (including Mary Samp and Rebecca Fox) will suffer the same short-lived First Amendment injuries that Edward Samp suffered during his nursing home stays.[11]  Accordingly, Plaintiffs submit that they continue to have standing to challenge the S&C Memo under the "capable of repetition, yet evading review" exception to mootness.

Third, and alternatively, Plaintiffs note that they are seeking to identify a new plaintiff who is both a current nursing home resident and in sufficiently good health to be likely to live for at least several more years (*i.e.*, long enough to allow all appeals of this case to be exhausted).  If the Court believes that Plaintiffs' challenge to the S&C Memo is otherwise moot, Plaintiffs ask that that challenge be held in abeyance for a brief period while the non-moot portions of the case move forward, to allow Plaintiffs time to identify such an individual and to add him/her as a new plaintiff.

---

[11]  It was this type of situation that Plaintiffs had in mind when, in August 2006, this suit was initially filed in the name of WLF (of which all Plaintiffs are members) rather than in the name of individual plaintiffs.  The Court later indicated its belief (in its opinion denying a preliminary injunction motion) that WLF lacked standing in this case to represent the interests of its members because (the Court determined) those interests were insufficiently germane to the organizational interests of WLF.  In response, we filed an amended complaint to remove WLF as a plaintiff and replace it with the three current Plaintiffs.

**II.    CMS's Content-based Restrictions on Noncommercial Speech Are Subject to
Strict Constitutional Scrutiny, a Scrutiny CMS Cannot Withstand**

Our opening brief demonstrated at length that CMS's speech restrictions are subject to

strict scrutiny because they are content-based and are targeted at noncommercial speech.  Pltf. SJ

Br. 23-34.[12]  CMS's entire response consists of a single paragraph.  CMS Br. 30-31.  CMS

asserts, "There is nothing ignoble about pharmacists having commercial interests when they sell

drugs or services to patients, but . . . they undoubtedly do have such interests, which the

Secretary wisely considers in implementing the prescription drug program."  *Id.* at 31.

CMS's response is without merit.  The products whose sales are at issue in this case are

Part D prescription drug benefit plans.  Those whose *speech* is at issue – health care providers

and professionals such as physicians, hospitals, nursing homes, pharmacies, and pharmacists –

are not in the business of offering Part D plans for sale.[13]  Because the speech being regulated by

CMS is not speech that proposes a commercial transaction between the speaker and the target of

that speech, it is not properly categorized as commercial speech.  The fact that the speaker has a

commercial relationship with the listener does not by itself make the speech anything other than

fully protected noncommercial speech, so long as the speech in question does not propose a

commercial transaction between the parties to the conversation.  For example, a theater review

published by the *Washington Post* is not deemed commercial speech when the reviewer

---

[12]  We argued alternatively that even if the speech at issue were deemed commercial,
the restrictions would still be subject to strict constitutional scrutiny because they seek to
prohibit the dissemination of truthful information that is of public concern.  Pltfs. SJ Br. 27-31.

[13]  To the extent that there may be a very few health care professionals who are also
employed as sales representatives of Part D plans, this lawsuit has not raised any First
Amendment objections to speech restrictions imposed on such individuals.

14

recommends that readers buy tickets to the play being reviewed, even though most readers are

regular newspaper subscribers and have paid money to the *Post* to obtain a copy of the review,

and even though the theater owner likely purchases advertisements in the *Post*.  As the Supreme

Court has emphasized, "Some of our most valued forms of fully protected speech are uttered for

a profit.  *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) [contents of a paid

advertisement in a newspaper were fully protected by the First Amendment]; *Buckley v. Valeo*,

424 U.S. 1 (1976) (per curiam)."  *Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 482

(1989).

       CMS argues that some providers and health care professionals may stand to profit

substantially if a patient chooses a particular Part D plan and thus may make biased

recommendations in hopes of financial gain.  CMS Br. 33-35.  If there are such providers and

health care professionals, we are unaware of them.  Certainly, the record before this Court does

not support CMS's claim.  As consulting Pharmacist Ross Brickley explained in his declaration:

> There is no realistic financial incentive for a consulting pharmacist such as myself to
> encourage a patient or his/her financially responsible party to enroll in a particular Part D
> prescription drug plan.  There are negligible differences in the ingredient charges and
> dispensing fees (the compensation my employer, the pharmacy, receives from a Part D
> plan for dispensing a particular prescription drug) payable by the different Part D plans
> with which my pharmacy has contracted.  My pharmacy contracted with all Part D plans
> in each area where it provides services.  The only real financial interest which the
> pharmacy has in selection of Part D plans is finding the plan that will cover the patient's
> medications, rather than imposing that cost on the patient.

Declaration of Ross Brickley ("Brickley Decl."), ¶¶ 12-13 (WLF SJ Br., Exh. D).

       Moreover, CMS's speech restrictions are not limited to prohibitions against providers

steering patients to a specific plan for their own financial gain.  Rather, CMS's Marketing

Guidelines state categorically that "[p]roviders also cannot direct, urge or attempt to persuade

beneficiaries to enroll in a specific plan."  Marketing Guidelines at 123-24 (Pltfs. SJ Br., Exh.

B).  Furthermore, CMS has stated:

> Under no circumstances should a nursing home require, request, coach or steer any
> resident to select or change a plan for any reason.  Furthermore, a nursing home should
> not knowingly and/or willingly allow the pharmacy servicing the nursing home to
> require, request, coach, or steer any resident to select or change a plan….

S&C Memo at 3 (Plttfs. SJ Br., Exh. A).  There is no plausible basis for suggesting that *all* such

speech, particularly when not motivated by a desire for financial gain, is properly categorized as

commercial speech.

Such content-based censorship of noncommercial speech cannot stand unless the

government carries its burden of demonstrating that the speech restrictions are narrowly tailored

to serve a "compelling" government interest.  *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2005).  Yet,

CMS's brief makes no effort to demonstrate that the CMS speech restrictions serve any sort of

compelling government interest.  In the absence of any such demonstration, Plaintiffs are entitled

to summary judgment on their First Amendment claims.

CMS also attempts to justify its speech restrictions under the rationale set forth in *Rust v.*

*Sullivan,* 500 U.S. 173 (1991).  CMS Br. 32.  *Rust* is wholly inapposite.  That decision upheld

federal government abortion-related speech restrictions imposed on family-planning service

providers as a condition for their receipt of federal subsidies.  The Court explained that the

federal government's goal in providing funding was to encourage family planning methods *other*

*than* abortion, and thus the provision restricting fund recipients from advocating abortion as a

family planning method directly served the government's goal.  500 U.S. at 193-94.  But the

Court upheld the speech restrictions at issue on the explicit understanding that they were limited

to speech paid for by government funding and did not restrict speech paid for by the family-

16

planning service providers themselves using non-federal funds as part of separate programs:

> [T]he government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The [HHS] Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require the grantee to keep such activities separate and distinct from Title X activities.

*Id.* at 196.

CMS's speech restrictions are not at all analogous to the restrictions upheld in *Rust*. They are not tied to any specific government appropriation; they apply without regard to whether the provider or health care professional is receiving *any* specific appropriation from the federal government. Moreover, CMS has provided no mechanism by which providers and health care professionals can avoid the speech restrictions by establishing a program that is separate and independent from programs that receive federal funds; such a mechanism is a prerequisite to any *Rust* defense. In sum, *Rust* provides no support for CMS's efforts to restrict truthful, noncommercial speech by providers and health care professionals.

## III.   The CMS Speech Restrictions Cannot Survive Intermediate First Amendment Scrutiny

Plaintiffs' opening brief demonstrated that even if CMS's speech restrictions were judged under the intermediate scrutiny applicable to commercial speech, they still could not withstand First Amendment scrutiny. Pltfs. SJ Br. 27-44. CMS's response fails to articulate any substantial interests directly advanced by its restrictions, and includes no coherent explanation regarding why the restrictions should be deemed no broader than necessary to advance any such interests. CMS Br. 33-42.

CMS asserts, "[S]ome providers may stand to gain if they can steer a customer to one drug plan rather than another." CMS Br. 33. Plaintiffs accept that the government has a

17

substantial interest in protecting Medicare beneficiaries from providers who, for financial gain, may steer a patient into a plan that is not in the best interest of the patient.  If the CMS speech restrictions were limited to such situations, it is unlikely that we would be in court at all.  But the CMS speech restrictions are far broader; they are not limited to providers who are acting for financial gain and *against* the best interests of their patients.  Rather, CMS states categorically that "[p]roviders also cannot direct, urge or attempt to persuade beneficiaries to enroll in a specific plan."  Marketing Guidelines 123-24.  That broad-brush speech prohibition does not directly advance CMS's articulated interest and certainly is far broader than necessary to serve that interest.  Moreover, as numerous declarations attached hereto or submitted in support of the summary judgment motion attest, the speech prohibitions are making it very difficult for patients and their relatives to receive the information they most desire:  which Part D plan best serves their medical needs.  *See* Declaration of Jessie England ("Suppl. England Decl.") ¶ 7, attached hereto as Exhibit E; Declaration of Margie White ("Suppl. White Decl.") ¶¶ 7-8, attached hereto as Exhibit D; Brickley Decl. ¶ 10; Fox Decl. ¶¶ 12, 17-19; Samp Decl. ¶¶ 10, 14; Suppl. Samp Decl. ¶¶ 6, 7; Skenderian Decl. ¶ 4.[14]

Plaintiffs find it astounding that CMS has provided virtually *no* evidence to support its claims that its broad speech prohibitions are necessary to protect Medicare beneficiaries from

---

[14]  CMS's brief argues that some of the declarations filed by Plaintiffs in support of their summary judgment motion should be discounted because they were initially drafted in support of Plaintiffs' motion for summary judgment and thus contain outdated information.  In response, Plaintiffs have attached hereto updated declarations (all signed within the past week) from four individuals whose prior declarations were attached to Plaintiffs' summary judgment motion:  Michael Scott Wood, Margie White, Jessie England, and William Donatelli.  These supplemental declarations demonstrate that those four health care professionals continue to hold their previously-expressed concerns about the negative effects of CMS's speech suppression policies on health-care delivery for senior citizens.

unscrupulous providers who have only their own financial interests at heart.[15]  CMS does not

contest our assertion, spelled out in detail in our opening brief, that even when one is applying

the somewhat-relaxed First Amendment standards applicable to restrictions on commercial

speech, the burden of justifying those standards falls squarely on the government.  Pltf. SJ Br.

34-35.  *See, e.g., Western States*, 535 U.S. at 373.  Moreover, that evidentiary burden is not light;

for example, the government's burden of showing that a commercial speech regulation advances

a substantial government interest "in a direct and material way . . . 'is not satisfied by mere

speculation or conjecture; rather, a government body seeking to sustain a restriction on

commercial speech must demonstrate that the harms it recites are real and that its restrictions

will alleviate them to a material degree.'"  *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487

(1995) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)).

     One searches in vain for evidence from CMS that "the harms it recites are real."  For

example, Abby Block, the CMS official responsible for putting together the Marketing

Guidelines, testified that she had "no reason" to doubt Ross Brickley's statement (in support of

Plaintiffs' motion for summary judgment) that reimbursement rates do not vary significantly

from Part D plan to Part D plan.  Block Dep. at 33.  She testified that, as far as she knows, CMS

---

     [15]  CMS asserts, with virtually no evidentiary support, that the financial interests of
pharmacists can diverge from those of their customers in one of four ways:  (1) pharmacists
may receive direct payment from a Part D plan to steer customers to that plan, CMS Br. 22; (2)
some Part D plans may pay pharmacists more than others for the same drugs, *id.*; (3)
pharmacists may have different profit margins for different drugs and thus have an incentive to
steer customers to use of drugs with higher profit margins -- and consequently to plans whose
formularies feature those higher-profit-margin drugs, *id* at 34; and (4) pharmacists have an
incentive to steer customer toward plans featuring higher premium payments but lower co-
pays because that type of plan may induce the customer to purchase a greater volume of drugs
(and thus increase the pharmacist's total profits).  *Id.*

has never even conducted a study to determine the extent to which reimbursement rates vary

from plan to plan.  *Id.* at 32-33.  She is "unaware" of any plan by CMS to study whether

pharmacists do, in fact, have "strong financial incentives" to steer patients toward particular Part

D plans.  *Id.* at 35-36.  In coordinating formulation of the Marketing Guidelines, she was not

aware of any discussion of whether the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

was sufficient by itself to deter providers from steering patients to particular Part D plans in

return for direct payments from that plan.  *Id.* at 36-37.

      CMS's assertions in its summary judgment motion that CMS needs to protect Medicare

beneficiaries from unscrupulous providers is based almost entirely on the Declaration of Jeffey

A. Kellman, who serves as the Chief Medical Officer in the Center for Beneficiary Choices with

CMS.  Yet, Kellman's declaration is devoted almost entirely to the nursing home setting, where

he claims that "the risk of undue influence is very high."  Kellman Decl. ¶ 3.  Outside of the

nursing home context, he says virtually nothing about the potential/incentive for providers to

steer patients toward Part D plans that serve the providers' interests instead of to plans that serve

the patients' interests.  *Id.* ¶¶ 3-6.  Moreover, even within the nursing home context, he does not

suggest that he has seen any evidence that providers are steering Medicare beneficiaries toward

inappropriate Part D plans.  Indeed, the record in this case is bereft of such evidence. One would

think that before the government imposed broad-scale speech restrictions on health care

providers, it would first have some evidence that at least some providers are working against the

interests of beneficiaries.  In the absence of such evidence, the government has not begun to

meet its burden.

      Moreover, the evidence suggests that the government's concerns about providers

working against the interests of beneficiaries are not well placed.  For example, nursing home administrator Jessie England states that based on her experience and conversation with pharmacists, pharmacists have no incentive to steer patients toward plans that have high premiums but lower co-pays.  Suppl. England Decl. ¶ 14.  In any event, CMS's theory in this regard makes little intuitive sense; it is the physician, after all, not the pharmacist or the beneficiary, that prescribes drugs, and the physician has no incentive to prescribe more drugs simply because co-pays are lower.

Pharmacist Michael Wood effectively rebuts several other of CMS's assertions.  He explains:

> In the absence of the marketing guidelines, the fact that certain drugs may be less expensive to a pharmacy group than others would not cause those pharmacies to prefer certain Part D plans, because, in my experience, drugs available to large pharmacies at lower costs are typically generic, less-expensive, and commonly-prescribed drugs that are widely available under every Part D plan formulary.  Pharmacies do not get rebates or cost-savings for highly expensive, low-volume drugs, and would thus have no financial incentive to steer beneficiaries toward formularies that offer reimbursement for these drugs based on cost-savings or increased profits to the pharmacy.  The driving factors for pharmacies with respect to which plan any given patient should choose are whether a plan covers the patient's prescription drugs, and efficient and effective plan administration.

Suppl. Wood Decl. ¶  10.  He adds, "In my opinion, an individual pharmacist like myself would not have a financial incentive to steer patients toward plans based on the reimbursement rates offered by those plans in the absence of the marketing guidelines, because as a practical matter, my day-to-day activities do not require me to know what the reimbursement rates are for individual drugs under different plans."  *Id.* ¶ 11.

CMS asserts that some providers *may* be biased in their recommendation because they *may* stand to gain financially if one Part D plan is chosen over another.  CMS Br. 34.  CMS's

21

Abby Block states that "a provider might receive more payment from one plan than another to furnish the same item or service to a Medicare beneficiary." Block Decl. ¶ 11. In other words, CMS's policy is based on speculation regarding what "might" happen. The evidence before the Court contradicts that speculation. As consulting pharmacist Ross Brickley explained in his declaration:

> There is no realistic financial incentive for a consulting pharmacist such as myself to encourage a patient or his/her financially responsible party to enroll in a particular Part D prescription drug plan. There are negligible differences in the ingredient charges and dispensing fees (the compensation my employer, the pharmacy, receives from a Part D plan for dispensing a particular prescription drug) payable by the different Part D plans with which my pharmacy has contracted. My pharmacy contracted with all Part D plans in each area where it provides services. The only real financial interest which the pharmacy has in selection of Part D plans is finding the plan that will cover the patient's medications, rather than imposing that cost on the patient.

Brickley Decl. ¶¶ 12-13 (Pltfs.SJ Br., Exh. D). CMS's speculation is insufficient to carry its burden of proving that its speech restrictions are justified, even under the somewhat relaxed standards applicable to commercial speech restrictions.

Moreover, commercial speech restrictions are particularly suspect where, as here, the government does not limit itself to efforts to prohibit misleading speech. The Supreme Court has explained:

> When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review. However, when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands.

*44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501 (1996).

CMS asserts that its speech restrictions "are narrowly crafted" and do no more than

impose a "narrow constraint on 'steering' customers toward a particular plan." CMS Br. 37. But to support that assertion, CMS points solely to the fact that its censorship might have been broader still; *e.g.,* it might have (but did not) bar providers from supplying patients with an "objective assessment of the beneficiary's needs and potential plan options that may meet their needs." *Id.* The fact that one could dream up more draconian regulatory regimes does not make an existing regime narrowly tailored. Rather, to meet its burden of proof in this regard, CMS is required to demonstrate that less restrictive regulatory regimes would not adequately serve CMS's interests. CMS has not attempted any such demonstration.

For example, Plaintiffs' initial brief pointed out that federal criminal law prohibits giving or receiving payments to steer patients toward a particular Part D plan. Pltfs. SJ Br. 43 (citing 42 U.S.C. § 1320a-7b(b)). CMS has failed to explain why that anti-kickback statute is not adequate to serve the government's interest in preventing providers from steering patients to a particular Part D plan for financial gain. CMS complains that asking it to apply the anti-kickback statute is akin to asking it to "drop an atom bomb." CMS Br. 33. It argues, "[T]he mere fact that the government could drop the atom bomb is not reason to disallow resort to a more measured response." *Id*. That argument cuts totally against established First Amendment law. CMS views speech prohibition as a "more measured response." But the Supreme Court has repeatedly made clear that speech restrictions should be the *last* resort of government regulators, not the first one. *Western States*, 535 U.S. at 376.

Finally, CMS asserts that the S&C Memo is not a speech restriction at all, but rather merely a prohibition against "coercion," with provider speech merely being used as potential evidence of coercion. CMS Br. 38-42. That is not what the S&C Memo says. It explicitly

targets speech:

> Under no circumstances should a nursing home require, request, coach or steer any resident to select or change a plan for any reason.  Furthermore, a nursing home should not knowingly and/or willingly allow the pharmacy servicing the nursing home to require, request, coach, or steer any resident to select or change a plan.

S&C Memo at 3.  If CMS intends to amend the S&C Memo, a memo that has been widely distributed nationwide among nursing home personnel, it should do so officially, not attempt to do so in court in an effort to head off litigation.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment, deny Defendants' motion for summary judgment, and bar enforcement of CMS speech restrictions against health care providers.

Respectfully submitted,

/s/ Richard A. Samp
Daniel J. Popeo
Richard A. Samp (D.C. Bar No. 367194)
  (Counsel of Record)
Washington Legal Foundation
2009 Massachusetts Ave., N.W.
Washington, DC 20036
Tel.: (202) 588-0302
Fax: (202) 588-0386
Email: rsamp@wlf.org

Dated:  December 11, 2007                    Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of December, 2007, a copy of the foregoing reply

brief in support of Plaintiffs' motion for summary judgment, along with all exhibits, was served

on the following counsel of record via the court's electronic filing system:

Brian G. Kennedy, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Room 7204
Washington, DC 20530


    /s/ Richard A. Samp
Richard A. Samp