IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REBECCA FOX, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-01490-RMC |
| | ) | Judge Collyer |
| MICHAEL O. LEAVITT, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

REPLY MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

I.    <u>The Persons That Have Been Named As Plaintiffs Lack Standing</u>

Plaintiffs have failed to show that any of defendants' policies are a "but for" cause of some otherwise willing speaker's unwillingness to steer plaintiffs to a particular Medicare prescription drug plan.  In the absence of such a showing, there is no case or controversy here.  *Pennsylvania Family Inst. v. Black*, 489 F.3d 156, 166 (3d Cir. 2007).

A.    <u>Rebecca Fox</u>

We assume *arguendo* that Rebecca Fox's pharmacist (whether he is Mr. Decy or Mr. Orvick or Mr. Ocvirk) will not tell her what Medicare prescription drug plan to choose.  Plaintiffs, however, present no direct evidence from the pharmacist that the Marketing Guidelines for Plans are even a reason, let alone a "but for" reason, of his not telling Mrs. Fox what plan to choose.

Plaintiffs respond that "<u>the logical</u> conclusion" is that he did not tell her what plan to choose because he knew he was prohibited by defendants from doing so.  Pls'

Opp. Mem. at 9 (emphasis supplied).  But the question why Mr. Decy/Orvick/Ocvirk did not direct Mrs. Fox which plan to choose is one of empirical fact, rather than a question to which there is *a priori* "the" answer, which can be determined just by thinking about the question as an exercise of abstract "logic[ ]."  That he was deterred from speaking by the Marketing Guidelines for Plans may be, in the absence of evidence, one possibility.  It is not the only one, however.  As we explained in our opening brief, pharmacists may not have the knowledge on issues of insurance and finance or on their customers' financial circumstances that would be needed to make such a recommendation.  Or they may not have the time.  Or they may be unwilling to steer for other reasons.  *See*, *e.g.*, http://www.theangrypharmacist.com/archives/2007/11/the_elderly_nee.html (posting of Nov. 16, 2007, last visited Dec. 14, 2007) (after opining that Medicare prescription drug plan options are difficult to understand: "People say 'Well thats [*sic*] where the pharmacist comes in!'  [Emphatic negative].  We are not insurance agents, salesmen, or explainers.  We do not get a fat check from AARP for helping [the elderly] out understanding the coverage gap or deductibles.").

Logic does not tell us which of these or other possibilities applies to Mr. Decy/Orvick/Ocvirk.  There is no direct evidence from Mr. Decy/Orvick/Ocvirk. Unlike Mrs. Samp's pharmacist, he has not provided plaintiffs with even a belated declaration claiming that his speech is in any way affected by defendants.  What evidence we have comes from what Mrs. Fox reported in her deposition that the pharmacist said, and that evidence points <u>away</u> from what plaintiffs argue is "the

logical conclusion." The first time Mrs. Fox attempted to talk to the pharmacist he was too busy to talk to her. That is not "speculation" or "the sort of argument only a lawyer could love." Pls' Opp. SJ at 8-9. It is sort of the answer that Rebecca Fox gave at her own deposition. Fox Dep. at 39. The second and last time Mrs. Fox attempted to obtain such advice, pharmacist Decy/Orvick/Ocvirk said that he did not "know" what to tell her, not that he did know but would not speak because of some prohibition. *Id.* at 40.[1]

To be sure, with respect to the second and last conversation, this parses plaintiff Fox's language closely (fairly so, since it is language she, rather than defendants, chose), and she was only indirectly quoting her pharmacist to begin with. If this means that "speculation," Pls' Opp. Mem. at 9, is still required to guess

---

[1] A "[p]laintiff cannot create or resurrect a genuine issue of fact and thereby defeat summary judgment by the simple expedient of filing an affidavit that contradicts previous sworn testimony." *Reetz v. Jackson*, 176 F.R.D. 412, 414 (D.D.C. 1997). Thus, to whatever extent plaintiffs attempt to exploit the inconsistencies between Mrs. Fox's declarations and her deposition to cast doubt on her deposition testimony, it provides no basis for denying defendants' summary judgment motion.

Plaintiffs argue that Mrs. Fox was enrolled in two prescription drug plans, that her pharmacist provided "assistance" in cancelling one enrollment, and that this "subsequent event[ ]" somehow renders "absurd[ ]" any view other than that, if only the pharmacist were unleashed from the bonds of the Marketing Guidelines for Plans, he would be able and willing to tell her what plan to choose. Pls' Opp. Mem. at 9. But this would not logically follow even if "assistance" in cancelling one plan were substantial (assistance in cancelling a plan is different in kind from deciding what plan a person should choose). In any event (as we pointed out in our opening brief (at 27)), whenever someone is enrolled in two Medicare prescription drug plans, one of the enrollments is <u>automatically</u> cancelled, 42 C.F.R. § 423.32(e)(i), so "assistance" on this point was superfluous.

whether the pharmacist would have steered plaintiff Fox if free to do so, it is plaintiffs' problem. Plaintiffs, not defendants, must bear the burden of providing clear evidence that plaintiff Fox's pharmacist was deterred from speaking by governmental action, *see Pennsylvania Family Inst. v. Black*, 489 F.3d 156, 166 (3d Cir. 2007), and they have not carried that burden.

B. <u>Mary and Edward Samp</u>

As plaintiffs now acknowledge (Pls' Opp. Mem. at 3), before they filed the suit, before defendants had their one opportunity to cross-examine Mrs. Samp, before defendants filed their summary judgment motion, Mrs. Samp had never asked her pharmacist for any advice on which Medicare prescription drug plan to choose. Or, at least that's a "highly formalistic view of the evidence" (Pls' Opp. Mem. at 3), which was: "Have you ever spoken to Mr. Skenderian to ask his recommendation as to which plan for prescription drugs would be best for you? A. No, I haven't." Samp Dep. at 40. Plaintiffs now attempt to create after-the-last-minute standing by saying that Mrs. Samp had conversations with Mr. Skenderian in time for their opposition brief and she was willing to take "no" for an answer.[2]

---

[2] This is a <u>reply</u> brief on defendants' summary judgment motion and not an opportunity to re-oppose plaintiffs' motion for summary judgment. We do note, however, that plaintiffs' filing of their <u>reply</u> in support of their own summary judgment motion included no less than seven new declarations, all filed after defendants' opportunity to oppose the motion. That we do not separately address how plaintiffs' motion for summary judgment is or is not affected by those new filings – which may not in all respects be merely the mirror image of how defendants' motion for summary judgment is affected – is a function only of the limited role of a reply brief, limits plaintiffs ignored when they filed their reply.

But a "no" answer for what question?  One possible kind of question is the merits, steering question, "which plan should I choose."  But there is here an antecedent question that the Marketing Guidelines for Plans do not address: "should I choose any plan?"  Plaintiffs' brief continues to confuse those two similar-sounding but different questions, by arguing, for example, that Mrs. Samp is deprived of the right to "receive information . . . regarding which, if any, Part D plan she should be enrolling in."  Pls' Opp. Mem. at 8.  On the facts of this case "Which?" and "Any?" are two quite different questions.[3]

Why the distinction matters might be more clear if we start with a more fanciful example in which the questions sound less similar.  Suppose there is a First Amendment challenge to the government's "paternalistic" rule against painters advising people what color they can paint houses in Cleveland, and the standing defense is that plaintiffs do not own a house in Cleveland.  The government would not be offering paternalistic and unsolicited advice whether to buy a house in Cleveland, but observing that those hypothetical plaintiffs do not in fact own one.

Here, whether the Samps are in the market for a Medicare prescription drug plan at all is the question that is antecedent to any concern over which plan to

---

[3] There are other types of questions as well, such as "which plans cover my drugs," or "what are the co-pays of each plan," and a host of others.  The distinction between those kinds of questions – which the pharmacist can also answer – and the steering question is important to the merits, but is not at the core of plaintiffs' misanalysis of standing.

choose.  And the government's point was that they are not.[4]  That they <u>should</u> not

be in the market is not "paternalistic" or "unsolicited advice" or advice of any kind.[5]

It is a way-station to the conclusion that they <u>are</u> not in that market, a conclusion

that is consistent with their own actions and decisions in retaining their retiree

health coverage.

    We showed in our opening brief that is it undisputed fact that Mrs. Samp

has, and Mr. Samp had, health benefit coverage from their former employers, that

included prescription drug coverage.  Mrs. Samp, who does not regularly take any

prescription drugs, has coverage provided by Harvard that includes prescription

drug coverage, that she does not want to drop and that counts as creditable cover-

---

[4] We address below the unfortunate circumstance of Mr. Samp's death, but for present purposes keep the present tense in addressing the Samps' situation as of the filing of the summary judgment motion.

[5] On one particular, plaintiffs argue either that the government's advice was wrong or that the government argues that the City of Cambridge's advice was wrong.  Citing pages 9-10 of our opening brief, plaintiffs argue that "CMS insists that *the City of Cambridge was wrong*: Edward Samp may well have been better off enrolling in the federal government's TRICARE program as his primary prescription drug payer" instead of continuing his enrollment with Cambridge.  Pls' Opp. Mem. at 6 (emphasis plaintiffs').  This misreads both Cambridge's advice (which says nothing about TRICARE versus retiree health coverage to begin with) and more importantly what the cited passage of our brief actually said: "<u>If</u> Mr. Samp were to withdraw from the City's health care benefit program and strike out on his own to choose a Medicare prescription drug plan, the government, which sponsors both Medicare and TRICARE prescription drug programs, has told people eligible for both programs that TRICARE, not Medicare, is the better deal."  Defs' SJ Mem. at 9-10 (emphasis supplied).  It is where a beneficiary must pay the Medicare premiums himself that TRICARE is generally the better deal.  If, as here, someone else (the City of Cambridge) is paying for some or all of the Medicare coverage, the calculus changes.

age that will let her buy a Medicare plan if she ever does drop it.  Samp Dep. at 6, 11, 26-27; Defs' SJ Ex. B; Oct. 5, 2007 Mary Samp Decl. ¶ 6.  Mr. Samp had coverage from his former employer, which he also did not want to lose, and was told by that employer that buying a separate, different Medicare plan on his own would risk that coverage that the employer was helping pay for.  Samp Dep. at 7, 12, 21-22, 32, 33-35; Oct 5, 2007 Mary Samp Decl. ¶ 5; Attachment to Oct 5, 2007 Mary Samp Decl.  These undisputed facts that are known <u>to the Samps</u> would necessarily – "logically" if we may borrow an adverb that our argument does justify – lead <u>them</u> to conclude that they are not in the market to buy any separate Medicare prescription drug coverage.  Mrs. Samp is merely not willing to take the last step to connect the dots.[6]

        In any event, even taking Mary Samp's declarations at full face value, they do not support her claim to standing.  Plaintiffs argue: "<u>Mary Samp is not now enrolled in a Part D plan</u>; rather, she has chosen to rely on the prescription drug coverage she purchases through her former employer, Harvard University.  Samp Decl. ¶ 6.  But she nonetheless wishes to consult with Mr. Skenderian regarding whether <u>that choice</u> is correct or whether she should purchase her coverage else-

_____

        [6] Perhaps the clearest, though far from the most important, illustration of the frustration of getting Mrs. Samp to acknowledge the obvious is the following passage from her deposition: "Q.  It [a letter from TRICARE] says, the first line: 'This notice has information about your current TRICARE prescription coverage.'  Does that change your view about or your recollection about whether TRICARE provides prescription drug coverage?  A.  My recollection is that we don't have TRICARE prescription drug coverage."  Samp Dep. at 19.  After her deposition, her recollection on that point changed or improved.  Oct. 5, 2007 Mary Samp Decl. ¶ 9.

where, particularly because, at age 87, her prescription drug needs could change significantly at any time. *Id*.; Suppl. Samp Decl. ¶ 6." Pls' Opp. Mem. at 7 (emphasis supplied, footnote omitted). For <u>that choice</u> – whether she should or should not enroll in <u>any</u> Part D plan, she can get whatever advice she wants from whomever she wants, including her pharmacist. The Marketing Guidelines for Plans, as we have explained, address only the "which" question, not the "any" question that Mrs. Samp says she needs advice on.

In light of our arguments and the undisputed facts, the most astonishing thing about the Skenderian declaration and the third Mary Samp declaration is what they do <u>not</u> say: They do not say what, if anything, Mrs. Samp asked pharmacist Skenderian about whether the Samps should buy <u>any</u> Medicare prescription drug policy (apart from the plan provided to Edward Samp as part of the total package of Cambridge benefits), and, if so, what, if anything, Skenderian said in response.[7] There are three possibilities that this silence could be hiding that would undermine plaintiffs' case. One possibility is that Mrs. Samp did not ask whether she or her husband should be choosing among Medicare prescription drug plans because she already knows that the answer is no, she already can connect the dots. The second possibility is that she did ask Skenderian whether she or her husband should be choosing among Medicare prescription drug plans, and his solicited advice

---

[7] The Marketing Guidelines for Plans would not in any way have constrained Skenderian from giving whatever advice he wanted on this antecedent question of whether the Samps should be in the market for <u>any</u> plan.

was the same as the government's "unsolicited advice" and Harvard's advice and Cambridge's advice.  The third possibility is that she did ask Skenderian, and he told her he did not know enough about the Harvard and Cambridge plans to advise her.

II.     Claims Relating To Edward Samps' Coverage Options Are Moot

Any claims that Mary or Edward Samp need advice on which Medicare prescription drug plan Edward Samp should choose have been mooted by his death. Plaintiffs make three arguments why those claims should not be moot, none of which is persuasive.

First, plaintiffs argue that the age of Mary Samp and Rebecca Fox  (87 and 88 respectively) is alone enough to create a "sufficiently imminent" likelihood that they will move to a skilled nursing facility to allow them to litigate about advice they could get from such a facility should such a move take place.  Pls' Opp. Mem. at 11.  But plaintiffs acknowledge that both Mrs. Samp and Mrs. Fox live "largely independent lives."  *Id.*  And, while many elderly people reside in nursing homes, the large majority of persons age 85 and over do not.[8]  The possibility that one or

---

[8] Census Bureau statistics indicate that in 2000 there were nearly 5,090,000 people over the age of 84 (1.7% of a total population of 299,398,485).  Persons over 84 constituted 42.8% of the 1,8334,880 Americans then living in nursing homes, *i.e.*, there were about 785,000 persons over 84 living in nursing homes. http://factfinder.census.gov/servlet/STTable?_bm=y&-geo_id=01000US&-qr_name= ACS_2006_EST_G00_S2601B&-ds_name=ACS_2006_EST_G00_&-_lang=en&-redo Log=false&-format=&-CONTEXT=st.  Thus, the percentage of Americans 85 and over who were living in nursing homes was about 15.5% in 2000.

both of the remaining plaintiffs will move to a nursing home based on their age alone is too speculative and uncertain to support standing.

Second, plaintiffs argue that Edward Samp's claims are "capable of repetition, yet evading review," relying on a case where the claims were those of persons who were terminally ill.  Pls' Opp. Mem. at 11-13, *citing Abigail Alliance for Better Access to Developmental Medicine v. von Eschenbach*, 469 F.3d 129, 136 (D.C. Cir. 2006), *pet. for cert. pending*, No. 07-444.  However, going into a nursing home is not an inherently short-duration experience.  While many nursing home stays are of short duration, in 1999 well over half of nursing home residents had been nursing home residents for over a year and more than a quarter had been residents for at least three years.  Frederick H. Decker, *Nursing Homes, 1977-99: What Has Changed, What Has Not* (Natl. Center for Health Statistics 2005).

In any event, "<u>in the absence of a class action</u>, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the <u>same complaining party</u> would be subjected to the same action again."  *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (emphasis supplied); *accord, e.g., Spencer v. Kemna*, 523 U.S. 1 (1998); *Murphy v. Hunt*, 455 U.S. 478 (1982); *Pharmachemie B.V. v. Barr Laboratories*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quoting *Weinstein* and

-10-

also emphasizing "same complaining party").  The same complaining party, Edward Samp, will not be subject to the same action again.  And this is not a class action.[9]

Plaintiffs' third argument is that, if they do not have standing, they will try to find a new plaintiff who does.  Pls' Opp. Mem. at 13.  We repeat: this is not a class action.  If the current plaintiffs have standing, they are entitled to receive an adjudication in their own right.  If not, it does not matter to their rights or their interests whether someone else might have standing.

When it is not itself representing plaintiffs, the Washington Legal Foundation (WLF) features a homepage link to a picture of chimpanzees dressed up as litigants for a poster titled "Lawyers seek 'victims' for class action lawsuit"[10] (air quotes WLF's) and preaches that the plaintiffs' bar overuses class actions.[11]  Perhaps that antipathy to class actions is why WLF did not label this case a class action.  But the WLF is trying here to bring an ersatz class action, one-sidedly incorporating the advantages (for plaintiffs) of a class action[12] without bothering to

---

[9] *Abigail Alliance* expressly <u>distinguished</u> *Weinstein*, apparently viewing the "adequately pleaded representational standing" in that case as the functional equivalent of a class action for this purpose.  469 F.3d at 136.  In this case, by contrast, associational standing is not present.

[10]  http://www.wlf.org/upload/08-27-07Nyt.pdf (last visited December 13, 2007).

[11]  http://www.wlf.org/Litigating/ (last visited Dec. 13, 2007).

[12]  The only reason one could imagine why plaintiffs' proposed order would provide that the parties' attorneys take two weeks to try to agree on a remedial order (when it would take maybe twenty minutes to write an order granting full relief to each and every one of the two remaining plaintiffs) is that they anticipate
(continued...)

comply with the Rule 23 certification requirements that are safeguards that real class actions incorporate to protect both defendants and absent class members. For better or worse, plaintiffs and their attorneys chose <u>not</u> to bring this case as a real class action and chose not to attempt to comply with the procedural safeguards of Rule 23. It is too late to revisit those decisions now.

III.    Neither The Marketing Guidelines For Plans
Nor The Anti-Coercion Protections For Nursing
<u>Home Residents Violate The First Amendment</u>

We explained in our opening brief why both the Marketing Guidelines for Plans and the anti-coercion protections for nursing home residents are constitutional. Only a few of the points plaintiffs attempt to make in response warrant a reply.

**1.** Citing, *inter alia*, *Rust v. Sullivan*, 500 U.S. 173 (1991), we explained in our opening brief that it is well established that the government may have interests in agreeing on the scope of speech in the context of its own contracts distinct from and beyond those that might support free-standing regulation of transactions to which the government is a stranger. Defs' SJ Mem. at 31. And the government is a participant in the market here. Medicare prescription drug plans are <u>Medicare</u> plans. Plaintiffs argue that *"Rust* is wholly inapposite" because there are no federal subsidies here and there are no alternative non-subsidized programs. Pls' Opp. Mem. at 16-17. In fact, the agreements between the private entities that market

---

[12](...continued)
seeking relief on behalf of persons who are not parties and whom they do not represent.

these plans and the government incorporate a large government subsidy. 42 U.S.C.

§ 1395w-115. In return, the government is a <u>participant</u>, not merely an inter-

meddling outside regulator, when it seeks agreement how the <u>plans</u> that receive

these government subsidies will market the subsidized plans by promulgating the

Marketing Guidelines for <u>Plans</u>.[13] And as Mary Samp's own drug coverage from

Harvard illustrates, there are numerous non-Medicare alternatives to pay for

prescription drugs that are not affected by the subsidy. The Marketing Guidelines

for Plans apply only to Medicare plans, not to other, non-subsidized plans.

    **2.** Plaintiffs mischaracterize the commercial speech portion of our argument

as supposing that if a speaker and listener can be connected through some daisy

chain of <u>different</u> commercial transactions, it is commercial speech whenever a

speaker recommends that a listener with whom he has transacted engage in a

different commercial transaction with someone else in the chain. Pls' Opp. Mem. at

14-15. That wasn't our theory. As we pointed out, the situation here is not one of

different parties to different transactions, but multiple parties to the <u>same</u> trans-

---

[13] Plaintiffs argue that the plans' agents, such as providers, do not <u>directly</u> receive these subsidies. Pls' Opp. Mem. at 17. But, as we explained in our opening brief (Defs' SJ Mem. at 32 n.17), the Marketing Guidelines for Plans are for plans, and do not <u>directly</u> affect providers either; the government's only recourse for a breach of a plan's promise to market in accordance with the Marketing Guidelines for Plans is against that plan. The Marketing Guidelines for Plans may have an indirect effect on providers who in turn contract with the plans. But either indirect effects matter here or they don't. It is inconsistent for plaintiffs to count the indirect effect on providers of the Marketing Guidelines for Plans without likewise counting the effects of the government's subsidy of the Medicare plans, with which the providers in turn contract.

action.  Defs' SJ Mem. at 30-31.  When a customer uses a Medicare prescription drug plan to buy drugs, the customer, the pharmacist, and the plan are all parties to that same transaction.  The pharmacist's recommendation concerning which other parties to deal with – or, as Skenderian's declaration reminds us (¶ 5), his statements of which parties he will refuse to deal with – is part and parcel of proposing the terms of that commercial transaction.  That is classic commercial speech.  See *Board of Trustees v. Fox*, 492 U.S. 469, 473-474 (1989) (speech that "propose[s] a commercial transaction" is commercial speech) (internal quotations omitted).[14]

**3**.  We explained in our opening memorandum four kinds of financial interests that pharmacists have in connection with the commercial transactions they propose.  Plaintiffs list, but do not attempt to systematically rebut, those interests.  Pls' Opp. Mem. at 19, n. 15.  Instead, they light a rhetorical bonfire under a strawman, suggesting that the government should go about identifying who are the "unscrupulous providers who have only their own financial interests at heart," and that maybe then the government could take action.  Pls' Opp. Mem. at 18-19 (emphasis supplied).  That's neither the issue nor the entire problem.  Persons who "at heart" have only altruistic or only non-altruistic interests are rare in the real world, and not readily identifiable in any event.

_____

[14] If one wanted an analogy to the actual situation, it would not involve plaintiffs' analogy of newspaper review-theater-reader daisy-chain of discrete transactions (Pls' Opp. Mem. at 14-15), but such situations as a car dealer steering his customers to a particular lender that will make payment directly to the dealer.

But providers who, by their own reckoning, think they are scrupulous and think they do not consider "only" their own financial interests may not even realize the extent to which their advice to customers can be colored by financial interest that has become so second-nature that it is no longer recognized as such. Plaintiffs quote, twice no less, a passage from one of their pharmacist declarants that they apparently think rebuts the existence of a pharmacist's financial interest, but actually confirms one such financial interest: "The only real financial interest which the pharmacy has in selection of Part D plans is in finding the plan that will cover the patient's medications, rather than imposing that cost on the patient." Brickely Decl., *quoted*, Pls' Opp. Mem. at 15, 22. As the brief does not recognize (though the declarant (perhaps) does), this is indeed a financial interest of the pharmacy.

Nor is there any certainty that the pharmacist's financial interest coincides with the customer's. Plaintiffs' own witness described his financial interest as merely "finding the plan that will cover the patient's medications." But, as we pointed out in our opening memorandum (Defs' SJ Mem. at 35), the plans that provide the most coverage for potential customers' medication are required to charge correspondingly higher premiums to do so, *see* 42 U.S.C. §§ 1395w-102(a)(2)(i), 1395w-113(a)(1)(C). The plan that best serves the pharmacy's interest by lowering the marginal cost of drugs the most may not serve the best interest of the customer, who may prefer to pay lower premiums and thereby retain money that he can use for any purpose rather than spending more to buy future discounts that he can use only for drugs.

-15-

Our point is not, of course, that is wrong for pharmacies to have financial interests; it is more that it is inevitable that they do. Plaintiffs' continued denial of the facts of commercial life is surprising.[15]

**4.** We also explained both why pharmacists are likely to be limited sources of assistance in advising customers on which Medicare plans to choose (even assuming a pure heart) and that there are other, better sources of information. On the latter point, we noted in particular that plaintiffs "ignore[d]" the State Health Insurance Assistance Programs that offer personalized counseling on choosing a Medicare prescription drug plan, and that Medicare specifically refers seniors to. Defs' SJ Mem. at 36. They still ignore that central source of information and assistance, and accordingly still overstate dramatically the difficulties seniors will have in getting sound advice on their Medicare options from sources other than their pharmacists.

---

[15] Plaintiffs also seem to suppose that the number of drugs a customer buys cannot possibly be sensitive to price at all since neither pharmacies nor patients write prescriptions, only doctors do. Pls' Opp. Mem. at 21. This supposition that prescription drugs are categorically exempt from the laws of supply and demand is surprising coming from a free enterprise public interest group. While there may be situations in which the demand for a drug is relatively inelastic, that will not always be true. In any event, while physicians may <u>write</u> prescriptions, the constant bombardment of "ask your doctor" commercials recognizes that patients' choices (and therefore their financial circumstances) affect which prescriptions doctors are <u>asked</u> to write, and it is the <u>patients</u> (some of whom may be price-sensitive) who decide which written prescriptions they will seek to actually have <u>filled</u>. Moreover, as Abby Block explained in the declaration submitted in opposition to the preliminary injunction (¶¶ 14-15), in the nursing home context, the <u>pharmacist</u> exercises tremendous influence as a practical matter over which drugs are prescribed.

On the value of pharmacists' advice, the Skenderian declaration undermines plaintiffs' claims. Skenderian apparently believes that, unlike the great majority of pharmacists in the nation (Watson Decl. ¶ 8), he is not part of TRICARE's network. Skenderian Decl. ¶ 5. Either he's right about that or he's wrong. If he were <u>right</u>, it would highlight how his financial interests diverge from the Samps', because the Samps could more easily take full advantage of the cost savings available for the taking by using TRICARE if they switched pharmacies,[16] which, to say the least, would be likely to skew Skenderian's advice toward a "solution" that has the Samps continuing to avoid the TRICARE coverage Edward Samp was already entitled to. If Skenderian is wrong and is already is a member of TRICARE's network without realizing it,[17] that would be a further illustration that knowing the differences among insurance plans is not the core expertise of pharmacists, a point already illustrated when Mrs. Fox's pharmacist did not know until months after the fact that the Lilly Answers program had ended. Nov. 9, 2006 Fox Decl. ¶¶ 4-6.

---

[16] Even if Skenderian were not a member of TRICARE's network, it would be possible, though more difficult, for his customers to receive TRICARE reimbursement. http://www.tricare.mil/mybenefit/home/Prescriptions/ FillingPrescriptions/Non-NetworkPharmacy.

[17] TRICARE's retail pharmacy program is run through Express-Scripts, Inc. *See* http://www.tricare.mil/mybenefit/home/Prescriptions/FillingPrescriptions/ RetailNetworkPharmacy (last visited Dec. 13, 2007). Express-Scripts lists Skenderian Apothecary as a participating pharmacy in the TRICARE network. http://member.express-scripts.com/web/pharmacyLocator/openPharmacyLocator.do? portal=dodCustom&net=1991 (search for area code 02138, last visited December 13, 2007).

Pharmacists are not likely to be able to offer either disinterested or fully knowledgeable advice.  It is no wonder, and no violation of the Constitution, that in agreeing with plans how insurance products that the government directly subsidizes may be marketed, the government would seek to assure that pharmacists who have contracted with the plans are allowed to offer a wide range of information to customers without steering them to a particular plan.

**5.**  We explained in our opening brief that the agency's policy that nursing homes may not coerce residents in their choice of Medicare plans was valid.  Def's SJ Mem. at 38-42.  Plaintiffs do not disagree, but they do misunderstand our brief.  They say (Pls' Opp. Mem. at 23): "CMS asserts that the S&C Memo is not a speech restriction at all, but rather merely a prohibition against 'coercion,' with provider speech merely being used as potential evidence of coercion.  CMS Br. 38-42."  Actually, as our brief explained, "the S&C Memo" does not "prohibit" anything – not even coercion; it is one <u>discussion</u> of a prohibition (of coercion) that is instead contained in the regulations we cited.  Defs' SJ Mem. at 38, *citing* 42 C.F.R. §§ 483.10(a)(2), 483.12(d)(1).  Plaintiffs insist (Pls' Opp. Mem. at 23) that defendants should "amend" a mere memorandum that is but one discussion of a policy embodied in a regulation that they do not challenge.  However, a later, and much more specific and detailed discussion is the deposition of Thomas Hamilton.  Plaintiffs identify no disagreement whatsoever with the policy Hamilton laid out in that later discussion, and Hamilton has heard no disagreement in his post-

memorandum conferences with industry representatives that provide ample

opportunity for discussion of agency policies, Hamilton Dep. at 35, 38.

<u>Conclusion</u>

For the reasons stated above and in the memorandum in support of

defendants' motion for summary judgment, defendants' motion for summary

judgment should be granted.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Brian G. Kennedy
SHEILA M. LIEBER
BRIAN G. KENNEDY (D.C. Bar No. 228726)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel.:  (202) 514-3357
Fax:  (202) 616-8470
Email:  Brian.Kennedy@usdoj.gov